# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re Clearview AI, Inc. Consumer
Privacy Litigation

Civil Action File No.: 1:21-cv-00135
Judge Sharon Johnson Coleman
Magistrate Judge Maria Valdez

**BRIEF OF AMICI FIRST AMENDMENT CLINIC AT DUKE LAW AND
PROFESSORS OF LAW EUGENE VOLOKH AND JANE BAMBAUER
IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………………………....………………… ii

STATEMENT OF INTEREST …………………………………………………………… 1

INTRODUCTION AND SUMMARY OF ARGUMENT…………………..………………… 1

ARGUMENT ……………………………………………………………………..... 2

I.   The First Amendment Protects The Collection And Analysis Of Publicly Available
     Information. …………………..…………………………...…………………………………… 2

II.  The Use/Conduct Distinction Is Inapplicable When A Law Targets Information Gathering,
     Analysis, And Creation. ……………………………………………………………………4

III. The Appropriate Standard Of Review In This Case Is Strict Scrutiny. ………………………7

IV.  BIPA Is Not Well-Tailored To An Important Privacy Interest. ……..………………………9

V.   Privacy Laws Must Be Crafted And Interpreted Carefully To Avoid Conflict With The First
     Amendment ……………………………...…………………………………………. 11

VI.  The First Amendment Protects The Use Of Innovative Mechanical Technologies In The
     Creative Process …………………………………………………………...……..…… 13

CONCLUSION …………………………………………...………………………… 15

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) .........................................................................4, 5, 10

*Anderson v. Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ...............................................................................4, 7

*Animal Legal Def. Fund, v. Otter*,
    44 F. Supp. 3d 1009 (D. Idaho 2014) ........................................................................6

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ...................................................................................5

*Barr v. American Ass'n of Political Consultants*,
    140 S. Ct. 2335 (2020)..............................................................................................8

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001).................................................................................................10

*Bd. of Educ. v. Pico*,
    457 U.S. 853 (1982)...................................................................................................2

*Boelter v. Advance Magazine Publishers*,
    210 F. Supp. 3d 579 (S.D.N.Y. 2016).....................................................................12

*Boelter v. Hearst Communs., Inc.*,
    192 F. Supp. 3d 427 (S.D.N.Y. 2016)................................................................... 12

*Bolger v. Youngs Drug Products Corp.*,
    463 U.S. 60 (1983).....................................................................................................8

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)...................................................................................................4

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980)...................................................................................................9

*Citizens United v. Fed. Election Comm'n*,
    588 U.S. 310 (2010)...................................................................................................2

*Desnick v. American Broadcasting Cos.*,
    44 F.3d 1345 (7th Cir. 1995) .....................................................................................4

ii

*Dex Media West, Inc. v. Seattle,*
  696 F.3d 952 (9th Cir. 2012) ........................................................9

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
  472 U.S. 749 (1985)........................................................................8

*Fields v. Philadelphia,*
  862 F.3d 353 (3d Cir. 2017)........................................................4, 5

*Florida Star v. B.J.F.*
  491 U.S. 524 (1989)...................................................................9, 11

*Fordyce v. Seattle,*
  55 F.3d 436 (9th Cir. 1995) .......................................................5-6

*Gericke v. Begin,*
  753 F.3d 1 (1st Cir. 2014)..............................................................5

*Gill v. Hearst Pub. Co.,*
  40 Cal. 2d 224 (Cal. 1953)............................................................12

*Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982)........................................................................2

*Goldschmidt v. Coco,*
  413 F. Supp. 2d 949 (N.D. Ill. 2006) .............................................3

*IMDb.com, Inc. v. Becerra,*
  2018 WL 979031 (N.D. Cal. Feb. 20, 2018) ..................................9

*Individual Reference Services Group, Inc. v. FTC,*
  145 F. Supp. 2d 6 (D.D.C. 2001) .................................................13

*Katz v. United States,*
  389 U.S. 347 (1967).......................................................................10

*NAACP v. Claiborne Hardware Co.,* ..............................................3
  458 U.S. 886 (1982)

*National Cable & Telecommunications Ass'n v. FCC,*
  555 F.3d 996 (D.C. Cir. 2009) .....................................................12

*PETA v. Stein,*
  2020 WL 3130158 (M.D.N.C. June 12, 2020) ...............................6

*Pochoda v. Arpaio,*
  2009 WL 1407543 (D. Ariz. 2009)..................................................2

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................................. 7-8

*Reno v. ACLU,*
  521 U.S. 844 (1997) ...................................................................................14

*Richmond Newspapers v. Virginia,*
  448 U.S. 555 (1980) .....................................................................................2

*Sandvig v. Sessions,*
  315 F. Supp. 3d 1 (D.D.C. 2018) ............................................................6, 11

*Sidis v. F-R Pub Corp.,*
  34 F. Supp. 19 (S.D.N.Y. 1938)..................................................................12

*Smith v. Cumming,*
  212 F.3d 1332 (11th Cir. 2000) ...................................................................5

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)................................................................................2, 14

*Trans Union Corp. v. FTC,*
  245 F.3d 809 (D.C. Cir. 2001) ...................................................................12

*Turner v. Lieutenant Driver,*
  848 F.3d 678 (5th Cir. 2017) .......................................................................5

*U.S. West, Inc. v. FCC,*
  182 F.3d 1224 (10th Cir. 1999) .................................................................12

*United States v. O'Brien,*
  391 U.S. 367 (1968)......................................................................................4

*West. Watersheds Project v. Michael,*
  869 F.3d 1189 (10th Cir. 2017) ...................................................................6

**Statutes**

Illinois' Biometric Information Privacy Act, ILL. COMP. STAT. § 14 (2008) ........................ *passim*

**Other Authorities**

First Amendment ......................................................................................... *passim*

2006 BRAIN COGN. 61(2)139-58, https://pubmed.ncbi.nlm.nih.gov/16466839/ ..........................13

Dorothy J. Glancy, *The Invention of the Right to Privacy,* 21 ARIZ. L. REV. 1, 8 (1979) .............15

Eugene Volokh, *Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People From Speaking About You*, 52 STAN. L. REV. 1049 (2000) ................................................................................................11

Jane Bambauer, *The Relationships Between Speech and Conduct*, 49 U.C. DAVIS L. REV. 1941, 1947 (2016) .............................................................................11

*The Right to Privacy,* 4 HARV. L. REV. 193 (1890) ...................................................15

9 WRITINGS OF JAMES MADISON 103 (Hunt ed. 1910)...................................................3

## STATEMENT OF INTEREST

The First Amendment Clinic at Duke Law and Professors of Law Eugene Volokh, of the University of California Los Angeles, and Jane Bambauer, of the University of Arizona, frequently engage in research, legal representations, and scholarship pertaining to the intersection of the First Amendment and privacy law. Collectively, amici have authored numerous amicus briefs and articles concerning free speech issues and have a wealth of expertise and knowledge relating to matters relevant to this case.

Amici write to assist the court in its analysis of the application of Illinois' Biometric Information Privacy Act (BIPA), 740 Ill. Comp. Stat. § 14 (2008), to faceprints derived from publicly accessible photographs. The application of BIPA to Clearview AI's practices is wholly unconstitutional pursuant to the First Amendment. The constitutional protection of free speech applies equally to the "upstream" speech-creation activities—such as information gathering and analysis—that make informed expression possible as to the ultimate resulting expression. Here, BIPA's restriction of Clearview AI's collection and analysis of publicly available information undermines free speech principles by purposefully halting the production of speech in violation of the First Amendment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment protects expression and related activities, such as gathering and analyzing information, which are the essential prerequisites of expression. Clearview AI ("Clearview") is engaged in the collection and analysis of publicly available information. BIPA, which prohibits such activities, violates the First Amendment as applied to faceprints derived from publicly accessible photographs. Therefore, amici maintain that Plaintiffs do not meet the preliminary injunction standard or likelihood of success on the merits because their claim conflicts with the protections guaranteed by the First Amendment.

## ARGUMENT

I. **The First Amendment Protects The Collection And Analysis Of Publicly Available Information.**

The "freedom of speech" protected by the First Amendment is an expansively defined right; it includes not just the end products of speech, such as expression and communication, but also the preceding or "upstream" activities, such as information gathering and analysis, that make that expression possible. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of First Amendment."); *Citizens United v. Fed. Election Comm'n*, 588 U.S. 310, 336 (2010) ("[L]aws enacted to control or suppress speech may operate at different points in the speech process."). This is logical, as activities such as information gathering, research, recording, and analysis are the bedrock of the process of speech creation.

Courts have repeatedly protected the activities of gathering and using public information in a variety of contexts, including by guaranteeing access to courts and public hearings and the right to record the actions of public officials. *See, e.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982) (protecting public access to criminal trials); *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (protecting public access to libraries, because "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom"); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (plurality opinion) (protecting public access to courtrooms, because "[f]ree speech carries with it some freedom to listen ... '[w]ithout some protection for seeking out the news, freedom of the press could be eviscerated'"); *Pochoda v. Arpaio*, 2009 WL 1407543, at *4 (D. Ariz. 2009) (protecting "observation of [a] demonstration" in a public forum, because the "the right to hear" is "no less protected" than "the right to speak," especially where the observer "was there to safeguard

or support the civil rights of the demonstrators"); *Goldschmidt v. Coco*, 413 F. Supp. 2d 949, 952–53 (N.D. Ill. 2006) (protecting note-taking in courtrooms, because it allows "courtroom monitors and evaluators of judicial performance representing public interest groups," among others, to "revisit what they have heard or read," and thus to "more fully and accurately evaluate and communicate the subject matter"); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 903–904, 907 (1982) (protecting public surveillance in preparation for a shaming campaign because "[e]ach of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments"). The expansive protection for the activities that precede expression serves important First Amendment values because each step in the production of speech—from information gathering to analysis to creation to dissemination—is critical to ensuring a healthy marketplace of ideas. *Cf. Bd. of Educ.*, 457 U.S. at 868 ("[J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members."). As James Madison recognized, both knowledge and the gathering of knowledge are crucial for maintaining an informed electorate and thus an effective democracy. *See* 9 WRITINGS OF JAMES MADISON 103 (Hunt ed. 1910) ("A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."). When the public cannot gather and analyze information, society is deprived of the opportunity to learn about, discuss, and form opinions based on that information. To function, the marketplace of ideas depends on a myriad of uncoordinated insights and information.

## II. The Use/Conduct Distinction Is Inapplicable When A Law Targets Information Gathering, Analysis, And Creation.

BIPA is impermissible as applied to faceprints derived from publicly accessible photographs because information gathering, analysis, and creation are protected by the First Amendment. In some other contexts, the Supreme Court has had to draw difficult lines when a state punished conduct with significant expressive value. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (burning of draft cards). However, the distinction is largely inapplicable to the information gathering and analysis stages of the speech creation process. Protecting the creative process is tantamount to protecting the end product; the speech right is meaningless without protection for the production of that speech. *Cf. Desnick v. American Broadcasting Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995) (holding that both the "broadcast" and the "production of the broadcast" were protected by the First Amendment); *Anderson v. Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010) ("[N]either the Supreme Court nor our court has ever drawn a distinction between the process of creating a form of pure speech . . . and the product of these processes . . . in terms of the First Amendment protection afforded.").

As circuit courts around the country have recognized, the right to gather and use non-private information is inextricably intertwined with the right to produce the speech upon which that information is based. *See e.g.*, *Fields v. Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings and for this protection to have meaning the Amendment must also protect the act of creating that material. There is no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them.") (internal citation omitted); *ACLU v. Alvarez,* 679 F.3d 583, 596 (7th Cir. 2012) ("[T]here is no fixed First Amendment line between the act of creating speech and the speech itself.").

For example, in the Seventh Circuit the public has a clearly established right to make audiovisual recordings in public. *Alvarez,* 679 F.3d at, 595–96. In *Alvarez,* the Seventh Circuit refused to apply Illinois' all-party consent wiretap statute against people who sought to monitor police conduct by recording the police officers' performance of their official duties. *Id.* The statute's requirement of all-party consent burdened individual speech and press rights by restricting the creation of information "at the front end of the speech process." *Id.* at 596. Such a restriction on information gathering "suppresses speech just as effectively as restricting the dissemination of the resulting recording." *Id.*

The use of mechanical means such as a camera does not negate First Amendment protection for information gathering. Prohibitions on the use of mechanical devices serve only to "limit[] the information that might later be published or broadcast" and thus burden free speech rights. *Id.* at 596–97. Other circuits have protected the right to record in public using similar reasoning. *See, e.g.*, *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) ("[A]udiovisual recordings are protected by the First Amendment."); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–89 (5th Cir. 2017) (finding a First Amendment right to record and create speech in the context of publicly recording law enforcement); *Fields*, 862 F.3d 353, 359 ("To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media."); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("First Amendment principles apply equally to the filming of a traffic stop and the filming of an arrest in a public park."); *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that "The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. Seattle*, 55 F.3d 436, 439 (9th Cir. 1995)

(recognizing plaintiff was exercising his "First Amendment right to film matters of public interest" when filming activities of police officers during a public protest march).

Finally, a state cannot burden the creation of specific types of speech by prohibiting or limiting the collection and use of specific types of research data. *See, e.g.*, *West. Watersheds Project v. Michael*, 869 F.3d 1189, 1192 (10th Cir. 2017) ("Although trespassing does not enjoy First Amendment protection, the statutes at issue target the 'creation' of speech by imposing heightened penalties on those who collect resource data."); *PETA v. Stein*, 2020 WL 3130158, at *9 (M.D.N.C. June 12, 2020) (holding that the government cannot avoid First Amendment analysis by regulating the collection and use of data rather than publication); *Animal Legal Def. Fund, v. Otter*, 44 F. Supp. 3d 1009, 1023 (D. Idaho 2014) (holding that unauthorized audiovisual recording qualifies as the creation of speech and is subject to First Amendment scrutiny); *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 8–9, 15–16 (D.D.C. 2018) (holding that the CFAA fails First Amendment intermediate scrutiny when applied to researchers using audit testing and data scraping to determine whether a website discriminates against members of a protected class because "the First Amendment ... prohibit[s] government from limiting the stock of information from which members of the public may draw") (citing *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). Neighboring jurisdictions have used strict scrutiny to analyze content-based prohibitions that target the collection of specific types of information. For example, in *PETA v. Stein*, a federal court in the Eastern District of North Carolina found that a statute that prohibited the recording and capturing of employer records in a manner that violated an employee's duty of loyalty to his employer failed strict scrutiny and thus violated the First Amendment. *PETA,* 2020 WL 3130158, at *5, *14, *25.

Here, BIPA implicates Clearview's First Amendment rights by limiting Clearview's ability to collect or analyze publicly available information using a mechanical process. A clear analogy

can be drawn between the activity of making audiovisual recordings and Clearview's information gathering activities. Making audiovisual recordings is the collection and retention of public information for the purpose of further uses, including analysis, speech-creation, and ultimately expression. Similarly, Clearview captures publicly available information and retains it in its databases for the purpose of analysis and speech-creation.

Further, Clearview's production of a faceprint is analogous to upstream creative processes that generates new information and expression in the world. Using machine learning, Clearview analyzes the publicly available images it has collected and produces faceprints. The process of analyzing and creating a faceprint is equivalent to the creative processes that unavoidably precede expressive activity. *See Anderson v. Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) ("The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds.").

Finally, Clearview's information gathering and analysis ultimately results in expressive activity. Using its database of faceprints, Clearview runs searches that compare photographs and find matching faces. Clearview then disseminates the results of its searches by sending them to clients (in this case, law enforcement agents). Like regulation of a painting process or a writing method, restriction of Clearview's use of faceprints restricts speech by preventing Clearview from creating new information. Illinois cannot circumvent the First Amendment by having its restrictions act earlier in the speech process. Restricting speech is just as nefarious at the information gathering and creation stages as at the publication stage.

### III.     The Appropriate Standard Of Review In This Case Is Strict Scrutiny.

BIPA is a facially speaker-based and content-based restriction on the speech-creation process, and thus on speech, and therefore is subject to strict scrutiny. *Reed v. Town of Gilbert*,

576 U.S. 155, 165 (2015). First, by its own terms, BIPA imposes burdens on the speech of private entities, but exempts agents or subcontractors of state and local governments and financial institutions subject to the Graham-Leach Bliley Act. *See* 740 ILL. COMP. STAT. 14/15 (2020). As such, the act "disfavors specific speakers" and is subject to strict scrutiny. *Sorrell*, 564 U.S. at 564. Additionally, BIPA explicitly prohibits faceprints of human faces, but not of any other type of face; Clearview can produce faceprints from pictures of cats without any legal impediment, but nonconsensual faceprints generated from pictures of human Illinois residents are restricted. Thus, the restriction of the law turns on the content of the faceprint—whether it refers to a human subject. *See Barr v. American Ass'n of Political Consultants*, 140 S. Ct. 2335, 2346 (2020). Accordingly, under *Reed,* strict scrutiny is presumptively required.

There are no justifications for applying a lower level of scrutiny. Intermediate scrutiny is inappropriate because the creation of faceprints is protected speech that is not a matter of purely private concern. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) (applying a lower constitutional standard in defamation involving matters of purely private concern). Indeed, the many recipients of Clearview's information are police departments who engage Clearview's services to pursue their public duty in the investigation of crimes and the enforcement of criminal laws. The public has an obvious interest in the prompt and accurate identification of criminal suspects.  Given that the precise name of a rape victim was presumed to be a "matter of public significance" in *Florida Star*, the identity of a suspect or perpetrator should qualify as well. *Florida Star v. B.J.F.* 491 U.S. 524, 536 (1989).

Nor can faceprints be characterized as commercial speech. Speech is given less protection if it does no more than propose a commercial transaction. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65–66 (1983). The factors identified in *Bolger* include three characteristics which, in combination, support a conclusion that the document at issue constitutes commercial speech,

including: (i) their advertising format, (ii) their reference to a specific product, and (iii) the underlying economic motive of the speaker. The only factor relevant to Clearview is the third, and that factor could apply equally well to the *New York Times* or any book publisher. A financial interest does not alone convert fully protected speech into lesser protected commercial speech. *See IMDb.com, Inc. v. Becerra*, 2018 WL 979031, at *1 (N.D. Cal. Feb. 20, 2018), *aff'd*, 962 F.3d 1111 (9th Cir. 2020) ("The fact that IMDb has a financial interest in people's reliance on IMDb.com for information doesn't transform the age-related information restricted by AB 1687 into commercial speech."); *Dex Media West, Inc. v. Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) (finding that the Yellow Pages are not commercial speech).

In any case, BIPA as applied to Clearview would not satisfy even intermediate review because the interest in privacy raised by comparing two publicly available images of faces is not sufficient to meet the heightened scrutiny of requirements of the *Central Hudson* test. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980).

### IV.    BIPA Is Not Well-Tailored To An Important Privacy Interest.

To the extent that BIPA protects privacy interests, those interests are not applicable to Clearview's activity, which only uses publicly available information. In the interest of protecting personal privacy, some limits can be placed on gathering information for speech purposes. For example, privacy interests justify restrictions on collection methods like illegal wiretapping of private conversations. *Bartnicki v. Vopper*, 532 U.S. 514, 533–35 (2001). The balance between free speech and privacy is struck by drawing a clear distinction between the collection of public information and the harvesting of private and sensitive information (e.g., a private conversation or information that, by its very nature, is particularly sensitive such as medical and financial records).

Wiretapping and other illicit collection methods implicate privacy interests because they capture the words, images, or both of individuals who are not aware that their conversations and

actions are being monitored. *See ACLU v. Alvarez,* 679 F.3d 583, 605 (7th Cir. 2012) ("[B]ut surreptitiously accessing the private communications of another by way of trespass or nontrespassory wiretapping or use of an electronic listening device clearly implicates recognized privacy expectations."). In contrast, the collection of publicly available images is the virtual equivalent of filming, photographing, or recording behavior in a public forum. *Cf. id.* at 605–06 ("Simply put, these privacy interests are not at issue here. The ACLU wants to openly audio record police officers performing their duties in public places and speaking at a volume audible to bystanders. Communications of this sort lack any 'reasonable expectation of privacy' for purposes of the Fourth Amendment."). The distinction between public and private information depends on the reasonable expectations of privacy of the person whose information is being gathered, and the public exposure of information usually destroys any reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Here, Clearview is not violating reasonable expectations of privacy because it built its database of faceprints from photographs that have been made publicly available on the Internet. Clearview creates biometric data using publicly available information—photographs and other identifying information—which people have voluntarily posted online. Because of the publicly available nature of these photos, users do not have a reasonable expectation of privacy in their content, including their distinctive facial features. To prevent Clearview from collecting and using publicly available photographs is the same as preventing Clearview from capturing recordings of pedestrians in the town square. An image may be captured because the subject is out in public, or because her photograph is already available on the public Internet, but in both cases, the subject has no right to control the decision of others to capture a photograph. Therefore, there are no countervailing privacy interests that would favor BIPA's application to Clearview.

10

## V.  Privacy Statutes Like BIPA Must Be Interpreted Carefully To Avoid Conflict With The First Amendment.

Applying BIPA's restrictions to Clearview's creation of faceprints from publicly available information violates the First Amendment. In the United States, privacy laws cannot ban the collection, analysis, or subsequent disclosure of information that is already in public view without conflicting with the First Amendment.[1] *Florida Star*, 491 U.S. at 534. This logic carries over to information available on the public Internet, the ultimate modern public square. *Sandvig*, 315 F. Supp. at 8–9, 11–12. Unless personal information is unusually sensitive or was learned through a special relationship, people are generally free to say whatever they want about others without the other person's cooperation or consent. *See generally* Eugene Volokh, *Freedom of Speech and Information Privacy: The Troubling Implications of a Right to Stop People From Speaking About You*, 52 STAN. L. REV. 1049 (2000); Jane Bambauer, *The Relationships Between Speech and Conduct*, 49 U.C. DAVIS L. REV. 1941, 1947 (2016). In privacy tort actions, liability is limited to situations that concern the involuntary disclosures of sensitive, nonpublic information. *See, e.g.*, *Sidis v. F-R Pub Corp.*, 34 F. Supp. 19, 25 (S.D.N.Y. 1938); *Gill v. Hearst Pub. Co.*, 40 Cal. 2d 224, 228–29 (Cal. 1953).

First Amendment principles and precedents restrict the government from recognizing expansive rights of control over information. Thus, to avoid conflict with the First Amendment, privacy laws must be narrowly interpreted to apply to particular contexts where the risks of informational injury outweigh the benefits of free speech, even when intermediate scrutiny applies. The Tenth Circuit, for example, has explained that "the government cannot satisfy the [substantial interest] prong of the *Central Hudson* test by merely asserting a broad interest in privacy. It must

---

[1] In contrast, the international trend in privacy regulation is to recognize expansive rights for individuals to control the collection, access, and use of information that describes them. *See, e.g.,* E.U. General Data Protection Regulation.

specify the particular notion of privacy and the interest served .... The specific privacy interest must be substantial, demonstrating that the state has considered the proper balancing of the benefits and harms of privacy. In sum, privacy may only constitute a substantial state interest if the government specifically articulates and properly justifies it." *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1234–35 (10th Cir. 1999).

In general, privacy statutes are compatible with the First Amendment *only* if they narrowly target a particular risk to personal information. The cases upholding privacy laws come in two overlapping categories. Some place restrictions on sensitive non-public information such as financial and health data. *See Trans Union Corp. v. FTC*, 245 F.3d 809, 815 (D.C. Cir. 2001) (financial information); *Boelter v. Hearst Communs., Inc.*, 192 F. Supp. 3d 427, 447–48 (S.D.N.Y. 2016) (magazine subscriber lists); *Boelter v. Advance Magazine Publishers*, 210 F. Supp. 3d 579, 602 (S.D.N.Y. 2016) (personal reading information). Other laws tether restrictions to specific professional or business relationships that produce large quantities of (often sensitive) personal data that are not otherwise publicly available. *See, e.g.*, *National Cable & Telecommunications Ass'n v. FCC*, 555 F.3d 996, 997, 1000 (D.C. Cir. 2009) (telecommunications providers); *Individual Reference Services Group, Inc. v. FTC*, 145 F. Supp. 2d 6, 41–42 (D.D.C. 2001) (financial institutions).

Using BIPA to prohibit Clearview from creating faceprints from its collection of publicly available information would be an unconstitutionally broad reading of the statute and fall outside of the narrow set of circumstances in which courts have upheld privacy statutes. As applied to Clearview, BIPA seriously burdens the collection and analysis of information that is already available to the public without adequately weighing the benefits of the expressive value of faceprints against the harms to the public. To the extent that BIPA protects privacy interests at

all—which is modest, given that the information Clearview uses is already publicly available—those interests are outweighed by the burden on Clearview's rights of expression.

## VI.     The First Amendment Protects The Use Of Innovative Mechanical Technologies In The Creative Process.

Expression does not forfeit its First Amendment protections simply because innovative or mechanical technologies are used in its creation. At its essence, Clearview's technology recreates, in mechanical form, the analytical process of comparing two images to determine and then express whether they are similar. When humans look at photographs of faces, they create mental maps of facial geometry and distinguishing features for the purpose of recognizing them later.[2] When humans compare photographs, the mental processes of viewing, consideration, analysis, and determination are processes protected by the First Amendment. That protection does not change simply because the process is performed by mechanical means. It is axiomatic that the "basic principles" of the First Amendment "do not vary when a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n,* 564 U.S. 786, 790 (2011). Similarly, the efficiencies afforded by computers and machine learning do not change the rules of First Amendment scrutiny. *Reno v. ACLU,* 521 U.S. 844, 876, 880 (1997) (protecting indecent speech on the Internet even though the accessibility of the Internet makes access by children very likely to occur).

If Illinois law had prohibited the comparison of faces *by any means,* including when a human being looks at two pictures and decides whether they are the same person or not, the impingement on freedom of thought and expression would be obvious. BIPA does not, of course,

---

[2] In fact, people afflicted with face blindness are impaired in this precise way—they do not log these "biometric identifiers" and therefore lack the library needed to recognize people later. Richard Le Grand et. al, *What aspects of face processing are impaired in developmental prosopagnosia?*, 2006 BRAIN COGN. 61(2)139-58, https://pubmed.ncbi.nlm.nih.gov/16466839/.

forbid a person from making a mental map of a person's face, nor does BIPA prohibit the taking of a photograph. It applies only to technologically-assisted recognition of faces. If Plaintiffs' reading of BIPA were accepted, the statute would effectively prohibit comparing photographs by using computers.

By seeking to hold Clearview liable for crippling damages, Plaintiffs attempt to quash an emerging technology based on its efficacy, but the mechanical nature of Clearview's speech creation does not diminish its constitutional protection. To the contrary, "the creation and dissemination of information are speech within the meaning of the First Amendment," even when the information is dry data. *See Sorrell v. IMS Health,* 564 U.S. 552, 570 (2011). To the extent that Plaintiffs concern is motivated by a desire to preserve a certain level of obscurity, so that our faces and bodies cannot be instantly identified by virtue of a new technology, it fails to overcome two hurdles.

First, this argument converts a descriptive account into a prescriptive one. The descriptive account is undeniable; it was once difficult to identify a person based only on her face or appearance while she was out in public unless you happened to know her. But the prescriptive account ("therefore we should be free from easy identification of our faces") is less convincing. Rather, it is an instantiation of status quo bias—an assumption that the amount of obscurity and exposure we are accustomed to right now is just the right amount.

Second, this status quo bias has little limiting principal and could have been applied to restrict technological advancements throughout history. The same bias would have had emotional appeal at the advent of hand-held cameras, smart phone video recording, and social media.[3] A bias

---

[3] Banning the use of hand-held cameras because of privacy risks may seem absurd in the modern day, but it would not have seemed absurd to Samuel Warren and Louis Brandeis. The portable camera was the innovative technology that inspired their famous article, *The Right to Privacy,* 4 HARV. L. REV. 193 (1890), and launched the legal recognition of a right to privacy. *Id.* at 193 ("Instantaneous photographs

against innovation could also apply to search engines, which facilitate searching for a person's name and image. While there may indeed be uses of faceprints and facial recognition technology that can cause unjustified informational harm to society, it is premature to assume that the technology as a whole must be closely regulated, particularly since faceprints only augment what humans can already do with their own eyesight and perception. The potential for misuse of an information technology cannot justify the restriction of *all* uses of that technology. Instead, a privacy statute must be designed to carefully minimize harmful information practices without unduly burdening other forms of speech.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the Plaintiffs' motion for preliminary injunction consistent with the protections guaranteed by the First Amendment.


Dated: April 28, 2021

/s/ Rachel S. Morse

Rachel S. Morse
MASSEY & GAIL LLP
50 East Washington Street
Suite 400
Chicago, Illinois 60602
(312) 283-1590
rmorse@masseygail.com

*Counsel for Amici First Amendment Clinic at Duke Law and Professors Eugene Volokh and Jane Bambauer*

---

and newspaper enterprise have invaded the sacred precincts of private and domestic life; . . . the law must afford some remedy for the unauthorized circulation of portraits of private persons") (internal quotation marks omitted); *see also* Dorothy J. Glancy, *The Invention of the Right to Privacy*, 21 ARIZ. L. REV. 1, 8 (1979). The First Amendment, with its expansive definition of speech, protects new communication technologies from well-intentioned regulations driven by fear of new technology.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned counsel certifies that on April 28, 2021, the foregoing was filed via the court's electronic case filing system, which shall cause a copy to be served on all counsel of record via email.

/s/ Rachel S. Morse
Rachel S. Morse
