# **Appendix – Unpublished Cases**

2019 WL 4196054
Only the Westlaw citation is currently available.
United States District Court, D. Alaska.

Jane DOE I, Jane Doe II, Jane
Doe III, Jane Doe IV, Jane Doe
V, and Does 6-20, Plaintiffs,
v.
David YESNER, University of Alaska
Board of Regents, and University
of Alaska System, Defendants.

No. 3:19-cv-0136-HRH
|
Signed 09/04/2019

**Attorneys and Law Firms**

Charles Alfred Sturm, Pro Hac Vice, Sturm Law PLLC, Cornelia Brandfield-Harvey, Pro Hac Vice, The Buzbee Law Firm, Houston, TX, Nicole C. Cusack, Cusack Law, LLC, Anchorage, AK, for Plaintiffs.

Danielle M. Ryman, Perkins Coie, LLP, Anchorage, AK, for Defendants University of Alaska Board of Regents, University of Alaska System.

Stacy Lee Walker, Walker & Eakes, LLC, Anchorage, AK, for Defendant David Yesner.

ORDER

Motions to Dismiss; Motion to Amend; Motion to Preclude Use of "Jane Doe" Pseudonyms

H. Russel Holland, United States District Judge

**\*1** Defendants University of Alaska Board of Regents and University of Alaska System move to dismiss plaintiffs' Counts IV through VIII.[1] Defendant David Yesner joins in this motion as to Count VIII.[2] This motion is opposed.[3] Yesner moves to dismiss some of plaintiffs' claims on statute of limitations grounds and to dismiss the fictitious plaintiffs.[4] The University defendants join in this motion.[5] This motion is opposed.[6] Yesner also moves to preclude the use of "Jane Doe" pseudonyms in this case.[7] This motion is opposed.[8] Plaintiffs move to amend their complaint.[9] This motion is unopposed. Oral argument was not requested on any of the pending motions and is not deemed necessary.

Background

Plaintiffs are former students at the University of Alaska. Yesner is a former professor at the University of Alaska.

Jane Doe I alleges that she first met Yesner in 2010 and that he was her "Anthropology Advisor from 2011 to the end of 2016/early 2017."[10] Jane Doe I alleges that Yesner "directed grotesque and sexually charged comments and unwanted staring" at her.[11] For example, Jane Doe I alleges that Yesner once asked her "if she ever wore heels while looking [her] up and down in a sexually explicit way, conveying to her that he was imaging what 'she would look like in heels.' "[12] Jane Doe I alleges that one evening Yesner invited her to dinner and while at dinner "emphasized ... that his wife was out of town and insinuated that [she] should join him at his house[.]"[13] Jane Doe I alleges that Yesner would take pictures of female students, including her, while on dig sites when they were wearing only sport bras and shorts due to the heat.[14] Jane Doe I alleges that she learned in March 2019 that Yesner's pictures of her showed that Yesner "was zeroing in on [her] breasts and buttocks...."[15]

Jane Doe II alleges that she first met Yesner in 2009 and that he became her thesis advisor in 2010.[16] Jane Doe II alleges that Yesner "made unwanted sexual advances towards [her] as well as sexually explicit and suggestive comments."[17] For example, Jane Doe II alleges that "Yesner directly stated to [her], 'if I were 30 years younger, I would be interested in you,' that 'you are beautiful,' and 'if I were not married, I would love to be with you sexually.' "[18] Jane Doe II alleges that "when [she] communicated dissatisfaction that her comprehensive exam was taking so long to grade, [d]efendant Yesner responded that 'maybe [she] needed to give [him] a spanking so that [he] would do better.' "[19] Jane Doe II alleges that Yesner would routinely question her then-boyfriend, who was also one of Yesner's students, "about his sex life with [her], asking about intimate details."[20] Jane Doe II alleges that "[t]he unwanted touching by" Yesner "was pervasive" and whenever he spoke to her, "he would stare at her breasts

and he would find ways for his hands to make contact with her breasts and buttocks."[21] She alleges that when Yesner would hug her, he "would put his hand on the small of her back and rub in circles just above her buttocks, lingering in the hug for several minutes" or he would "intentionally brush his hand across [her] breasts in the process of hugging her and often times leave his hand wrapped around her hip."[22] Jane Doe II alleges that in November 2017, Yesner "perused [her] Instagram account and selected a sexually suggestive photograph of [her], showing her cleavage[,]" which he "put on her poster that would be displayed on campus, advertising her thesis presentation."[23] Jane Doe II alleges that Yesner kept pornography on the computer "that she shared with him" and that "pornographic pictures would be left open on [the] computer when she came into the lab and [d]efendant Yesner would be elsewhere."[24]

**\*2**  Jane Doe III alleges that she first met Yesner in 2016.[25] Jane Doe III alleges that "each time she had an interaction with [d]efendant Yesner he would stare lasciviously at her breasts for the duration of the conversation[.]"[26] Jane Doe III alleges that in October 2017, she was alone in a classroom performing a necropsy on a bear when Yesner "suddenly appeared in the doorway, intensely staring at [her] and standing in silence just watching her."[27] Jane Doe III alleges that "[w]ithin a few minutes, [d]efendant Yesner began to walk slowly towards [her] in a threatening manner, still without saying anything."[28] Jane Doe III alleges that "[i]n an attempt to protect herself, [she] chose to jump over the bear carcass on the floor instead of going around the table so she could be out of arms reach" of Yesner.[29] Jane Doe III alleges that when she was taking a geology class in the Fall of 2017, Yesner would sit behind her and "lean in close where [she] could feel his breath down her neck" and he would "make bizarre, inappropriate comments."[30]

Jane Doe IV alleges that she "first met [d]efendant Yesner as an undergraduate student at field school in 2013 and during summer work before entering UAA's graduate program in 2014 and 2015."[31] Jane Doe IV alleges that Yesner became her advisor in the fall of 2015.[32] Jane Doe IV alleges that "Yesner made sexually explicit and suggestive comments to [her] as well as unwanted staring."[33] For example, Jane Doe IV alleges that Yesner once told her "that he cheated on his wife with another woman" and that "he wanted to have sex with a particular undergraduate professor and committee

member[.]"[34] Jane Doe IV alleges that "Yesner incessantly and exaggeratedly looked [her] body up and down."[35] Jane Doe IV alleges that once when she was in the field with Yesner, who had "his camera in tow," she wiped a knife blade that she was using to take core samples on "her knee/thigh area. As she wiped the knife on her knee/thigh, [d]efendant Yesner commented that [she] had wiped the knife on her 'crotch' and said, 'Good thing I did not get a picture of that.' "[36] Jane Doe IV alleges that "Yesner would often get [her] alone with him in disturbing situations."[37] For example, Jane Doe IV alleges that Yesner once arranged for her to meet him at the museum when it was closed and that he once insisted that she come into his camper when they were in the field and she went to retrieve him for dinner.[38] Jane Doe IV alleges that "[a]t this same field site in 2016," she and Yesner were out in the woods and "[a]s [she] was rummaging in the back of her car to retrieve field gear, she looked to see if [d]efendant Yesner was behind her but instead saw [him] urinating in plain sight."[39] Jane Doe IV alleges that "there were times when she would walk into [d]efendant Yesner's office to meet with him and find that he was waiting for her with his pants unzipped and his shirt open, almost exposing himself to [her]."[40] Jane Doe IV alleges that Yesner would force her "to sit side-by-side with him alone whenever she was working on her thesis."[41] Jane Doe IV alleges that "Yesner would often hug [her] without her consent, lingering in the hug for several minutes to which [she] had no escape."[42]

Jane Doe V alleges that she "first met [d]efendant Yesner as an undergraduate student ... in [the] Fall of 2014."[43] Jane Doe V alleges that at a party in December 2014, "Yesner approached her aggressively and demanded that she drink a shot of liquor. [Yesner] moved close into [her] personal space as he made his demands, backing [her] into a corner which made her feel disturbed and trapped."[44] Jane Doe V alleges that "[e]ven after [she] politely refused, [Yesner] kept forcing alcohol on her, pressuring [her] to drink."[45] Jane Doe V alleges that "Yesner would often stare intensely at [her] breasts for a long time when she would have interactions with him[.]"[46]

**\*3**  Plaintiffs allege that outside counsel retained by the University released a report on March 15, 2019, which "detail[ed Yesner's] years and years of predatory behavior inflicted upon ... female students."[47] Plaintiffs allege that "[t]he March 15, 2019 report found [d]efendant Yesner guilty of violating several University regulations" and found that he

had "engaged in sex discrimination and sexual harassment" of nine unnamed complainants (C1-C9) and sexually assaulted complainant C9.[48] Plaintiffs also allege that the report found that Yesner had "engaged in sexual exploitation through inappropriate use and possession of female student pictures" and violated University regulations "by possessing obscene material on his University computer."[49] Plaintiffs allege that after the report was released, Yesner was banned "from the University campus and from affiliating with the University of Alaska."[50]

Plaintiffs commenced this action on May 15, 2019. Plaintiffs' complaint contains eight counts. In Counts I-III, plaintiffs assert Title IX[51] claims against the University defendants. In Count IV, plaintiffs assert sexual discrimination claims pursuant to AS 14.18.010 against the University defendants. In Count V, plaintiffs assert § 1983 Monell claims against the University defendants. In Count VI, plaintiffs assert assault and battery claims against all defendants. In Count VII, plaintiffs assert intentional infliction of emotional distress claims against all defendants. In Count VIII, Jane Does I and II assert common law invasion of privacy tort claims. For relief, plaintiffs seek damages, an injunction enjoining the University "from unlawful discrimination on the basis of sex," "a formal public statement in support of [p]laintiffs[,]" and the "[r]emoval of Defendant David Yesner's name from diplomas and other official university documents[.]"[52]

Pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, defendants now move to dismiss certain claims. Pursuant to Rule 17, defendants move to dismiss Jane Does 6-20. Pursuant to Rule 10(a), Yesner moves to preclude plaintiffs from proceeding under pseudonyms. And, pursuant to Rule 15(a), plaintiffs move to amend their complaint to add two additional plaintiffs.

Rule 12(b)(6) Motions to Dismiss

" 'To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " Id. (quoting Iqbal, 556 U.S. at 678). "The plausibility standard requires more than the

sheer possibility or conceivability that a defendant has acted unlawfully." Id. " 'Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Iqbal, 556 U.S. at 678). "[T]he complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " In re Rigel Pharmaceuticals, Inc. Securities Litig., 697 F.3d 869, 875 (9th Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." Adams v. U.S. Forest Srvc., 671 F.3d 1138, 1142-43 (9th Cir. 2012). "However, the trial court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations." In re Tracht Gut, LLC, 836 F.3d 1146, 1150 (9th Cir. 2016).

**\*4** The University defendants first move to dismiss plaintiffs' state law claims (Counts IV, VI, VII, and VIII) and plaintiffs' § 1983 claims (Count V) on Eleventh Amendment grounds.[53] "The Eleventh Amendment protects states and state instrumentalities ... from suit in federal court." Doe v. Regents of the Univ. of Calif., 891 F.3d 1147, 1153 (9th Cir. 2018). Both Alaska state courts and the Ninth Circuit have held that the University itself is an instrumentality of the state. See Univ. of Alaska v. Nat'l Aircraft Leasing, Ltd., 536 P.2d 121, 124 (Alaska 1975) ("the University must be regarded as uniquely an instrumentality of the state itself"); Ellingstad v. State, Dep't of Natural Resources, 979 P.2d 1000, 1007 (Alaska 1999) ("Alaska law treats the University as a state entity for purposes of sovereign immunity"); Townsend v. Univ. of Alaska, 543 F.3d 478, 481 (9th Cir. 2008) ("[i]t is undisputed that the University is an arm of the State of Alaska"). And, because "[a] claim alleged against a state officer acting in his official capacity is treated as a claim against the state itself[,]" Morongo Band of Mission Indians v. Calif. State Bd. of Equalization, 858 F.3d 1376, 1382 n.5 (9th Cir. 1988), the Board of Regents is also protected from suit in federal court by the Eleventh Amendment.

However, "[t]here are two 'well-established' exceptions to the Eleventh Amendment protection from suit." Micomonaco v. State of Wash., 45 F.3d 316, 319 (9th Cir. 1995) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 (1985)). "Congress can abrogate the Eleventh Amendment without the consent of the states in certain instances or a state may waive its immunity by consenting to suit in federal court." Id.

The University defendants concede that the state has waived sovereign immunity in state court for claims alleging violations of AS 14.18.010 and for state-law tort claims. See AS 09.50.250; AS 14.18.100. But, they argue that the state has not waived sovereign immunity as to such claims being brought in federal court. The University defendants also argue that there is no federal statute that abrogates the state's immunity in federal court for such claims. Thus, the University defendants argue that plaintiffs' claims against them in Counts IV, VI, VII, and VIII should be dismissed.

Plaintiffs first argue that these claims should not be dismissed because the court has supplemental jurisdiction of these claims pursuant to 28 U.S.C. § 1367. This argument fails. "Eleventh Amendment immunity extends to state law claims over which a federal court could exercise supplemental jurisdiction." S.B. by and through Kristina B. v. Calif. Dep't of Educ., 327 F. Supp. 3d 1218, 1235 (E.D. Cal. 2018) (citing Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 541 (2002)).

Plaintiffs next argue that their state law discrimination claims under AS 14.18.010 are not barred by the Eleventh Amendment. Plaintiffs argue that because the University defendants' sovereign immunity has been abrogated as to Title IX claims, they should be able to bring their AS 14.18.010 claims in federal court because this state statute is "extremely similar" in purpose to Title IX.[54] Plaintiffs provide no authority to support this novel theory. Although "Congress has properly abrogated state sovereign immunity for Title IX claims[,]" Stanley v. Trustees of Calif. State Univ., 433 F.3d 1129, 1133 (9th Cir. 2006), plaintiffs have cited to no language in Title IX that suggests that Congress intended to abrogate state sovereign immunity for similar state law claims.

Plaintiffs also argue that their state law discrimination and tort claims against the University defendants should not be dismissed because this court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3). Section 1343(a)(3) provides:

> **\*5** The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing

for equal rights of citizens or of all persons within the jurisdiction of the United States[.]

Section 1343(a)(3) does not give the court jurisdiction over claims involving rights protected by state statutes or state common law. Rather, it gives the court jurisdiction over claims involving rights protected by the U.S. Constitution or federal law. See Jaa v. City of Dublin, Case No. 14–cv–03260–JCS, 2014 WL 12775830, at *4 (N.D. Cal. Aug. 29, 2014) ("Section 1343 provides a separate basis for federal jurisdiction for certain claims arising from violations of federally-protected civil and constitutional rights").

Plaintiffs next argue that because the University defendants consented to suit in federal court for tort claims in another case, they can be sued in federal court for tort claims in this case. The case cited by plaintiffs is McBeath v. University of Alaska, Case No. 3:08-cv-0008-TMB. Assuming that the University defendants waived their sovereign immunity defense as to McBeath's state-law claim, that does not mean that the University defendants have waived their sovereign immunity in this case. Plaintiffs cite to no authority, nor is the court aware of any, that stands for the proposition that waiver or consent in one case means waiver or consent in all cases.

Finally, plaintiffs argue that their tort and state law discrimination claims should not be dismissed because it would be more efficient to litigate all of their claims in one forum. But, judicial efficiency cannot trump "the fundamental principle of sovereign immunity [which] limits the grant of judicial authority in Art. III." Green v. Mansour, 474 U.S. 64, 68 (1985) (citation omitted).

Plaintiffs' state law discrimination and tort claims are barred by the Eleventh Amendment. Plaintiffs' claims against the University defendants in Counts IV, VI, VII, and VIII are dismissed without prejudice. Plaintiffs are not given leave to amend as to these claims because "amendment would be futile." Ebner v. Fresh, Inc., 838 F.3d 958, 968 (9th Cir. 2016).

As for plaintiffs' § 1983 Monell claims against the University defendants in Count V, " '[s]tates or governmental entities that are considered "arms of the State" for Eleventh Amendment purposes' are not 'persons' under § 1983." Flint v. Dennison, 488 F.3d 816, 824 (9th Cir. 2007) (quoting Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989)). Thus, the University defendants argue that plaintiffs' § 1983 claims should be dismissed.

Plaintiffs first argue that their § 1983 claims for damages should not be dismissed because Yesner is a "person" for purposes of § 1983 and the University defendants are vicariously liable for his actions. This argument fails because "[i]t is well-settled that '§ 1983 suits do not allow for the imposition of vicarious liability[.]' " Kaur v. City of Lodi, 263 F. Supp. 3d 947, 984 (E.D. Cal. 2017) (quoting Starr v. Baca, 652 F.3d 1202, 1206 (9th Cir. 2011)).

Plaintiffs next argue that their § 1983 claims should not be dismissed because they are not only seeking damages, but also equitable relief. "[C]ourts have ... allowed suit under 42 U.S.C. § 1983 when the action was for equitable relief rather than damages." Wolfe v. O'Neill, 336 F. Supp. 1255, 1259 (D. Alaska 1972).

*6 The University defendants do not dispute that "[a] state official in his or her official capacity, when sued for injunctive relief, [is] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' " Will, 491 U.S. at 58 n.10 (quoting Kentucky v. Graham, 473 U.S. 159, 167, n.14 (1985)). But, they point out that this exception to Eleventh Amendment immunity is limited to "prospective injunctive relief to prevent a continuing violation of federal law." Green, 474 U.S. at 68. The Supreme Court has "refused to extend" this exception "to claims for retrospective relief." Id. "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." Id.

Here, plaintiffs seek to enjoin the University defendants "from unlawful discrimination on the basis of sex[.]"[55] "An award of prospective injunctive relief requires the plaintiff to demonstrate a reasonable likelihood of future injury." Bank of Lake Tahoe v. Bank of America, 318 F.3d 914, 918 (9th Cir. 2003). " '[P]laintiffs must demonstrate that a credible threat exists that they will again be subject to the specific injury for which they seek injunctive ... relief.' " Id. (quoting Sample v. Johnson, 771 F.2d 1335, 1340 (9th Cir. 1985)). An "amorphous request for future blanket protection does not meet the 'credible threat' requirement." Id. (quoting Sample, 771 F.2d at 1340).

Plaintiffs have not demonstrated a reasonable likelihood of future injury as they are former students and they allege that "[t]he University has banned Professor Yesner from the University campus and from affiliating with the University of Alaska."[56] All plaintiffs have done here is make an amorphous request for injunctive relief. Plaintiffs have inadequately pled a claim for injunctive relief against the Board of Regents.

Plaintiffs' § 1983 claims for damages and equitable relief against the University of Alaska System are dismissed with prejudice. Plaintiffs' § 1983 claims for damages against the Board of Regents are also dismissed with prejudice. Plaintiffs' § 1983 claims for equitable relief against the Board of Regents are dismissed without prejudice. Although its strikes the court that it is unlikely that plaintiffs will be able to pled plausible claims for prospective injunction relief against the Board of Regents, it may be possible that at least some of the plaintiffs could plausibly plead such claims. Therefore, plaintiffs are given leave to amend as to their § 1983 claims for equitable relief against the Board of Regents.

Next, Yesner moves to dismiss all but one of the tort claims asserted against him by Jane Does I, II, IV, and V in Counts VI, VII, and VIII. In Alaska, a two-year statute of limitations applies to tort claims. AS 09.10.070. Plaintiffs filed their complaint on May 15, 2019. Thus, in order for plaintiffs' tort claims to be timely, Yesner argues that they must be based on conduct that occurred on or after May 14, 2017. But, he contends that the only conduct alleged by Jane Does I, II, IV, and V to have occurred after May 14, 2017 is the placement of a sexually suggestive picture on Jane Doe II's thesis poster. All of the other wrongful conduct alleged by Jane Does I, II, IV, and V is alleged to have occurred before May 14, 2017 or at unspecified times, thereby making these claims, according to Yesner, untimely.

As an initial matter, plaintiffs argue Yesner is equitably estopped from asserting a statute of limitations defense. " '[A] party who fraudulently conceals from a plaintiff the existence of a cause of action may be estopped to plead the statute of limitation if the plaintiff's delay in bringing suit was occasioned by reliance on the false or fraudulent representation.' " Palmer v. Borg-Warner Corp., 838 P.2d 1243, 1247 (Alaska 1992) (quoting Sharrow v. Archer, 658 P.2d 1331, 1333 (Alaska 1983)).

*7 Equitable estoppel generally requires that "the party seeking to assert it show that the other party made some misrepresentation, or false statement, or acted fraudulently and that he reasonably relied on such acts or representations of the other party, and due to such reliance did not institute suit timely."

2019 WL 4196054

Id. (quoting Groseth v. Ness, 421 P.2d 624, 632 n.23 (Alaska 1966)).

Plaintiffs argue that the University defendants had knowledge of Yesner's conduct since the 1980s but concealed this information from plaintiffs. Plaintiffs argue that they had no way of knowing about Yesner's conduct until December 2017, when the University defendants began to seriously investigate the sexual harassment claims against Yesner. Plaintiffs then suggest that it was not really until March 2019, when the University defendants released the investigative report, that they knew about their claims against Yesner.

The problem with this argument is that plaintiffs are contending that the University defendants were concealing information. But, it is not the University defendants who are attempting to assert a statute of limitations defense. Rather, it is Yesner who is asserting such a defense. Plaintiffs have not alleged that Yesner was concealing information. Thus, plaintiffs' equitable estoppel argument fails.

Plaintiffs also argue that Jane Does I, II, IV, and V's tort claims against Yesner should not be considered time barred because the University's own policies provide that " 'there is no time limit on reporting sexual and gender-based discrimination, including sexual harassment or sexual assault....' "[57] Plaintiffs argue that the court should take this into account and allow these plaintiffs' claims to go forward.

However, the University's policy is not binding on this court. The court must apply the two-year statute of limitations provided by statute in determining whether Jane Does I, II, IV, and V's tort claims against Yesner are timely.

As for Jane Doe I's tort claims against Yesner, plaintiffs argue that these claims are not timed barred because of the discovery rule. "Under the discovery rule, the statute of limitations will not begin to run until a reasonable person has enough information to be on notice for a potential cause of action or to inquire into the extent of the injury." Flint Hills Resources Alaska, LLC v. Williams Alaska Petroleum, Inc., 377 P.3d 959, 972 (Alaska 2016). "Under the discovery rule, the date on which the statute of limitations begins to run is a question of fact. But it is a legal question whether undisputed facts establish that a plaintiff is on inquiry notice." Egner v. Talbot's, Inc., 214 P.3d 272, 277 (Alaska 2009).

Plaintiffs argue that the earliest Jane Doe I knew or should have known of the facts that gave rise to her tort claims is December 2017, which was when, according to plaintiffs, she was first interviewed by a Title IX investigator. This argument, however, makes no sense given that Jane Doe I has alleged that "[i]n 2016, [she] reported to defendant University of Alaska that Defendant Yesner had sexually harassed her and then retaliated against her."[58] This allegation, if taken as true as the court must on a motion to dismiss, indicates that Jane Doe I was aware of the facts that gave rise to her tort claims against Yesner by at least 2016. Because plaintiffs' complaint was not filed until May 15, 2019, Jane Doe I's tort claims against Yesner are untimely, except to the extent that her tort claims are based on the sexually suggestive photographs Yesner allegedly took of her. Jane Doe I has alleged that she did not learn about the nature of these photographs until March 2019. Thus, the statute of limitations for tort claims based on the photographs did not begin to run until then, thereby making her tort claims based on the photographs timely.

**\*8** Plaintiffs attempt to save Jane Doe's untimely tort claims by arguing that the continuing violations doctrine applies. "The continuing violations doctrine allows plaintiffs to establish an ongoing tort through incidents that occurred before the statute of limitations period and that continued into the limitations period." Reich v. Cominco Alaska, Inc., 56 P.3d 18, 25–26 (Alaska 2002). "To benefit from the continuing violation theory, a plaintiff must first demonstrate that some discriminatory act occurred within the limitations period." Sengupta v. Univ. of Alaska, 21 P.3d 1240, 1249 (Alaska 2001). "The plaintiff must then show that the timely filed claim—based upon this act within the limitation period—is closely related to the otherwise time-barred claims." Id. "To determine whether the claims are sufficiently related, federal circuit courts have often looked at three primary characteristics of the violations: subject matter, temporal proximity, and permanence." Id. "Many courts have designated the permanence factor as the most important." Id. "The 'permanent' violation triggers a reasonable person's awareness of the alleged discrimination and the need to assert her rights." Id. "On a subjective basis, if a plaintiff's actions show that she knew her rights had been violated by a certain point in time, the limitations period starts running from that date." Id. " ' 'The continuing violation doctrine does not exist to give a second chance to [a plaintiff] who allowed a legitimate ... claim to lapse.' ' " Id. (quoting Roberts v. Gadsden Mem'l Hosp., 835 F.2d 793, 800 (11th Cir. 1988)).

Because Jane Doe I has alleged that she knew she was being sexually harassed by at least 2016, the continuing violation

2019 WL 4196054

doctrine cannot save her untimely claims. The statute of limitations as to these claims began running when she knew that her rights had been violated, which she has alleged was in 2016.

Jane Doe I's torts claim against Yesner are barred by the statute of limitations except to the extent that they are based on allegations related to the sexually suggestive photographs. Jane Doe I's tort claims against Yesner, except for those based on the sexually suggestive photographs, are dismissed without prejudice. Jane Doe I is given leave to amend these claims as it is possible (but unlikely) that she could amend these claims to make them timely.

As for Jane Doe II's tort claims, plaintiffs argue that they are not time barred because they are based, in part, on allegations that would constitute felony sexual assault, which has no statute of limitations. AS 09.10.065(a)(2) provides that "[a] person may bring an action at any time for conduct that would have, at the time the conduct occurred, violated provisions of ... felony sexual assault[.]" "An offender commits the crime of sexual assault in the second degree," which is a felony, "if ... the offender engages in sexual contact with another person without consent of that person[.]" AS 11.41.420(a)(1). "Sexual contact" is defined as "the defendant's ... knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast[.]" AS 11.81.900(b)(60)(A)(i). Jane Doe II alleges that whenever Yesner spoke to her, "he would stare at her breasts and he would find ways for his hands to make contact with her breasts and buttocks."[59] She alleges that when Yesner would hug her, he "would put his hand on the small of her back and rub in circles just above her buttocks, lingering in the hug for several minutes" or he would "intentionally brush his hand across [her] breasts in the process of hugging her and often times leave his hand wrapped around her hip."[60] This unwanted touching meets the definition of sexual contact.

However, the statute requires that the "sexual contact" be "without consent." " '[W]ithout consent' means that a person ... with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone[.]" AS 11.41.470(8)(A). "[T]he phrase 'without consent' refers to a particular type of unwanted sexual activity: unwanted sexual activity that is coerced by force or the threat of force." Inga v. State, 440 P.3d 345, 349 (Alaska Ct. App. 2019). Jane Doe II has not alleged that the

unwanted sexual contact by Yesner was "coerced by force or the threat of force." Id.

**\*9** Plaintiffs then argue that the continuing violations doctrine makes all of Jane Doe II's tort claims timely. This argument fails. Jane Doe II has alleged that "[s]ometime in September 2013, [she] ... believed she [made] a formal sexual harassment complaint about the conduct of Defendant Yesner to the Provost's office of the University."[61] Because Jane Doe II has alleged that she knew by at least 2013 that she was being sexually harassed by Yesner, the continuing violation doctrine has no application to her claims.

Jane Doe II's tort claims against Yesner are barred by the statute of limitations except to the extent they are based on allegations related to her thesis poster. Jane Doe II's tort claims against Yesner, except for those based on her thesis poster, are dismissed without prejudice. Jane Doe II is given leave to amend these claims as it is possible (but unlikely) that she could amend these claims to make them timely.

As for Jane Does IV and V, plaintiffs argue that their tort claims against Yesner are not time barred because they did not realize that what Yesner was doing was sexual harassment until December 2017, which is when they allegedly reported Yesner's conduct to the University Chancellor and a Title IX investigation was begun. But, these plaintiffs' allegations belie their contention that they were not aware that Yesner's conduct could be considered sexual harassment prior to December 2017. Jane Doe IV alleges that she "reported her experiences with [d]efendant Yesner to her University of Alaska Graduate Committee Member...."[62] This allegation indicates that Jane Doe IV was aware of the facts that gave rise to her tort claims against Yesner prior to December 2017. Although there are no allegations in the complaint about Jane Doe V reporting Yesner's conduct to anyone, Jane Doe V alleges that Yesner's constant staring made her feel violated and that she tried to avoid interactions with him.[63] These allegations indicate that Jane Doe V was aware of the facts giving rise to her claims prior to December 2017.

Jane Does IV and V's tort claims cannot be saved by the continuing violation doctrine, as plaintiffs argue, because neither of these plaintiffs has alleged an act within the limitation period. Jane Does IV and V's tort claims against Yesner are barred by the statute of limitations and are dismissed without prejudice. Jane Does IV and V are given leave to amend these claims as it is possible (but unlikely) that they could amend these claims to make them timely.

Yesner next moves to dismiss most of Jane Does I and II's timely tort claims in Count VIII as implausible. In Count VIII, Jane Does I and II allege claims based on three theories of liability for invasion of privacy: 1) intrusion of solitude, 2) public disclosure of public facts, and 3) false light. Yesner argues that all of these claims have been inadequately pled, except for Jane Doe II's false light claim.

First, Yesner moves to dismiss Jane Does I and II's intrusion of solitude claim. An intrusion of solitude claim is based on the Restatement (Second) of Torts § 652B, which reads, in relevant part:

> "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

Greywolf v. Carroll, 151 P.3d 1234, 1244–45 (Alaska 2007). In order for a plaintiff to prevail on an intrusion of solitude claim, she must prove "(1) that [she] had a reasonable expectation of privacy, and (2) that [the] defendant intruded in a manner highly offensive to a reasonable person." Id. at 1245. Whether a plaintiff has a "reasonable expectation of privacy" contains a subjective and objective component. Id.

 *10  Jane Doe I's intrusion of solitude claim is based on her allegations that Yesner took sexually suggestive photos of her at the Broken Mammoth Archaeological Site.[64] Yesner argues that there is no liability for intrusion of solitude for taking photographs when other people are present. As the comments to Section 625B explain, "there [is no] liability for observing [the plaintiff] or even taking [her] photograph while [she] is walking on the public highway, since [she] is not then in seclusion, and h[er] appearance is public and open to the public eye."[65] Yesner contends that courts have routinely held that intrusion of solitude claims fail as a matter of law if they are based on photographs taken of persons in accessible locations. See Muratore v. M/S Scotia Prince, 656 F. Supp. 471, 483 (D. Me. 1987), aff'd in part, vacated in part on other grounds, 845 F.2d 347 (1st Cir. 1998) (no intrusion of solitude based on photographs of the plaintiff taken in public areas of the ship, even though the plaintiff did not want her photograph taken); Cheatham v. Paisano Publications, Inc., 891 F. Supp. 381, 384-85 (W.D. Ky. 1995) (no intrusion of solitude based on photograph taken at a bikers' convention of the plaintiff wearing "one of her distinctive creations, which displayed her bottom through fishnet fabric that replaced cut

out portions of her blue jeans"); Bogie v. Rosenberg, 705 F.3d 603, 611 (7th Cir. 2013) (no intrusion of solitude based on video taken when the plaintiff was "visiting a celebrity performer's backstage area where the general public, of which Bogie was a member, was not allowed, but where at least several others were present"); King v. Metcalf 56 Homes Ass'n, Inc., 385 F. Supp. 2d 1137, 1146 (D. Kan. 2005) (no intrusion of solitude based on photographs taken of people entering and leaving a residence and of vehicles parked in the driveway because they were "readily observable to the public eye"). Similarly here, Yesner argues that there can be no liability for photographs taken at an archaeological site where other students were present.

Plaintiffs argue that Jane Doe I has adequately alleged an intrusion of solitude claim. They argue that she has alleged that she had a reasonable expectation of privacy and that she believed that her picture was being taken for legitimate educational and professional reasons. Plaintiffs argue that Jane Doe I's allegations are much different from those in the cases cited by Yesner because she has alleged that the photographs were taken at a secluded archeological site while she was taking a University class. Plaintiffs argue that the archeological site is not an "accessible" location and is not at all akin to a public street or a residential driveway. Plaintiffs remind defendants that there may still be an invasion of privacy if a person is in a public space. Plaintiffs cite to Daily Times Democrat v. Graham, 162 So.2d 474 (Ala. 1964), by way of example.

There, a photograph was taken of Graham at an amusement park when a gust of wind caused her skirt to fly up over her head. Id. at 476. The court observed that

> [o]ne who is a part of a public scene may be lawfully photographed as an incidental part of that scene in his ordinary status. Where the status he expects to occupy is changed without his volition to a status embarrassing to an ordinary person of reasonable sensitivity, then he should not be deemed to have forfeited his right to be protected from an indecent and vulgar intrusion of his right of privacy merely because misfortune overtakes him in a public place.

Id. at 478. Plaintiffs argue that much the same is true here, that although Jane Doe I may have been in a public place, she did not consent to having sexually suggestive photographs taken.

While it is possible that Jane Doe I could plead a plausible intrusion of solitude claim, she has not done so. It is possible that the archaeological site was secluded and not accessible, but there are not allegations to that effect in the complaint.

2019 WL 4196054

As currently pled, Jane Doe I's intrusion of solitude claim is implausible, and it is dismissed without prejudice. Jane Doe I is, however, given leave to amend this claim.

Jane Doe II's intrusion of solitude claim is based on allegations that Yesner "peruse[d] her social media profile and select[ed] a sexually suggestive photograph" of her to use on her thesis poster.[66] Yesner argues that she cannot state a plausible intrusion of solitude claim based on his using a photograph from her Instagram account because the entire point of using social media is to share content with others. Yesner argues that it is implausible that Jane Doe II had a reasonable expectation of privacy as to the photos on her Instagram account, particularly since there are no allegations that her account was private or that she had limited access to her account in any way.

*11 Plaintiffs argue that Jane Doe II's intrusion of solitude claim is plausible because Yesner is not one of her followers on Instagram. They argue that this means that Jane Doe II did not intend to share her photograph with Yesner.

But, there are no allegations in the complaint as to who was or was not a follower of Jane Doe II's Instagram account. Moreover, there are no allegations in the complaint that Jane Doe II took any steps to limit access to her Instagram account. As currently pled, this claim is implausible, and it is dismissed without prejudice. Jane Doe II is, however, given leave to amend this claim.

Next, Yesner moves to dismiss Jane Doe II's public disclosure of private fact claim. Section 652D of the Restatement (Second) of Torts "outlines the elements of the privacy tort of public disclosure of private facts[.]" Doyle v. Harper Collins Publishers, Inc., Case No. 3:05-cv-0300-TMB, 2006 WL 8438639, at *2 (D. Alaska May 31, 2006). Section 652D provides:

One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.[67]

Jane Doe II alleges that "[t]he public disclosure of" her Instagram "photograph amounts to public disclosure of private facts."[68] However, "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public."[69] Given that the

photograph in question was published by Jane Doe II on a social media site, Yesner argues that she had already made this photograph public and that she could not have had a reasonable expectation of privacy in this account.

Plaintiffs argue that Jane Doe II's public disclosure of private facts claim is plausible because she had not shared this photograph for Yesner to view. Plaintiffs also argue that Jane Doe II did not intend the public at large to see her Instagram account, but there are no allegations to this effect in the complaint. As currently pled, this claim is implausible and it is dismissed without prejudice. Jane Doe II is, however, given leave to amend this claim.

Yesner next argues that Jane Doe I's false light claim is not plausible. "A false light invasion of privacy claim arises when the defendant publicizes a matter that places the plaintiff before the public in a false light." State v. Carpenter, 171 P.3d 41, 53 (Alaska 2007). Jane Doe I's false light claim is based on allegations that Yesner stored the sexually suggestive photographs he took of her "on his public work computer at the University," where they "could be seen by fellow students who used his computer for work and study."[70] Yesner argues that this claim is not plausible because Jane Doe I has not alleged that the photographs were "publicized" to the public at large. Communicating the information in question to "a single person or even to a small group of persons" is not sufficient.[71] Here, Yesner argues that Jane Doe I has not alleged how many students might have seen the photographs but argues that it is unlikely that the number would be so many as to constitute "the public at large." See Polin v. Dun & Bradstreet, Inc., 768 F.2d 1204, 1206-07 (10th Cir. 1985) (group of 17 insufficient); Hunter v. The Buckle, Inc., 488 F. Supp. 2d 1157, 1180 (D. Kan. 2007) (group of 20 insufficient).

*12 Plaintiffs argue that it is possible that the photographs of Jane Doe I were shared with enough people to be considered publicized to the "public at large" which may be true. But, as currently pled, this claim is implausible as it is not at all clear who had access to Yesner's public work computer or how many people might have seen the photographs. This claim is dismissed without prejudice. But, Jane Doe I is given leave to amend this claim.

Finally, defendants move to dismiss Jane Does 6-20 without prejudice. These plaintiffs allegedly "are and/or were students of Defendant University of Alaska System who were subjected to harassment, retaliation, and/or discrimination but who have yet to come forward and be identified."[72]

Defendants argue that these fictitious plaintiffs should be dismissed because Rule 17 requires that "[a]n action ... be prosecuted in the name of the real party in interest." Given that plaintiffs could always amend to add new plaintiffs, as evidenced by the pending motion to amend, these placeholder plaintiffs are dismissed.

Motion to Amend

Pursuant to Rule 15(a), plaintiffs move to amend their complaint to add two plaintiffs, Jane Doe VI and Jane Doe VII. Jane Doe VI proposes to allege, among other things, that Yesner sexually assaulted her in 1992. Jane Doe VII proposes to allege that Yesner sexually harassed her in 2003-2004. These proposed plaintiffs assert the same claims as the five original plaintiffs.

"Rule 15(a) is very liberal and leave to amend 'shall be freely given when justice so requires.' " AmerisourceBergen Corp. v. Dialysist West, Inc., 465 F.3d 946, 951 (9th Cir. 2006) (quoting Bowles v. Reade, 198 F.3d 752, 757 (9th Cir. 1999)). "But a district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." Id. "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995).

Plaintiffs prematurely filed their amended complaint at Docket No. 28. That amended complaint is stricken because plaintiffs' motion to amend is granted in part and denied in part. While plaintiffs can amend to add Jane Does VI and VII as plaintiffs, some of the claims proposed to be asserted by Jane Does VI and VII would be subject to dismissal and thus amendment as to some of these claims would be futile. As discussed above, the state law claims asserted against the University defendants are being dismissed on sovereign immunity grounds as are the § 1983 claims and plaintiffs are only being given leave to amend the § 1983 claims for equitable relief against the Board of Regents. And, Jane Doe VII's tort claims against Yesner, as she proposes to plead them, would be barred by the statute of limitations for the same reason the claims of Jane Does IV and V are time barred.

Motion to Preclude Use of "Jane Doe" Pseudonyms

Yesner moves to preclude the use of "Jane Doe" pseudonyms. In the Ninth "[C]ircuit, [courts may] allow parties to use pseudonyms in the 'unusual case' when nondisclosure of the party's identity 'is necessary ... to protect a person from harassment, injury, ridicule or personal embarrassment.' " Does I thru XXIII v. Advanced Textile Corp., 214 F.3d 1058, 1067–68 (9th Cir. 2000) (quoting United States v. Doe, 655 F.2d 920, 922 n.1 (9th Cir. 1981)). "[A] party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity." Id. at 1068. Courts permit plaintiffs to use pseudonyms "when anonymity is necessary to preserve privacy in a matter of sensitive and highly personal nature[.]" Id. (citation omitted).

**\*13** Plaintiffs argue that this case involves matters that are sensitive and highly personal. But the cases plaintiffs cite to in support, Doe v. Cabrera, 307 F.R.D. 1, 5-6, (D.D.C. 2014) and Doe v. Trustees of Dartmouth College, Case No. 18–cv–040–LM, 2018 WL 2048385, at \*5 (D.N.H. May 2, 2018), involved allegations of sexual assault, as opposed to allegations of sexual harassment. "Plaintiffs alleging sexual harassment generally have not been allowed to proceed anonymously." E.E.O.C. v. ABM Industries Inc., 249 F.R.D. 588, 594 (E.D. Cal. 2008).

"However, anonymity is justified where plaintiffs face 'greater threats of retaliations than the typical plaintiff.' " Id. (quoting Advanced Textile, 214 F.3d at 1070–1071). Plaintiffs argue that it is sufficient that they have alleged that Yesner retaliated against them when they rejected his sexual advances, but given that Yesner apparently already knows plaintiffs' identities, this does not help plaintiffs.

Plaintiffs also contend that they have received disturbing threats and backlash for filing this lawsuit, that one of them has considered filing a police report because of the threats, and that another one has received hate mail at her house. Plaintiffs argue that they will be subjected to further retaliation and social stigmatization if their identities are revealed. They argue that their right to privacy outweighs the public's interest in knowing their identities. And, they argue that Yesner will not be prejudiced in any way if they are allowed to use pseudonyms because he is already aware of their identities. They point out that Yesner will be allowed to use their names in discovery under the terms of a protective order.

Plaintiffs seem to be saying that they have received threats and backlash from persons other than defendants, which indicates that their identities are already known. The court is unpersuaded that plaintiffs (except proposed Jane Doe VI, due to the highly personal nature of her allegations) face threats or retaliation greater than named plaintiffs suing over similar harassment claims. While the court perceives no prejudice to defendant Yesner, plaintiffs' wish for anonymity does not outweigh the public interest in disclosure.

Yesner's motion to preclude the use of "Jane Doe" pseudonyms is granted except as to proposed Jane Doe VI.

Conclusion

The University defendants' motion to dismiss[73] is granted. Plaintiffs' state law discrimination and tort claims asserted against the University defendants is Counts IV, VI, VII, and VIII are dismissed without prejudice. But, plaintiffs are not given leave to amend as to these claims. Plaintiffs' § 1983 claims for damages and equitable relief asserted against the University of Alaska System in Count V are dismissed with prejudice. Plaintiffs' § 1983 claims for damages asserted against the Board of Regents in Count V are dismissed with prejudice. Plaintiffs' § 1983 claims for equitable relief asserted against the Board of Regents in Count V are dismissed without prejudice. Plaintiffs are given leave to amend as to their § 1983 claims for equitable relief against the Board of Regents.

Yesner's motion to dismiss[74] is granted. Except for Jane Doe II's false light claim, the tort claims asserted by Jane Does I, II, IV, and V against Yesner in Counts VI, VII, and VIII are dismissed without prejudice. Jane Does I, II, IV, and V are given leave to amend as to the claims being dismissed. The fictitious plaintiffs (Jane Does 6-20) are dismissed without prejudice.

**\*14** Plaintiffs' amended complaint[75] is stricken. Plaintiffs' motion to amend[76] is granted in part and denied in part. Plaintiffs may amend their complaint to add plaintiffs Jane Does VI and VII. However, these plaintiffs may not assert claims that would be subject to dismissal on Eleventh Amendment grounds, and Jane Doe VI is reminded that she cannot assert timed-barred claims.

Yesner's motion to preclude the use of pseudonyms[77] is granted, except as to proposed plaintiff Jane Doe VI. Going forward, the other plaintiffs must use their actual names.

Plaintiffs' amended complaint, should they elect to file one, shall be filed on or before September 25, 2019.

**All Citations**

Slip Copy, 2019 WL 4196054

Footnotes

1     Docket No. 13.
2     Docket No. 18.
3     Docket No. 21.
4     Docket No. 16.
5     Docket No. 30.
6     Docket No. 25.
7     Docket No. 20.
8     Docket No. 23.
9     Docket No. 27.
10    Complaint at 16, ¶¶ 34-35, Docket No. 1.
11    Id. at 17.
12    Id. at 17, ¶ 39.
13    Id. at 18, ¶ 40.
14    Id. at 19, ¶ 44.
15    Id. at 22, ¶¶ 49, 55.
16    Id. at 23, ¶¶ 56-57.

17  Id. at 23.
18  Id. at 23, ¶ 59.
19  Id. at 24, ¶ 60.
20  Id. at 24, ¶ 62.
21  Id. at 24, ¶ 64.
22  Id. at 25, ¶¶ 66.
23  Id. at 25, ¶ 68.
24  Id. at 27, ¶ 77.
25  Id. at 30, ¶ 88.
26  Id. at 30, ¶ 90.
27  Id. at 31, ¶ 91.
28  Id.
29  Id.
30  Id. at 31, ¶ 93.
31  Id. at 32, ¶ 97.
32  Id. at 32, ¶ 98.
33  Id. at 32.
34  Id. at 32-33, ¶¶ 99-100.
35  Id. at 33, ¶ 101.
36  Id. at 33, ¶ 102.
37  Id. at 34.
38  Id. at 34-35, ¶¶ 104-105.
39  Id. at 35 ¶ 106.
40  Id. at 35, ¶ 107.
41  Id. at 35, ¶ 108.
42  Id. at 36, ¶ 109.
43  Id. at 37, ¶ 116.
44  Id. at 38, ¶ 120.
45  Id.
46  Id. at 38, ¶ 121.
47  Id. at 40, ¶ 128.
48  Id. at 43, ¶ 137.
49  Id.
50  Id. at 14, ¶ 31.
51  20 U.S.C. §§ 1681-88.
52  Id. at 60-61.
53  "Ninth Circuit cases have held that dismissal based on Eleventh Amendment immunity should be analyzed under Rule 12(b)(6) and not as a jurisdictional issue under Rule 12(b)(1)." Steshenko v. Gayrard, 44 F. Supp. 3d 941, 948 n.1 (N.D. Cal. 2014).
54  Plaintiffs' Response [etc.] at 5, Docket No. 21.
55  Complaint at 60-61, Docket No. 1.
56  Complaint at 14, ¶ 31, Docket No. 1.
57  Plaintiffs' Response [etc.] at 14, Docket No. 25 (quoting University of Alaska Board of Regents Policy P.01.04.060(D)) (emphasis omitted).
58  Complaint at 6, ¶ 16, Docket No. 1.
59  Id. at 24, ¶ 64.
60  Id. at 25, ¶ 66
61  Id. at 7, ¶ 18.
62  Id. at 8, ¶ 19.
63  Id. at 38, ¶¶ 121-22.

64    Complaint at 58, ¶ 188, Docket No. 1.

65    Restatement (Second) of Torts § 652B, cmt c.

66    Complaint at 59, ¶ 190, Docket No. 1.

67    Restatement (Second) of Torts § 652D (1977).

68    Complaint at 59, ¶ 192, Docket No. 1.

69    Restatement (Second) of Torts § 652D, cmt. b.

70    Complaint at 58-59, ¶ 189, Docket No. 1.

71    Restatement (Second) of Torts § 652D, cmt. a.

72    Complaint at 3, ¶ 6, Docket No. 1.

73    Docket No. 13.

74    Docket No. 16.

75    Docket No. 28.

76    Docket No. 27.

77    Docket No. 20.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Kessler v. Pass, Not Reported in Fed. Supp. (2018)

2018 WL 5307821

2018 WL 5307821
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

Windsor W. KESSLER, III, Plaintiff,
v.
Randall PASS, Leslee Brooks and
Warden of USP-Marion, Defendants.

Case No. 18-cv-530-JPG-DGW
|
Signed 10/26/2018

**Attorneys and Law Firms**

Windsor W. Kessler, III, Marion, IL, pro se.

Laura J. Jones, Assistant U.S. Attorney, Fairview Heights, IL,
for Defendants.

**MEMORANDUM AND ORDER**

J. PHIL GILBERT, DISTRICT JUDGE

*1  This matter comes before the Court on the Report and
Recommendation ("Report") (Doc. 70) of Magistrate Judge
Donald G. Wilkerson recommending that the Court deny
plaintiff Windsor W. Kessler III's motion for a preliminary
injunction (Doc. 29). Magistrate Judge Wilkerson held a
hearing on Kessler's motion on September 6, 2018, before
issuing the Report. Kessler has objected to the Report (Doc.
74).

The Court may accept, reject or modify, in whole or in part,
the findings or recommendations of the magistrate judge
in a report and recommendation. Fed. R. Civ. P. 72(b)(3).
The Court must review de novo the portions of the report
to which objections are made. Id. "If no objection or only
partial objection is made, the district court judge reviews
those unobjected portions for clear error." Johnson v. Zema
Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999).

Kessler filed this action under Bivens v. Six Unknown Named
Agents of the Federal Bureau of Narcotics, 403 U.S. 388,
397 (1971), alleging that defendants Randall Pass and Leslee
Brooks, medical providers at USP-Marion, where Kessler
is incarcerated, were deliberately indifferent to his serious

medical need for diagnosis and treatment of his right shoulder
pain and a liver condition. In his motion for a preliminary
injunction, Kessler seeks a referral to a hepatologist for his
suspected liver condition and a referral to an orthopedist for
his shoulder.

In the Report, Magistrate Judge Wilkerson noted that the
observations by medical personnel—a normal range of
motion in Kessler's shoulder, a prior negative x-ray, no signs
of physical problems, intermittent or lack of pain complaints
from Kessler—were not consistent with Kessler's subjective
shoulder complaints and alleged functional limitations. He
further noted that, despite those findings, Kessler was
prescribed physical therapy and instructed on exercise, and
Dr. Pass recently ordered an MRI, which was done after the
preliminary injunction hearing.

Magistrate Judge Wilkerson noted that, with respect to
Kessler's suspected liver condition, Kessler was given regular
blood tests to check for liver indicators, had normal CT
and ultrasound scans, and has been diagnosed with Gilbert's
Syndrome, a common, harmless liver condition that explains
one irregularity in Kessler's blood tests. Otherwise, Kessler's
blood tests for liver function suggested no liver abnormality
and no need for further testing or treatment of the liver.

Magistrate Judge Wilkerson observed that Kessler had
received significant healthcare for these and other health
problems from the defendants and that it appears he is simply
not satisfied with that care. Magistrate Judge Wilkerson
concluded that, although Kessler has at least some chance
of success on the merits of his deliberate indifference claim,
he has not shown he will suffer irreparable harm or needs
immediate relief. Neither Kessler's shoulder nor suspected
liver condition poses any immediate need for referral to a
specialist or for an order directing different medical treatment,
especially in light of the ongoing efforts to evaluate and
treat Kessler's problems by the USP-Marion medical staff.
As such, Magistrate Judge Wilkerson concluded that an
injunction would serve no purpose at this time in light of
Kessler's ongoing care.

*2  In his objection, Kessler takes issue with a number of
statements in the Report that were not necessary to Magistrate
Judge Wilkerson's conclusions or recommendations, for
example, because Magistrate Judge Wilkerson concluded
that Kessler has a chance of success on the merits.[1] There
is no need to address the accuracy of those statements.
Apparently conceding he has not shown irreparable harm,

Kessler contends he cannot make such a showing without a diagnosis. Finally, he takes issue with Magistrate Judge Wilkerson's statement that his shoulder condition does not interfere with his activities of daily living where Kessler testified it wakes him up at night and causes his problems when drying off after a shower. The Court finds, however, that those impairments do not amount to irreparable harm while the defendants and other USP-Marion medical staff continue a search for a solution to Kessler's shoulder problem.

The Court has conducted a *de novo* review of the Report and finds that it is correct for the reasons set forth therein. While Kessler has shown he has a non-negligible chance of prevailing on the merits, he has not shown he will suffer irreparable harm before the final resolution of this case.

If he ultimately prevails, any harm he suffers will likely be compensable through money damages. Accordingly, the Court:

- **ADOPTS** the Report in its entirety (Doc. 70);

- **OVERRULES** Kessler's objections (Doc. 74); and

- **DENIES** Kessler's motion for a preliminary injunction (Doc. 29).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5307821

---

Footnotes

1    In addition, Kessler appears to cite to portions of the hearing—for example, on the first page of his objection he cites to "Hearing 000081-82"—but the Court cannot discern to what he is referring. There was no hearing transcript prepared, and the audio recording of the hearing—to which the Court has listened—is not measured by any scale that corresponds to such a citation.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 17 of 51 PageID #:403

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Rosenbach v. Six Flags Entertainment Corporation, Ill.App. 2 Dist., December 21, 2017

2017 WL 4099846
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Alejandro MONROY, on behalf of himself
and all others similarly situated, Plaintiffs,

v.

SHUTTERFLY, INC., Defendant.

Case No. 16 C 10984
|
Signed 09/15/2017

**Attorneys and Law Firms**

Frank S. Hedin, David P. Milian, Carey Rodriguez O'Keefe Milian Gonya, LLP, Miami, FL, Katrina Carroll, Ismael Tariq Salam, Kyle Alan Shamberg, Lite Depalma Greenberg LLC, Chicago, IL, Bradley K. King, Robert R. Ahdoot, Tina Wolfson, Ahdoot & Wolfson, PC, Los Angeles, CA, Meredith S. Lierz, Ahdoot & Wolfson, PC, West Hollywood, CA, for Plaintiffs.

Lauren R. Goldman, Michael Evan Rayfield, Mayer Brown LLP, New York, NY, John Nadolenco, Mayer, Brown & Platt, Los Angeles, CA, Matthew David Provance, Mayer Brown LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Joan B. Gottschall, United States District Judge

**\*1** Alejandro Monroy ("Monroy") brings this putative class action alleging that defendant Shutterfly, Inc. ("Shutterfly") violated Illinois' Biometric Information Privacy Act (BIPA), 740 Ill. Comp. Stat. 14/1 et seq. Shutterfly has moved to dismiss the complaint on several grounds. For the reasons discussed below, the motion is denied.

**I. BACKGROUND**

Shutterfly is the operator of websites that allow users to upload, organize, and share digital photographs. When a user uploads a photo, Shutterfly's facial recognition software scans the image, locates each of the faces in the image, and extracts a highly detailed "map" or "template" for each face based on its unique points and contours. According to the complaint, a person can be uniquely identified by his face geometry in the same way that he can be identified by his fingerprints. Compl. ¶ 5.

The complaint further alleges that Shutterfly stores these maps of face geometry in a massive database, and that whenever a new image is uploaded onto Shutterfly's site, the faces in the image are compared against those in the database. If a face's geometry matches that of an individual already in its database, Shutterfly suggests that the user "tag" the image with the individual's name. Id. ¶ 23. If no match is found, Shutterfly prompts the user to enter a name. Id.

Monroy alleges that in September 2014, an unnamed Shutterfly user residing in Chicago uploaded a photograph of Monroy onto a Shutterfly site. According to the complaint, "Shutterfly automatically located Plaintiff's face, analyzed the geometric data relating to the unique contours of his face and the distances between his eyes, nose and ears, and used that data to extract and collect Plaintiff's scan of face geometry." Id. ¶¶ 29-30. Monroy further says that Shutterfly prompted the uploader to tag the face with a name, and that the user entered "Alex Monroy." The complaint also states that Shutterfly then stored Monroy's biometric data in its database, and that based on the scan, it extracted and stored additional information regarding his gender, age, race, and geographical location. Id. ¶ 32. Monroy does not use Shutterfly and never consented to Shutterfly's extraction and storage of data representing his face geometry. Id. ¶¶ 33-34.

According to Monroy, Shutterfly's collection and storage of this data violates BIPA. Passed in 2008, BIPA was the first law in the nation to address the collection and storage of biometric data.[1] The legislative findings that precede the statute's substantive provisions observe that the "use of biometrics is growing in the business and security screening sectors and appears to promise streamlined financial transactions and security screenings." 740 Ill. Comp. Stat. 14/5(a). However, the legislature also notes that the "overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information." Id. § 14/5(d). This is because, unlike social security numbers and other personal information, biometrics

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

"are biologically unique to the individual ... [so that] once compromised, the individual has no recourse, [and] is at heightened risk for identity theft." *Id.* § 14/5(c).

**\*2** Among other things, BIPA requires private entities in possession of biometric data to develop publicly available written policies containing guidelines for permanently destroying the data within a specific time period. *Id.* § 14/15(a). In addition, BIPA prohibits private entities from collecting, capturing, or otherwise obtaining an individual's biometric data without first informing him or her in writing, and disclosing the specific purpose and length of time for which the data is being collected and stored. *Id.* § 14/15(b) (1)-(2). Entities are prohibited from collecting and storing a person's biometric data unless he or she first executes a written release. *Id.* § 14/15(b)(3).

Monroy brings this suit on behalf of himself and a putative class consisting of "[a]ll individuals who are not users of Shutterfly and who had their biometric identifier, including scan of face geometry, collected, captured, received, or otherwise obtained by Shutterfly from a photograph uploaded to Shutterfly's website from within the state of Illinois." Compl. ¶ 36. Shutterfly moves to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## II. DISCUSSION

"In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 760 (N.D. Ill. 2017) (citing *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)). Shutterfly claims that Monroy's complaint must be dismissed because: (1) BIPA's statutory text makes clear that it does not apply to scans of face geometry obtained from photographs; (2) Monroy's suit requires an impermissible extraterritorial application of the statute; and (3) BIPA requires a plaintiff to allege actual damages, and Monroy has failed to do so. The court considers these arguments *seriatim*.

### A. BIPA's Application to Scans from Photographs

Shutterfly first contends that BIPA's statutory text demonstrates that the act does not apply to biometric data obtained from photographs. Its argument is based on the statute's definitions of the terms "biometric identifier" and "biometric information," which are as follows:

"Biometric identifier" means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry. Biometric identifiers do not include writing samples, written signatures, photographs, human biological samples used for valid scientific testing or screening, demographic data, tattoo descriptions, or physical descriptions such as height, weight, hair color, or eye color. Biometric identifiers do not include donated organs, tissues, or parts as defined in the Illinois Anatomical Gift Act or blood or serum stored on behalf of recipients or potential recipients of living or cadaveric transplants and obtained or stored by a federally designated organ procurement agency. Biometric identifiers do not include biological materials regulated under the Genetic Information Privacy Act. Biometric identifiers do not include information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996. Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other image or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening.

"Biometric information" means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers.

**\*3** 740 Ill. Comp. Stat. 14/10.

It is clear that the data extracted from Monroy's photograph cannot constitute "biometric information" within the meaning of the statute: photographs are expressly excluded from the definition of "biometric identifier," and the definition of "biometric information" expressly excludes "information derived from items or procedures excluded under the definition of biometric identifiers." *Id.*

But this leaves open the question of whether the data obtained from the photograph of Monroy may constitute a "biometric identifier"—and in particular, whether it constitutes a "scan of face geometry" referenced in the definition. Shutterfly maintains that by excluding data derived from photographs from the definition of "biometric information," the Illinois

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 19 of 51 PageID #:405

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

legislature intended to exclude from BIPA's purview all biometric data obtained from photographs. Accordingly, Shutterfly contends, it would make no sense to interpret "biometric identifier" as including such data.

This reading of the statute seems sensible enough at first blush, but it begins to unravel under scrutiny. Indeed, Google and Facebook have asserted the same argument in seeking dismissal of suits brought against them under BIPA, and in both cases, the argument has been rejected. *See, e.g.*, *Rivera v. Google Inc.*, No. 16 C 02714, 2017 WL 748590, at *6 (N.D. Ill. Feb. 27, 2017); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1172 (N.D. Cal. 2016). The problems come more sharply into relief by considering what a "scan of face geometry" means under Shutterfly's interpretation of the statute. As Shutterfly acknowledges, if biometric identifiers do not include information obtained from images or photographs, the definition's reference to a "scan of face geometry" can mean only an *in-person* scan of a person's face. Such a narrow reading of the term "biometric identifier" is problematic in many respects. Foremost among these is the absence of any textual support for Shutterfly's interpretation. *See, e.g.*, *Rivera*, 2017 WL 748590, at *6 ("The problem with this argument is that there is no textual or structural clue to support it. The definition of 'biometric identifier' does not use words like 'derived from a person,' 'derived in person,' or 'based on an in-person scan,' whereas the definition of 'biometric information' does say that it is information 'based on' a biometric identifier."); *In re Facebook*, 185 F. Supp. 3d at 1172 ("Trying to cabin this purpose within a specific in-person data collection technique has no support in the words and structure of the statute.").[2] The Illinois General Assembly clearly sought to define the term "biometric identifier" with a great deal of specificity: the definition begins by identifying six particular types of biometric data that are covered by the term (i.e., retina or iris scans, fingerprints, voiceprints, scans of hand or face geometry); it then provides a long list of other specific types of biometric data that are excluded from the definition. If the legislature had intended a "scan of face geometry" to refer only to scans taken of an individual's actual face, it is reasonable to think that it would have signalled this more explicitly.

**\*4** Shutterfly attempts to support its interpretation by invoking the canon of *noscitur a sociis*, according to which "the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." *People v. Diggins*, 919 N.E.2d 327, 332 (Ill. 2009) (brackets and quotation marks omitted). According to Shutterfly, all of the other terms included in the definition of "biometric identifier"—retina or iris scans, fingerprints, voiceprints, and hand scans—involve "in-person processes." Hence, Shutterfly argues, a "scan of face geometry" should likewise be understood as referring only to data obtained from a person who is physically present. Shutterfly further contends that limiting the definition of "biometric identifier" to data obtained via in-person processes is consistent with the impetus behind BIPA's passage— namely, consumer wariness about the use of biometric data when making purchases and engaging in other commercial transactions. Further, Shutterfly points out that the examples cited in the legislative findings—"finger-scan technologies at grocery stores, gas stations, and school cafeterias" 740 Ill. Comp. Stat. 14/5(b)—take place in the consumer's physical presence.

For several reasons, the court is not persuaded. As an initial matter, Shutterfly's argument assumes that the other biometric identifiers listed in the definition can be obtained only via in-person processes. That is incorrect. For example, it appears that fingerprints and retinal scans can be obtained from images and photographs. *See, e.g.*, David Goldman, *Hackers Recreate Fingerprints Using Public Photos*, CNN MONEY (Dec. 30, 2014), http://money.cnn. com/2014/12/30/technology /security/ fingerprint-hack/index.html (reporting a demonstration at a cybersecurity convention showing that it is possible to "mimic a fingerprint just by analyzing photographs"); Thomas Fox-Brewster, *Hacking Putin's Eyes: How to Bypass Biometrics the Cheap and Dirty Way with Google Images*, Forbes (Mar. 6, 2016), https://www.forbes.com/sites/ thomasbrewster/2015/03/05/clone-putins-eyes-using-google-images/#5cf7f79e214a) (reporting that, according to a security researcher, it is possible to fool iris-scanners "just using high-resolution images found in Google searches," and that "where photos are vivid and large enough, it's possible to simply print copies of people's eyes and bypass biometric authentication"); Kim Zetter, *Reverse-Engineered Irises Look So Real, They Fool Eye-Scanners*, Wired (July 25, 2012), https://www.wired.com/2012/07/ reverse-engineering-iris-scans/(reporting that researchers in Spain have "found a way to recreate iris images that match

2017 WL 4099846

digital iris codes that are stored in databases and used by iris-recognition systems to identify people" and to "trick commercial iris-recognition systems into believing they're real images"). And even if particular forms of biometric data cannot be obtained via photographic images using present-day technology, it would be rash, given the pace of technological development, to assume that obtaining such data via photographs will not become possible in the future.

The court is also unconvinced by Shutterfly's insistence that BIPA is narrowly concerned with the use of biometric data in the context of commercial transactions. True, the statute's legislative findings observe that "[t]he use of biometrics is growing in the business and security screening sectors and appears to promise streamlined financial transactions and security screenings"; and that "[m]ajor national corporations have selected the City of Chicago and other locations in this State as pilot testing sites for new applications of biometric-facilitated financial transactions." 740 Ill. Comp. Stat. 14/5(a)-(b). But the legislative findings also take note of consumer leeriness regarding the connection between biometric data and personal information more generally. *See id.* § 14/5(d) (noting that "overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances *and other personal information*") (emphasis added). Nothing in the text of the law itself evinces an intent to limit its application to commercial entities. On the contrary, the law applies to any "private entity" in possession of biometric data; and the statute's definition of "private entity" is notably expansive, encompassing "any individual, partnership, corporation, limited liability company, association, or other group, however organized." *Id.* § 14/10.

 **\*5** Finally, as other courts have observed, the interpretation of the term "scan of face geometry" proposed by Shutterfly would leave little room for the law to adapt and respond to technological development. BIPA's legislative findings specifically note that "[t]he full ramifications of biometric technology are not fully known." *Id.* § 14/5(f). As Judge Chang stated in *Rivera*, "advances in technology are what drove the Illinois legislature to enact the Privacy Act in the first place," so "it is unlikely that the statute sought to limit the definition of biometric identifier by limiting how the measurements are taken. Who knows how iris scans, retina scans, fingerprints, voiceprints, and scans of faces and hands will be taken in the future?" 2017 WL 748590, at *5; *see also In re Facebook*, 185 F. Supp. 3d at 1172 ("The statute is an informed consent privacy law addressing the

collection, retention and use of personal biometric identifiers and information at a time when biometric technology is just beginning to be broadly deployed. Trying to cabin this purpose within a specific in-person data collection technique has no support in the words and structure of the statute, and is antithetical to its broad purpose of protecting privacy in the face of emerging biometric technology.") (citation omitted).[3]

In short, the court sees nothing in BIPA's statutory text to indicate that it lacks application to data of the sort obtained by Shutterfly's facial-recognition technology.

## B. Extraterritoriality & The Dormant Commerce Clause

Turning from BIPA's text to its application, Shutterfly next argues that Monroy's complaint must be dismissed because BIPA does not apply extraterritorially, and because applying the statute to the facts of this case would violate the U.S. Constitution's Dormant Commerce Clause. Although related, these arguments raise separate concerns, and the court addresses them separately.

### 1. Extraterritoriality

The Illinois Supreme Court has stated that "a 'statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.' " *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (2005) (quoting *Dur–Ite Co. v. Industrial Comm'n*, 68 N.E.2d 717 (1946)). However, none of BIPA's express provisions indicates that the statute was intended to have extraterritorial effect. Accordingly, as Monroy acknowledges, BIPA does not apply extraterritorially.

 **\*6** However, the parties disagree over whether Monroy's suit in fact requires the statute's extraterritorial application. The answer to that question turns on whether "the circumstances that relate to the disputed transaction occur[red] primarily and substantially in Illinois." *Id.* at 854.[4] There "is no single formula or bright-line test for determining whether a transaction occurs within [Illinois]." *Id.* Rather, "each case must be decided on its own facts." *Id.*

Here, some of the circumstances relating to Monroy's suit are alleged to have occurred in Illinois: the complaint alleges that the photo of Monroy was uploaded to Shutterfly's website from a device that was physically located in Illinois and had been assigned an Illinois-based IP address. Compl. ¶ 10. Monroy also alleges that the photo was uploaded by a

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 21 of 51 PageID #:407

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

citizen of Illinois. *Id.* ¶ 29. In addition, he maintains that the actual violation of the statute took place in Illinois because that is where Shutterfly failed to obtain the requisite release prior to allegedly collecting his biometric data. At the same time, other relevant circumstances point to locations outside of Illinois: Monroy himself is a citizen and resident of Florida, and Shutterfly is a Delaware corporation headquartered in California. Moreover, Shutterfly argues while Monroy claims that the alleged violation took place in Illinois, he does not claim to have suffered any injury in Illinois.

However, the location of other important circumstances is as yet undetermined. For example, it is unclear where the actual scan of Monroy's face geometry took place, and where the scan was stored once it was obtained. Answers to these questions require a fuller understanding of how Shutterfly's facial recognition technology operates. In addition, these factual questions potentially raise legal questions that the parties have not addressed. (For example, given that Monroy's biometric data was extracted and stored in cyberspace, how is their physical location to be determined?).

In short, the court is unable at this time to determine whether the circumstances of Monroy's claim can be said to have occurred primarily and substantially in Illinois, and thus whether Monroy's suit would require extraterritorial application of BIPA. At this stage, therefore, the court is not persuaded by Shutterfly's extraterritoriality argument. Shutterfly may raise the argument at a later time, if and when the record affords a clearer picture of the circumstances relating to Monroy's claim. *See Rivera,* 2017 WL 748590, at *10 ("Assessing [the defendant's extraterritoriality] arguments at this initial stage, the Court concludes that the Plaintiffs sufficiently allege facts that would deem the asserted violations as having happened in Illinois. But there is no bright-line rule for determining this, so the parties will have the chance to develop more facts during discovery.").

## 2. The Dormant Commerce Clause

*\*7* Shutterfly also argues that BIPA's application to the facts of this case would violate the Dormant Commerce Clause. While the Constitution "explicitly grants Congress the authority to regulate commerce among the States, it has long been understood that it also directly limits the power of the States to discriminate against or burden interstate commerce." *Alliant Energy Corp. v. Bie,* 330 F.3d 904, 911 (7th Cir. 2003). "This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce." *Id.*

Shutterfly correctly observes that the Dormant Commerce Clause "precludes the application of a state statute" that has "the practical effect of ... control[ling] conduct beyond the boundaries of the State," "whether or not the commerce has effects within the State"—thereby preventing "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." Def.'s Br. 12 (quoting *Healy v. Beer Inst., Inc.,* 491 U.S. 324, 336-37 (1989)). According to Shutterfly, applying BIPA in this case would have precisely these effects. This is especially problematic, Shutterfly argues, because California, where it is headquartered, previously rejected legislation that would have regulated the collection and storage of biometric data. *See* Def.'s Br. 13 (citing Cal. Sen. Bill No. 169 (July 5, 2001) (Ex. E)); *see also* Yana Welinder, *A Face Tells More Than a Thousand Posts: Developing Face Recognition Privacy in Social Networks,* 26 Harv. J.L. & Tech. 165, 200 (2012) (describing a bill that did not pass at the end of the 2011-2012 legislative session that "would have required a company that collects or uses 'sensitive information,' including biometric data, to allow users to opt out of its collection, use, and storage"). Thus, Shutterfly contends that to apply BIPA to these facts would be to override California's decision against regulating biometric data.

This contention is overwrought. Shutterfly cites three cases in support of its position: *Morrison v. YTB International, Inc.,* 649 F.3d 533 (7th Cir. 2011), *Midwest Title Loans, Inc. v. Mills,* 593 F.3d 660 (7th Cir. 2010), and *Morley-Murphy Co. v. Zenith Electronics Corp.,* 142 F.3d 373 (7th Cir. 1998). The laws at issue in these cases affected out-of-state conduct in a very different way, and to a very different degree, than would result from applying BIPA in this case. *Midwest Title,* for example, struck down an Indiana law purporting to regulate car-title loans to Indiana citizens, even when the loan transactions took place in other states. *Id.* at 669. *Morley-Murphy* addressed whether the Wisconsin Fair Dealership Law could be invoked to prevent manufacturers from terminating their relationships with distributors, even where neither party was located in Wisconsin. *Id.* at 378-80. *Morrison v. YTB Int'l, Inc.,* 649 F.3d 533 (7th Cir. 2011), did not mention the commerce clause at all, but simply observed that "[e]xpanding Illinois law in a way that overrode the domestic policy of other states would be problematic." *Id.* at 538.

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 22 of 51 PageID #:408

Monroy's suit, as well as his proposed class, is confined to individuals whose biometric data was obtained from photographs uploaded to Shutterfly in Illinois. Applying BIPA in this case would not entail any regulation of Shutterfly's gathering and storage of biometric data obtained outside of Illinois. It is true that the statute requires Shutterfly to comply with certain regulations if it wishes to operate in Illinois. But that is very different from controlling Shutterfly's conduct in other states. Indeed, laws imposing similar requirements on out-of-state businesses have been upheld against Dormant Commerce Clause challenges. In *International Dairy Foods Ass'n v. Boggs*, 622 F.3d 628 (6th Cir. 2010), for example, the Sixth Circuit rejected a Dormant Commerce Clause challenge brought by out-of-state dairy processors to an Ohio law requiring the inclusion of certain information on the labels of milk products sold within the state. Similarly, in *National Electrical Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), the Second Circuit rejected a Dormant Commerce Clause challenge by out-of-state manufacturers to a Vermont statute imposing labeling requirements for lamps containing mercury sold within the state.

**\*8** As noted above, important information is lacking regarding how Shutterfly's technology works. It is therefore conceivable that, after further development of the factual record, this case will appear closer to *Midwest Title* than to *Boggs* or *Sorrell*. At this point, however, the court has no basis for concluding that applying BIPA in this case would entail control over out-of-state conduct in a way that would run afoul of the dormant commerce clause. *Cf. Rivera*, 2017 WL 748590, at *12 ("The Commerce Clause argument is directly related to the extraterritoriality effect argument.... Whether [BIPA] is nevertheless being summoned here to control commercial conduct wholly outside Illinois is not possible to figure out without a better factual understanding of what is happening in the Google Photos face-scan process. What is learned from discovery there will inform both the more general extraterritoriality analysis above and this Dormant Commerce Clause analysis.").

For these reasons, the court is unpersuaded at this stage that Monroy's suit requires BIPA's application extraterritorially or in a way that violates the Dormant Commerce Clause.

### C. Actual Damages
As a final basis for dismissal of Monroy's suit, Shutterfly argues that Monroy has failed to allege that he suffered actual

damages as a result of Shutterfly's conduct. Monroy responds that it is unnecessary to allege actual damages to state a claim under BIPA, but that, in any event, he has alleged actual damage by claiming that Shutterfly invaded his privacy. This raises two questions: (1) whether BIPA requires a plaintiff to allege actual damages; and if so (2) whether Monroy has sufficiently alleged such damages.

BIPA's text is of little help in answering these questions. The statute does not define the meaning of "actual damages." The term is mentioned only in § 14/20(1), which provides: "A prevailing party may recover for each violation: (1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages, whichever is greater." 740 Ill. Comp. Stat. 14/20(1). To date, few courts have addressed whether BIPA requires a showing of actual damages, and those that have pronounced on the issue have reached opposite conclusions. *Compare Rosenbach v. Six Flags Entertainment Corp.*, 2016 CH 13 (Cir. Ct., Lake County, Ill., June 17, 2016) (BIPA does not require a showing of actual damages), with *Rottner v. Palm Beach Tan, Inc.*, No. 2015-CH-16695 (Ill. Cir. Ct. Dec. 20, 2016) (BIPA requires a showing of actual damages). Nor does the term otherwise have a settled meaning. *See, e.g., F.A.A. v. Cooper*, 566 U.S. 284, 294 (2012) (observing that "the term 'actual damages' has this chameleon-like quality," and that while in some contexts it has been "construed ... narrowly to authorize damages for only pecuniary harm," in other contexts is has been "understood to include nonpecuniary harm"). Monroy argues that, read straightforwardly, § 14/20(1) presents plaintiffs with "a binary election between actual or statutory liquidated damages." Pl.'s Resp. Br. 23. According to Shutterfly, recovery under BIPA always requires a showing of actual damages. The option of liquidated damages exists under § 14/20(1) solely for cases in which a plaintiff's actual damages cannot reliably be quantified.

Although the question is a close one, the court ultimately is not persuaded by Shutterfly's position. Shutterfly's argument is based on cases in which courts have interpreted other statutes to require a showing of actual damages.[5] But each of these cases is readily distinguishable. For example, *Doe v. Chao*, 540 U.S. 614 (2004), held that plaintiffs were required to show actual damages in order to recover under the Privacy Act of 1974, 5 U.S.C. § 552a(b). However, the provision at issue in *Doe* made the government liable for violations in the amount of the "actual damages sustained by the individual as a result of the [violation], but in no case shall a person entitled to recovery receive less than the sum of $1,000."

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 23 of 51 PageID #:409

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

*Doe*, 540 U.S. at 619 (quoting 5 U.S.C. § 552a(g)(4)(A)). Whereas § 14/20(1) presents liquidated damages and actual damages disjunctively, the reference to statutory damages in the Privacy Act is more naturally read as placing a lower limit on the amount of a plaintiff's recovery. Moreover, the plaintiff in *Doe* sued based on a specific provision of the Privacy Act that applied where violation of the act had resulted in an "adverse effect on an individual." *See* 5 U.S.C. § 552a(g)(1)(D) (providing a cause of action where the government "fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual"). Thus, under the provision in question, a plaintiff must show some form of actual harm even before the statutory damages provision comes into play. *Id.* at 620. Here, by contrast, nothing in BIPA makes recovery dependent upon a showing of "adverse effects."

*9 Similarly, *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535 (7th Cir. 2012), held that plaintiffs are required to show actual damages in order to recover under the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Like the Privacy Act in *Doe*, the VPPA provides for recovery of "actual damages but not less than liquidated damages in an amount of $2,500," 18 U.S.C. § 2710(c)(2)(A), and thus can be read as establishing a lower limit on the amount of a plaintiff's recovery, rather than as an alternative type of recovery. Moreover, as was also true in *Doe*, *Sterk*'s conclusion was based in key part on idiosyncratic aspects of the VPPA's structure. Specifically, the court noted that although the statute included multiple subsections outlining various prohibitions—e.g., wrongful disclosure of private information, § 2710(b); receipt of such information as evidence in a legal, regulatory, or arbitral proceeding, § 2710(d); failure to destroy private information in a timely manner, § 2710(e)—the provision creating a private cause of action, § 2710(c), was inserted immediately after subsection (b), which prohibited the wrongful disclosure of information. Hence, the court concluded that Congress had intended to make recovery available only in cases where private information was wrongfully disclosed. Once again, this structural peculiarity is absent from BIPA. Rather, § 14/20(1) applies to "[a]ny person aggrieved by a violation of th[e] Act."

Finally, Shutterfly cites *Pace Communications, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587 (7th Cir. 1994), for the proposition that a liquidated damages "provision must be a reasonable attempt to estimate actual damages." *Id.* at 593. But the question presented in *Pace Communications*

was whether the liquidated damages provision in the parties' contract was enforceable. The court held that such provisions are enforceable only if they are reasonable. Nothing in the decision suggests that liquidated damages can never serve any function other than to provide an estimate of actual damages.

Moreover, in contrast to the statutes in *Doe* and *Sterk*, the court notes that many statutes have been interpreted as allowing recovery of statutory damages without a showing of actual damages. These include the Fair Credit Reporting Act, *see, e.g.*, *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 303 (N.D. Ill. 2005) ("Proof of actual damage is not required to state a cause of action under the provision at issue here. Murray only has to show that the prescreening of the proposed class's credit did not comport with any of the permissible purposes outlined in section 1681b [of the FCRA]."); the Fair Debt Collection Practices Act, *see, e.g.*, *Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998) ("The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages."); and the Truth in Lending Act, *see, e.g.*, *Brown v. Marquette Sav. & Loan Ass'n*, 686 F.2d 608, 614 (7th Cir. 1982) ("[T]he violation before us is a purely technical one, and that the plaintiffs do not claim that they were misled or suffered any actual damages as a result of the statutory violation. It is well settled, however, that a borrower need not have been so deceived to recover the statutory penalty."). In short, while the matter is not free from doubt, the court declines to hold that a showing of actual damages is necessary in order to state a claim under BIPA.

In light of this conclusion, the court need not address the question of whether, in alleging that Shutterfly invaded his privacy, Monroy has in fact alleged that he suffered a form of actual damage. The court notes, however, that Shutterfly has failed to address this issue. Instead, it asserts that Monroy's argument "can be disregarded because plaintiff's complaint does not claim that he suffered these damages." Def.'s Reply Br. 18. That is not true. Monroy specifically alleges that "[b]y collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Shutterfly violated the right of Plaintiff and each Class member to privacy in their biometric identifiers and biometric information." Compl. ¶ 51.

Thus, the court declines to dismiss Monroy's suit based on his alleged failure to allege actual damges.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 24 of 51 PageID #:410

Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 4099846

## CONCLUSION

 **\*10**  For the reasons discussed above, Shutterfly's motion to dismiss, ECF No. 22, is denied.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4099846

Footnotes

1    To date, Texas is the only other state to have passed a similar law. *See* Tex. Bus. & Com. Code Ann. § 503.001 (West 2015).

2    In May 2016, Illinois State Senator Terry Link proposed an amendment that would have excluded both physical and digital photographs from BIPA's definition of "biometric identifier," and would have limited the definition of "scan" to in-person scans. *See* Natasha Kohne, Kamran Salour, *Biometric Privacy Litigation: Is Unique Personally Identifying Information Obtained from A Photograph Biometric Information?*, 25 Competition: J. Anti., UCL & Privacy Sec. St. B. Cal. 150, 165 (2016). The day after it was introduced, it was "put on hold" for unspecified reasons. *Id.* at 167.

3    Shutterfly also cites BIPA's legislative history in support of its interpretation of "biometric identifier." Specifically, Shutterfly observes that an earlier version of the definition stated: " 'Examples of biometric identifiers include, *but are not limited to*[,] iris or retinal scans, fingerprints, voiceprints, and *records* of hand or facial geometry." Defs.' Br. 8 (quoting Sen. Bill 2400, § 10 (Feb. 14, 2008)) (emphasis supplied by Shutterfly). Shutterfly also notes that the Illinois Senate considered and rejected a proposal that would have defined "biometric identifier" to include " 'records or scans of hand geometry, facial geometry, or *facial recognition*.' " *Id.* (quoting Sen. Am. to Sen. Bill 2400, § 10 (Apr. 11, 2008)) (emphasis supplied by Shutterfly). Finally, Shutterfly points out that an earlier definition of "biometric information" did not include the clause stating that "[b]iometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers," 740 Ill. Comp. Stat. 14/10, and thus did not exclude data derived from photographs. Shutterfly reasonably regards these textual changes as evidence of the legislature's attempts to limit the definition of "biometric identifier." However, they provide no evidence that the legislature intended to confine the term "scans of face geometry" to data obtained in person, nor that it intended to exclude data obtained from photographs from the definition of the "biometric identifier." If anything, Shutterfly's position is significantly undermined by its failure to identify any reference in the legislative record to in-person processes or any distinction between biometric data obtained by such processes and data obtained from digital images and other sources.

4    *Avery* involved the question of whether the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, applied extraterritorially. Hence, in the passage quoted above, the court is concerned with the location of the circumstances surrounding the disputed "transaction." However, *Avery*'s extraterritoriality test has been applied to other Illinois statutes. *See, e.g.*, Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp., No. CV 13 C 3455, 2017 WL 1062322, at \*5 (N.D. Ill. Mar. 21, 2017) (applying *Avery* to claim under Illinois Uniform Fraudulent Transfer Act); *Rivera*, 238 F. Supp. 3d at 1102 (applying *Avery* to claim under BIPA). Hence, like the parties, the court relies on *Avery* in determining whether Monroy's suit requires BIPA's extraterritorial application.

5    In McCollough v. Smarte Carte, Inc., No. 16 C 03777, 2016 WL 4077108 (N.D. Ill. Aug. 1, 2016), the court opined that actual damages were required to state a claim under BIPA. However, *McCollough*'s treatment of the issue came only after the court had concluded that, based on the plaintiff's failure to allege a concrete injury-in-fact, the suit had to be dismissed for lack of Article III standing. *Id.* at \*4. Further, in stating that BIPA required a showing of actual-injury, the court relied heavily on Doe v. Chao, 540 U.S. 614 (2004), and Sterk v. Redbox Automated Retail, LLC, 672 F.3d 535 (7th Cir. 2012). As is discussed more fully below, the court concludes that these cases are inapposite here.

     The court notes that, in addition to *McCollough*, Vigil v. Take-Two Interactive Software, Inc., 235 F. Supp. 3d 499 (S.D.N.Y. 2017), also dismissed a BIPA suit after concluding that the plaintiffs were unable to satisfy Article III's injury-in-fact requirement. Although Shutterfly has not challenged Monroy's standing in this case, the court has an independent obligation to assure itself of its jurisdiction. *See, e.g.*, Baez-Sanchez v. Sessions, 862 F.3d 638, 641 (7th Cir. 2017). The court has considered the issue and has concluded that Monroy has alleged a sufficient injury-in-fact for Article III purposes. Putting aside the question of whether a merely procedural or technical violation of the statute alone is sufficient to confer standing in light of Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016), Monroy alleges that Shutterfly has violated his right to privacy. As courts have noted in discussing the issue of standing in the context of other statutes designed to safeguard privacy, "[a]ctions to remedy defendants' invasions of privacy ... have long been heard by American courts, and the right of privacy is recognized by most states." Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1043 (9th Cir. 2017); Pavone v. Law Offices of Anthony Mancini, Ltd., No. 15 C 1538, 2016 WL 7451628, at \*2 (N.D. Ill. Dec. 28, 2016)

**Monroy v. Shutterfly, Inc., Not Reported in Fed. Supp. (2017)**

2017 WL 4099846

("[A] violation of the right to privacy results in the sort of harm that provides an appropriate basis for a lawsuit."). In this respect, the facts alleged in this case differ significantly from those alleged in *McCollough* and *Vigil*. In the latter cases, the plaintiffs voluntarily provided their biometric data to the defendants. The plaintiff in *McCollough* had rented one of the defendant's electronic storage lockers, which were locked and unlocked using customers' fingerprints on a touchscreen. In *Vigil*, the plaintiffs voluntarily had their faces scanned to create personalized avatars for use in a videogame. The harm alleged in the latter cases was the defendants' failure to provide them with certain disclosures (e.g., that their biometric data would be retained for a certain length of time after it had been obtained). Monroy, by contrast, alleges that he had no idea that Shutterfly had obtained his biometric data in the first place. Thus, in addition to any violation of BIPA's disclosure and informed consent requirements, Monroy also credibly alleges an invasion of his privacy.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 26 of 51 PageID #:412

Outdoor Lighting Perspectives Franchising, Inc. v. Stubbs, Not Reported in Fed. Supp....

2012 WL 12904016

2012 WL 12904016
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Charleston Division.

OUTDOOR LIGHTING PERSPECTIVES
FRANCHISING, INC., Plaintiff,
v.
Steve and Tammy STUBBS, and
Lightscapes of Charleston, LLC, a South
Carolina Corporation, Defendants.

Civil Action No. 2:11-2524-RMG
|
Signed 06/15/2012

**Attorneys and Law Firms**

Ryan Earhart, Nelson Mullins Riley and Scarborough, Charleston, SC, Michael Gray, Gray Plant Mooty, Minneapolis, MN, for Plaintiff.

Timothy O'Neill Lewis, Allan Riley Holmes, Gibbs and Holmes, Charleston, SC, for Defendants.

**ORDER**

Richard Mark Gergel, United States District Judge

**\*1** This matter comes before the Court on Plaintiff's motion for a preliminary injunction, in which it seeks to obtain pretrial enforcement of a non-competition agreement prohibiting Defendants from engaging in the outdoor lighting business for 24 months within 100 miles of their former territory or within 100 miles of any other franchise of Plaintiff. Plaintiff also seeks a preliminary injunction to enjoin the use of its franchisee's former telephone number, prohibit Defendants from engaging in any unfair or deceptive business practices and compel the return of certain business related materials. (Dkt. No. 7).

By way of background, Defendants Steve and Tammy Stubbs held a franchise with Plaintiff Outdoor Lighting Perspectives Franchising, Inc. ("OLP") in Charleston County, South Carolina from 2006 until January 2011. (Dkt. No. 7-3 at 1). OLP describes itself as the largest outdoor franchisor in the

United States, with 54 franchisees in 25 states. (Dkt. No. 7-3 at 4; 13-1 at 4). Defendants Steve and Tammy Stubbs operated their franchise business out of their Charleston area home and at the time of the termination of their franchise agreement due to financial exigencies they were being forced to draw funds from their retirement account to make their home mortgage payments. They have attempted to continue to operate a small outdoor lighting business, now named Lightscapes of Charleston, L.L.C., out of their home. In an affidavit filed with the Court, Mr. Stubbs stated that being completely forced out of the outdoor lighting business would "be a tremendous hardship for my wife and me" because it "is our only source of income" and the "[w]e have not engaged in any other trade for many years." (Dkt. No. 13-2 at 2). Mr. Stubbs further noted that being forced to move from Charleston would also be a tremendous hardship because his children were born in the area and are presently high school students. *Id.* at 2-3.[1]

**Legal Standard**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 24 (2008). To obtain this extraordinary form of relief, the moving party must demonstrate by a "clear showing" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of equities tips in favor of the moving party; and (4) an injunction is in the public interest. *Real Truth About Obama, Inc. v. Federal Election Commission,* 575 F.3d 342, 345-346 (4th Cir. 2009).

**Discussion**

**\*2** A careful review of the record reveals that Plaintiff has failed to make a clear showing that it will likely suffer irreparable injury should a preliminary injunction not be issued or to demonstrate that the balance of equities tips in its favor.[2] To support its claim of irreparable injury, Plaintiff has offered the affidavit of Corey Schroeder, who is identified as OLP's vice president and chief financial officer. (Dkt. No. 7-3 at 1). The affidavit contains numerous general declarations that OLP will suffer irreparable injury in the absence of a preliminary injunction but no real specifics to support such a claim. On the other hand, Defendants have submitted an affidavit describing their extremely modest and struggling

home based business, and the Court has trouble envisioning how the largest outdoor light franchise operation in the United States is materially affected by the Defendants continuing to operate this marginal business prior to a disposition of this case on the merits. (Dkt. No. 13-2).

Further, in weighing the equities and relative hardships of the parties by the granting or denying of the motion for preliminary injunction, it is quite clear to the Court that the equities do not tip in favor of Plaintiffs. While the grant or denial of the preliminary injunction will likely have a *de minimus* effect on Plaintiff, the Court finds that the grant of the preliminary injunction would likely lead to the Stubbs' loss of their family residence and the disruption of their family lives just as their children are in their critical high school years.

The Court finds that the equities decidedly tip in favor of Defendants.

**Conclusion**

Based upon the foregoing, Plaintiff's motion for a preliminary injunction is denied. (Dkt. No. 7).

AND IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2012 WL 12904016

---

Footnotes

1   Mr. Stubbs stated in his affidavit that Defendants are no longer using the former telephone number of the OLP franchise and have removed all OLP marks and references from their van. (Dkt. No. 13-2 at 1). He also indicated that he had returned all OLP materials previously in his possession. *Id.* To the extent Plaintiff contests any of these sworn statements, it should supplement its findings with sworn statements or other evidence to contest these assertions. Based on the information now before the Court, there appears no present need to address the Defendants' continued use of OLP phone numbers, marks or materials.

2   Since Plaintiff cannot satisfy the irreparable injury and balance of equity requirements for the grant of a preliminary injunction, the Court does not reach the issue of whether Plaintiff has made a clear showing of likelihood of success on the merits.

---

**End of Document**                                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 28 of 51 PageID #:414

Pacific Trellis Fruit, LLC v. Agricola Yaurilla, S.A., Not Reported in Fed. Supp. (2016)

2016 WL 9226379

2016 WL 9226379
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

PACIFIC TRELLIS FRUIT, LLC
v.
AGRICOLA YAURILLA, S.A., et al.

Case No. CV 16–4160 DSF (GJSx)
|
Filed 10/17/2016

**Attorneys and Law Firms**

June T. Monroe, Patricia J. Rynn, Bartholomew M. Botta, Rynn and Janowsky LLP, Newport Beach, CA, Paul A. Blechner, Greenberg Glusker Fields Claman Machtinger & Kinsella, Los Angeles, CA, for Pacific Trellis Fruit, LLC.

Craig A. Stokes, Stokes Law Office LLP, San Antonio, TX, for Agricola Yaurilla, S.A.

**MEMORANDUM**

**Proceedings:** (In Chambers) Order DENYING Defendants' Motion for Preliminary Injunction (Dkt. 15)

DALE S. FISCHER, United States District Judge

**\*1** Defendants Agricola Yaurilla, S.A. (Yaurilla) and Richard Forsyth Rebagliati (Forsyth) move to preliminarily enjoin Plaintiff Pacific Trellis Fruit, LLC (Pacific) from enforcing a security agreement. Because Defendants fail to demonstrate irreparable harm, the motion is denied.

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " Lopez v. Brewer, 680 F.3d 1068, 1072 (9th Cir.2012) (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)). "A [movant] seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).

The Ninth Circuit's " 'serious questions' approach survives Winter when [it is] applied as part of the four-element Winter test." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). Accordingly, " 'serious questions going to the merits' and a balance of hardships that tips sharply towards the [movant] can support issuance of a preliminary injunction, so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id.

Defendants have failed to demonstrate irreparable harm. "Speculative injury cannot be the basis for a finding of irreparable harm," In re Excel Innovations, Inc., 502 F.3d 1086, 1098 (9th Cir. 2007), and "mere financial injury ... will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation." Goldie's Bookstore, Inc. v. Superior Court of State of Cal., 739 F.2d 466, 471 (9th Cir. 1984). Thus, courts rarely grant preliminary injunctions for breach of contract claims. See Telephia Inc. v. Cuppy, No. C 04–03508 SI, 2005 WL 588441, at \*3 (N.D. Cal. Mar. 11, 2005) ("[A] claim for breach of contract can be compensated by money damages, and does not warrant the issuance of a preliminary injunction."). Although "[t]he threat of being driven out of business is sufficient to establish irreparable harm," American Passage Media Corp. v. Cass Communications, Inc., 750 F.2d 1470, 1474 (9th Cir.1985), a movant "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1133 (9th Cir. 2014). In his declaration, Forsyth states that—based on his experience—importers of grapes check the UCC registry to see if there are any outstanding security interests. Mot. (Dkt. 15), Ex. D at 7.[1] So if Plaintiff were to enforce its security interest, there would be a "real danger" that these importers would not do business with Yaurilla, leading to the closure of Yaurilla's business. Id. at 7–8. Defendants cannot demonstrate irreparable harm with such speculative conclusions devoid of factual support.[2]

**\*2** The motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 9226379

**Pacific Trellis Fruit, LLC v. Agricola Yaurilla, S.A., Not Reported in Fed. Supp. (2016)**

2016 WL 9226379

Footnotes

| | |
|---|---|
| 1 | The Court notes that neither side has complied with the Court's requirements concerning tabbing exhibits and pagination. They should do so in the future. |
| 2 | Therefore, the Court need not address the other three <u>Winter</u> factors. |

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 30 of 51 PageID #:416

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

2017 WL 2362572
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES of America

v.

Mohammad Waqas KHAN

Case No. 15-cr-00286
|
Signed 05/31/2017

**Attorneys and Law Firms**

AUSA, Kelly Lynn Guzman, United States Attorney's Office,
Chicago, IL, Pretrial Services, for United States of America.

## MEMORANDUM OPINION

John Robert Blakey, United States District Judge

**\*1** On July 23, 2015, *pro se*[1] Defendant Mohammad
Waqas Khan ("Defendant") was indicted for communicating
a threat in violation of 18 U.S.C. § 875(c). Indictment [16].
Pending before the Court are Defendant's timely[2] pretrial
motions, including: (1) Motion to Suppress Evidence [89];
(2) Motion to Dismiss the Indictment [89]; (3) Motion to
Void 18 U.S.C. § 875(c) for Vagueness [89]; (4) Motion to
Unseal Pertinent Documents, Subpoena Medical Records of
Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend
His Diagnosis [85]; (5) Motion to Rebuke and Sanction
the Government and Defendant's Former Public Defender
for Unauthorized Disclosure of Privileged Physician-Client
Medical Information [85]; (6) Motion to Show Cause on Bill
of Particulars [97]; (7) Motion to Compel Discovery [85];
(8) Motion to Show Cause on Subject Matter Jurisdiction
[97]; (9) Motion to Dismiss for Lack of Territorial Jurisdiction
[101]; and (10) Motion to Extend Trial Date [85].

The Court held an evidentiary hearing on April 12 and
13, 2017. At the evidentiary hearing, Defendant raised an
additional oral motion regarding supposed destruction of
exculpatory evidence. This Memorandum Opinion outlines
the Court's rulings on all pending timely motions. Having
considered the evidence presented, the parties' written

submissions, and oral arguments, the Court makes the
following findings of fact and conclusions of law:

## I. Findings of Fact

### A. The Original Tip to Law Enforcement
1. On May 13, 2015, the Illinois State Police Firearms
Owners Identification ("FOID") Department received an
email regarding Defendant's Facebook activities.[3] Tr. [144]
14:14-19.

2. On May 13, 2015, after receiving the email, Illinois State
Police notified the Federal Bureau of Investigations ("FBI")
Headquarters in Washington, D.C. *Id.* at 21:19-20.

3. On May 13, 2015, after receiving the notification from
Illinois State Police, FBI Headquarters notified the FBI field
office in Springfield, Illinois for further investigation. *Id.* at
21:20-23; 25:13-15.

4. On May 13, 2015, after receiving the lead from FBI
Headquarters, the FBI field office in Springfield notified the
FBI field office in Chicago, Illinois. *Id.* at 25:14-15, 118:5-14.

**\*2** 5. On May 13, 2015, upon notification from the FBI field
office in Springfield, the FBI field office in Chicago assigned
Special Agent Timothy Walther to investigate Defendant's
Facebook activities. *Id.* at 52:5-7.

6. Timothy Walther has been employed as a Special Agent
with the FBI since March 2008. Tr. [144] 11:7-10; Gov. Ex.
"Warrant."

### B. Facebook
7. Facebook is an online social media platform that can
be accessed by Facebook users to post comments and
photographs. Def. Ex. 35 at 3.

8. Facebook maintains servers outside the State of Illinois.
*Id.* When Facebook users post comments on their Facebook
profile, their messages travel across state lines to Facebook
servers. *Id.* at 4.

9. Through their personal privacy and application settings,
Facebook users control the extent to which content and
information posted on their Facebook page is shared with
other Facebook users. Def. Ex. 24 at 1.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 31 of 51 PageID #:417

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

10. By adjusting privacy and application settings, Facebook users can make content and information available only to themselves, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Gov. Ex. "Warrant."

11. When Facebook users publish content or information without privacy restrictions (also known as the "Public" setting), they allow everyone, including non-Facebook users, to access and use that information. Def. Ex. 24 at 1.

### C. Defendant's Facebook Page

12. Defendant initially created his Facebook account in 2011. Gov. Ex. "Warrant."

13. On May 13, 2015, Special Agent Walther viewed Defendant's Facebook page. Tr. [144] at 53:5-8.

14. At the time, Defendant did not have any privacy restrictions on his Facebook account, and his Facebook page was publicly viewable. *Id.* at 53:9-14.

15. When Special Agent Walther reviewed Defendant's Facebook page, he observed the following posts by Defendant:

a. At 9:22 p.m. on May 7, 2015, Defendant posted: "If I see a high value target Ima exploit it. I'm not killin sum bum on the street. I want a high net individual to shoot. I want this to be a real human tragedy. Much mourned. I have a month. Ima hunt aggressively tonite. Keep an eye out for ideal victims. If I don't catch nobody tonite then another nite." Gov. Ex. "Facebook Pages."

b. At 12:26 a.m. on May 8, 2015, Defendant posted: "Good dry run tonight. Saw a couple of excellent targets. The key is right approach and timing. There were many potential witnesses because it was a college student night. Inshallah[4] the deed will be done well before the deadline I have set. Jab manay bola hai to karun ga.[5] When I have said something, it means I will do it. The rest is opportune timing." *Id.*

16. Special Agent Walther also viewed photographs posted on Defendant's Facebook page. *Id.* at 58:6-9. Some of these photographs featured firearms. *Id.* at 61:11-13.

17. After Special Agent Walther reviewed Defendant's Facebook page, the FBI contacted Facebook, who provided

an emergency disclosure of subscriber information. Def. Ex. 35 at 4. This information identified Defendant as a subscriber, as well as provided the static internet protocol ("IP") address that had been used to access Defendant's Facebook account. *Id.*

**\*3** 18. Special Agent Walther determined that the IP addressed used to access Defendant's Facebook account was owned and maintained by Comcast. *Id.* The FBI contacted Comcast, who provided the FBI with subscriber information for the IP address. *Id.* at 4-5. The subscriber information named Mohammad Iqbal Khan, whom the FBI determined to be Defendant's father. *Id.* at 5. The subscriber information also listed a residential address in Glen Ellyn, Illinois. *Id.*

### D. Other Information Obtained by the FBI

19. From the Illinois Secretary of State's Office, the FBI ascertained Defendant's address to be 2N525 Pleasant Avenue, Glen Ellyn, Illinois. Gov. Ex. "Warrant."

20. From the Illinois FOID Department, the FBI determined that in 2014, Defendant became the registered owner of a Glock Model 19 9mm handgun, a Smith and Wesson .40 caliber semi-automatic handgun, and a Winchester 12-gage semi-automatic shotgun. Def. Ex. 35 at 11. Each of these firearms was depicted in the photographs posted on Defendant's Facebook page. *Id.* at 12.

21. The FBI also conducted a search of U.S. Custom and Border Protection travel records. Tr. [144] 56:19-20. From these records, the FBI learned that on April 24, 2015, Defendant purchased an airline ticket to travel from Chicago to Karachi, Pakistan on June 8, 2015. *Id.* at 56:20-22; Gov. Ex. "Warrant."

### E. Interviews Conducted by the FBI

22. Between May 13, 2015 and May 14, 2015, the FBI conducted multiple witness interviews for Defendant's investigation. Tr. [144] at 58:16-59:2.

a. In one interview, FBI agents interviewed an individual who identified Defendant as a family friend. *Id.* at 59:19-20. The individual confirmed the location of Defendant's residence and told the FBI that Defendant possessed three weapons. *Id.* at 60:14-61:9.

b. The second interview subject told the FBI that Defendant had a history of inflammatory comments on Facebook

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 32 of 51 PageID #:418

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

and confirmed that Defendant was the owner of three firearms. *Id.* at 63:14-65:1.

c. Both individuals were also shown the photographs from Defendant's Facebook page. From these photographs, both individuals identified Defendant's bedroom, and confirmed that the firearms depicted in the photographs were identical to the firearms previously seen in the possession of Defendant. *Id.* at 61:11-62:3, 64:5-17. Additionally, both interview subjects informed the FBI that Defendant resided with his father, mother, and fourteen year-old brother. Gov. Ex. "Warrant."

**F. Surveillance of Defendant**

23. On the afternoon of May 13, 2015, the FBI established personal surveillance of Defendant's residence. Tr. [144] 64:24-65:1.

24. During their surveillance on May 13, 2015, FBI agents identified Defendant leaving the residence in a silver Toyota Corolla heading eastbound into the City of Chicago. *Id.* at 65:16-20. FBI agents maintained surveillance of Defendant in his vehicle. *See id.*

25. When Defendant reached downtown Chicago, he began picking up and dropping off passengers. *Id.* at 66:3-5. FBI agents interviewed the first individual dropped off, who stated that she had just exited an Uber ride.[6] *Id.* at 66:6-9. The individual did not inform FBI agents of any suspicious or illegal activity by Defendant. *Id.* at 81:15-17.

26. FBI agents maintained surveillance of Defendant as he conducted approximately five to ten more Uber rides. *Id.* at 66:9-13.

**\*4** 27. At approximately midnight, FBI agents lost surveillance contact with Defendant's vehicle. *Id.* at 66:14-67:2. The agents returned to Defendant's residence, and arrived at approximately 1:00 a.m. on the morning of May 14, 2015. *Id.* at 67:3-6.

28. Upon arrival at Defendant's residence, FBI agents identified Defendant's silver Toyota Corolla parked in the driveway. *Id.* at 67:7-10.

29. Shortly thereafter, FBI agents were made aware of a new Facebook post on Defendant's Facebook page:

a. At 1:11 a.m. on May 14, 2015, Defendant posted: "The gun is cocked and ready to go. You keep sending those witnesses around and they're gona see some shit go down that they might now have signed up for. Now I'm gona get my revenge, and that involves putting bullets in someone's body, so get out of the way or I'll literally shoot at them as well and we'll end up with a much bigger scenario on our hands. I'm not leaving America without getting my revenge even if it costs me my life. And that's that. You're not going to intimidate me by threatening to become a witness." *Id.* at 67:18-23; Gov. Ex. "Facebook Pages."

30. Following Defendant's post, the FBI established twenty-four hour surveillance of Defendant. Tr. [144] 67:11-15.

**G. The Traffic Stop and Detention of Defendant**

31. Between approximately 3:00 p.m. and 5:00 p.m. on May 14, 2015, FBI Special Agent Ranjit Takher briefed deputies of the DuPage County Sheriff's Office regarding the FBI investigation of Defendant. Tr. [144] 105:15-23, 161:8-10. One of the deputies present at the briefing was Detective Patrick O'Neil. *Id.* at 161:5-7.

32. During the briefing, Special Agent Takher informed DuPage County deputies that Defendant possessed firearms and was making threatening remarks on his Facebook page. *Id.* at 106:6-20, 162:11-15; Tr. [145] 209:21-210:15. Photographs of Defendant and his firearms were also provided. *Id.* at 107:7-10, 161:11-23; Tr. [145] 210:16-211:9.

33. Special Agent Takher requested that the DuPage County Sheriff's Office conduct a traffic stop of Defendant and detain him for further questioning. *Id.* at 96:15-23, 165:8-10.

34. At the time Special Agent Takher requested the DuPage County Sheriff's Office to conduct a traffic stop, law enforcement did not possess an arrest warrant for Defendant or a search warrant for his vehicle. *Id.* at 96:24-25; Gov.'s Resp. [111] Ex. 1 at 15:2-4.

35. Following Special Agent Takher's briefing, at approximately 5:15 p.m. on May 14, 2015, Detective O'Neil waited in his squad car approximately two blocks south of Defendant's residence. Tr. [145] 211:24-212:7; Gov.'s Resp. [111] Ex. 1 at 9:22-10:8.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 33 of 51 PageID #:419

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

36. At approximately 5:45 p.m., Detective O'Neil received notification from the FBI that Defendant had left his residence in a vehicle. Tr. [145] 212:8-14; Def. Ex. 2.

37. At approximately 5:51 p.m., Detective O'Neil observed Defendant's vehicle traveling eastbound on Armitage Avenue. Tr. [145] 212:15-19; Gov.'s Resp. [111] Ex. 1 at 13:4-9. Detective O'Neil observed Defendant driving the vehicle. Tr. [145] 212:20-23.

38. Detective O'Neil stopped Defendant's vehicle at the intersection of Armitage Avenue and Pleasant Avenue. Tr. [144] 172:2-7; Tr. [145] 212:24-213:2.

39. Prior to stopping Defendant's vehicle, Detective O'Neil did not observe Defendant engage in any traffic violations. Gov.'s Resp. [111] Ex. 1 at 15:15-18.

 **\*5** 40. After curbing Defendant's vehicle, Detective O'Neil exited his police vehicle and approached Defendant's vehicle on foot. Tr. [145] 214:1-4.

41. Detective O'Neil asked Defendant to step out of the vehicle so that Detective O'Neil could speak with him. Tr. [144] 176:7-10; Tr. [145] 214:16-19.

42. At the time Detective O'Neil asked Defendant to step out of the vehicle, Defendant was not under formal arrest.

43. After Defendant exited the vehicle, Detective O'Neil requested that Defendant walk to the back of Defendant's vehicle. Tr. [144] 178:12-15; Tr. [145] 215:8-9.

44. At approximately the time Defendant exited his vehicle, another DuPage County detective arrived at the scene. Gov.'s Resp. [111] Ex. 1 at 28:17-20.[7]

45. At the back of Defendant's vehicle, Detective O'Neil informed Defendant that he was being detained pursuant to an FBI investigation. Tr. [144] 182:1-9; Tr. [145] 214:20-22, 216:1-4.

46. Detective O'Neil then asked Defendant if he had any firearms on his person. Tr. [144] 186:4-6; Tr. [145] 216:12-13. Defendant stated that he did not. Tr. [144] 186:7-8; Tr. [145] 216:12-13.

47. Detective O'Neil then asked Defendant if he had any firearms in the vehicle. Tr. [144] 186:9-11; Tr. [145]

216:25-217:3. Defendant hesitated in answering Detective O'Neil's question. Tr. [144] 187:10-13; Tr. [145] 217:3. Upon further questioning, however, Defendant admitted that there was a 9mm Glock in the lower pocket of the driver's door. Tr. [144] 189:16-190:8; Tr. [145] 217:3-7; Def. Ex. 2.

48. Detective O'Neil asked Defendant if he possessed a concealed carry permit and if the firearm was loaded. Tr. [145] 217:10-16. Defendant stated that the firearm was loaded and that, although he possessed a FOID card, he did not have a concealed carry permit. *Id.*

49. Prior to Detective O'Neil's questioning, he did not provide Defendant with *Miranda* warnings. Gov.'s Resp. [111] Ex. 1 at 19:10-16.

50. Prior to or during Detective O'Neil's questioning, he never: (1) brandished a firearm at Defendant; (2) placed Defendant in restraints; (3) threatened Defendant with arrest; (4) psychologically intimated Defendant; or (5) engaged in deceptive interrogation tactics.

51. At the time of Detective O'Neil's questioning, Defendant was not under formal arrest.

52. Detective O'Neil then asked Defendant for permission to retrieve the firearm from Defendant's vehicle. Tr. [145] 217:22-23. Defendant voluntarily consented. *Id.*

53. Detective O'Neil retrieved the firearm from the lower pocket of the driver's door. Tr. [145] 218:12-15. The firearm was loaded with a round in the chamber. Tr. [144] 196:19-23; Tr. [145] 219:3-5.

54. After retrieving the firearm, Detective O'Neil placed Defendant under arrest for a concealed carry violation. Tr. [145] 219:20-22.

55. Prior to transporting Defendant to the DuPage County Sheriff's Office, DuPage County detectives inventoried Defendant's vehicle and called for a tow, pursuant to DuPage County policy. *Id.* at 220:4-18.

 **\*6** 56. During the course of their routine inventory, DuPage County detectives discovered firearm magazines loaded with ammunition. Gov.'s Resp. [111] Ex. 1 at 22:20-23-1.

## H. The Search Warrant for Defendant's Residence

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 34 of 51 PageID #:420

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

57. On the evening of May 14, 2015, Special Agent Walther obtained a search warrant for Defendant's residence from Magistrate Judge Michael T. Mason in the Northern District of Illinois. Tr. [144] 67:24-68:20; Gov. Ex. "Warrant."

58. In obtaining the search warrant for Defendant's residence, Special Agent Walther presented Magistrate Judge Mason with multiple copies of the warrant. Tr. [144] 69:20-22.

59. On the top copy of the warrant, Magistrate Judge Mason noted the time that the warrant was signed: 6:40 p.m. *Id.* at 69:23-70:3. Magistrate Judge Mason did not make a similar notation on the other copies of the warrant. *Id.* at 70:7-9.

60. Once the search warrant for Defendant's residence was signed at 6:40 p.m., Special Agent Walther contacted Special Agent Takher, the on-scene commander at Defendant's residence, via telephone. *Id.* at 70:17-21. Special Agent Walther informed Special Agent Takher that a search warrant had been signed and that a search of Defendant's residence could begin. *Id.* at 70:22-24.

### I. The Search of Defendant's Residence

61. At approximately 6:47 p.m. on May 14, 2015, Special Agent Tenzin Atsatsang and Special Agent Michelle Callahan were conducting surveillance of Defendant's residence. Tr. [145] 231:21-232:7.

62. Special Agents Atsatsang and Callahan observed Defendant's father, Mohammad Iqbal, and his mother enter a vehicle in the driveway of the residence. *Id.* at 232:13-15. Special Agents Atsatsang and Callahan approached the vehicle, identified themselves, and notified Defendant's father that the FBI had a search warrant for the residence. *Id.* at 232:15-16.

63. After Defendant's father exited the vehicle, Special Agent Atsatsang informed him of Defendant's Facebook threats. *Id.* at 232:23-233:3. The conversation occurred in both English and Urdu. *Id.* at 233:12-14.

64. Special Agent Takher arrived on the scene at approximately 6:55 p.m. Tr. [144] 107:17-21, 123:18-23. Special Agent Takher informed Defendant's parents that Defendant had been arrested by the DuPage County Sheriff's Office. *Id.* at 108:16-18, 137:12-19, 148:19-21. She further reiterated the existence of Defendant's Facebook threats and

that the FBI had obtained a search warrant for the residence. *Id.* at 108:19-21, 138:1-14, 148:22-149:4.[8]

65. The search of Defendant's residence began at approximately 7:10 p.m. on May 14, 2015. *Id.* at 107:15-16; Gov. Ex. "Return."

**\*7** 66. During the search, FBI agents seized multiple items, including a Smith and Wesson .40 caliber semi-automatic handgun and a 12-gage Winchester semi-automatic shotgun, both of which were located underneath the bed in Defendant's bedroom. Gov. Ex. "Receipt"; Def. Ex. 35 at 14. FBI agents also seized two computers located in Defendant's bedroom. Gov. Ex. "Receipt"; Def. Ex. 35 at 14.

67. After the search of Defendant's residence was completed, a receipt was created for the property that was seized. Tr. [144] 73:25-74:2; Gov. Ex. "Receipt." A copy of the receipt was provided to Defendant's father, as well as Magistrate Judge Mason. Tr. [144] 74:3-8, 113:4-7, 114:16-17.

### J. The Interviews of Defendant's Family

68. At the onset of the search of Defendant's residence, Defendant's mother, father, and brother were asked to wait outside while FBI agents cleared the residence. Tr. [144] 112:6-10. After the residence was cleared, FBI agents instructed Defendant's mother, father, and brother to sit in the living room. *Id.* at 71:15-17, 112:15-17.

69. During the search, although Defendant's mother, father, and brother were not physically restrained, they were not permitted to leave the living room without FBI supervision. *Id.* at 112:18-20, 117:2-6, 144:20-25, 146:12-14, 152:13-23. At various points, however, Defendant's mother, father, and brother left the room under FBI supervision in order to eat and pray. *Id.* at 153:1-3.

70. During the course of the search, Special Agent Walther conducted separate interviews of all three individuals. *Id.* at 71:25-72:1. Each interview lasted for approximately 45 minutes. *Id.* at 72:18-21.

71. During his interview, Defendant's brother stated that he had previously shot the firearms located in Defendant's bedroom with Defendant. Def. Ex. 35 at 15. Additionally, Defendant's family members stated that the computers located in Defendant's bedroom were used solely by Defendant. *Id.*

72. No attorney was present during Special Agent Walther's interviews, and Defendant's mother, father, and brother were not advised that they could refuse to answer any questions. Tr. [144] 130:7-12.

### K. Events at the DuPage County Jail

73. At approximately 11:30 p.m. on May 14, 2015, Special Agent Walther and Special Agent Curtis Gonzales attempted to conduct an interview of Defendant at the DuPage County jail. Tr. [144] 76:8-10.

74. Special Agents Walther and Gonzales identified themselves to Defendant. *Id.* at 78:8-9.

75. Before Special Agents Walther and Gonzales asked any questions, Defendant made an approximately two-minute spontaneous oral statement. *Id.* at 78:9-18. Defendant's statement covered several topics, including his assertion that he had been the victim of a vast government conspiracy. Gov.'s Resp. [111] Ex. 8.

76. After Defendant inquired about the FBI looking at his Facebook page, Special Agents Walther and Gonzales advised Defendant of his *Miranda* rights. Tr. [144] 78:19-22; Gov.'s Resp. [111] Ex. 8. Defendant requested to speak to an attorney. Tr. [144] 78:23; Gov.'s Resp. [111] Ex. 8. Special Agents Walther and Gonzales terminated their interview at that time. Tr. [144] 78:24; Gov.'s Resp. [111] Ex. 8.

## II. Conclusions of Law

### A. Defendant's Motion to Suppress Evidence [89]

Defendant challenges the constitutionality of: (1) Special Agent Walther's viewing of Defendant's Facebook page on May 13, 2015; (2) Detective O'Neil's *Terry* stop of Defendant's vehicle on May 14, 2015; (3) Detective O'Neil's questioning of Defendant during the course of the *Terry* stop; (4) Detective O'Neil's retrieval of the firearm located in Defendant's automobile; (5) Detective O'Neil's arrest of Defendant; (6) the subsequent search of Defendant's automobile that resulted in the discovery of loaded magazines; (7) the FBI's search of Defendant's home on May 14, 2015; (8) Special Agent Walther's interviews of Defendant's family during the course of the search; and (9) Special Agents Walther and Gonzales' attempted interview of Defendant at the DuPage County jail. The Court addresses each objection in turn.

### 1. Special Agent Walther's Viewing of Defendant's Facebook Page was Lawful

**\*8** Special Agent Walther's first investigative step on May 13, 2015 was a viewing of Defendant's publicly available Facebook page. Defendant claims that the evidence derived from this viewing should be suppressed because: (1) the government did not possess a search warrant for his Facebook account; (2) the viewing violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, *et seq.*; and (3) the viewing violated Facebook's "Statement of Rights and Responsibilities."

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment "search" only occurs, however, when "the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). Although a person generally has a reasonable expectation of privacy in the contents of his own personal computer, *see, e.g.,* *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007); *United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir. 2004); *Guest v. Leis,* 255 F.3d 325, 333 (6th Cir. 2001), such an expectation may be extinguished "when a computer user disseminates information to the public through a website." *Palmieri v. United States*, 72 F. Supp. 3d 191, 210 (D.D.C. 2014) (citing *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.")). Thus, whether the Fourth Amendment applies to Facebook "partly depends on a user's privacy settings." *United States v. Adkinson*, No. 415-CR-00025-TWPVTW, 2017 WL 1318420, at \*5 (S.D. Ind. Apr. 7, 2017). There is no expectation of privacy in a public Facebook page. *See, e.g., id.*; *Chaney v. Fayette Cty. Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1316 (N.D. Ga. 2013) *United States v. Devers*, No. 12-CR-50-JHP, 2012 WL 12540235, at \*2-3 (N.D. Okla. Dec. 28, 2012); *United States v. Meregildo,* 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012).

Here, at the time of Special Agent Walther's viewing, Defendant did not maintain any privacy restrictions on his Facebook account, and his Facebook profile was viewable

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 36 of 51 PageID #:422

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

by any Facebook user. Hence, Defendant possessed no reasonable privacy expectation in the information found on his Facebook page. As a result, he cannot claim a Fourth Amendment violation.[9]

The Court need not address the merits of Defendant's SCA claim at length. Even if this Court were to assume a violation of the SCA, federal courts that have addressed the issue have routinely held that the SCA does not provide for a suppression remedy. *See, e.g.,* *Huon v. Mudge*, 597 Fed.Appx. 868, 875 (7th Cir. 2015); *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) ("Congress has made clear that it did not intend to suppress evidence gathered as a result of [SCA] violations."); *United States v. Perrine*, 518 F.3d 1196, 1201-02 (10th Cir. 2008) ("[V]iolations of the [SCA] does not warrant exclusion of evidence"); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) ("The SCA creates criminal and civil penalties, but no exclusionary remedy."); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998) ("[T]he Stored Communications Act does *not* provide an exclusion remedy. It allows for civil damages, and criminal punishment, but nothing more.") (emphasis in original) (internal citations omitted). This Court follows this well-reasoned line of cases.

**\*9** Defendant's appeal to Facebook's "Statement of Rights and Responsibilities" is equally unavailing. The operative issue is whether Special Agent Walther's actions violated the Fourth Amendment, not Facebook's internal policies and procedures. *See* *United States v. Caceres*, 440 U.S. 741, 755 (1979) (rejecting application of exclusionary rule where executive agency violated its own internal regulations); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) ("[T]he federal exclusionary rule, which forbids the use of evidence obtained in violation of the Fourth or Fifth Amendments, does not extend to violations of statutes and regulations."); *United States v. Chaparro–Alcantara*, 226 F.3d 616, 621 (7th Cir. 2000) ("Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it."). Special Agent Walther's viewing of Defendant's Facebook page, therefore, was lawful.

## 2. Detective O'Neil's *Terry* Stop of Defendant on May 14, 2015 was Lawful

Defendant claims that the traffic stop conducted by Detective O'Neil on May 14, 2015 violated the Fourth Amendment because it was not based upon reasonable suspicion, probable cause, or a valid warrant.

Under *Terry v. Ohio*, 392 U.S. 1, 21 (1968), police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Williams*, 731 F.3d 678, 683 (7th Cir. 2013) (quoting *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010)). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (internal quotations omitted). It requires "some minimal level of objective justification for making a stop," given the "totality of the circumstances" and "common-sensical judgments and inferences about human behavior." *Id.* (internal quotations omitted). When used by trained law enforcement officers, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." *United States v. Cortez*, 449 U.S. 411, 419 (1981). Moreover, because reasonable suspicion is evaluated in light of the totality of the circumstances, "certain behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." *Id.* at 824 (internal quotations omitted).

In addition, the officer involved need not be personally aware of all the facts justifying the investigatory stop. The collective-knowledge doctrine "allows one officer, when directed by other officers to stop a suspect, to rely on the aggregate knowledge of directing officers," so long as the directing officers "themselves have reasonable suspicion or probable cause" and the stop is "no more intrusive than would have been permissible for the directing officers." *United States v. Roman*, 626 Fed.Appx. 177, 179 (7th Cir. 2015) (citing *United States v. Williams,* 627 F.3d 247, 252-53 (7th Cir. 2010)).

Here, law enforcement officers possessed reasonable suspicion that Defendant had not only communicated violent online threats, but was also actively seeking an opportunity to act them out in a violent manner. Between May 7, 2015 and May 14, 2015, Defendant's threats increased in intensity and specificity, and repeatedly referenced a one-month deadline, which agents knew corresponded to Defendant's upcoming international flight to Pakistan. Defendant promised that he would carry out his threat even at the cost of his own life, and reiterated that witnesses would not deter him. On May 14, 2015, just hours before Detective O'Neil's stop, Defendant posted: "The gun is cocked and ready to go....

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 37 of 51 PageID #:423

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

Now I'm gona [sic] get my revenge, and that involves putting bullets in someone's body." These posts were accompanied by photographs of multiple firearms that FBI agents confirmed were owned by Defendant.

**\*10** It was also reasonable for law enforcement to suspect that Defendant might execute his threats *while driving a vehicle.* On May 7, 2015, Defendant posted that he was going to "hunt aggressively" and "[k]eep an eye out for ideal victims." One day later, he posted that he had been on a "[g]ood dry run" and that he had indeed identified "a couple of excellent targets." Defendant posted his last threat on May 14, 2015, shortly after transporting numerous Uber passengers in the City of Chicago.

These circumstances, taken together, gave Detective O'Neil more than reasonable suspicion to stop Defendant as he drove his vehicle from his home on the evening of May 14, 2015. They further justified Detective O'Neil's request for Defendant to step out of his car and accompany him to the back of the vehicle. *See Pennsylvania v. Mimms,* 434 U.S. 106, 110-11 (per curiam); *United States v. Spotts,* 275 F.3d 714, 719 n. 2 (8th Cir. 2002) ("Officers who have conducted a lawful *Terry* stop of a vehicle may order the driver to exit the vehicle pending completion of the stop."); *United States v. Ibarra–Sanchez,* 199 F.3d 753, 761 (5th Cir. 1999).[10]

### 3. Detective O'Neil's Questioning of Defendant was Lawful

After Defendant exited his car and followed Detective O'Neil to the back of his vehicle, Detective O'Neil informed Defendant that he was being detained pursuant to an FBI investigation. Detective O'Neil then inquired as to whether: (1) there were firearms on Defendant's *person* (to which Defendant stated no); (2) there were firearms in Defendant's *vehicle* (to which Defendant eventually stated yes); (3) Defendant possessed a concealed carry permit (Defendant stated no); and (4) the firearm was loaded (Defendant stated yes). Detective O'Neil did not preface his questioning with *Miranda* warnings. Defendant claims that this omission— which preceded Detective O'Neil's retrieval of the loaded 9mm Glock—violated Defendant's Fifth Amendment right against self-incrimination.

Under *Miranda v. Arizona,* 384 U.S. 436 (1966), the admissibility of a custodial statement is conditioned upon a precedent warning from law enforcement regarding the suspect's rights against self-incrimination. Failure by law enforcement to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. *Missouri v. Seibert,* 542 U.S. 600, 608 (2004). *Miranda* only applies, however, to "custodial interrogation." *U.S. ex rel. Church v. De Robertis,* 771 F.2d 1015, 1018 (7th Cir. 1985). The question here, therefore, is whether Defendant was "in custody" for the purposes of *Miranda* when Detective O'Neil asked about the presence of firearms.

Used within the context of *Miranda,* "custody" is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields,* 565 U.S. 499, 508-09 (2012). In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California,* 511 U.S. 318, 322-323 (1994) (per curiam), there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Maryland v. Shatzer,* 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles,* 467 U.S. 649, 655 (1984)). Of course, "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." *Berkemer v. McCarty,* 468 U.S. 420, 436 (1984). Indeed, under the law of most states, "it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission. Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Id.*

**\*11** The Supreme Court has declined, however, to "accord talismanic power" to the freedom-of-movement test. *Id.* at 437. In other words, a significant restriction on freedom of movement "identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer,* 559 U.S. at 112. This is because fidelity to the doctrine announced in *Miranda* "requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer,* 468 U.S. at 437. Thus, the ultimate question is whether the environment in which law enforcement questioning occurs "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.*

In the context of the roadside questioning of a motorist detained pursuant to a traditional *Terry* or traffic stop, the

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 38 of 51 PageID #:424

**United States v. Khan, Not Reported in Fed. Supp. (2017)**

2017 WL 2362572

Supreme Court has answered this question in the negative. *Berkemer*, 468 U.S. at 439. According to the *Berkemer* Court, two features of a traditional traffic stop "mitigate the danger that a person questioned will be induced to speak where he would not otherwise do so freely":

> First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief. The vast majority of roadside detentions last only a few minutes. A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way. In this respect, questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek.

> Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability.

*Id.* at 438 (internal citations and quotations omitted). The Court went on to say that in "both of these respects," the usual traffic stop is analogous to a typical *Terry* stop, where an officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. The detainee, however, "is not obliged to respond," and unless the detainee's answers "provide the officer with probable cause to arrest him, he must then be released." *Id.* at 440. The Court found that the "comparatively nonthreatening character" of such detentions explained "the absence of any

suggestion in [the Court's] opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.*; *see also Shatzer*, 559 U.S. at 113 ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.") (internal citation omitted); *United States v. Saadeh*, 61 F.3d 510, 519 (7th Cir. 1995); *United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994); *United States v. Boden*, 854 F.2d 983, 993 (7th Cir. 1988).

**\*12** Of course, if a detained individual "is subjected to treatment that renders him 'in custody' for practical purposes," he is entitled "to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440. There is no bright-line rule for such a determination; rather, it "should focus on all of the features of the interrogation," *Howes v. Fields*, 565 U.S. 499, 514 (2012), including the location of the questioning (and, by extension, the degree of police control over the environment); its duration; statements made during the interview; the presence or absence of physical restraints; whether the suspect has been made aware of his right to refrain from answering questions; whether there has been coercive and accusatory questioning; and whether police have employed subterfuge in order to induce self-incrimination. *Id.*; *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996).

Analyzing the present case under this framework, this Court concludes that Defendant was not "in custody" for *Miranda* purposes when Detective O'Neil questioned him at the back of Defendant's vehicle. Only a brief period of time elapsed between the initial stop and the time Defendant was questioned. *See Berkemer*, 468 U.S. at 441; *United States v. Murray*, 89 F.3d 459, 462 (7th Cir. 1996). The encounter took place during daylight hours on a residential street in public view. *See Murray*, 89 F.3d at 462. Only two law enforcement officers were present, *see Buchler*, 79 F.3d at 641, and there is no evidence that they engaged in conduct which might have overborne Defendant's will. *See Murray*, 89 F.3d at 462. The number of questions was "moderate," and aimed at "confirming or dispelling" Detective O'Neil's suspicion that Defendant might be armed, either on his person or in his vehicle. *See Berkemer*, 468 U.S. at 439. Considering the totality of these circumstances, the Court finds that a reasonable person in Defendant's position "would not have considered the brief questioning at the scene to be a custodial interrogation." *Murray*, 89 F.3d at 462. Detective O'Neil's questioning, therefore, was lawful.

#### 4. The Seizure of the Firearm in Defendant's Vehicle was Lawful

Detective O'Neil's limited search of Defendant's vehicle in order to seize the 9mm Glock was also constitutional. There are multiple theories upon which this Court bases this finding. First and foremost, Defendant consented to the minor intrusion into his vehicle. Consent "lifts the warrant requirement" of the Fourth Amendment as long as the consent is voluntary. *United States v. Quinones-Sandoval*, 943 F.2d 771, 774 (7th Cir. 1991); *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) ("A well-recognized exception to the warrant requirement applies, however, when someone consents to a search."). The test for "voluntariness" is "a factual one" that requires an examination "of all the circumstances in which consent was given." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). As discussed *supra*, the atmosphere surrounding Defendant's consent was not coercive. Although Defendant objects to Detective O'Neil's failure to advise him of his right to refuse, the "failure to inform a suspect of his right to refuse to consent to a search does not invalidate a consent that is voluntary." *United States v. Baker*, 78 F.3d 1241, 1245 (7th Cir. 1996). Accordingly, his consent was legally valid.[11]

**\*13** Aside from consent, Detective O'Neal's actions also constituted a lawful search incident to his *Terry* stop. An officer "with a reasonable suspicion that a motorist may be armed and may be able to gain immediate control of weapons may conduct a protective search of the passenger compartment of the vehicle without a warrant." *United States v. Arnold*, 388 F.3d 237, 239 (7th Cir. 2004) (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)); *United States v. Leiva*, 821 F.3d 808, 817 (7th Cir. 2016) (holding that police officer may search automobile without a warrant "if there is reasonable suspicion that an occupant of the car possesses or the car itself contains accessible weapons"). This remains true where, as here, the motorist has been moved away from the vehicle. *See United States v. Boden*, 854 F.2d 983, 994 (7th Cir. 1988) ("It is not disputed that Boden told [the officer] that there might be a weapon in his car. Given that Boden was not under arrest and none of the agents were restraining him, [the officer] had an articulable suspicion that Boden could gain control of a weapon. Therefore, [the officer] could search in the passenger compartment for that weapon.... [W]hile [the officer] could have *and in fact did* move Boden away from the station wagon, there was still a continuing possibility that

Boden could reenter it, as he was not under arrest.") (emphasis added).

Here, Detective O'Neil possessed not only reasonable suspicion, but *probable cause* to believe Defendant was armed. Probable cause exists "when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *United States v. Richards*, 719 F.3d 746, 754 (7th Cir. 2013) (internal quotations omitted); *see also Illinois v. Gates*, 462 U.S. 213, 231 (1983) (stating that probable cause "does not deal with hard certainties, but with probabilities"); *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (holding that although probable cause requires "something more than a hunch," it does not require a finding "that it was more likely than not" that an individual has engaged in unlawful activity). As discussed at length above, the fruits of the FBI's detailed investigation and Defendant's admissions at the scene generated probable cause for Detective O'Neil to believe that Defendant's vehicle contained a loaded firearm that constituted evidence of several criminal offenses. *See Leiva*, 821 F.3d at 817.

Given the existence of probable cause, Detective O'Neil's limited search of Defendant's automobile is further supported by the automobile exception to the Fourth Amendment's warrant requirement. Under that exception, police do not need a warrant to search a vehicle when they have probable cause to believe it contains evidence of criminal activity. *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

#### 5. Detective O'Neil's Arrest of Defendant was Lawful

A "warrantless arrest, like a warrantless search, must be supported by probable cause." *United States v. Navarro*, 90 F.3d 1245, 1254 (7th Cir. 1996). Probable cause to justify an arrest exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). Once again, this is a "purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id.* In other words, although the Court "focuses on what the officer knew at the time of the arrest," it must determine "whether those facts and circumstances, 'viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.' " *Id.* (quoting *Maryland v. Pringle*, 540

2017 WL 2362572

U.S. 366, 371 (2003)). If this test is met, an officer may arrest the offender without violating the Fourth Amendment, even if the individual has only committed "a very minor criminal offense." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Here, Defendant possessed a functional, accessible, loaded, unenclosed firearm in his vehicle. At the same time, Defendant did not hold a valid concealed carry permit. Under the totality of circumstances in this case, an objectively reasonable officer possessed probable cause to believe that Defendant had committed several criminal offenses, including but not limited to an unlawful use of a weapon. *See* 720 ILCS § 5/24-1(a)(4) ("Unlawful Use of Weapons"). Thus, Defendant's arrest was lawful.

## 6. The Search of Defendant's Automobile was Lawful

 **\*14** Prior to transporting Defendant to the DuPage County Sheriff's Office, DuPage County detectives inventoried Defendant's vehicle and called for a tow, pursuant to DuPage County policy. During the course of their routine inventory search, DuPage County detectives discovered loaded magazines. Defendant contests the lawfulness of DuPage County's impoundment and inventory procedure. Specifically, Defendant argues that impoundment was unnecessary because, given the location of Detective O'Neil traffic stop, his vehicle could have either been quickly retrieved by a nearby family member or merely left on the side of the residential street.

It has long been recognized that a vehicle impoundment and inventory search may "constitute a well-recognized exception to the warrant requirement." *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010) (citing *South Dakota v. Opperman,* 428 U.S. 364, 376 (1976)). Police departments routinely inventory and secure the contents of impounded automobiles, because doing so generally "protects the police from potential danger, protects the owner's property while it remains in police custody, and protects the police against claims of lost, stolen, or damaged property." *Id.* at 613-14.

Warrant exception aside, however, both "the decision to take the car into custody *and* the concomitant inventory search must meet the strictures" of the Fourth Amendment's reasonableness requirement. *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996) (emphasis added). On this score, "the decision to impound (the 'seizure') is properly

analyzed as distinct from the decision to inventory (the 'search')." *Id.* Typically, the decision to impound, "unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *Id.* at 353. As one might expect, the results of such an analysis vary widely depending upon the specific facts of a particular case. *Compare id.* at 351-54 (finding decision to impound unreasonable and suppressing evidence found during the course of subsequent inventory search) *and Thompson v. Vill. of Monee,* 110 F. Supp. 3d 826, 846-50 (N.D. Ill. 2015) (finding decision to impound unreasonable) *with Cartwright*, 630 F.3d at 613-16 (affirming reasonableness of both impoundment and inventory).

Ultimately, this Court need not conduct its own impoundment and inventory analyses for this case, since DuPage County's search of Defendant's vehicle following his arrest was separately supported by probable cause. *See Richards,* 719 F.3d at 754. By that point, officers not only knew the details of the FBI's investigation into Defendant's online threats, but had also discovered a loaded 9mm handgun in the driver's door of Defendant's vehicle. By extension, law enforcement possessed probable cause to believe that the passenger compartment might contain the very thing that was ultimately found: additional weapons or ammunition. Pursuant to the automobile exception, this probable cause search did not require a search warrant. *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). DuPage County's search of Defendant's vehicle and seizure of the loaded magazines, therefore, was lawful.

## 7. The Search of Defendant's Home on May 14, 2015 was Lawful

Where a search "is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant." *United States v. Jenkins*, 850 F.3d 912, 917 (7th Cir. 2017) (internal quotations and modifications omitted). A warrant "is a judicial mandate to an officer to conduct a search or make an arrest." *United States v. Leon,* 468 U.S. 897, 920 n. 21 (1984). The purpose of a search warrant "is twofold: to show that a judicial officer authorized the search, and to indicate to the government agents who will execute the warrant what the limits of the authorization are." *United States v. Torres*, 751 F.2d 875, 886 (7th Cir. 1984). The Fourth Amendment requires that a warrant "be supported by probable cause and

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 41 of 51 PageID #:427

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

that it describe, with particularity, the place to be searched and the items or persons to be seized." *Id.* Moreover, absent exigent circumstances, "a neutral magistrate must make the probable-cause determination and issue the warrant." *Id.* (citing *Chambers v. Maroney,* 399 U.S. 42, 90 (1970); *Jones v. Wilhelm,* 425 F.3d 455 (7th Cir. 2005)).

**\*15** Defendant first alleges that the FBI searched his residence without a warrant. Defendant's assertion, however, is undermined by the evidence presented at the evidentiary hearing. Special Agent Walther obtained a search warrant from Magistrate Judge Mason at 6:40 p.m. on May 14, 2015. The search of Defendant's residence did not begin until approximately 7:10 p.m., after Special Agent Walther contacted Special Agent Takher via telephone and informed her that a warrant had been secured.

In the alternative, Defendant alleges that the warrant submitted by the government is a forgery. This accusation, however, is wholly unsupported by the record and rejected by this Court.

Defendant next argues that even if the warrant was not forged, it was not sufficiently supported by probable cause. Specifically, Defendant takes issue with the fact that Special Agent Walther's supporting affidavit failed to reference the initial tip provided to the Illinois State Police FOID Department. Defendant claims that as a result of this omission, Magistrate Judge Mason never independently evaluated the credibility and reliability of the informant upon whom law enforcement relied for information. Indeed, where an affidavit submitted in support of a search warrant relies upon information supplied by an informant, the probable cause inquiry "generally focuses on the informant's reliability, veracity, and basis of knowledge." *United States v. Dismuke,* 593 F.3d 582, 586 (7th Cir. 2010). In drafting his search warrant application in this case, however, Special Agent Walther did not rely upon the initial tip provided to the Illinois State FOID Department. Instead, Special Agent Walther relied upon the results of the FBI's own *independent* investigation of Defendant in the days before May 14, 2015. *See* Gov. Ex. "Warrant." As a result, the reliability of the initial tip to Illinois State Police is irrelevant to Magistrate Judge Mason's ultimate probable cause determination.

Defendant also claims that the search warrant for his residence was overly broad. He asserts that the warrant impermissibly authorized the FBI to "rummage" through his house and seize all documents and physical objects "of any kind."

Def.'s Mot. [93] 10. The particularity requirement of the Fourth Amendment "protects against open-ended warrants that leave the scope of the search to the discretion of the officer executing the warrant, or permit seizure of items other than what is described." *United States v. Clark,* 754 F.3d 401, 410 (7th Cir. 2014); *United States v. Aljabari,* 626 F.3d 940, 947 (7th Cir. 2010) (stating that the particularly requirement "helps enforce the probable cause requirement by limiting law enforcement officers' discretion to determine for themselves the scope of their search."). Contrary to Defendant's assertions, however, the warrant at issue here was sufficiently particular. It listed the precise place to be searched (Defendant's residence) as well as the items to be seized. *See* Gov. Ex. "Warrant." Far from sanctioning the wholesale seizure of any article found in Defendant's home, the warrant is limited to items related to Defendant's on-line violation of 18 U.S.C. § 875(c).

Finally, Defendant argues that the warrant for his residence was defective because it does not list the "date and time the warrant was executed; the executing officer's signature, name, or date; [or] the inventory of the property taken." Def.'s Mot. [93] 10-11. Such information, however, is provided on the warrant *return,* *after* the search authorized by the warrant itself has been executed. As such, its absence cannot logically impact the legitimacy of the predicate search authorization. *See, e.g. United States v. Motz,* 936 F.2d 1021 (9th Cir. 1991) (holding that failure to list 725 marijuana plants on search warrant return and filing the return ten weeks after the search was not a basis to suppress evidence of the marijuana plants); *United States v. Clark,* 934 F.2d 322 (6th Cir. 1991) (holding that absent a showing of prejudice, the failure to return the search warrant (including the inventory) as required by state law was not a basis for granting motion to suppress); *United States v. Burroughs*, 882 F. Supp. 2d 113, 125 (D.D.C. 2012) (denying motion to suppress evidence where warrant return was not signed until over three months after the warrant was executed).

**\*16** In sum, Defendant's motion to dismiss evidence seized from his residence on May 14, 2015 is denied.[12]

### 8. The FBI's Interviews with Defendant's Family on May 14, 2015 are Admissible

Defendant asserts that the FBI's interviews of his family during the execution of the search warrant for his home were unconstitutional. The Court need not reach the merits

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 42 of 51 PageID #:428

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

of Defendant's claim because he lacks standing to bring it in the first instance. Generally, "individuals not personally the victims of illegal government activity cannot assert the constitutional rights of others." *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984) (citing *United States ex rel. Cunningham v. DeRobertis*, 719 F.2d 892, 895-96 (7th Cir. 1983)). This "is clearly true in the Fourth Amendment context." *DeRobertis*, 719 F.2d at 895. Although a violation of a non-defendant's *Fifth Amendment* rights may result in a fundamentally unfair trial for the defendant "when the government seeks a conviction through use of evidence obtained by extreme coercion or torture," *Chiavola*, 744 F.2d at 1273, Defendant has not presented any evidence that the government's actions rose to that level of misconduct. Although Defendant's mother, father, and brother were generally not permitted to leave their living room without FBI supervision during the search (for safety reasons), they also were not physically restrained, and at various points were permitted to leave in order to eat and pray. Special Agent Walther's interviews only lasted for approximately 45 minutes each, and Defendant has adduced no evidence of coercive tactics. Defendant's motion to suppress his family's statements at trial, therefore, is denied.

### 9. Defendant's Spontaneous Statements to Special Agents Walther and Gonzales at DuPage County Jail are Admissible

Finally, although Defendant was certainly "in custody" at DuPage County Jail, not "all statements obtained by the police after a person has been taken into custody are considered the product of interrogation." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). By "its own terms, *Miranda* does not apply to volunteered statements." *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990); *see also United States v. Abdulla*, 294 F.3d 830, 835 (7th Cir. 2002). Statements are volunteered "when they are not the result of 'compelling influences, psychological ploys, or direct questioning.' " *Hendrix*, 509 F.3d at 374 (quoting *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)). Special Agents Walther and Gonzales' mere act of identifying themselves as law enforcement does not qualify as any of these exceptions. Accordingly, Defendant's statements are admissible.

### B. Defendant's Motion to Dismiss the Indictment [89]

Defendant next moves to dismiss his indictment because, according to Defendant: (1) inadmissible evidence was

presented to the grand jury; (2) the government's witnesses perjured themselves before the grand jury; (3) the government failed to inform the grand jury of the FBI's role in Defendant's initial arrest; (4) the prosecution of Defendant was arbitrary, selective, and discriminatory; and (5) Defendant's actions do not satisfy the elements of the offense charged. Once again, the Court addresses Defendant's protests in turn.

### 1. Defendant Has Not Shown Errors in His Grand Jury Proceedings that Resulted in Prejudice

**\*17** Defendant's first three objections can be fairly characterized as alleged errors in his grand jury proceedings. *See* Fed. R. Crim. P. 12(b)(3)(A)(v). From the outset, it must be noted that "because the grand jury is an institution separate from the courts, over whose functioning the courts do not preside," *see United States v. Williams*, 504 U.S. 36, 47 (1992), courts "generally do not exercise supervisory authority over grand jury proceedings." *United States v. O'Neill*, 52 F. Supp. 2d 954, 969 (E.D. Wis. 1999), *aff'd sub nom. United States v. Warneke*, 199 F.3d 906 (7th Cir. 1999); *see also United States v. Udziela*, 671 F.2d 995, 999 (7th Cir. 1982) ("Strictly speaking, the grand jury is a constitutional fixture in its own right, belonging to neither the executive nor the judicial branch ... we must [therefore] take care not to encroach on legitimate executive activities before the grand jury."). Thus, a district court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)); *United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005). "Prejudice" only occurs "when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful that the decision to indict was free from that violation's considerable influence." *Brooks*, 125 F.3d at 498.

Defendant believes that his grand jury proceedings were tainted because the government presented inadmissible evidence and perjured testimony. The Court disagrees. As discussed at length *supra*, this Court finds that all of the evidence attacked by Defendant was obtained through constitutional means, and Defendant has failed to introduce *any* evidence showing that a government witness committed perjury during the grand jury proceedings. Regardless, the Seventh Circuit has held that the jury may act upon evidence obtained in violation of a defendant's Fourth and Fifth

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 43 of 51 PageID #:429

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

Amendment rights so long as such violation was not "at the hands" of the grand jury returning the indictment. *United States v. Puglia*, 8 F.3d 478, 482 (7th Cir. 1993) (citing *Lawn v. United States,* 355 U.S. 339, 348 (1958)); *see also Bracy v. United States*, 435 U.S. 1301, 1302 (1978) ("While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that factfinding process, its introduction before the grand jury poses no such threat."). Defendant's attack on this front therefore fails.

The government's alleged failure to reveal the FBI's role in Defendant's initial arrest, even if assumed to be true, is equally insignificant. The primary purpose of a grand jury is to determine whether there is probable cause to charge an individual with a crime. *See United States v. Dionisio*, 410 U.S. 19, 48 (1973); *Henry v. Ryan*, 775 F. Supp. 247, 254 (N.D. Ill. 1991). The involvement of a particular law enforcement agency (here, the FBI) in a specific investigatory action (Defendant's arrest) has no bearing upon the probable cause question.

## 2. Defendant Has Not Made a Showing of Selective Prosecution

Defendant next argues that the indictment should be dismissed because the government improperly targeted him "despite the existence of many other unindicted individuals who have engaged in the same type of activity with which [Defendant] is charged." *United States v. Finley*, 705 F. Supp. 1297, 1302 (N.D. Ill. 1988).

An exercise of prosecutorial discretion, however, "cannot be successfully challenged" merely on the ground that it is supposedly "irrational or arbitrary." *United States v. Moore*, 543 F.3d 891, 900 (7th Cir. 2008); *United States v. Smith*, 953 F.2d 1060, 1063 (7th Cir. 1992) ("Arbitrariness—that is, unjustified disparities in the treatment of similarly situated persons—is not among the grounds on which to contest an exercise of prosecutorial discretion."). Likewise, the "mere conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *United States v. Niemiec*, 611 F.2d 1207, 1209 (7th Cir. 1980) (internal quotations omitted). Indeed, selectivity "is not only inevitable but also desirable when it conserves resources." *Falls v. Town of Dyer, Ind.*, 875 F.2d 146, 148 (7th Cir. 1989). The government "rationally may decide that imposing stiff penalties on 10% of offenders is the best way to enforce the law against all." *Id.*

*18 Courts generally presume "that prosecutors faithfully and lawfully discharge their constitutional duties and, in the ordinary case, prosecutors have significant discretion to determine whether or not to prosecute." *United States v. Blake*, 415 F.3d 625, 627 (7th Cir. 2005); *see also United States v. LaBonte*, 520 U.S. 751, 762 (1997) (noting that prosecutorial discretion is an "appropriate" and "integral feature of the criminal justice system"); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

Such discretion is, of course, "subject to constitutional restraints, and cannot be based upon invidious criteria." *Moore*, 543 F.3d at 900; *Armstrong*, 517 U.S. at 464. That is, the decision to prosecute "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.' " *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). To show that the government engaged in improper selective prosecution, however, Defendant must demonstrate that the prosecutorial decision "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* (quoting *Wayte v. United States,* 470 U.S. 598, 608, (1985)). In other words, Defendant must show "that other similarly situated individuals were not prosecuted, and that his prosecution was motivated by discrimination." *United States v. Flores-Flores*, 42 Fed.Appx. 868, 870 (7th Cir. 2002).

Despite his allegations, Defendant here has shown neither. Defendant offers no evidence to support the inference that the government opted to prosecute him because of his "religious, national, [or] political background." Def.'s Mot. [89] at 43-44. Moreover, although Defendant's motion references several notable public figures who have made inflammatory statements without subsequent criminal prosecution—including militia leader Michael Brian Vanderboegh, mixed-martial artist Conor McGregor, and Governor Paul LePage of Maine—it fails to prove how such individuals are similarly situated to Defendant. This is not enough.

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 44 of 51 PageID #:430
United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

### 3. Whether Defendant's Actions Satisfy the Elements of the Offense Charged is a Matter for Trial

Finally, Defendant claims that the indictment should be dismissed because, in Defendant's view, his actions do not satisfy the elements of the offense charged. In particular, Defendant challenges the government's position that his Facebook postings constituted immediate "true threats" rather than constitutionally protected speech. The Supreme Court, however, "has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime." *Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014). The "grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Id.* at 1098. For this reason, a "sufficient indictment returned by a legally constituted and unbiased grand jury is enough to call for a trial on the merits." *United States v. Lee*, No. 12-cr-109, 2017 WL 56630, at *1 (N.D. Ill. Jan. 5, 2017) (citing *Costello v. United States*, 350 U.S. 359, 362 (1956)). Thus, "while an indictment may be dismissed if subject to a defense that raises only a question of law, a defense relating to the strength of the government's evidence ordinarily must wait for trial." *Id.*

**\*19** In sum, Defendant's Motion to Dismiss the Indictment [89] is denied.

### C. Defendant's Motion to Void Title 18 U.S.C. § 875(c) for Vagueness [89] is Unavailing

Defendant argues that the statute under which he is charged, 18 U.S.C. § 875(c), is unconstitutionally vague. According to Defendant, an individual "cannot know with any certainty which statements are acceptable and which he is supposed to avoid." Def.'s Mot. [85] 46. Defendant claims this uncertainty "leaves the door open for arbitrary and selective justice." *Id.* at 47.

To satisfy due process, a penal statute must define the criminal offense: (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). A statute "that does not provide 'fair notice' of what 'conduct is forbidden' or 'is so indefinite that it encourages arbitrary and erratic arrests and convictions' is deemed void for vagueness." *United States v. Sylla*, 790 F.3d 772, 774 (7th

Cir. 2015) (quoting *Colautti v. Franklin*, 439 U.S. 379, 390 (1979)).

The language of the statute at issue here reads as follows:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c).

Because § 875(c) criminalizes "pure speech," the speech involved must constitute a "true threat" and not constitutionally protected speech. *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005). Until recently, most courts, including the Seventh Circuit, held that to establish a "true threat," the government was required to prove that the statement came "in a context or under such circumstances wherein *a reasonable person would foresee* that the statement would be interpreted by those to whom the maker communicates a statement as a serious expression of an intention to inflict bodily harm upon or to take the life of another individual." *Id.* (emphasis added) (internal quotations and brackets omitted). In other words, whether something constituted a "true threat" was "an objective inquiry ... not dependent upon what the defendant intended, but whether the recipient could reasonably have regarded the defendant's statement as a threat." *Id.* (internal citations and quotations omitted); *see also United States v. White*, 670 F.3d 498, 510 (4th Cir. 2012); *United States v. Francis*, 164 F.3d 120, 122 (2d Cir. 1999); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997); *United States v. Himelwright*, 42 F.3d 777, 782-83 (3d Cir. 1994); *United States v. DeAndino*, 958 F.2d 146, 149-50 (6th Cir. 1992); *but see United States v. Twine*, 853 F.2d 676, 680 (9th Cir. 1988). Even under this "general intent" standard, multiple courts declined to void § 875(c) for vagueness. *See, e.g., United States v. Martinez*, No. 10-60332-CR, 2011 WL 1099261, at *7 (S.D. Fla. Mar. 22, 2011); *United States v. Tiller*, No. CRIM.A. 07-50067, 2008 WL 4690511, at *1 (W.D. La. Oct. 21, 2008).

**\*20** In 2015, however, the Supreme Court held that a defendant may not be convicted of violating § 875(c) based "solely on how his [words] would be understood by a reasonable person." *Elonis v. United States*, 135 S. Ct. 2001, 2011 (2015). Rather, to violate § 875(c), a defendant must transmit a communication: (1) for the purpose of issuing a threat; (2) with knowledge that the communication will be viewed as a threat; or possibly (3) with reckless

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 45 of 51 PageID #:431

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

disregard for the likelihood that the communication would be perceived as a threat.[13] *Id.* at 2012. At least one circuit court has still found § 875(c) sufficiently definite under this specific intent standard. *See United States v. Sutcliffe,* 505 F.3d 944, 953-54 (9th Cir. 2007). Indeed, in the eyes of the Ninth Circuit, "rather than making the statute void for vagueness, the narrowing construction ... actually alleviates possible void-for-vagueness concerns.... An ordinary citizen can understand what is meant by the terms 'threat to kidnap' and 'threat to injure,' and we are persuaded that the statute provides sufficient standards to allow enforcement in a non-arbitrary manner." *Id.*; *see also United States v. Yassin,* No. 16-03024-01-CR-S-MDH, 2017 WL 1324141, at *6 (W.D. Mo. Feb. 23, 2017), *report and recommendation adopted,* No. 16-3024-01-CR-S-MDH, 2017 WL 1337438 (W.D. Mo. Apr. 6, 2017). This Court agrees, and Defendant's motion is therefore denied.

### D. Defendant's Motion to Show Cause on Bill of Particulars [97]

In his motion for a bill of particulars, Defendant requests an order directing the government to disclose the specific targets of Defendant's purported threats. Under Federal Rule of Criminal Procedure 7(f), this Court indeed has the power to direct the government to file a bill of particulars. The purpose of a bill of particulars, however, "is to provide the defendant with the information necessary to prepare a defense." *United States v. Finley,* 705 F. Supp. 1272, 1277-78 (N.D. Ill. 1988) (internal citation omitted). A defendant "is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *United States v. Kendall,* 665 F.2d 126, 135 (7th Cir. 1981) (internal quotations omitted). Accordingly, a bill of particulars is necessary "only where the indictment does not sufficiently apprise the defendant of the charges to enable her to prepare for trial." *United States v. Esteves,* 886 F. Supp. 645, 646 (N.D. Ill. 1995); *United States v. Blanchard,* 542 F.3d 1133, 1140 (7th Cir. 2008). Information relevant to the preparation of a defense "includes the elements of each charged offense, the time and place of the accused's allegedly criminal conduct, and a citation to the statute or statutes violated." *Blanchard,* 542 F.3d at 1140.

Even where the indictment "fails to provide the full panoply of such information," a bill of particulars "is nonetheless unnecessary if the information is available through some other satisfactory form, such as discovery." *Id.* (internal quotations omitted). Thus, in deciding whether a bill of

particulars is appropriate, the Court considers "the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill." *United States v. Coffey,* No. 92-cr-203, 1993 WL 424239, at *10 (N.D. Ill. Oct. 19, 1993) (internal citations omitted). The decision to require a bill of particulars rests within the sound discretion of the Court. *United States v. Canino,* 949 F.2d 928, 949 (7th Cir. 1991).

In light of the discovery available and the nature of the offense, this Court finds that the indictment in this case is sufficiently detailed to inform Defendant of the charge against him. It sets forth the specific threat that forms the basis of the charge, the time at which the threat was made, the means by which it was transmitted, and a citation to the statute violated. *See* Indictment [16]. In addition, throughout the pretrial process, this Court has ensured the government's compliance with its discovery obligations under the Federal Rules of Criminal Procedure. Such discovery "further informs [Defendant] about the evidence against him and the Government's likely theories of the case." *United States v. Tomkins,* No. 07-cr-227, 2012 WL 1357701, at *1 (N.D. Ill. Apr. 19, 2012). To the extent Defendant seeks a bill setting forth additional facts, "such evidentiary detail is beyond the proper scope of a bill of particulars." *Esteves,* 886 F. Supp. at 646-47; *see also United States v. Burge,* No. 08-cr-846, 2009 WL 3597950, at *8 (N.D. Ill. Oct. 27, 2009), *aff'd,* 711 F.3d 803 (7th Cir. 2013); *United States v. Berumen,* No. 87-cr-20012, 1990 WL 304210, at *2 (N.D. Ill. Sept. 24, 1990). Accordingly, Defendant's motion is denied.

### E. Defendant's Motion to Unseal Pertinent Documents, Subpoena Medical Records of Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend His Diagnosis [85]

**\*21** On October 28, 2015, Defendant's former attorney requested that this Court issue an ex parte order to appoint a psychiatrist, Dr. Carl Wahlstrom, on Defendant's behalf. *See* Def.'s Mot. [28]. This request was granted on November 4, 2015 in a sealed court order. *See* Order [31]. Defendant originally requested that copies of his medical records from Dr. Wahlstrom be turned over in discovery and that the order granting his evaluation be unsealed. Defendant also requested that the Pretrial Bail Report [5] issued on July 14, 2015 be unsealed.

At the evidentiary hearing, both the government and Defendant agreed that, in the interest of protecting Defendant's privacy, the above-named materials should remain sealed. Tr. [145] 313:10-314:21. The parties further

2017 WL 2362572

agreed, however, that the government would provide complete copies to Defendant for his personal review. *Id.* Defendant's Motion to Unseal Pertinent Documents and Subpoena Medical Records of Dr. Carl Wahlstrom [85], therefore, is granted in part and denied in part, as agreed in open court. Defendant's Motion to Order Dr. Wahlstrom to Amend His Diagnosis [85] is denied.

### F. Defendant's Motion to Rebuke and Sanction the Government and Defendant's Former Public Defender for Unauthorized Disclosure of Privileged Physician-Client Medical Information [85]

Defendant argues that the disclosure of Defendant's medical information constituted a violation of the Health Insurance Portability and Accountability Act ("HIPAA") and requests that the Court sanction the government and Defendant's former counsel $5,000 each. Defendant's request is denied. Defense counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). The record before this Court does nothing to rebut this presumption, and Defendant's demand lacks a sufficient basis in law or fact.

### G. Defendant's Motion to Compel Discovery [85] and, in the Alternative, Oral Motion to Suppress Evidence for Destruction of Exculpatory Evidence

Special Agent Timothy Walther testified—during both the grand jury proceedings and evidentiary hearing—that the FBI first learned of Defendant's conduct as a result of an email that was sent to the Illinois State Police FOID Department, which was then forwarded to the FBI. Tr. [144] 21:19-20; Def. Ex. 35 at 16.

During a status hearing held on October 11, 2016, Defendant requested that this email be produced in the course of discovery. Tr. [95] 20:3-24. The government objected to such production and declared that it does not intend to use the email in its case-in-chief. *Id.* at 21:2-22:14. The Court ordered the government to determine if the email was still in existence, and if so, submit an unredacted copy for *in camera* inspection. *Id.* 24:24-25:8.

Counsel for the government subsequently learned that the initial email sent to the Illinois State Police FOID Department was not retained, and that the identity of the sender remains unknown to law enforcement. Counsel for the government also learned, however, that an Illinois State Police employee

sent an email to the FBI conveying the substance of the original report along with a link to Defendant's Facebook page. The government submitted a redacted[14] copy of the FBI "Internet Activity Report" documenting this email to the Court for *in camera* inspection.

**\*22** Having concluded its *in camera* review, this Court finds that Defendant is not entitled to the "Internet Activity Report." Discovery in criminal prosecutions "is limited," *United States v. Neal*, 611 F.3d 399, 401 (7th Cir. 2010); and courts possess "broad discretion with regard to discovery motions in criminal cases." *United States v. Delatorre*, 438 F. Supp. 2d 892, 900 (N.D. Ill. 2006), *aff'd sub nom. United States v. Benabe*, 436 Fed.Appx. 639 (7th Cir. 2011). Federal Rule of Criminal Procedure 16 outlines "the minimum amount of discovery to which the parties are entitled," although the rule does not limit the "judge's discretion to order broader discovery in appropriate cases." Fed. R. Crim. P. 16, Advisory Committee Note. Additionally, pursuant to the Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83 (1963), the Government "has a duty to disclose evidence favorable to the defense (either exculpatory or that which could be used for impeachment) where such evidence is material either to guilt or punishment." *Delatorre*, 438 F. Supp. 2d at 901.

The "Internet Activity Report," however, reveals no information favorable to the defense. Nor does it fall under one of the disclosure categories outlined in Rule 16. *See* Fed. R. Crim. P. 16(a)(1). The report does not contain an oral, written, or recorded statement of Defendant; Defendant's prior record; the results of physical or mental examinations or scientific tests or experiments; or a summary of expert witness testimony. *See id.* Moreover, because the report merely memorializes facts already known to Defendant (that Illinois State Police received an email concerning Defendant's Facebook page and subsequently notified the FBI), the report is not material to preparing a defense. *See id.* at 16(a)(1)(E)(i). As a result, Defendant's Motion to Compel [85] is denied.

Upon learning at the evidentiary hearing that the initial email sent to the Illinois State Police FOID Department was not preserved, Defendant orally moved to suppress all evidence against him as a remedy for what he deems the destruction of exculpatory evidence. To prevail on a due process claim based upon destruction of exculpatory evidence, however, Defendant bears the burden of establishing that: (1) the government, in bad faith, destroyed or failed to preserve the evidence; (2) the exculpatory value of the evidence was

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 47 of 51 PageID #:433

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

apparent before the evidence was destroyed; and (3) the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means. *United States v. Andreas*, No. 96-cr-762, 1998 WL 214666, at *3 (N.D. Ill. Apr. 22, 1998), *aff'd*, 216 F.3d 645 (7th Cir. 2000) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)). Bad faith is determined by whether the government knew the exculpatory value of the evidence at the time it was lost or destroyed. *See Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992). To show bad faith, the defendant "must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence." *McCaughtry*, 965 F.2d at 477 (citing *U.S. v. Nesbitt*, 852 F.2d 1502, 1520 (7th Cir. 1988)). Defendant has made no such showing here, and his oral motion is accordingly denied.

### H. Defendant's Motion to Show Cause on Subject Matter Jurisdiction [97]

According to Defendant, internet threats are covered by state criminal law. *See* 720 ILCS § 5/26.5-3 ("Harassment through electronic communications"). Moreover, Defendant claims that under the FBI's Domestic Investigations and Operations Guide, the federal government does not possess subject matter jurisdiction over an offense unless a request for investigative assistance is made by an appropriate state official. Defendant requests an order directing the government to disclose "the form, content and identity of the State official who requested the FBI for assistance." Def.'s Mot. [97] 1.

*23 Defendant misunderstands jurisdictional precepts. The fact that Illinois maintains its own criminal threat statute is immaterial. Such duality is merely the product of "two sovereignties, deriving power from different sources, capable of dealing with the same subject matter within the same territory. Each may, without interference by the other, enact laws to secure prohibition." *United States v. Lanza*, 260 U.S. 377, 382 (1922). Where a defendant "in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences,' " and thus can be prosecuted by either government (or both). *Heath v. Alabama*, 474 U.S. 82, 88 (1985).

Furthermore, federal jurisdiction is conferred by the Constitution and congressional statute, not internal operation guides of executive agencies. *United States v. Wahi*, 850 F.3d 296, 299 (7th Cir. 2017). Defendant is charged with violating 18 U.S.C. § 875(c). District courts "*always* have subject-matter jurisdiction based on *any* indictment purporting to

charge a violation of federal criminal law." *United States v. Bjorkman*, 270 F.3d 482, 490 (7th Cir. 2001) (emphasis in original); 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."). Defendant's unfounded motion, therefore, is denied.

### I. Defendant's Motion to Dismiss for Lack of Territorial Jurisdiction [101]

Finally, citing Article I, Section 8, Clause 17 of the U.S. Constitution, Defendant asserts that the federal government can only exercise jurisdiction with the "cession" or "consent" of a state. Def.'s Mot. [101] 3. Defendant argues that, because there has been no "cession" or "consent" by the State of Illinois, the federal government lacks jurisdiction over his case.

Defendant's constitutional construction is misplaced. Article I, Section 8, Clause 17 states that Congress shall have the power to enact:

> exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I, § 8, cl. 17. This clause—often referred to as the "District Clause" or "Enclave Clause," depending upon the reader's focus—applies to the District of Columbia and federal enclaves. It allows, pursuant to proper "cession" or "consent" by relevant states, the grant of "exclusive" legislative power to Congress over the District of Columbia and federal territories. *See Black Hills Power & Light Co. v. Weinberger*, 808 F.2d 665, 668 (8th Cir. 1987).

Defendant, however, cites the clause for a countervailing proposition—that the federal government lacks *any* jurisdiction over *any* territory not so ceded. Not so. The Enclave Clause does nothing to limit Congress' concomitant authority to regulate interstate commerce, *see* U.S. Const. art. I, § 8, cl. 3, including the use of the channels of interstate commerce; protection of the instrumentalities of interstate commerce; or persons or things in interstate commerce; and activities substantially affecting interstate commerce. *United States v. Morrison*, 529 U.S. 598, 608-09 (2000). Congress

United States v. Khan, Not Reported in Fed. Supp. (2017)
2017 WL 2362572

lawfully enacted 18 U.S.C. § 875(c) pursuant to this authority. Defendant's motion, therefore, is denied.

**J. Defendant's Motion to Extend Trial Date [85]**

**\*24** Given the case's current procedural posture, Defendant's motion to extend his trial date from November 16, 2016 to January 16, 2017 is denied as moot. This Court shall set a trial date at the next status.

**III. Conclusion**

Defendant's timely pretrial motions, including: (1) Motion to Suppress Evidence [89]; (2) Motion to Dismiss the Indictment [89]; (3) Motion to Void 18 U.S.C. § 875(c) for Vagueness [89]; (4) Motion to Unseal Pertinent Documents, Subpoena Medical Records of Dr. Carl Wahlstrom, and Order Dr. Wahlstrom to Amend His Diagnosis [85]; (5) Motion to Rebuke and Sanction the Government and Defendant's Former Public Defender for Unauthorized Disclosure of Privileged Physician-Client Medical Information [85]; (6) Motion to Show Cause on Bill of Particulars [97]; (7) Motion to Compel Discovery [85] and, in the Alternative, Oral Motion to Suppress Evidence for Destruction of Exculpatory Evidence; (8) Motion to Show Cause on Subject Matter Jurisdiction [97]; (9) Motion to Dismiss for Lack of Territorial Jurisdiction [101]; and (10) Motion to Extend Trial Date [85], are denied for the reasons stated above.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2362572

Footnotes

1   Defendant has been advised on multiple occasions of the possible perils of proceeding *pro se. See, e.g.,* Tr. [105] 3:18-7:5; Tr. [126] 2:15-5:25.

2   The final deadline set by this Court for pretrial motions was January 12, 2017. *See* Minute Entry [100]. Defendant filed multiple memoranda after that date. *See, e.g.,* Def.'s Exposition on the Commerce Clause and Interstate Commerce [102]; Def.'s Amended Brief of the Commerce Clause and Interstate Commerce [109]. These briefs were properly stricken from the record, *see* Minute Entry [103, 110], and are not further discussed in this Memorandum Opinion.

3   Much has been made, particularly by Defendant, regarding the unknown source and content of the original email sent to Illinois State Police. Such questions are left unanswered by the record presently before the Court. As discussed *infra*, however, these factual ambiguities do not impact the Court's ultimate conclusions of law.

4   "Inshallah" is an Urdu word meaning "God willing." Def. Ex. 35 at 7.

5   This sentence is also written in Urdu. *Id.* at 6. A rough translation is, "when I say something it will be done." *Id.*

6   Uber is an internet-based ride sharing company that allows passengers to arrange transportation similar to ordering a taxi. Gov. Ex. "Warrant." Uber drivers use their own vehicle and often work part-time. *Id.*

7   A third detective arrived approximately two minutes later. This detective, however, merely took the place of the second detective, who left the immediate area. Gov.'s Resp. [111] Ex. 1 at 28:17-29:18.

8   During the evidentiary hearing, Special Agent Takher testified that, during this conversation, she also obtained written consent from Defendant's father to search the residence. Tr. [144] 109:1-111:23. Defendant contends that this consent was neither knowing nor voluntary, which Defendant's father supported through his testimony at the evidentiary hearing. *See id.* at 137:8-11, 142:4-5, 143:20-144:1, 149:5-150:8, 155:10-14. Although the government offered evidence to rebut this assertion, *see, e.g.,* Tr. [145] 233:17-234:11, 235:6-237:25, this Court need not, and does not, make any findings of fact or conclusions of law on the issue.

9   This same conclusion applies to: (1) Defendant's Facebook subscriber information; (2) the IP addresses used to access Defendant's Facebook account; and (3) Defendant's (or his father's) Comcast subscriber information. *See Huon v. Mudge,* 597 Fed.Appx. 868, 875 (7th Cir. 2015) (holding that individual had no constitutionally protected expectation of privacy in his subscriber information); *United States v. Caira,* 833 F.3d 803, 809 (7th Cir. 2016) (holding that defendant had no reasonable expectation of privacy in his I.P. addresses).

10  In support of his Motion to Suppress [89], Defendant cites a state court ruling (based upon a less-detailed factual record than the one presented here) that found Detective O'Neil's traffic stop unlawful. This Court, however, is not bound by a state court's rulings on matters of federal law. *Calvin v. Sheriff of Will Cty.,* 405 F. Supp. 2d 933, 940 (N.D. Ill. 2005), *amended,* No. 03-cv-3086, 2006 WL 1005141 (N.D. Ill. Apr. 14, 2006); *Finch v. Ford Motor Co.,* 327 F. Supp. 2d 942, 945 (N.D. Ill. 2004) (citing *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir. 1997)).

Case: 1:21-cv-00135 Document #: 43-9 Filed: 04/30/21 Page 49 of 51 PageID #:435

United States v. Khan, Not Reported in Fed. Supp. (2017)

2017 WL 2362572

11   Notably, this conclusion remains even assuming, *arguendo*, that Defendant was actually "in custody" at the time consent was given. A consent to search "can be voluntary—and therefore Fourth-Amendment-compliant—notwithstanding the fact that it was given while a defendant was in custody without having received *Miranda* warnings." *United States v. Renken*, 474 F.3d 984, 987 (7th Cir. 2007).

12   Because this Court rules that the search warrant authorized by Magistrate Judge Mason satisfies the Fourth Amendment, it need not address the government's alternative argument that Defendant's father knowingly and voluntarily consented to the search of Defendant's residence.

13   The *Elonis* Court explicitly left open whether a finding of recklessness would be sufficient. 135 S. Ct. at 2012.

14   Specifically, the government redacted the identifying information of the Illinois State Police employee who made the report to the FBI. Such redactions are amenable to the Court and have no bearing upon the Court's ruling on Defendant's Motion to Compel [85].

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 218709
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Darrin WHITE, Plaintiff,

v.

ROZUM, et al. Defendants.

No. Civ.A. 3:06−244.
|
Jan. 25, 2007.

**Attorneys and Law Firms**

Darrin White, Somerset, PA, pro se.

Mariah Passarelli, Office of the Attorney General, Pittsburgh, PA, for Defendants.

*MEMORANDUM OPINION & ORDER*

GIBSON, J.

 *1  Now before the Court are Plaintiff's Motion for Leave to File Supplemental Complaint (Document No. 11) and Motion for Permanent Injunction Relief (Document No. 12), as well as Defendants' Combined Response thereto. In his Amended Complaint, Plaintiff alleges violations of the First and Fourteenth Amendments of the United States Constitution, stemming from his treatment at the hands of Defendants, various state prison officials. On November 15, 2006, Magistrate Judge Keith A. Pesto permitted limited discovery on the issue of whether Plaintiff had exhausted his administrative remedies prior to filing this civil action and ordered the Parties to file cross motions for summary judgment on this issue by January 12, 2007. Document No. 8, p. 6. Defendants' motion was filed on December 29, 2006 (Document No. 8); Plaintiff filed his motion on January 9, 2007 (Document No. 13).

In the interim, however, Plaintiff filed the two motions *sub judice*. Plaintiff's first motion requests leave to file a supplemental complaint under Fed. R. Civ. P. 15(d). Plaintiff seeks to add new defendants and new claims rising from his continued incarceration despite an order of parole allegedly issued on October 5, 2006. Document No. 11, pp. 1–2. In the

second, Plaintiff alleges that he received parole on October 5, 2006, and seeks permanent injunctive relief from continuing incarceration. Document No. 12, pp. 1–2. Both motions thus arise from the same essential facts.

In their Combined Response, Defendants agree that on October 5, 2006, Plaintiff was paroled to the Community Corrections Center (hereinafter "CCC") in Sharon, Pennsylvania. However, the motion and supporting affidavit aver that "placement in a[CCC] is dependent upon the availability of space in that particular Center and thus is beyond the control of both the [Department of Corrections] and the Board [of Probation and Parole]." Document No. 19, ¶ 12; Damiter Decl., Exh. 1 attached to Document No. 19, ¶¶ 3–4. Where space at the assigned CCC is not immediately available, it is the practice of the Department of Corrections to assign the paroled inmate a "bed date," a time when space will be available. The Plaintiff was informed on January 12, 2007, that his bed date for CCC—Sharon was April 30, 2007.

According to Fed. R. Civ. P. 15(d), the Court may permit a litigant to supplement pleadings to include "transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." "In keeping with the liberal nature of Rule 15, a motion to supplement should be denied only where there is undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party or futility of amendment." *Life & Health Ins. Co. v. Federal Ins. Co.,* No. 92–6736, 1994 U.S. Dist. LEXIS 4639, at —— 3–4 (E.D. Pa. April 13, 1994) (citations and alterations omitted). A proposed amendment or supplement is futile if it would not survive a motion to dismiss. *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 125 (3d Cir.1983). The Rule 15 Motion must therefore be denied. Plaintiff has received a bed date and will presumably be transferred to CCC—Sharon at that time.

 *2  The Motion for injunctive relief must also be denied. In analyzing the motion, the Court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001). Not being allowed to supplement his Complaint, Plaintiff is obviously not likely to prevail on the claim to which his request for injunctive relief relates. Furthermore, denial of this relief will operate no irreparable injury on the plaintiff, while granting the injunction will not further the public

interest. The Court sees no point in enjoining Defendants to do what they have already done: assign Plaintiff a bed date. Accordingly, Plaintiff's Motion for Permanent Injunctive Relief will be denied.

An appropriate Order follows.

AND NOW, this 25th day of January, 2007, upon consideration of Plaintiff's Motion for Leave to File Supplemental Complaint (Document No. 11) and Plaintiff's Motion for Permanent injunction Relief (Document No. 12), IT IS HEREBY ORDERED that both Motions are DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 218709

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.