**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | Civil Action File No.: 1:21-cv-00135 |
|  | Judge Sharon Johnson Coleman |
|  | Magistrate Judge Maria Valdez |

**<u>PLAINTIFFS' FEE PETITION</u>**

## TABLE OF CONTENTS

I.     Introduction ................................................................................................................. 1

II.    Background .................................................................................................................. 2

   A.   Nature of the Case ................................................................................................. 2

   B.   The Litigation ........................................................................................................ 3

   C.   The Settlement Negotiations ................................................................................. 7

III.   Class Counsel's fee request is reasonable and should be approved .................................. 8

   A.   Legal Standard ...................................................................................................... 9

   B.   A fee award based on a percentage of the common fund is proper ..................... 9

   C.   Counsel's request for 39.1% of the Settlement Fund is appropriate given the circumstances of the case and the Seventh Circuit case law ........................................................... 10

   D.   A declining fee percentage is neither appropriate nor workable in this case .................... 12

   E.   *Ex ante* negotiations would have yielded at least a 39.1% contingency agreement .......... 14

   F.   Defendants were represented by high-quality lawyers ...................................... 15

IV.   The Court should approve incentive awards for the Named Plaintiffs ................................ 16

V.    The Court should order that the Fee Award be apportioned amongst Class Counsel according to their agreement previously approved by the Court ................................................... 17

VI.   Conclusion ................................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. Cir. Ct. No.
2020 CH 04353 ................................................................................................ 8

*Aranda v. Caribbean Cruise Line, Inc.*, 12 C 4069, 2017 WL 1369741
(N.D. Ill. Apr. 10, 2017) ........................................................................... 10, 12

*Berger v. Xerox Corp. Retirement Income Guarantee Plan*, No. 2004 WL 287902
(S.D. Ill. Jan. 22, 2004) ................................................................................. 17

*Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018) .................................. 10

*Boone v. Snap Inc.*, Cir. Ct. DuPage Cty. Ill. No. 2022-LA-708 .................................................. 15

*Broccolino v. Clearview AI, Inc.*, No. 20-2222 (S.D.N.Y.) ................................................... 3, 4

*Burke v. Clearview AI, Inc.*, No. 20-3104 (S.D.N.Y.) ........................................................ 3, 4

*Calderon v. Clearview AI, Inc.*, No. 20-1296 (S.D.N.Y.) ....................................................... 3

*Calderon v. Clearview AI, Inc.*, S.D.N.Y. No. 20-1296; ........................................................ 4

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825 (7th Cir. 2018) .......... 9

*Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ....................... 13

*Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994) ......................................... 9

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) .................................................................. 13, 14

*Gerald R. Turner & Associates, S.C. v. Moriarty*, 25 F.3d 1356 (7th Cir. 1994) ....................... 15

*Hall v. CDW Government* LLC, No. 20-846 (N.D. Ill.) ........................................................ 3, 4

*Hurvitz v. Clearview AI, Inc.*, No. 21-2960 (E.D.N.Y.) ........................................................... 4

*In re Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ................................. 9, 10, 15

*In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838 (N.D. Ill. 2015) ................................. 12, 13

*In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD .......... 14

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*,

    251 F. Supp. 3d 1225 (N.D. Ind. 2017) ............................................................... 10

*In re Household International Inc.*, No. 02 cv 7921 (N.D. Ill. November 22, 2004) ................... 13

*In re Potash Antitrust Litig.*, No. 08-6910 (N.D. Ill. June 12, 2013) ............................................ 13

*In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791

    (7ᵗʰ Cir. 2017) ........................................................................................................... 9

*In re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir. 2003) (*Synthroid II*) .............. 12, 13

*In re Synthroid Mktg Litigation*, 264 F.3d 712 (7ᵗʰ Cir. 2001) (*Synthroid I*) ............... 9, 11, 13, 15

*In re TikTok, Inc. Consumer Privacy Litig.*, N.D. Ill. No. 20-cv-4699 ........................... 14, 15, 16

*John v. Clearview AI, Inc.*, No. 20-3481 (S.D.N.Y.) ................................................................. 3, 4

*Kenseth v. C.I.R.*, 259 F.3d 881 (7th Cir. 2001) ......................................................................... 15

*Kirchoff v. Flynn*, 786 F.2d 320 (7ᵗʰ Cir. 1986) ......................................................................... 9

*Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) ........................................................ 10

*Mansfield et al. v. Airline Pilots Assoc.*, No. 06 cv 6869 (N.D. Ill. Dec.14, 2009) ..................... 13

*Marron v. Clearview AI, Inc.*, No. 20-2989 (N.D. Ill.) .............................................................. 3, 4

*McPherson v. Clearview AI, Inc.*, No. 20-3053 (S.D.N.Y.) ....................................................... 3, 4

*Mutnick v. Clearview AI, Inc., et al.*, No. 20-cv-512 (N.D. Ill.) ................................................. 3, 4

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ................................................................. 11

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ..................................................... 11

*Renderos v. Clearview AI, Inc.*, No. 21-4572 (N.D. Cal.) ............................................................ 4

*Rivera v. Google, LLC*, Cook Cty. Cir. Ct. No. 2019-CH-990 ................................................... 14

*Roberson v. Clearview AI, Inc.*, No. 20-3705 (S.D.N.Y.) ......................................................... 3, 4

*Robert W. Karr & Associates, Ltd. v. Novoselsky*, No. 08 cv 1197, 2008 WL 4865573

(N.D. Ill. July 14, 2008) ................................................................................... 15

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) ............................. 9

*Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) .................................. 10

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ..................................................... 9

*Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) .............................................. 11

*United States ex rel. LeFan v. Gen. Elec. Co.*, No. 4:00-CV-222, 2008 WL 3390807

(W.D. Ky. Aug. 8, 2008) .................................................................................. 15

*Vestrand v. Clearview AI, Inc.*, No. 21-4360 (C.D. Cal.) ............................................ 4

*Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174

(S.D. Ill. Nov. 22, 2010) ................................................................................. 16

**Rules**

Rule 37 ......................................................................................................... 5

**Statutes**

28 U.S.C. 1407 ................................................................................................. 4

 **State Law**

Illinois Biometric Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA") .......................... 2, 3, 9

## I.    Introduction

After almost four years of litigation, this Court preliminarily approved the settlement of this class action involving a massive nationwide class which raised cutting-edge issues of biometric privacy law.  The settlement itself is also precedent setting, making the Class members effectively part owners of the Defendant and giving them equity in the value generated from their biometric data. The Settlement represents a victory for the Class that was far from certain when undersigned counsel embarked on representing them.

Both before and after consolidation into this MDL on January 8, 2021, this matter has been hotly contested and heavily litigated, both as to the merits and as to a host of discovery issues. And achieving the settlement did not come quickly or easily: it was reached near the end of more than two years of fact discovery, after much wrangling in court, and multiple mediations stretching out over a year with a well-respected former judge of this Court.

Class Counsel fought on to obtain a recovery despite Clearview's status as a cash-strapped start-up company with no means of satisfying any potential judgment. To win for the Class without the pyrrhic victory of bankrupting the Defendant, we ultimately hired tax and securities experts to create a settlement that achieves the best possible value for the Class members, far out-stripping settlement of similar claims against tech behemoths such as Facebook and Google in terms of the percentage of enterprise value the Class will receive. The proposed settlement also builds in significant protections for the Class in the form of a Settlement Master (another highly respected former Judge of this Court), who has authority to inspect Clearview's books and records and monitor its activities to ensure the Class obtains the maximum value for its stake in the company.

In short, Class Counsel transformed this complex case against a startup with serious risk of zero recovery into a first of its kind equity-based settlement that dwarfs similar cases from a

valuation perspective. In consideration for the extensive time, effort, and expertise Class Counsel expended, Plaintiffs seek attorneys' fees in the amount of 39.1% of the Settlement Fund. The percentage sought is inclusive of Class Counsel's fees and expenses, and the payout to the Class will not be further diminished by payment of settlement administration and expenses, all of which will be borne by Clearview.

Against this backdrop, Class Counsel's fee request of 39.1% of the Settlement Fund, and incentive payments for each of the four named Plaintiffs in an amount equal to the lesser of 50 shares in the Net Settlement Fund $1,500.00, is reasonable.

## II.    Background

### A.    Nature of the Case

Defendant Clearview AI ("Clearview") is a start-up company that offers its customers the ability to identify unknown individuals whose facial images have been captured on film or video. It is able to offer this service because it amassed a database of billions of facial images posted on public websites, along with the metadata identifying the website where the image was captured.[1] Clearview's customers – law enforcement agencies or (at the time) private companies – would submit a facial image, and Clearview, using biometric facial geometry, would attempt to "match" the submitted facial image to those in its database. Clearview's customers could then use the metadata associated with the matched image(s) to further investigate the identity of the individual in the submitted image. The Class alleges that Clearview's practice of collecting their facial geometry without prior consent violates the Illinois Biometric Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA") and other laws.

---

[1] *See, generally*, Dkt. 573 at ¶¶ 27-30.

**B.** **The Litigation**

This case has been heavily litigated since its inception. In November of 2019, Lead Class Counsel, Loevy & Loevy, learned about Clearview's practices via information obtained under the Freedom of Information Act from law enforcement and began developing this case.[2] Two months later, when the New York Times article "The Secretive Company that Might End Privacy as We Know It" was published on January 18, 2020, Lead Class Counsel was already working on the case and thus were the first to file claims on behalf of the Class.[3] Additional filings, many copying our work, soon followed in courts across the country, alleging not only BIPA violations but also claims based on privacy and computer crime statutes in New York, Virginia and California.[4]

In the original *Mutnick*[5] action, Lead Class Counsel moved quickly to advance the BIPA claims. Within weeks of filing, Lead Class Counsel had sent FOIA requests to law enforcement agencies in Illinois, New York and New Jersey amassing evidence on Clearview's contracts with those agencies.[6] On April 8, 2020 – as offices and courts across the country shut down in response to Covid – Lead Class Counsel filed a motion for preliminary injunction seeking to enjoin Clearview's BIPA-violating practices.[7]

---

[2] Ex. A, Declaration of Mike Kanovitz, ¶ 8.

[3] Ex. A, ¶ 9; *see Mutnick v. Clearview AI, Inc., et al.*, N.D. Ill. No. 20-cv-512, Dkt. 1.

[4] Ex. A., ¶ 10; *see Hall v. CDW Government* LLC, N.D. Ill. No. 20-846; *Marron v. Clearview AI, Inc.*, N.D. Ill. No. 20-2989; *Calderon v. Clearview AI, Inc.*, S.D.N.Y. No. 20-1296; *Broccolino v. Clearview AI, Inc.*, S.D.N.Y. No. 20-2222; *McPherson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3053; *Burke v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3104; *John v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3481; *Roberson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3705.

[5] *Mutnick v. Clearview AI, Inc., et al.*, N.D. Ill. No. 20-cv-512.

[6] Ex. A, ¶ 11.

[7] Ex. A, ¶ 12; *Mutnick*, N.D. Ill. No. 20-cv-512, Dkt. 31.

Clearview filed a motion to dismiss on April 27, 2020, and also sought a stay to forestall Plaintiff's motion for preliminary injunction.[8]

The various pleadings motions, motions to stay, and motion for preliminary injunction led to regular filings by Lead Class Counsel over the ensuing months, as reflected on the Court's docket and those of the consolidated actions.[9] Finally, on August 18, 2020 (two days after it had finally responding to Plaintiff's motion for preliminary injunction), Clearview moved to consolidate ten existing actions into a multidistrict litigation pursuant to 28 U.S.C. 1407.[10] Clearview also sought to stay the *Mutnick* case pending resolution by the JPML, which the Court granted. Following briefing and oral argument, on December 15, 2020, the Judicial Panel on Multidistrict Litigation ordered that nine of the pending actions be consolidated into this action.[11] The JPML ordered two additional cases transferred to this MDL on June 21, 2021 and another on October 5,2021.[12]

Upon consolidation into this MDL on January 8, 2021, the frenetic pace of litigation redoubled. Following this Court's appointment of Loevy & Loevy as Interim Lead Class Counsel

---

[8] Ex. A, ¶ 13; *Mutnick*, N.D. Ill. No. 20-cv-512, Dkts. 45 & 47.

[9] Ex. A, ¶ 14.

[10] *In re Clearview AI, Inc. Privacy Litigation*, MDL No. 2967, Dkt. 1.

[11] *Id.*, Dkt. 50. The original MDL transfer order dated January 8, 2021 included the following cases: *Mutnick v. Clearview AI, Inc.*, N.D. Ill. No. 20-512; *Hall v. CDW Government* LLC, N.D. Ill. No. 20-846; *Marron v. Clearview AI, Inc.*, N.D. Ill. No. 20-2989; *Calderon v. Clearview AI, Inc.*, S.D.N.Y. No. 20-1296; *Broccolino v. Clearview AI, Inc.*, S.D.N.Y. No. 20-2222; *McPherson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3053; *Burke v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3104; *John v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3481; *Roberson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3705. Dkt. 1. Two additional cases were transferred to the MDL on June 21, 2021: *Vestrand v. Clearview AI, Inc.*, C.D. Cal. No. 21-4360 and *Hurvitz v. Clearview AI, Inc.*, E.D.N.Y. No. 21-2960. Dkt. 108. An additional case was transferred on October 5, 2021: *Renderos v. Clearview AI, Inc.*, N.D. Cal. No. 21-4572.

[12] *Id.*, Dkts. 66 & 95.

on March 10, 2021, Lead Class Counsel coordinated with Class Counsel to submit a proposed

Case Management and Discovery Plan, as well as a Consolidated Class Action Complaint.[13]

Lead Class Counsel also renewed Plaintiffs' motion for preliminary injunction and sought and

received expedited discovery to support the motion, resulting in the deposition of Defendant

Thomas Mulcaire (Clearview's General Counsel) being taken on May 13, 2021.[14] During this

same time, Lead Class Counsel also propounded Plaintiffs' initial written discovery requests,

sending interrogatories and requests for production on May 24, 2021.[15] The parties also engaged

in a settlement conference with Magistrate Judge Valdez at this time, resulting in an agreed

resolution on Plaintiffs' motion for preliminary injunction but with the litigation otherwise

continuing apace.[16]

Clearview and the Macy's Defendants also renewed their motions to dismiss, with

multiple amici curiae weighing in on their behalves. The Court ultimately granted in part and

denied in part the motions to dismiss in orders dated January 27, 2022, and February 14, 2022.[17]

Defendants sought reconsideration and interlocutory appeal, to no avail.[18]

Meanwhile, even with the motions to dismiss pending, Plaintiffs forged ahead with

written discovery and third-party subpoenas. Class Counsel sent the first of many Rule 37 meet

and confer letters on July 26, 2021, triggering a dispute with Clearview that would ultimately

lead to competing motions for sanctions against Clearview and for a protective order which were

---

[13] Ex. A, ¶ 15; Dkts. 27 & 29.

[14] Ex. A, ¶ 16; Dkts. 30 & 44.

[15] Ex. A, ¶ 17.

[16] Ex. A, ¶ 18; Dkt. 94.

[17] Dkts. 272 & 279.

[18] Dkts. 283, 307.

still pending when the matter was stayed for settlement discussions more than a year and a half later.[19] Class Counsel negotiated a detailed ESI protocol in this case involving billions of records and also negotiated Clearview's ultimate agreement to allow Plaintiffs' retained expert to inspect Clearview's source code – both processes took months of negotiation, with dozens of letters, emails, and phone calls, as well as (at times) the Court's intervention.[20] Clearview's document production ultimately resulted in the production of more than 300,000 pages of documents.[21]

In addition to the time, effort and expertise brought by the attorneys to this cause, Lead Class Counsel also incurred significant costs and expenses, primarily in the retention of experts but also in connection with travel costs, legal research, and other routine litigation expenses. All told, Lead Class Counsel has expended more than $160,000.00 in out-of-pocket costs in prosecuting this litigation.[22]

In sum, prosecution of this action entailed near-daily activity by multiple attorneys over a period of three years. Lead Class Counsel has employed ten different attorneys on this matter supported by at least as many paralegals and support staff, and additional attorneys from other Class Counsel firms also contributed significant time and effort to the matter.[23] All of this effort was undertaken with full understanding of the risk that Class Counsel might recover nothing;

---

[19] Ex. A, ¶ 20.

[20] Ex. A, ¶ 21.

[21] Ex. A, ¶ 22.

[22] Ex. A, ¶ 23.

[23] Ex. A, ¶ 24.

indeed, to this day Class Counsel knows only that any fees will be collected only when the Class has realized a recovery.[24]

### C.    The Settlement Negotiations

Plaintiffs and Clearview first discussed settlement in mid-2022, engaging Hon. Wayne Andersen (ret.) to explore a potential resolution.[25] While the parties held extensive discussions facilitated by Judge Andersen at that time, no resolution was reached.[26] In late December of 2022, Plaintiffs and the Clearview Defendants again expressed interest in exploring settlement. Plaintiffs and Clearview re-engaged Judge Andersen as a mediator and conducted mediation on March 7, 2023.[27]

From the outset, it was clear that the case would not be settled with an adequate cash payment. The size of the proposed plaintiff class and subclasses – encompassing virtually any individual whose face has been posted on the internet – mandates that any monetary settlement be substantial. And Clearview simply does not have the means to make such a payment. Clearview is a startup with few unencumbered assets, and the pendency of this litigation also meant that it could not attract additional funding rounds necessary for its growth. The company provided convincing evidence of its financial condition demonstrating that it could not even survive to continue paying to fight the litigation.[28]

Nor would it have made sense to give up on financial relief in order to secure an injunction. Collateral litigation, brought after these consolidated cases were filed, sought and

---

[24] Ex. A, ¶ 25.

[25] Ex. A, ¶ 26; Ex. B, Declaration of Hon. Wayne Andersen, ¶ 6.

[26] Ex. A, ¶ 27; Ex. B, ¶ 7.

[27] Ex. A, ¶ 28; Ex. B, ¶ 8.

[28] Ex. A, ¶ 29; Ex. B, ¶ 9.

settled for injunctive-only relief that addressed the landscape of needed changes to the company's practices as well as programmatic accommodations for Class members.[29] It also ended any ongoing violations by the putative defendant class. Among other matters, that settlement permanently bans Clearview from granting free or paid access to its database to private companies, unless explicitly exempt under BIPA, thereby primarily limiting it to government customers with legal authority to use the database, and also allows Class members to remove themselves from the database.[30]

These realities led Lead Class Counsel to fashion a creative solution, that secures for the Class a percentage of the value Clearview could achieve in the future, should they not bankrupt it by continuing to litigate. Over the ensuing months, with the help of Judge Andersen as well as securities and tax experts retained by Lead Class Counsel, the Parties developed the structure and negotiated the terms of this novel approach.[31] To the best of our awareness, this settlement is trailblazing, with no other class action lawyers having found a way to achieve significant value for their clients under such challenging circumstances.[32]

## III. Class Counsel's fee request is reasonable and should be approved

Class Counsel's hard work has led to the creation of a Settlement Fund that may potentially exceed $51 million should Clearview succeed as a company. We seek an award of 39.1% of that Settlement Fund as a fee for securing it for the Class. As described below, Illinois law likely

---

[29] *See American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. Cir. Ct. No. 2020 CH 04353.

[30] Ex. A, ¶ 30; *see also https://www.aclu.org/press-releases/big-win-settlement-ensures-clearview-ai-complies-with-groundbreaking-illinois*

[31] Ex. A, ¶ 31.

[32] Ex. A, ¶ 32.

governs this fee petition, but regardless of whether Illinois law or federal common law applies, a fee of 39.1% of the Settlement Fund is reasonable and should be approved.

### A. Legal Standard

As Judge Lee recently stated in approving attorneys' fees in another MDL class action arising from BIPA and other state and federal privacy laws:

> When evaluating the reasonableness of a request for attorneys' fees, the Seventh Circuit has stated that the district court must "compare attorney fees to what is actually recovered by the class," *In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017), with a goal "to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832-33 (7th Cir. 2018) (quoting *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007).[33]

As noted by Judge Lee, a material consideration in determining an appropriate fee is the risk of nonpayment. *See Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013); *In re Synthroid Mktg Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (*Synthroid I*). "The lawyers for the class receive no fee if the suit fails." *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992). "Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman*, 739, F.3d at 958 (citing *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986).

### B. A fee award based on a percentage of the common fund is proper

Courts in the Seventh Circuit have the discretion to award fees based on a percentage of the common fund or using the lodestar method. *See*, *e.g.*, *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994). The common fund doctrine is "based on the equitable notion that those who have benefited from litigation should share its costs." *Skelton v. General Motors*

---

[33] *In re TikTok, Inc. Consumer Privacy Litigation*, 617 F. Supp. 3d 904, 939 (N.D. Ill. 2022).

*Corp.*, 860 F.2d 250, 252 (7th Cir. 1988) (citations omitted). The Seventh Circuit has recognized "that there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration." *Id.*; *see also In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 251 F. Supp. 3d 1225, 1236 (N.D. Ind. 2017) ("Our court of appeals favors the percentage-of-the-fund fee in common fund cases because it provides the best hope of estimating what a willing seller and a willing buyer seeking the largest recovery in the shortest time would have agreed to *ex ante*."); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 501 (N.D. Ill. 2015) (percentage of fund is preferred approach in consumer class actions "because fee arrangements based on the lodestar method require plaintiffs to monitor counsel and ensure that counsel are working efficiently on an hourly basis, something a class of nine million lightly-injured plaintiffs likely would not be interested in doing").[34]

### C. Counsel's request for 39.1% of the Settlement Fund is appropriate given the circumstances of the case and the Seventh Circuit case law

When awarding fees from a common fund, "[t]he object . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible." *In re Continental*, 962 F.2d at 572. The relevant fee is the percentage of the recovery that counsel would have negotiated before undertaking the case, given the expected need for labor and out of pocket costs that counsel need to put at risk, and, in particular, the risk of losing it all. *Sutton v.*

---

[34] The hours spent on litigating the case after filing are not an inherent measure of the *ex ante* risk, and so the Court need not conduct a lodestar cross-check. *See, e.g.*, *Aranda v. Caribbean Cruise Line, Inc.*, 12 C 4069, 2017 WL 1369741, at *9 (N.D. Ill. Apr. 10, 2017) (explaining that lodestar cross-check would not "be particularly helpful" because "it is clear that counsel provided exceptional representation for the class and produced high-value output"), *aff'd sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018); *see also Kolinek*, 311 F.R.D. 483, 500 (N.D. Ill. 2015) ("no Seventh Circuit case law suggests that a percentage-of-the-fund approach will yield a reasonable result only where it satisfies a lodestar cross-check").

*Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (the *ex ante* contingency negotiation would be affected by the risk of nonpayment, the quality and quantity of the work needed to litigate the case, and the likely stakes to be won), citing *Synthroid I*, 264 F.3d at 721 (7th Cir. 2001) "The greater the risk of loss, the greater the incentive compensation required." *Synthroid I*, 264 F.3d at 719.

In the Seventh Circuit, the fee must be calculated based on the net recovery to the class after deducting expenses. *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) (finding attorneys' fees are calculated by comparing "the ratio of (1) the fee to (2) the fee plus what the class members received."). The Seventh Circuit has explained that in applying this ratio, "the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014).

As the Court is aware, the ultimate payout to the Class (and thus to Class Counsel) remains entirely contingent. Clearview must succeed as a company and its degree of success will determine the payouts, depending on which of the Settlement Agreement's payout methods are ultimately utilized. What is certain, however, is that the Settlement Fund will not be reduced by the cost of notice and settlement administration, which are borne entirely by Clearview under the Parties' agreement. Nor will the Class be required to reimburse Class Counsel's litigation expenses of over $160,000.00. Thus, this is not a case (such as *Redman* or *Pearson*) in which the Court is burdened with comparing a set dollar figure for fees against an uncertain or diminished amount payable to the Class. Upon establishment of the Settlement Fund, whatever the amount might be, Class Counsel will receive the percentage approved by the Court, and no more.

Accordingly, Class Counsel's request for a percentage award of 39.1% falls well within the Seventh Circuit's range.

### D. A declining fee percentage is neither appropriate nor workable in this case

Courts in this circuit sometimes calculate common-fund fee awards in large cases using a declining marginal scale such as the one the Seventh Circuit sketched in *In re Synthroid Marketing Litigation*, 325 F.3d 974 (7th Cir. 2003) (*Synthroid II*), particularly in consumer cases, *see Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *4 (N.D. Ill. Apr. 10, 2017). That approach is intended to ensure that lawyers do not receive unearned windfalls, i.e. far more than would have been agreed to in an arm's length negotiation *ex ante*.

The marginal scale, however, is not mandatory, and is not a one size fits all. *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 845-46 (N.D. Ill. 2015). It is particularly a misfit in this unusual case, where the dollar values are not yet knowable. In short, there is no way to apply a declining marginal scale as there is no dollar amount against which to gauge whether the fee Counsel may ultimately receive is fair *ex ante* or a windfall. There is only equity to be divided according to whatever *ex ante* deal the Court finds reasonable.

As explained below, there are no grounds to believe that the proposed fee of less than 40% (inclusive of litigation expenses) is a windfall, given that the market rate tends to be between 1/3 and 40%, and that Counsel has accepted the continuing risk of receiving nothing. As Judge Dow explained when he awarded fees in the amount of 1/3 of a $45 million common fund, the *Synthroid* sliding scale "is not a one-size-fits-all recovery scheme, and there are many other factors to consider before declaring this pricing grid the Cinderella slipper." *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 845-46 (N.D. Ill. 2015) (explaining "that there is no shortage of cases supporting the reasonableness of Class Counsel's request").

Indeed, courts in this circuit and elsewhere frequently award fees of approximately one-

third or higher, after deduction of settlement administration and litigation costs, both before and after *Synthroid II*. *See, e.g., Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (approving a fee of 38% of a $20 million dollar common fund in a risky case); *Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) ("A 33.99% market rate award in a complex case that involved a lengthy and contentious discovery period would by no means be an unreasonable outlier."); *In re Potash Antitrust Litig.*, No. 08-6910, Dkt. 589 at 2 (N.D. Ill. June 12, 2013) (one-third fee awarded from $90 million settlement fund); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d at 842, 845, 848, 861 (agreeing that class counsel under a "sizeable risk" to bring the case justifying an award of 1/3 of the $46 million common fund); *Mansfield et al. v. Airline Pilots Assoc.*, No. 06 cv 6869 at 7 (N.D. Ill. Dec.14, 2009) (approving 35% of a $44 million common fund and finding 35% to be the market rate given that there was a "significant risk" of non-payment) (attached as Ex. C); *In re Household International Inc.*, No. 02 cv 7921 (N.D. Ill. November 22, 2004) (awarding 30% of a $46.5 million fund and finding that 30% was "at or below the market rate").

Of note, in each of those cases, the courts were dividing up a pot of cash, and Counsel was being paid – definitely and certainly. By contrast here, the fee is entirely on the come, meaning that quibbling over percentage reductions is less meaningful and that the percentages should arguably be higher to offset the unknown (but certainly extant) risk of Counsel receiving nothing. Moreover, a marginal fee arrangement that reduced the contingency percentage as the recovery increased here would have been a poor arrangement for the Class in terms of economic incentives given that the Defendant was a startup and essentially broke. It is also one that Class Counsel would not have agreed to at the outset of the case. *See Synthroid I*, 264 F.3d at 721 ("This is not to say that systems with declining marginal percentages are always best. They also

create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client.").

### E. *Ex ante* negotiations would have yielded at least a 39.1% contingency agreement

Contingency agreements providing for fees of between one-third and forty-plus percent – after deduction of expenses – are standard for tort litigation, and so there is every reason to believe that *ex ante* negotiations between the Class and Class Counsel would have resulted in an agreement somewhere in that range. *See*, *e.g.*, *Gaskill*, 160 F.3d at 362. That Class Counsel seeks an award within that range – with no deduction for litigation or settlement administration costs – indicates that the request fee percentage is reasonable. At the outset, this case involved difficult issues concerning liability, class certification and damages, and once filed, it also involved well-funded, sophisticated defendants represented by some of the top law firms in the country. There are few firms with the wherewithal and risk tolerance to litigate such cases at the highest level.

Moreover, the result we obtained for the Class under extremely challenging circumstances of an impecunious defendant is noteworthy. The settlement far exceeds other comparable BIPA settlements in terms of the percentage of the Defendant's valuation. In *In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD, for example, the class obtained a $650 million settlement, but that amounted to less than 1% of Facebook's market capitalization at that time. The same is true of the $100 million settlement in *Rivera v. Google, LLC*, Cook Cty. Cir. Ct. No. 2019-CH-990, which represented approximately .01% of Google's value. Measured against these benchmarks, obtaining almost one-quarter of Clearview's equity is an exceptional result. *See also In re TikTok, Inc. Consumer Privacy Litig.*, N.D. Ill. No. 20-cv-4699 ($92 million settlement, representing less than 1% of TikTok's

14

estimated valuation); *Boone v. Snap Inc.*, Cir. Ct. DuPage Cty. Ill. No. 2022-LA-708 ($35 million settlement representing less than 1% of Snapchat's market capitalization).

Also to be considered is the quality of the legal talent brought to bear for the Class. In an arm's length *ex ante* negotiation, between the Class and Class Counsel, it is unlikely that the Class would have shopped around for less well-situated attorneys or walk away from a fee offer of 39.1%, because the contribution that Loevy & Loevy was likely to make could expand the pie available to the Class to such a degree that it would dwarf the effect of the difference in a few percentage points. *See Synthroid I*, 264 F.3d at 720 ("Quality varies among lawyers, and awards net of fees could rise with the level of fees if a higher payment attracts the best counsel. We never see private clients auctioning off their legal work to the lowest bidder.").

Because a 39.1% contingency award is within the range of what is typically negotiated *ex ante* it is the fee that the Court should approve. *In re Continental*, 962 F.2d at 572.[35]

### F. Defendants were represented by high-quality lawyers

Some courts also consider the quality of Defendants' representation in setting a reasonable fee. *See*, *e.g.*, *In re TikTok*, 617 F. Supp. 3d at 942 (N.D. Ill. 2022). In this case, Defendants had extremely high-quality representation. Namely, Defendants were represented by multiple large law firms, and the defense was led by Jenner & Block, one of the largest and most successful law firms in the country. *See* Chambers and Partners review, available at

---

[35] *See, e.g., Kenseth v. C.I.R.*, 259 F.3d 881 (7th Cir. 2001) (40% contingency contract for age discrimination case); *Gerald R. Turner & Associates, S.C. v. Moriarty*, 25 F.3d 1356 (7th Cir. 1994) (40% contingency for medical malpractice claim); *Robert W. Karr & Associates, Ltd. v. Novoselsky*, No. 08 cv 1197, 2008 WL 4865573 (N.D. Ill. July 14, 2008) (40% contingency fee to handle attorney malpractice claim); *United States ex rel. LeFan v. Gen. Elec. Co.*, No. 4:00-CV-222, 2008 WL 3390807, at *2 (W.D. Ky. Aug. 8, 2008) (in False Claims Act case, "representation agreement that the attorneys had entered into with the plaintiffs provided for a 40% contingency fee"), *aff'd*, 394 F. App'x 265 (6th Cir. 2010).

https://chambers.com/law-firm/jenner-block-llp-usa-5:3580 (noting that "Jenner & Block is a leading practice for the most important litigation and arbitration matters facing companies" and "differentiates itself through its deep experience and abiding commitment to excellence."). "That Class Counsel were able to secure a favorable settlement in the face of this opposition weighs in favor of a one-third fee." *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d at 942.

## IV. The Court should approve incentive awards for the Named Plaintiffs

As the Court is aware, the four Named Plaintiffs were added as such in the Third Amended Consolidated Complaint after their predecessor named plaintiffs declined to participate in the proposed settlement. Accordingly, they did not participate in discovery or have their depositions taken. Nonetheless, each was willing to take on the responsibility of being a class representative under abnormal circumstances in order to see this settlement come to fruition. Accordingly, we request incentive awards that fairly reward their willingness to come forward after the prior reps abandoned the Class as well as the contingent nature of the amount that will be paid to individual class members. As the Court will recall, payments will be made to individual Class and Subclass members at varying levels depending on their pro rata share of the Settlement Fund, which is based on their state of residence. We propose that the Named Plaintiffs receive an incentive payment equal to 50 shares of the Settlement Fund, or 5 times the amount payable to unnamed participants in the Illinois Subclass, to be capped at $1,500.00 in light of their limited involvement in the litigation.

The proposed incentive awards are well below those paid to named plaintiffs who played a more active role in other class actions. *See*, *e.g.*, *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (describing $25,000 named plaintiff incentive award as "well within the ranges typically awarded" for participation in the litigation); *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, No. 2004 WL 287902, at *3 (S.D. Ill.

16

Jan. 22, 2004) (approving $20,000 named plaintiff incentive awards).

**V.     The Court should order that the Fee Award be apportioned amongst Class Counsel according to their agreement previously approved by the Court**

Per the Court's request, Class Counsel filed their Proposal of Plaintiffs' Counsel Regarding Allocation of Fees (Dkt. 511), which the Court approved by Minute Entry on December 16, 2022. (Dkt. 512). The approved proposal provides that after reimbursement of costs and expenses reasonably expended, fees will be allocated as follows:

1. 20% to Lead Class Counsel Loevy & Loevy;

2. 12% to Drury Legal

3. 8% to Bursor & Fisher and Hedin Hall; and

4. The remaining 60% to be split *pro rata* based on lodestar reasonably expended.

Lead Class Counsel requests the Court order all Class Counsel to exchange records of their respective lodestars on or before November 13, 2024, and that Class Counsel submit a Joint Status Report by December 11, 2024 as to the agreed-upon allocation of the 60% to be split *pro rata* by lodestar or, in the alternative, any disputes requiring resolution by the Court.

**VI.    Conclusion**

Class Counsel took this case on despite the need to invest a substantial amount of time and out-of-pocket expenses. Recovery of anything was uncertain, not least because Clearview is a start-up company with limited access to capital. A 39.1% fee, inclusive of costs and expenses, is reasonable and fair in light of the risks and effort needed to reach a successful outcome.

For those reasons and the reasons addressed above, Loevy & Loevy respectfully requests that the Court enter an order: (1) approving its request for an attorneys' fee award in the amount of 39.1% of the Settlement Fund; (2) approving incentive payments equal to the lesser of 50 shares of the Settlement Fund or $1,500.00 for each of the four Named Plaintiffs; and (3)

allocation of the Fee Award to Class Counsel according to their Court-approved agreement.

Dated: September 6, 2024

Respectfully submitted:

By: */s/ Thomas M. Hanson*
Thomas M. Hanson

Jon Loevy (jon@loevy.com)
Michael Kanovitz (mike@loevy.com)
Thomas M. Hanson (hanson@loevy.com)
**LOEVY & LOEVY**
311 N. Aberdeen St.
Chicago, Illinois
312.243.5900

*Lead Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

      I, Thomas M. Hanson, an attorney, hereby certify that, on September 6, 2024, I filed the foregoing document using the Court's CM/ECF system, which affected service on all counsel of record.

                                              <u>/s/ *Thomas M. Hanson*</u>
                                              Thomas M. Hanson