# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | Civil Action File No.: 1:21-cv-00135 |
| | Judge Sharon Johnson Coleman |
| | Magistrate Judge Maria Valdez |

**DECLARATION OF HON. WAYNE R. ANDERSEN (RET.) REGARDING
PLAINTIFFS' FEE PETITION**

I, WAYNE R. ANDERSEN, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I submit this Declaration in my capacity as the mediator in connection with the proposed settlement of the claims asserted in this nationwide class action. While the mediation process is confidential, the parties have authorized me to inform the Court of the procedural and substantive matters set forth herein in support of the Parties' negotiations regarding Plaintiffs' Fee Petition. I make this Declaration based on personal knowledge and am competent to so testify.

2.      For the reasons discussed herein, and based on my extensive discussions with the parties and the information made available to me during negotiations, I believe that the Settlement was negotiated in good faith and the result of each side zealously advocating to obtain the best result for their respective clients given the legal and economic risks involved. This was particularly true with regard to the negotiations regarding the proposed 39.1% percentage for Class Counsel fees.

3.      I am a former U.S. District Judge, a former Judge of the Circuit Court of Cook County, a former Deputy Secretary of State of Illinois, and a former partner with the law firm of Burditt & Calkins. I currently serve as a mediator and arbitrator with the alternative dispute

resolution company, JAMS, working out of the JAMS Chicago office at 71 S. Wacker Drive in Chicago. I am a member of the State Bar of Illinois. I earned my Bachelor of Arts *cum laude* from Harvard University, and my J.D., from the University of Illinois College of Law. After serving as an administrative assistant to Illinois House of Representatives Majority Leader Henry J. Hyde, an associate and partner in private practice at Burditt & Calkins, and a deputy Secretary of State of Illinois, I became a judge of the Circuit Court of Cook County, a position I held for seven years, from 1984-1991.

4.      In 1991, I was nominated by President George H.W. Bush to serve as a United States District Judge for the Northern District of Illinois, a position I held for almost 20 years, from 1991-2010. While on the bench, I presided over hundreds of federal and state court trials. On the bench, I conducted thousands of settlement conferences with parties in state and federal court. These settlement conferences often occurred before trial, enabling the parties to resolve matters without a trial, but I also conducted settlement conferences while withholding entry of judgment on jury verdicts to allow the parties, with my assistance, to work out post-trial final settlements.

5.      I left the federal bench in 2010 and joined JAMS, where, for roughly 14 years, I have helped parties resolve disputes in a wide array of matters including acting as a mediator, arbitrator and discovery master. At JAMS, I have devoted considerable time and energy to serving as a mediator and arbitrator in connection with large, complex cases such as this one. I have successfully mediated numerous complex commercial cases, including large-scale data privacy actions and other, complex class actions.

6.      In 2022 I was first contacted to serve as mediator in connection with a potential resolution of the litigation involving Clearview AI, Inc. ("Clearview"), and I agreed. I did not oversee a typical, day-long in-person mediation session at that time, but coordinated a lengthy

2

series of back-and-forth conversations and information exchanges between Class and Defense counsel. These discussions and submissions addressed highly complex factual, legal and technological issues that revealed substantial expert and investigatory work. These discussed issues included, for example: (1) the facts surrounding Clearview's data scraping and database of photographs and facial vector information; (2) the huge size of potential liability under Illinois' Biometric Information Privacy Act, 740 ILCS 14/1 ("BIPA") and recent decisions applying BIPA; (3) Clearview's defenses to the all Class claims under BIPA; (4) Clearview's arguments as to the territorial limitation of BIPA as applied to non-Illinois residents; (5) the strength of and defenses to class claims brought under California, New York, and Virginia law, as well as the strength of and defenses to nationwide class claims; and (6) the Class claims against Macy's and the putative Defendant class, including the scope and extent of any use by vendors of the information from the Clearview database. Finally, the parties and I considered the inability of Clearview, as a technology start-up with limited funding, client-base, and revenue, to pay any judgment in the tens, never mind the hundreds, of millions of dollars. On this issue of Clearview finances, Clearview provided extensive information – everything that the Class requested – as to its financial condition.

7.      Ultimately, these 2022 discussions did not lead to any agreement or resolution. The Class insisted on receiving a substantial payment from Clearview, along with other forms of possible relief, while Clearview claimed that it could not make the payment being demanded.

8.      In February of 2023, Interim Lead Class Counsel reached out to me to see whether I would be willing to facilitate further negotiations. Counsel for Clearview agreed to the resumption of mediated negotiations. I again agreed to serve as the mediator.

9.      At the outset of this second round of mediated negotiations, both parties had agreed to Lead Class Counsel's plan that any viable class action settlement would need to include the

Class receiving a meaningful equity stake in Clearview AI, Inc. Clearview continued to represent that it could not afford a payment large enough to serve as the basis for a settlement of a class action of this size, and Clearview provided Class Counsel with updated information as to its financial position, revenues, and capitalization.

10.     By the spring of 2023, after numerous conversations in which I served as the go-between and mediator, the parties ultimately agreed on the basic economic terms that were ultimately incorporated into an early September term sheet.  These terms are now reflected in the Class Action Settlement Agreement included with the Motion for Preliminary Approval. The discussions preceding this agreement were extensive and detailed, and addressed key factual issues, legal issues related to liability, damages and class definition/certification, as well as issues of taxation and securities law. I found these discussions to be extremely valuable in helping me understand the relative merits of each party's positions, and to identify the issues that were likely to serve as the primary drivers and obstacles to achieving a settlement.

11.     Among the many complex issues negotiated by the parties was the percentage of the settlement fund that would be proposed to be allocated to Class Counsel fees. The parties were cognizant, as was I, that fee awards for contingent, complex class action settlements usually range from 33% to 40%. Interim Lead Class Counsel argued that the fee percentage should tend to the higher end of that range for a number of reasons. First, the matter itself was exceedingly complex, with numerous factual and legal issues presenting hurdles to any recovery. Class Counsel – and Interim Lead Class Counsel in particular – had nonetheless litigated the case extensively, offering no quarter in the face of an equally zealous (and expensive) defense put on by one of the nation's pre-eminent class action defense firms.

4

12.     Second, the contingent nature of the fee would not end even if the Court ultimately approved the proposed settlement. Rather, just as payout to the Class is contingent on Clearview's ability to achieve its currently-estimated valuation in an IPO or liquidation event, so too is payment of Class Counsel's fees. At no point did Interim Lead Class Counsel intimate that it expected its fees to be paid, or its costs reimbursed, notwithstanding the size or timing of the payout to the Class; to the contrary, Interim Lead Class Counsel insisted that the attorney fee payment be tied to the Class payment, both quantitatively and temporally.

13.     Third, Interim Lead Class Counsel did not propose that its expenses be "taken off the top" before application of the fee percentage. Thus, unlike other settlements where the fee percentage is actually significantly higher than stated due to subtraction of costs and expenses, the proposed 39.1% fee award is a true percentage that will not increase as litigation costs and expenses are backed out. Put differently, Interim Lead Class Counsel contributed its costs (which I am told exceed $160,000) to the fund.

14.     For these reasons, I saw no issues with encouraging the parties to continue to seek a resolution based on a 39.1% fee percentage. To the contrary, I believed that the proposed fee percentage appropriately balanced the highly contingent and hard-fought nature of the litigation with the potential recovery for the Class, which could potentially exceed $30 million even after payment of the proposed fees.

15.     In sum, based on my experience as a litigator, a former U.S. District and state court Judge and a mediator, I believe that the entire settlement – including the proposed 39.1% fee percentage – represents the Parties' strongly held positions throughout the months of hard negotiations.

I declare that the foregoing facts are true and correct and that this declaration was executed this 6th day of September, 2024.

/s/ *Wayne R. Anderson*

Hon. Wayne R. Andersen (ret.)