# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | **Civil Action File No.: 1:21-cv-00135**<br><br>**Judge Sharon Coleman**<br>**Magistrate Judge Maria Valdez**<br><br>**OBJECTION TO THE PROPOSED CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR** |

Dinesh McCoy (pro hac vice)
JUST FUTURES LAW
95 Washington Street Suite 104-149
Canton, MA 02021
954-790-1275
dinesh@justfutureslaw.org
*Attorney for Objector*


Sheila Bedi
Clinical Professor of Law
Director, Community Justice & Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
sheila.bedi@law.northwestern.edu
*Attorney for Objector (local counsel)*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................i

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    I.    Factual Background .....................................................................................................2

    II.   The Litigation Efforts..................................................................................................2

IDENTITY OF OBJECTOR AND INTENT TO APPEAR................................................4

STANDARD ........................................................................................................................4

ARGUMENT .......................................................................................................................5

    I.    The Settlement Unfairly Limits The Legal Rights of The California Subclass ................5

        A.   The Settlement Fails To Address Clearview's Ongoing Harms and Violations of California Law.....6

           1.   Clearview's Ongoing Harms .........................................................................6

               a.   Clearview's Actions Violate California State Law .................................9

               b.   The Settlement Allows Harmful and Illegal Conduct to Continue ...........12

           2.   The Settlement Does Not Fairly Compensate The California Subclass For Release of Claims ....14

    II.   The Form of The Settlement Is Unconscionable................................................................18

    III.  The Notice Is Inadequate ............................................................................................18

        A.   Descriptions in Advertisements Inadequate To Put Class Members on Notice ...............19

        B.   Advertising Based on Search Terms Puts Burden on Class Members ..............................20

        C.   Banner Advertisements Ineffective for Putting Class Members on Notice .......................21

        D.   Time for Notice Must Be Extended ................................................................................22

    IV.  The Release Provision Is Unreasonably Broad................................................................22

CONCLUSION ...................................................................................................................24

i

## TABLE OF AUTHORITIES

Cases

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)...................................................................5

*Brown v. Sega Amusements*, U.S.A., Inc., 2015 WL 1062409 (S.D.N.Y. Mar. 9, 2015)...........................21

*Clement v. Am. Honda Finance Corp.*, 176 F.R.D. 15 (D. Conn. 1997)....................................................15

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ....................................................................5

*Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146 (7th Cir. 2020)........................................................7

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ............................................................................18

*Greenfield v. Villager Indus.*, 483 F.2d 824 (3d Cir. 1973) ........................................................18

*In re Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d 1111(N.D. Ill. 2022), clarified on denial of reconsideration, No. 21-CV-0135, 2022 WL 2915627 (N.D. Ill. July 25, 2022). ...............3, 9, 10, 11

*Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y.2007) ................................................................21

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276 (7th Cir. 2017)...........................14

*Lugosi v. Universal Pictures*, 160 Cal.Rptr. 323 (Cal. 1979)..............................................................11

*Michaels v. Internet Ent. Grp., Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998)..................................................11

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004). ................................................17

*See Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146 (7th Cir. 2020) ............................................7

*Shurland v. Bacci Café*, 271 F.R.D. 139 (N.D.Ill.2010) ..........................................................21

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir.2006). ...................................5, 18

*Winet v. Price*, 6 Cal.Rptr.2d 554 (Cal. Ct. App. 1992) ............................................................24


Court Documents

Civil Case Information Statement, *Renderos v.* Clearview, A167179, Cal. Ct. App. 1st, Feb. 16, 2023. ....4

Class Action Settlement Agreement and Release, ECF 578-1, June 12, 2024.....................................12, 23

Compl., *Renderos v. Clearview*, RG21096898, Super. Ct. Alameda, CA, Apr. 22, 2021. ...........................3

Decl. of Cameron Azari, ECF 578-3, June 12, 2024. ..........................................................................19, 20

Mem. Op. and Order, *In Re. Clearview AI, Inc., Consumer Privacy Litigation*, 21-cv-0135, ECF 315, Mar. 23, 2022.........................................................................................................................................3

Order Re: Ruling on Submitted Matter, *Renderos v. Clearview*, RG21096898, Nov. 18, 2022...........3, 4, 9

Pls.' Unopposed Mot. for Prelim. Approval Class Action Settlement, ECF 578, June 12, 2024. ...3, 12, 15, 16

Prelim. Ord. Approval Class Action Settlement, ECF 580, June 21, 2024. .................................................3

Resp'ts' Answer. Br., *Renderos v. Clearview*, A167179, Cal. Ct. App. 1st, Aug. 2, 2024.......................13

Third Amend. Compl., ECF 573, May 13, 2024 .........................................................................3, 13, 17

Transfer Order, MDL No. 2967, ECF. 50, Dec. 15, 2020. ...........................................................................2

Exhibits

*See* Ex. 1, Decl. of Joshua De Leon..............................................................................................................4

Other Authorities

*An Open Letter to Portland City Council on Facial Recognition*, ACLU Coalition Letter (Jan. 6, 2020), https://www.aclumaine.org/ en/news/open-letter-portland-city-council-facial-recognition. ...................7

Ban Facial Recognition Map, Fight for the Future (last accessed Sept 17, 2024), https://www.banfacialrecognition.com/map/...............................................................................7

Drew Harrell, *Facial Recognition Firm Clearview AI Tells Its Investors It's Seeking Massive Expansion Beyond Law Enforcement*, Wash. Post (Feb. 16, 2022), https://www.washingtonpost.com/technology/2022/02/16/clearview-expansion-facial-recognition/ ......2

*Google, YouTube, Venmo and LinkedIn Send Cease-and-Desist Letters To Facial Recognition App That Helps Law Enforcement*, CBS News, Feb. 5, 2020, https://www.cbsnews.com/news/clearview-ai-google-youtube-send-cease-and-desist-letter-to-facial-recognition-app/. ..................................................9

Google.com (search "Clearview Settlement") (last visited Sept. 5, 2024)...................................................20

James Clayton & Ben Derico, *Clearview AI Used Nearly 1m Times By U.S. Police, It Tells BBC*, BBC (Mar. 27, 2023), https://www.bbc.com/news/technology-65057011. .......................................................6

Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024), https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true. ................7, 8

Nicole Ozer, *The California Constitutional Right to Privacy – A History and a Future Rooted in Intersectional Justice and Integrated Advocacy*, 39 Berkeley Tech. L.J. _ (forthcoming), https://www.law.berkeley.edu/wp-content/uploads/2023/10/California-Constitutional-Right-to-Privacy.-A-History-and-a-Future-Rooted-in-Intersectional-Justice-and-Integrated-Advocacy-October-DRAFT.pdf. ...........................................................................................................................................10

Philip P. Ehrlich, *Comment*, A Balancing Equation for Social Media Publication Notice, 84 U. Chi. L. Rev 2197 & n. 221 (2016) ...........................................................................................................21

Rebecca Heilweil, *The World's Scariest Facial Recognition Company, Explained*, Vox (May 8, 2020), https://www.vox.com/recode/2020/2/11/21131991/clearview-ai-facial-recognition-database-law-enforcement. ......................................................................................................................6, 7

Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen To Anyone Else*, Time (June 29, 2024), https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/.........................................................................................8

Ryan Mac, et al., *Clearview's Facial Recognition App Has Been Used By The Justice Department, ICE, Macy's, Walmart, and the NBA*, Buzzfeed News (Feb. 27, 2020), https://www.buzzfeednews.com/article/ryanmac/ ...................................................................2

*Facial Recognition Firm Clearview Fined €30.5 Million and Banned From Using 'Invasive' AI In The Netherlands*, Fortune (Sept. 3, 2024), https://fortune.com/europe/2024/09/03/facial-recognition-clearview-fined-30-5-million-banned-invasive-ai-the-netherlands/........................................................2

Kashmir Hill, *The Secretive Company That Might End Privacy As We Know It*, N.Y. Times (Nov. 2, 2021). ........................................................................................................................1, 8

Senator Edward Markey, Letter to Clearview Founder and Chief Executive Hoan Ton-That (June 8, 2020), https://www.markey.senate.gov/news/press-releases/senator-markey-presses-clearview-ai-on-facial-recognition-monitoring-during-nationwide-protests. ...................................................8

Settlement Agreement and Release at 2, ACLU, May 4, 2022, https://www.aclu.org/legal-document/exhibit-2-signed-settlement-agreement?redirect=exhibit-2-signed-settlement-agreement. ...13

Vera Bergengruen, *Ukraine's 'Secret Weapon' Against Russia Is A Controversial U.S. Tech Company*, Time (Nov. 14, 2023), https://time.com/6334176/ukraine-clearview-ai-russia/ ................................6, 11

<u>Rules</u>

Fed.R.Civ.P. 23(e)(3)...........................................................................................................................4

## INTRODUCTION

California subclass member Joshua De Leon objects to the proposed class settlement of this case. Mr. De Leon brings this objection to draw attention to the ongoing harms caused by Clearview AI, Inc. ("Clearview") to all California residents, and to address the inadequacy and unfairness of the proposed settlement for the California subclass.

In particular, the proposed settlement fails to address Clearview's ongoing harms and violations of California law. For years, Clearview has illicitly collected and sold the biometric data of anyone with a photo on a publicly accessible web page to create its facial recognition application. *See* Kashmir Hill, *The Secretive Company That Might End Privacy As We Know It*, N.Y. Times (Nov. 2, 2021). In doing so, it has enabled the clandestine and invasive surveillance of millions of Californians and people from around the country.

Clearview's actions violate California laws intended to protect the rights to privacy and control of personal information. Those laws provide meaningful avenues for relief for California residents, including a potential injunction against Clearview's practice of harvesting and selling access to their faceprints without consent. The proposed settlement gives away those avenues for injunctive relief for only a speculative and inadequate promise of a *future* monetary award—an award contingent on Clearview's success in its business of using class members' biometric data without consent. Furthermore, the settlement lumps Californians' meaningful claims with those of a massive nationwide class, diluting the value of the California subclass's avenues for relief. Lastly, the vast majority of the California subclass will likely have no idea about the impact of the proposed settlement on their rights because the notice plan is inadequate and relies on methods unlikely to alert the majority of California residents.

For all these reasons, the Court should reject the proposed settlement.

## BACKGROUND

### I.      Factual Background

Clearview has built the largest faceprint database in the nation by illicitly collecting over forty billion photographs of unsuspecting individuals. *See Facial Recognition Firm Clearview Fined €30.5 Million and Banned From Using 'Invasive' AI In The Netherlands*, Fortune (Sept. 3, 2024), https://fortune.com/europe/2024/09/03/facial-recognition-clearview-fined-30-5-million-banned-invasive-ai-the-netherlands/. It hopes to grow its database to 100 billion images—equal to about 14 photos for each person on Earth. Drew Harrell, *Facial Recognition Firm Clearview AI Tells Its Investors It's Seeking Massive Expansion Beyond Law Enforcement*, Wash. Post (Feb. 16, 2022), https://www.washingtonpost.com/technology/2022/02/16/clearview-expansion-facial-recognition/. Clearview did this by capturing billions of faceprints, including millions of Californians, from images available online, all without the knowledge—much less the consent—of those pictured. Clearview AI has provided thousands of governments, public agencies, and private entities access to its database. *Id.; see also* Ryan Mac, et al., *Clearview's Facial Recognition App Has Been Used By The Justice Department, ICE, Macy's, Walmart, and the NBA*, Buzzfeed News (Feb. 27, 2020), https://www.buzzfeednews.com/article/ryanmac/clearview-ai-fbi-ice-global-law-enforcement.

### II.      The Litigation Efforts

In December 2020, the Judicial Panel on Multidistrict Litigation created this multidistrict litigation case, consolidating related actions against Clearview in the Northern District of Illinois. Transfer Order, MDL No. 2967, ECF. 50, Dec. 15, 2020. In their first amended class action complaint, class plaintiffs alleged that the Clearview defendants' conduct violated their privacy rights and that defendants' use of their biometric information was without their knowledge and consent. *In re Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d 1111, 1118 (N.D. Ill.

2022), clarified on denial of reconsideration, No. 21-CV-0135, 2022 WL 2915627 (N.D. Ill. July 25, 2022). This Court allowed the majority of the class claims to move forward in its decision on Clearview's motion to dismiss. *Id.* After filing their third amended complaint in May 2024 with new named plaintiffs, the parties in the litigation proposed this settlement in June 2024. Third Amend. Compl., ECF 573, May 13, 2024; Pls.' Unopposed Mot. for Prelim. Approval Class Action Settlement, ECF 578, June 12, 2024. The Court set the final approval hearing date for January 8, 2025, and required that objectors or individuals who chose to exclude themselves from the settlement take the necessary steps to do so by Sept. 20, 2024. Prelim. Ord. Approval Class Action Settlement at ¶¶ 6, 10, ECF 580, June 21, 2024.

Individuals and organizations with members in California brought a different suit against Clearview "to enjoin Clearview ... from illegally acquiring, storing, and selling their likenesses, and the likenesses of millions of Californians, in its quest to create a cyber surveillance state." Compl. at ¶1, *Renderos v. Clearview*, RG21096898, Super. Ct. Alameda, CA, Apr. 22, 2021. The *Renderos* plaintiffs seek relief through three causes of action: the common law protection against appropriation of likeness, the right to privacy under the California constitution, and the unlawful and unfair business practices provision of Cal. Business and Professions Code section 17200. *Id.* at ¶¶76-90. Though Clearview attempted to remove and join this action to the MDL here, this Court remanded the case to Alameda County Superior Court. Mem. Op. and Order, *In Re. Clearview AI, Inc., Consumer Privacy Litigation*, 21-cv-0135, ECF 315, Mar. 23, 2022. The California Superior Court denied Clearview's demurrer, finding that plaintiffs plausibly alleged each of their causes of action. Order Re: Ruling on Submitted Matter, *Renderos v. Clearview*, RG21096898, Nov. 18, 2022 (hereinafter "Renderos Trial Court Order"). The Superior Court also denied Clearview's anti-SLAPP motion, which Clearview immediately appealed. *Id.*; Civil

Case Information Statement, *Renderos v. Clearview*, A167179, Cal. Ct. App. 1st, Feb. 16, 2023. Because California law allows for immediate appellate review of anti-SLAPP decisions, the trial court stayed the *Renderos* litigation and awaits a decision from the California Court of Appeals.

## IDENTITY OF OBJECTOR AND INTENT TO APPEAR

These objections are filed by class member Joshua De Leon, who objects on behalf of the entire California subclass. *See* Ex. 1, Decl. of Joshua De Leon. Mr. De Leon has lived in California most of his life, and has resided in Long Beach, California since 2020. *Id.* at ¶ 1. Based on the definitions in the settlement agreement and website and because there are pictures of his face online, Mr. De Leon believes he is a member of the class. *Id.* at ¶ 7. Mr. De Leon has used social media for over a decade, and at times has posted pictures of himself on platforms including Facebook, LinkedIn, and Instagram. *Id.* at ¶ 2. He also knows that other people have posted pictures of him online, including sometimes without his knowledge. *Id.* at ¶ 3. Mr. De Leon maintains a public presence as a result of his work and his political advocacy. *Id.* at ¶ 3, 10. In both professional and volunteer roles, he previously appeared in news media or employer websites alongside his name and picture. *Id.* Mr. De Leon intends to appear at the Final Approval Hearing through counsel and present argument in support of these objections.

## STANDARD

A court may approve a settlement that binds class members only if it determines after a hearing that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(3). In the Seventh Circuit, courts use a balancing test to evaluate these three areas: the test includes: "[1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties, [4] the opinion of competent

counsel, and [5] the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.2006) (*quoting Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir.1996)).

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiffs' case on the merits balanced against the amount offered in the settlement.'" *Id.* at 653 (*quoting In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'" *Id.* (*quoting Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002)).

In addition, a court evaluating a settlement proposal before certification of the class must apply "undiluted, even heightened attention" to "protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) ("[i]n [cases involving settlements prior to class certification], settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e).").

## ARGUMENT

### I. The Settlement Unfairly Limits The Legal Rights of The California Subclass

The Court should reject the settlement because the California subclass' interests are unfairly prejudiced by the settlement's broad release and limited relief. The California subclass has legal avenues for pursuing broad relief that would fundamentally prevent Clearview from continuing its mass surveillance and nonconsensual data collection practices in the state. But the

current settlement sacrifices these central goals for only speculative future monetary recovery, undermining millions of California residents' rights and goals of ending Clearview's harmful practices.

**A. The Settlement Fails To Address Clearview's Ongoing Harms and Violations of California Law**

***1. Clearview's Ongoing Harms***

Allowing this settlement to move forward will do nothing to address the serious ongoing harms and legal violations Californians experience as a result of Clearview's practices.

Clearview's application allows its customers to compare a photograph of a person with over 40 billion images of people's faces from around the world, placing everyone in a "perpetual police lineup." Vera Bergengruen, *Ukraine's 'Secret Weapon' Against Russia Is A Controversial U.S. Tech Company*, Time (Nov. 14, 2023), https://time.com/6334176/ukraine-clearview-ai-russia/; James Clayton & Ben Derico, *Clearview AI Used Nearly 1m Times By U.S. Police, It Tells BBC*, BBC (Mar. 27, 2023), https://www.bbc.com/news/technology-65057011. Any customer with access to the Clearview application could upload a picture of an individual at a protest, a house of worship, a health clinic, or any other place, and instantly see any sufficiently similar images of people in its database linked to various social media platforms and websites. *See generally* Rebecca Heilweil, *The World's Scariest Facial Recognition Company, Explained*, Vox (May 8, 2020), https://www.vox.com/recode/2020/2/11/21131991/clearview-ai-facial-recognition-database-law-enforcement. The websites may describe all that's knowable about the person online – the person's address, employment information, political affiliations, religious activities, and familial and social relationships.

Clearview's business practices erode long-established rights of personal privacy and autonomy, supercharging governments' power to surveil marginalized groups and threatening

free expression. People cannot freely organize, seek reproductive health care, or attend a place of worship if they fear that their faces, who they are, where they go, and what they do could at any moment be unjustly used against them by the government. *Id.* A person's faceprint is immutable– it generally cannot be changed. *See Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1155 (7th Cir. 2020) (biometric identifiers "are meaningfully different because they are immutable, and once compromised, are compromised forever."). Once a person's face is widely available to government, they lose any meaningful anonymity in public life through the constant potential for government identification and tracking. *See An Open Letter to Portland City Council on Facial Recognition*, ACLU Coalition Letter (Jan. 6, 2020), https://www.aclumaine.org/ en/news/open-letter-portland-city-council-facial-recognition. Over twenty communities around the country banned the use of Clearview and other facial recognition technology because of its damaging impact on public trust, personal privacy, and community safety. *See* Ban Facial Recognition Map, Fight for the Future (last accessed Sept 17, 2024), https://www.banfacialrecognition.com/map/.

Clearview's practices exacerbate harms for people of color who are already disproportionately the targets of government surveillance and violence. For example, in Louisiana, police reportedly relied solely on an incorrect face recognition search result from Clearview AI as purported probable cause for an arrest warrant. Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024), https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true. That misidentification led police to wrongfully arrest Randal Quran Reid, a Black Georgia resident who had never even been to Louisiana, for a crime he could not have committed and was held

for nearly a week in jail. *Id.* In similar circumstances, facial recognition technologies led to the wrongful arrests of Porcha Woodruff, Robert Williams, and Michael Oliver, all of whom were arrested because of police reliance on faulty facial recognition searches targeting Black people. Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen To Anyone Else*, Time (June 29, 2024), https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/.

Clearview also chills speech rights given its potential use to target individuals for their political speech and views. This is not a hypothetical scenario– police used Clearview AI to surveil individuals who took part in Black Lives Matter protests, which prompted Senator Edward Markey to make a congressional inquiry into Clearview's potentially stifling impacts on First Amendment protected speech. Senator Edward Markey, Letter to Clearview Founder and Chief Executive Hoan Ton-That (June 8, 2020), https://www.markey.senate.gov/news/press-releases/senator-markey-presses-clearview-ai-on-facial-recognition-monitoring-during-nationwide-protests.

Furthermore, Clearview fundamentally ignores basic legal privacy protections by collecting and selling California residents' and others' biometric data without consent. To build its database, Clearview illicitly scrapes images of millions of people all across the internet, including Facebook, Twitter, LinkedIn, Venmo, employment sites, and news sites. *See* Kashmir Hill, *supra*. Scraping is the process of using automated computer software to gather and copy data from websites on the internet into a database for further retrieval and analysis. At no point does Clearview inform those individuals whose images it acquires or obtain their consent. And it continues to scrape images, despite multiple cease and desist letters from social media companies, including Google, YouTube, Facebook, Venmo, LinkedIn, and Twitter. *Google,*

8

*YouTube, Venmo and LinkedIn Send Cease-and-Desist Letters To Facial Recognition App That Helps Law Enforcement*, CBS News, Feb. 5, 2020, https://www.cbsnews.com/news/clearview-ai-google-youtube-send-cease-and-desist-letter-to-facial-recognition-app/. These companies determined that Clearview's scraping was so invasive that it violated their terms of service with their respective users. *See id.* Therefore, even if a user consents to a website's terms of service, that consent does not extend to Clearview's scraping. That consent also in no way extends to Clearview's subsequent use of its algorithms to "scan[s] the face geometry of each individual depicted to harvest the individuals' unique biometric identifiers and corresponding biometric information." *In re Clearview AI*, 585 F.Supp.3d at 1118. Clearview stores "faceprints" in a searchable database and sells access to it for lucrative contracts with domestic and international customers. In the process, individuals lose the ability to control their sensitive and immutable facial geometry data without receiving any compensation for Clearview's use of their faceprints. *See id.* at 1120.

### a. *Clearview's Actions Violate California State Law*

Clearview's myriad harms violate state laws enacted to protect California residents from abusive intrusions on their privacy and misuse of their identities. California residents have brought claims under the California constitutional right to privacy and the common law right against appropriation to protect their interests, and this Court and the trial court in *Renderos* recognized those causes of action as valid in decisions rejecting Clearview's attempts to dismiss plaintiffs' legal claims. *See In re Clearview AI*, 585 F. Supp. 3d at 1128–30; Renderos Trial Court Order.

*California Constitutional Privacy Protections*

In 1972, California's voters amended California's constitution to include a right to privacy designed to preserve Californians' privacy interests against incursions by the government and companies like Clearview. Nicole Ozer, *The California Constitutional Right to Privacy – A History and a Future Rooted in Intersectional Justice and Integrated Advocacy*, 39 Berkeley Tech. L.J. _ (forthcoming), https://www.law.berkeley.edu/wp-content/uploads/2023/10/California-Constitutional-Right-to-Privacy.-A-History-and-a-Future-Rooted-in-Intersectional-Justice-and-Integrated-Advocacy-October-DRAFT.pdf. Specifically, the ballot argument in favor of Proposition 11, the Privacy Amendment, stated that given the lack of "effective restraints on the information activities of government and business," the "amendment creates a legal and enforceable right of privacy for every Californian." *Id.* at 3. Furthermore, the authors explained the right to privacy's injunctive relief is intended to "prevent[] government and business interests from collecting and stockpiling unnecessary information" and stop the "[misuse of] information gathered for one purpose in order to serve other purposes or to embarrass us." *Id.*

These protections afforded by the right to privacy strike at the heart of Clearview's harmful conduct and impacts on California subclass members. As this Court recognized in its decision rejecting Clearview's motion to dismiss, plaintiffs' plausibly alleged violations of the California constitution "because biometric information, by its very nature, is sensitive and confidential" and the Clearview's nonconsensual collection "invades plaintiffs' privacy in their biometric information." *In re Clearview*, 585 F. Supp. 3d at 1130. Furthermore, the restriction against the "stockpiling of unnecessary information" undermines Clearview's extractive and illicit business model– Clearview has taken the biometric data from over 40 billion images of

people's faces, without regard for terms of service that forbid this practice and without making any effort to give notice to or seek consent from the individuals in these photos. *See* Bergengruen, *supra.* And as discussed above, Clearview's application is ripe for misuse, as government agencies have relied on the faceprints to surveil protesters and make arrests based on misidentifications.

For these reasons, the California constitutional right to privacy provides for meaningful protections for the California subclass.

*Appropriation of Likeness*

Clearview's conduct violates the California subclass' common law right against appropriation of likeness. The California common law right against appropriation of likeness provides for both injunctive relief and damages to prevent defendants from exploiting plaintiffs' likenesses without consent. *See Michaels v. Internet Ent. Grp., Inc.*, 5 F. Supp. 2d 823, 836 (C.D. Cal. 1998); *Lugosi v. Universal Pictures*, 160 Cal.Rptr. 323, 328 (Cal. 1979). Here, the appropriation of likeness claim addresses Clearview's practice of collecting, using, and selling California subclass members' biometric data without consent. This Court held that California plaintiffs plausibly alleged "the California Subclass was injured because the Clearview defendants did not compensate them for the use of their likenesses, identities, and photographs." *See In. re Clearview AI, Inc.* 585 F. Supp. 3d at 1128-30.

Given this Court's recognition of the potential for California plaintiffs to obtain relief for these violations, the Court must appropriately weigh the tangible value of these legal rights against the settlement's proposed relief.

**b.** *The Settlement Allows Harmful and Illegal Conduct to Continue*

The settlement proposal only provides for speculative future monetary recovery without any injunctive relief. The harms to privacy and autonomy described above, and Clearview's resulting profit from its nonconsensual collection and sale of California class members' biometric data would continue under the settlement. The settlement's broad release provision, discussed below in Section IV, would prevent the classes from either pursuing their ongoing claims against Clearview or seeking injunctive relief in the future, unless they take the steps to exclude themselves from the settlement. Class Action Settlement Agreement and Release at ¶ 1.46, ECF 578-1, June 12, 2024. As is further discussed in Subsection III below, the notice plan exacerbates these shortcomings because it does not adequately ensure that class members will know about their rights to make claims or exclude themselves from the settlement.

Class counsel wrongly suggests that Clearview's harmful conduct has already been addressed by the limited injunctive relief provided through a prior settlement in *American Civil Liberties Union, et al. v. Clearview AI*, Inc., Cook Cty. (Ill.) Cir. Ct. Chancery Div. No. 2020 CH 04353. Their unopposed motion for approval describes the injunctive relief in the prior case as "address[ing] the landscape of needed changes to the company's practices as well as programmatic accommodations for Class members." Pl. Unopposed Mot. at 6, ECF 578, June 12, 2024. The unopposed motion states:

> [The settlement in *ACLU v. Clearview*] also ended any ongoing violations by the putative defendant class. Among other matters, that settlement permanently bans Clearview from granting free or paid access to its database to private companies, unless explicitly exempt under BIPA, thereby primarily limiting it to government customers with legal authority to use the database, and also allows Class members to remove themselves from the database. *Id.* at 6-7.

This assessment overstates the impact of the *ACLU* settlement on Clearview's practices, which while meaningful, does not cure all "ongoing violations." The allegations in the class complaint

are not limited to the use of Clearview by private entities– they relate directly to Clearview's conduct in collecting, using, and selling individuals' information without consent, and relate to Clearview's nonconsensual sale of class members' biometric information to government customers. *See* Third Amend. Compl. at ¶ 27, 28, 29, 51, 52. Furthermore, while the *ACLU* settlement provided temporary injunctive relief in the form of a five-year ban on government use of Clearview's faceprint database in Illinois, governments in all other jurisdictions, including California, can continue to use Clearview's faceprint app. Settlement Agreement and Release at 2, ACLU, May 4, 2022, https://www.aclu.org/legal-document/exhibit-2-signed-settlement-agreement?redirect=exhibit-2-signed-settlement-agreement. Similarly, the ACLU settlement provides for only Illinois-based class members to exclude themselves from Clearview's biometric database. *Id.* at 4.

Moreover, while Clearview claims to provide mechanisms to residents of California, Colorado, Connecticut, Oregon, Utah, and Virginia to affirmatively take steps to remove their data from Clearview's database, the deposition testimony of Clearview's general counsel Thomas Mulcaire confirms that Clearview continues to retain those individuals' data. Resp'ts' Answer. Br. at 18, *Renderos v. Clearview*, A167179, Cal. Ct. App. 1st, Aug. 2, 2024. Thus, even if an individual "opts out" or requests "deletion" of their data, Clearview retains their images in its database, despite claims in its Privacy Policy that "once we receive and confirm your request, we will delete your Personal Information in our active records." *Id.* Consequently, Plaintiffs' biometric data, absent the sought injunctive relief, will remain in Clearview's database.

Despite these serious questions regarding the effectiveness of the opt-out and deletion provisions, even a mechanism that allowed individuals from some states to truly exclude themselves from Clearview's database would place the burden on well-informed individuals to

be aware of and take affirmative steps to prevent Clearview's continuous collection and sale of their biometric data. The burden should instead fall on Clearview to refrain from its harmful non-consensual business practices. At the very least, the settlement should provide adequate value to California class members for forgoing their pursuit of a full prohibition of Clearview's use of their biometric information without consent.

Moreover, it is possible that injunctive relief may be granted through the litigation in *Renderos*, barring Clearview's practice of harvesting and selling access to the individual and organizational plaintiffs' faceprints without consent. This injunction could thus set a precedent that creates paths for meaningful relief from Clearview's harms for all California residents. By releasing their claims (potentially unknowingly) through this settlement, California subclass members may be unable to benefit from this significant relief down the line, and many may not obtain any benefits at all.

As discussed in subsection 2 below, when balanced against the strength and robust nature of relief potentially available under the California claims here and in other lawsuits this settlement fails to provide adequate compensation for the California subclass.

### 2. *The Settlement Does Not Fairly Compensate The California Subclass For Release of Claims*

In evaluating a settlement, courts must weigh the benefits of the settlement's monetary and injunctive relief to the classes against the risks and potential benefits of potential future litigation. *See Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 284-85 (7th Cir. 2017). Here, the limited and speculative monetary relief, combined with the lack of injunctive relief, make the settlement woefully inadequate and unfair to California subclass members. As discussed above, the California subclass could benefit significantly from pursuing litigation that enjoins Clearview from creating more harm to individuals and their communities.

14

The parties state that Clearview will fund a settlement through one of the following four means: 1) an Initial Public Offering ("IPO"), 2) a "Deemed Liquidation Event," 3) a "Cash Demand," or 4) the sale of the right to receive the settlement payment. Pls.' Unopposed Mot. at 9-10. The parties estimate the value of options 1 and 2, based on Clearview's current capitalization and a recent, estimated valuation, at $51.7 million. *Id.* For option 3, the cash demand would be equal to "17% of Clearview's GAAP recognized revenue for the period commencing on the date of final approval and ending on the date of the cash demand," and would only be pursued if the Settlement Master "deemed it a better deal for the class than the potential equity-based payments [outlined in options 1 and 2]." *Id.* at 10. For option 4, the Settlement Master can sell the right to receive a settlement for a "commercially reasonable price" that would "necessarily exceed the equity-based options set forth above" in options 1 and 2. *Id.* Furthermore, even if the estimated valuation under options 1 or 2 actually equal $51.7 million, under the settlement, class counsel are entitled to seek up to 39.1% of the settlement fund. *Id.* at 14. At the current provided valuation, after payment of incentive awards and attorneys' fees, the parties estimate that an IPO would provide a net common fund in excess of $31 million. *Id.* at 3.

This labyrinth of hypothetical futures for class members and estimated valuations, and the resulting lack of clarity on what is likely to occur, show that the settlement is too speculative and uncertain to provide meaningful relief for the California subclass. *See Clement v. Am. Honda Finance Corp.*, 176 F.R.D. 15, 28 (D. Conn. 1997) (rejecting settlement where the value to the class members was "too speculative" and there was "a strong danger that the settlement will have absolutely no value to the class"). This assessment reflects the reality that the parties openly admit to in the settlement proposal: "Clearview plainly lacked and lacks sufficient funds for a meaningful settlement and was likely to be bankrupted by its costs of litigation alone." Pls.'

Unopposed Mot. at 17-18. In another section, the parties describe their uninspiring predicament: "Clearview and the Class members were trapped together on a sinking ship: the potential liability was massive, there was no money for a substantial settlement, and the costs of litigation itself would bankrupt Clearview before the case ever got to trial, leaving nothing for the Class members." *Id.* at 2. Despite the apparent fears of Clearview's impending bankruptcy, salvaging Clearview's business provides little value to class members seeking an end to the challenged conduct. Allowing the company to fold under the weight of the numerous, potentially viable challenges to its illicit conduct very well could provide greater benefits to class members who sought meaningful injunctive relief.

The hope that Clearview avoids additional financial pitfalls and roars back into viability appears shaky at best, foolish at worst. While the proposed settlement and its four-level framework of payout options may provide the best avenues for California class members to obtain *some* monetary relief, a bad settlement is not better than continuing to pursue litigation that 1) preserves the legal rights of the California subclass to pursue the relief available through California law, and 2) may result in bankruptcy for a company that is likely engaged in illegal activity that creates substantial and ongoing harms for class members. The settlement proposal itself indicates that there is some chance that the estimated value of Clearview decreases rather than increases over time, leaving class members with little to show for their claims. Furthermore, the settlement structure unfairly requires class members to assess the impossible given the uncertainty of a potential payout and how to weigh that against the benefits of opting out. The settlement's uncertainty especially undermines the California subclass given their potential avenues for meaningful relief under California law, as described above. The Court must ensure the settlement recognizes the value of the potential relief under California law, which could lead

to widespread benefits for the California subclass. "[C]olorable legal claims are not worthless merely because they may not prevail at trial" and "may have considerable settlement value." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783, 57 Fed. R. Serv. 3d 1158 (7th Cir. 2004). The settlement does not adequately compensate the California subclass for giving up their colorable claims.

Moreover, the California subclass members are disadvantaged by the inclusion of the nationwide class in the settlement. As discussed above, this Court evaluated the merits of the California-based claims on behalf of the California subclass as well as claims under other state laws, finding that multiple claims withstood Clearview's motion to dismiss. While the nationwide class seeks relief under an unjust enrichment theory, most of the claims, including those held to be meritorious in this Court's ruling on the motion to dismiss, are state law claims. Third Amend. Compl. at ¶¶ 70-201. While the proposed settlement provides additional settlement fund shares for Virginia, California, New York, and Illinois subclass members, the sheer size of the nationwide class undermines any attempts to account for a fair weighing of the subclasses' positions. This is especially the case for the California sub-classes, who would be foregoing claims that could result in meaningful injunctive relief.

In sum, the settlement is inadequate and does not fairly compensate the California subclass for release of their legal challenges. Clearview's serious ongoing harms motivated California plaintiffs to seek relief through this lawsuit and *Renderos*, and this Court should not approve a settlement that fails to limit Clearview's harms, undermines existing legal challenges, and offers only a speculative and potentially minimal settlement fund.

## II.     The Form of The Settlement Is Unconscionable

The settlement structure itself is unfair because it makes the California subclass' and others' recovery contingent on Clearview's future business success. In other contexts, courts have held that settlements that "force[] future business with the defendant" are impermissible. *Synfuel*, 463 F.3d at 654. While this argument generally relates to forms of non-cash settlements and coupons, the format of the settlement here promotes an unfair continuing business relationship because the class benefits most if Clearview successfully profits from the largely nonconsensual collection and sale of class members' biometric information moving forward. Obtaining a share of Clearview's business through the settlement places the California subclass members and others, who sought broad injunctive relief, in the position of only benefiting if Clearview survives its current financial challenges and shares some portion of its ill-gotten funds with the class. This Court should recognize that Clearview's value at an IPO or a future sale depends on its business success, and this settlement offers only that uncertain and unsavory future to class members with no new limits on Clearview's ability to profit from the sale of their biometric data.

## III.     The Notice Is Inadequate

The notice plan the parties have implemented fails to adequately inform class members of their legal rights and why they may be entitled to make claims. Where notice to a class has been inadequate, it may be appropriate to reject the settlement in its entirety. *Girsh v. Jepson*, 521 F.2d 153, 158 (3d Cir. 1975) (rejecting class action settlement because, inter alia, the court was not satisfied that the best practicable notice had been provided to class members); *Greenfield v. Villager Indus.*, 483 F.2d 824, 830–31 (3d Cir. 1973) (vacating class action settlement because the form of notice by publication undertaken was insufficient).

The notice plan, as described in the Declaration of Cameron Azari, "includes various forms of notice including a digital/internet notice and social media, internet sponsored search listings, and an informational release." Decl. of Cameron Azari at ¶ 32, ECF 578-3, June 12, 2024. Given the potential difficulties of providing individualized notice, the notice plan relies heavily on internet advertising, with claims that the plan will reach a broad segment of the population. *Id.* at ¶ 32. The Court should reject the proposed settlement because these methods do not provide adequate notice to class members.

### A. Descriptions in Advertisements Inadequate To Put Class Members on Notice

Effective notice to class members about what Clearview allegedly did requires particular care, given class members have no customer relationship or other consent-based relationship with Clearview. When class members, their friends, or their family members uploaded pictures of class members' faces online to social media, photo sharing websites, or other domains, they were never alerted or informed that Clearview would collect their biometric data without consent and sell it to government agencies and previously to private entities.

Based on the limited sample of settlement advertisements accessible through public search, the language in these advertisements does not put class members on notice. For example, in the following advertisement on Google, all that is indicated is that individuals may be entitled to money if pictures of their face were posted online.



Google.com (search "Clearview Settlement") (last visited Sept. 5, 2024).

The advertisement does little to capture the nature of the alleged harm. Key words such as "privacy," "facial recognition," "surveillance," "biometric," "faceprint," "identification," "profit," or "company," are missing from the advertisement. The advertisement language here suggests that the alleged harm is merely the posting of pictures. The tangible harms are instead Clearview's collection and use of individuals' biometric data from these pictures without consent, and Clearview's unlawful profit from that use. The parties must provide a more robust description of the harm alleged in order to adequately provide notice and alert potential claimants of their right to compensation.

**B. Advertising Based on Search Terms Puts Burden on Class Members**

While there are a variety of methods of digital notice in the notice plan, a closer examination of each type undermines the effectiveness of the plan. Regarding the "common keyword combinations" that generate search results indicating an individuals' potential eligibility for the Clearview settlement, a class member must almost certainly have some prior knowledge of the settlement in order to find the advertisements. Decl. Azari at ¶ 43.

For example, as of Sept. 4, 2024, a search on Google or Yahoo search for "Clearview" or "Clearview AI" will not prompt a sponsored advertisement for the settlement and the settlement website. Nor will a search for "Clearview facial recognition" or "facial recognition lawsuit" or "facial recognition settlement." Only when some combination of the phrase "Clearview lawsuit" or "Clearview settlement" is entered together does the sponsored advertisement for the settlement appear.

This approach places the burden on individuals to precisely indicate their knowledge of the settlement or lawsuit to find relevant content. Other courts have taken significantly more rigorous measures to ensure notice to class members when individual notice is not available. For

example, some courts have urged or mandated that defendants place information about the settlement in a conspicuous location on their company websites. *See, e.g., Shurland v. Bacci Café*, 271 F.R.D. 139, 147 (N.D.Ill.2010) (urging plaintiff to propose new notice plan including link to class notice on defendant's website); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 93 (E.D.N.Y.2007) (requiring settling parties who wished to use an electronic means of notice to post the notice "in a conspicuous place on PayPal's web site during the entire notice period"). Similar measures, or others that help combat the relative ignorance of everyday people to Clearview, are necessary here. The sponsored search provision of the notice plan does little to provide meaningful notice to the class and must be remedied with stronger protections.

### C. Banner Advertisements Ineffective for Putting Class Members on Notice

The settlement's reliance on banner ads is also misplaced given their increasing ineffectiveness. Scholars and courts alike have indicated that banner ads should not be relied on to provide meaningful notice, particularly given the low click-rate on advertisements despite the number of "impressions" they may provide. *See* Philip P. Ehrlich, *Comment*, A Balancing Equation for Social Media Publication Notice, 84 U. Chi. L. Rev 2197 & n. 221 (2016) (noting that "[d]espite auspicious beginnings, banner ads now rarely capture people's attention; some studies estimate that less than 0.08 percent of Internet users who see a banner ad click on it" and that "[t]he low click-through rate is potentially problematic in the class action notice context, because class action banner advertisements link to websites with additional information"); *see also Brown v. Sega Amusements*, U.S.A., Inc., 2015 WL 1062409, at *2 (S.D.N.Y. Mar. 9, 2015) (denying Plaintiffs' motion for proposed settlement approval in part on the basis that "Plaintiff provides no factual basis for its assertion that the various proposed "banner ads" are likely to be seen by any, much less most or all, potential class members"). While the Azari Declaration

indicates that many individuals are likely to have advertisements about the settlement appear on their screen during the notice period, it does not indicate the likelihood that individuals click on the banner advertisements and complete claims. This notice plan's overreliance on banner advertisements renders it inadequate, and this Court must demand stronger notice protections for the class.

### D. Time for Notice Must Be Extended

Given these inadequacies to the notice plan and its implementation, the brief time allowed by the settlement to either opt-out, object, or make a claim is unfair. As demonstrated above, the notice plan does not provide enough context to class members nor reliably lead individuals to the resources where they can learn more. This Court should exercise its discretion both to require more robust notice and provide a longer time period for class members to decide their best course of action as individuals. Particularly considering the California subclass' avenues for meaningful relief, the Court must address the insufficiency of notice and prevent California subclass members from losing their rights against Clearview.

### IV. The Release Provision Is Unreasonably Broad

The release provision is overbroad and unfair, and further prejudices the California subclass. As applied to millions of California subclass members who may lose their avenues for meaningful relief without obtaining notice, the release's restriction on all claims related to any action arising from Clearview's current business model is unconscionable.

The settlement states:

"Released Claims" means any and all claims, theories, or causes of action, whether known or unknown (including "Unknown Claims" as defined below), arising from or related to Defendants' alleged collection, capture, purchase, storage, possession, receipt through trade, obtainment, sale, lease, trade, profiting from and/or dissemination, disclosure or redisclosure of images and/or facial vectors and/or Biometric Data using the Clearview Biometric Database or other Clearview technology, including, without

22

limitation, Clearview's algorithms, facial vectors, or other proprietary technology, to make use of those images and/or biometric data, including all claims and issues that were litigated in the Action or that could have been brought in the Action and claims for any violation of the Illinois Biometric Information Privacy Act ("BIPA") or other Illinois statutory or common law related to facial recognition, as well as any and all state law claims (including, but not limited to claims under the laws of Illinois, California, New York, and Virginia) and federal statutory, constitutional, and common law claims that were, or could have been, advanced regarding the images held in the Biometric Database in any of the cases assigned by the Judicial Panel on Multidistrict Litigation to the Action.

Class Action Settlement Agreement and Release at ¶ 1.46, ECF 578-1, June 12, 2024.

Furthermore, the settlement defines "Unknown Claims" broadly, and includes a waiver of rights and benefits of § 1542 of the California Civil Code, which states:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

*Id.* at ¶1.62.

These two provisions, read together, insulate Defendants and any potential future successors of Clearview's assets from any legal action arising from its current business model. The release applies to millions of California residents who are unlikely to even know about Clearview's surreptitious collection and sale of their biometric data. Given the inadequacy of notice to the class (described above in section III), the release is particularly concerning as many class members will not even know about their eligibility for the settlement's minimal financial relief.

The release provision especially undermines the California subclass given their avenues for legal relief (described in Section I). The release targets the statutory protections for

Californians provided in California Civil Code § 1542, which support individuals who do not know about facts or claims that would change the calculus of settlement. While the class may be bound by a waiver of the section's protection if they understand and consciously agree to the waiver, here, the insufficiency of notice to the California subclass and the potential for harm to the class because of the settlement weigh against allowing a broad release and waiver of statutory protections. *See Winet v. Price*, 6 Cal.Rptr.2d 554 (Cal. Ct. App. 1992) (allowing waiver in when conditions negotiated at arm's length).

In sum, both the breadth of the release and its applicability to broad nationwide and state classes are unfair, and should be rejected particularly in light of the inadequate consideration Clearview provides California subclass members who give up their legal claims.

## CONCLUSION

The Court should deny final approval of the proposed class action settlement.


Joshua De Leon
525 E Seaside Way #1203
Long Beach CA 90802
jgdeleon21@gmail.com
*Objector*


*s/Dinesh McCoy*
Dinesh McCoy (pro hac vice admission pending)
JUST FUTURES LAW
95 Washington Street Suite 104-149
Canton, MA 02021
954-790-1275
dinesh@justfutureslaw.org
*Attorney for Objector*

Sheila Bedi
Clinical Professor of Law
Director, Community Justice & Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave., 8th Floor
Chicago, IL 60611
sheila.bedi@law.northwestern.edu
*Attorney for Objector (local counsel)*