**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | Civil Action File No.: 1:21-cv-00135 Judge Sharon Johnson Coleman Magistrate Judge Maria Valdez |

**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT**

Jon Loevy
Michael Kanovitz
Thomas M. Hanson
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 4

A.   The New York Times Report Triggers a Wave of Litigation Ultimately Consolidated into this MDL................................................................................................ 4

B.   The Litigation................................................................................................ 5

C.   The Settlement Negotiations ........................................................................ 6

D.   TERMS OF THE SETTLEMENT AND CLASS ADMINISTRATION PLAN .............. 8

E.   The Settlement Class and Subclasses ......................................................... 8

F.   The Settlement Fund .................................................................................... 9

G.   Funding Events and Distribution ............................................................... 10

H.   Incentive Awards and Attorneys' Fees ...................................................... 12

I.   Release of Liability .................................................................................... 13

J.   Implementation of the Notice Plan ........................................................... 13

    1.   Internet Digital Notice Campaign.................................................. 14

    2.   Sponsored Search Listings............................................................ 16

    3.   Informational Release .................................................................... 17

    4.   Settlement Website ........................................................................ 17

    5.   Toll-free Telephone Number and Postal Mailing Address ............ 18

K.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ...................... 18

    1.   Legal Standard for Final Approval ................................................ 18

    2.   The Court Should Certify the Settlement Class and Subclasses.......................... 18

    3.   The Implemented Notice Plan Comports with Due Process................................ 21

    4.   The Proposed Settlement Should be Approved Because it is Fair, Reasonable and Adequate ........................................................................................ 23

i

5.      The Strength of the Plaintiffs' Case Compared to the Amount of the Settlement Offer Favors Approval ........................................................................................... 24

6.      The Potential Length, Complexity, and Expense of Further Litigation Favor Approval ................................................................................................................. 30

7.      An Evaluation of the Opposition to the Settlement Favors Approval ................. 32

8.      The Opinion of Competent Counsel Supports Approval ..................................... 32

9.      The Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval............................................................................................ 34

III.  CONCLUSION ................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727

(N.D. Ill. Feb. 28, 2012) ........................................................................................... 26, 27, 39

*American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. (Ill.)

Cir. Ct. Chancery Div. No. 2020 CH 04353 .............................................................................. 2

*American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. Cir. Ct.

No. 2020 CH 04353 ................................................................................................................... 8

*Ameritech Benefit Plan Comm. V. Communication Workers of Am.*, 220 F.3d 814

(7th Cir. 2000)........................................................................................................................ 30

*Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773 (7th Cir. 2021) ......................................... 20

*Armstrong*, 616 F.2d at 325 ........................................................................................................ 39

*Barnett v. Apple*, 469 Ill.Dec. 759, 225 N.E.3d 602 (Ill. 2022)................................................. 32

*Bell v. PNC Bank, Nat. Assn.*, 800 F.3d 360 (7th Cir. 2015)...................................................... 21

*Bhavilai v. Microsoft Corp.,* No. 22 C 3440, 2024 WL 992928 (N.D. Ill. Feb. 8, 2024)............ 32

*Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 ...................................................... 37

*Boone v. Snap Inc.*, Cir. Ct. DuPage Cty. Ill. No. 2022-LA-708................................................. 33

*Broccolino v. Clearview AI, Inc.*, S.D.N.Y. No. 20-2222 ............................................................. 1

*Burke v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3104..................................................................... 1

*Calderon v. Clearview AI, Inc.*, S.D.N.Y. No. 20-1296 ............................................................... 1

*Carmean v. Macy's Retail Holdings, Inc.* 20-cv-04589 (N.D. Ill.) .............................................. 31

*Cothron v. White Castle Systems, Inc.*, 23 IL 128004, ¶ 42, 216 N.E.3d (2023) ........................ 28

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)........................................................... 25, 26

*Flood v. Dominguez*, Case No. 08-cv-153 (N.D. Ind.) ................................................................ 37

*Hall v. CDW Government* LLC, N.D. Ill. No. 20-846 .................................................................. 1

*Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) ................................ 22

*Hurvitz v. Clearview AI, Inc.*, E.D.N.Y. No. 21-2960 .................................................................... 1

*In re AT&T Mobility Wireless Data Svcs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010).... 25, 26, 27

*In re Clearview AI, Inc. Privacy Litigation*, MDL No. 2967........................................................... 5

*In re Clearview*, 21-cv-00135 (N.D. Ill.) ..................................................................................... 31

*In re Facebook Biometric Information Privacy Litig.*, 326 F.R.D. 535 (N.D. Cal. 2018) ........... 27

*In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD.......... 33

*In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197

    (N.D. Ill. Aug. 26, 2013).......................................................................................................... 27

*In re TikTok, Inc. Consumer Privacy Litig.,* N.D. Ill. No. 20-cv-4699........................................ 33

*In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904 (N.D. Ill. 2022)............... 19, 21

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996)...................................................................... 25, 27, 36

*John v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3481......................................................................... 1

*Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679 .......................................................................... 32

*Marron v. Clearview AI, Inc.*, N.D. Ill. No. 20-2989 ...................................................................... 1

*McPherson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3053 .............................................................. 1

*Moffat v. UniCare Midwest Plan Group 31451*, No. 04-C-5685, 2006 WL 897918

    (N.D. Ill. Apr. 5, 2006) ......................................................................................................... 30

*Mutnick v. Clearview AI, Inc.*, N.D. Ill. No. 20-512....................................................................... 1

*Rivera v. Google, LLC*, Cook Cty. Cir. Ct. No. 2019-CH-990...................................................... 33

*Roberson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3705 ................................................................. 1

*Rogers v. BNSF*, 19 C 3083, 2022 WL 787955 (N.D. Ill. Mar. 15, 2022) .................................. 37

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)............................................... 34

*Sheppard v. Fantasia Trading LLC*, __ F. Supp. 3d __, 2024 WL 1916763

    (C.D. Cal. Apr. 25, 2024) ...................................................................................................... 32

*Solis v. Hilco Redevelopment LLC*, N.D. Ill. No. 20-cv-2348 ....................................................... 37

*Stauffer v. Innovative Heights Fairview Heights, LLC,* No. 3:20-CV-00046-MAB,

    2022 WL 3139507 (S.D. Ill. Aug. 5, 2022) ............................................................... 32

*Svoboda v. Amazon.com, Inc.*, No. 21-C-5336, 2024 WL 1363718

    (N.D. Ill. Mar. 30, 2024) ........................................................................................ 28

*Synfuel Techs. Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) .......... 24, 25, 26, 39

*Thillens, Inc. v. Community Currency Exch. Assoc. Of Ill. Inc.*, 97 F.R.D 668

    (N.D. Ill. 1983) ........................................................................................................ 30

*Vestrand v. Clearview AI, Inc.*, C.D. Cal. No. 21-4360 ..................................................... 1

*Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) .............. 37

*Zellmer v. Facebook, Inc.*, 3:18-cv-01880-JD (N.D. Cal. Mar. 31, 2022) ................................... 28

**RULES**

Fed. R. Civ. P. 23(a) ...................................................................................................... 19

Fed. R. Civ. P. 23(b)(3) .................................................................................................. 19

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................. 22

Fed. R. Civ. P. 23(e)(2) ................................................................................................... 24

**STATUTES**

28 U.S.C. 1407 ................................................................................................................ 5

## I.    INTRODUCTION

The Settlement Agreement before the Court, if approved, will resolve eleven class actions filed in four different districts, all of which have been consolidated into this action by the Judicial Panel on Multidistrict Litigation.[1] Each of the consolidated cases was brought on behalf of individuals who allege that their privacy rights were violated under state and federal law. Specifically, Plaintiffs allege that Defendant Clearview AI, Inc. ("Clearview") unlawfully collected their biometric facial geometry by "scraping" their photos from publicly available websites and processing them into a massive biometric database. Clearview's customers are entities which have an image of an individual whom they want to identify – for example, an image from a security camera of an individual suspected of theft or assault. Clearview's proprietary software allows it to "probe" the image of the unidentified individual against its database and, using facial recognition, potentially locate other images of the individual in question, which may enable the Clearview customer to identify the individual.

The litigation of these consolidated cases – both before and after consolidation – included multiple rounds of pleadings and motions related to pleadings, extensive discovery and expert analysis, and numerous discovery motions. Most of Plaintiffs' claims survived motions to dismiss, leading the parties to conduct written discovery that substantiated certain facts asserted

---

[1] The original MDL transfer order dated January 8, 2021 included the following cases: *Mutnick v. Clearview AI, Inc.*, N.D. Ill. No. 20-512; *Hall v. CDW Government* LLC, N.D. Ill. No. 20-846; *Marron v. Clearview AI, Inc.*, N.D. Ill. No. 20-2989; *Calderon v. Clearview AI, Inc.*, S.D.N.Y. No. 20-1296; *Broccolino v. Clearview AI, Inc.*, S.D.N.Y. No. 20-2222; *McPherson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3053; *Burke v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3104; *John v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3481; *Roberson v. Clearview AI, Inc.*, S.D.N.Y. No. 20-3705. Dkt. 1. Two additional cases were transferred to the MDL on June 21, 2021: *Vestrand v. Clearview AI, Inc.*, C.D. Cal. No. 21-4360 and *Hurvitz v. Clearview AI, Inc.*, E.D.N.Y. No. 21-2960. Dkt. 108.

in Plaintiffs' claims against Clearview but that undermined Plaintiffs' claims against Macy's and the prospect of certifying a defendant class of Clearview's customers.

On March 6, 2023, Plaintiffs and Clearview commenced mediating with the Honorable Wayne Anderson (ret.). Over the next several months, although Plaintiffs and Clearview made significant progress toward resolution, three factors complicated settlement of the matter: First, the sheer number of people in the class – virtually anyone in the United States whose face appears on the internet. Second, Clearview was a start-up company with few assets, meaning it could not provide meaningful financial relief to the Class. Indeed, Clearview was likely to go under while paying attorneys to defend it. Third, Clearview had by then already settled a case with the ACLU[2] (brought after this case), and that settlement afforded extensive injunctive relief.

Thus, Clearview and the Class members faced the same conundrum: the potential liability was massive, Clearview had no money for a substantial settlement, and the costs of litigation itself would bankrupt Clearview before the case ever got to trial, leaving nothing for the Class members.

To address this state of affairs the sides worked together – with significant and ongoing assistance from Judge Andersen – to forge a creative settlement structure, one that could provide meaningful consideration for the Class members while providing Clearview the breathing room needed to become a viable business (with its practices modified to address the legal concerns raised by the Class). The agreement the sides eventually reached awards the Class members a substantial stake in Clearview's future value – the equivalent of 23% of the company's

---

[2] *American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. (Ill.) Cir. Ct. Chancery Div. No. 2020 CH 04353.

capitalization as of September 6, 2023. Under the settlement, the Class can recognize this 23% interest upon an initial public offering (IPO), sale or other liquidation event.

While it is unknown what valuation Clearview can ultimately achieve, operating legally and without the threat of ruinous litigation hanging over it, the company was valued at over $130 million in 2021, raised funds in a January 2022 convertible note offering with a valuation of as much as $201.75 million, and in early 2024 was valued by a third party at $225 million.[3] All things being equal one would expect it to go up if for no other reason than that the litigation is over (and Clearview certainly intends to work to increase its value and seek additional investment to fuel its growth without the weight of the lawsuit), but even if all the company accomplishes is to maintain its latest valuation until an IPO, a net common fund in excess of $31 million would be available to satisfy class members' claims after a reasonable incentive award to the Class Representatives and any attorneys' fees awarded by the Court are paid.

This is an extraordinary result given the challenges of the litigation and the lack of funds for a settlement. Indeed, when measured as a percentage of Clearview's value or revenue, this proposed settlement *dwarfs the highest privacy violation awards ever achieved*, such as those against Facebook, Google, TikTok and Snapchat, all of which settled for a fraction of a percent of those defendants' values.

After the Court preliminarily approved the settlement, the Settlement Administrator carried out a robust, court-approved notice process. In this case, because direct notice to potential

---

[3] As set forth in the Declaration of Hon. Wayne R. Andersen (ret.) attached to the Preliminary Approval Motion as Exhibit B, Dkt. 578-2, Clearview provided confidential financial information to Lead Class Counsel and Judge Andersen throughout the course of the settlement negotiations. Clearview has requested that those materials remain confidential but has indicated it will provide them for the Court's *in camera* review upon request.

class members was not available, the Settlement Administrator proposed and (subsequent to preliminary approval) implemented an extensive Media Notice Plan, which included an internet digital notice campaign, sponsored search listings, bilingual press releases, and a settlement website.

The Settlement Administrator estimates that because of these efforts, 70% of the adult population of the United States were exposed to the notice, each having the opportunity to view the notice 2.6 times. The success of the notice campaign is reflected in the tens of thousands – and perhaps as many as 189,000 – of valid claims filed.[4] This response was overwhelmingly positive, measured against only 16 objectors and 1,008 requests for exclusion.

The Settlement Agreement, a copy of which is attached as Exhibit A, provides meaningful relief to Class Members who filed a valid claim. That, combined with the small number of objections and opt outs (miniscule when measured against the number of valid claims), shows that the Settlement should be viewed as fair, adequate, and reasonable. Plaintiffs respectfully request that the Court enter an Order (i) granting final approval of the Class Settlement; and (ii) approving the request for fees, incentive awards and expenses.

## II.      BACKGROUND

### A.      The New York Times Report Triggers a Wave of Litigation Ultimately Consolidated into this MDL

In early 2020, a series of lawsuits were filed against Clearview after the New York Times published a story with the headline, "The Secretive Company that Might End Privacy as We

---

[4] As discussed below and in the Declaration of Cameron Azari of Epiq Class Action and Claims Solutions, Inc. ("Epiq") attached hereto as Exhibit B, Epiq is continuing to analyze potentially fraudulent claims but estimates that the number of valid claims will be approximately 65,000 to 125,000.

Know It." The story described how Clearview's founder, Defendant Hoan Ton-That, had designed a tool that used facial recognition to match photos against a database of three billion images[5] Clearview had scraped from Facebook, Venmo, and millions of other websites. The first lawsuit – filed on January 22, 2020 by the undersigned Lead Class Counsel – was assigned to this Court. Undersigned counsel were in position to file first because our firm had already been investigating Clearview's practices well in advance of the article being published.

On August 18, 2020, Clearview moved to consolidate ten existing actions into a multidistrict litigation pursuant to 28 U.S.C. 1407. *In re Clearview AI, Inc. Privacy Litigation*, MDL No. 2967, Dkt. 1. Following briefing and oral argument, on December 15, 2020, the Judicial Panel on Multidistrict Litigation ordered that nine of the pending actions be consolidated into this action. *Id.*, Dkt. 50. The JPML ordered two additional cases transferred to this MDL on June 21, 2021, *Id.*, Dkt. 64.

**B.**  **The Litigation**

Since consolidation into this MDL on January 8, 2021, this matter has been hotly contested and heavily litigated. Plaintiffs filed their first Consolidated Class Action Complaint on April 9, 2021, naming as defendants Clearview, its co-founders Hoan Ton-That and Richard Schwartz, Clearview's affiliate Rocky Mountain Data Analytics LLC, and Clearview's general counsel, Thomas Mulcaire. Dkt. 29. Also named as a defendant was Macy's, Inc., individually and on behalf of a defendant class comprised of private entities who had used Clearview for security purposes. *Id.* On the same day, Plaintiffs moved for a preliminary injunction, Dkt. 30,

---

[5] According to Clearview's discovery responses in this matter, its database contained approximately 10 billion images as of October 29, 2021. *See* Ex. C, No. 8.

which ultimately resulted in a stipulation that Clearview would cease certain allegedly BIPA-violating practices. Dkt. 97. Each Defendant filed a motion to dismiss, Dkts. 87, 111, which triggered voluminous briefing not only by the parties but by various advocacy groups as *amici curiae*.

The Court ultimately granted in part and denied in part the motions to dismiss in orders dated January 27, 2022 and February 14, 2022. Dkts. 272 & 279. Defendants sought reconsideration and interlocutory appeal, to no avail. Dkts. 283, 307. Meanwhile, even with the motions to dismiss pending, Plaintiffs forged ahead with written discovery and third-party subpoenas. Plaintiffs filed their first motion to compel discovery on November 18, 2021, Dkt. 215, triggering a dispute with Clearview that would ultimately lead to competing motions for sanctions against Clearview and for a protective order which were still pending when the matter was stayed for settlement discussions. Plaintiffs' motion to compel against Macy's was less successful. The Court denied both Plaintiffs' initial motion to compel Macy's to provide Rule 26(a)(1) disclosures and discovery responses, and Plaintiffs' subsequent motion to compel Macy's to provide further responses to Plaintiffs' written discovery. Dkts. 165, 388.

## C.    The Settlement Negotiations

Plaintiffs and Clearview first discussed settlement in mid-2022, engaging Hon. Wayne Andersen (ret.) to explore a potential resolution.[6] While the parties held extensive discussions facilitated by Judge Andersen at that time, no resolution was reached. In late December of 2022, Plaintiffs and the Clearview Defendants again expressed interest in exploring settlement. Plaintiffs and Clearview re-engaged Judge Andersen as a mediator and conducted an initial

---

[6] Dkt. 578-2, ¶ 6.

mediation session on March 7, 2023. From the outset, it was clear that the case could not be settled with an adequate cash payment. The size of the proposed plaintiff class and subclasses – encompassing virtually any individual whose face has been posted on the internet – would have made a commensurate cash settlement difficult for most companies in the world, and for a startup like Clearview it was worse. Clearview was and still is a small company with few unencumbered assets, and the pendency of this litigation also meant that it could not attract additional funding rounds necessary for its growth. The company provided convincing evidence of its financial condition to Plaintiffs and the mediator, demonstrating that it could not even survive paying the legal fees necessary to continue fighting the litigation.

Nor would it have made sense to pivot to injunctive relief. The ACLU largely occupied that area through collateral litigation, brought after these consolidated cases were filed, for injunctive-only relief. Its settlement of that case addressed the landscape of needed changes to the company's practices as well as programmatic accommodations for Class members. *See American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cty. Cir. Ct. No. 2020 CH 04353. It also ended any ongoing violations by the putative defendant class. Among other matters, that settlement permanently bans Clearview from granting free or paid access to its database to private companies, unless explicitly exempt under BIPA, thereby primarily limiting it to government customers with legal authority to use the database, and also allows Illinois Class members to remove themselves from the database. That settlement, although addressing only conduct under Illinois law, restricted Clearview conduct nationwide, and made clear that no additional injunctive relief could be provided under the Complaint's primary claims – the seven counts under BIPA.

After months of back-and-forth and sharing of information, these realities ultimately led the sides to seek a creative solution by obtaining for the class an interest in Clearview's value so that the Class could benefit if the company succeeds by operating legally. Even then, it took several more months, with the help of Judge Andersen as well as securities and tax experts retained by Lead Class Counsel, for the Parties to develop the structure and negotiate the terms of this novel approach.

D.     **TERMS OF THE SETTLEMENT AND CLASS ADMINISTRATION PLAN**

The terms of the Settlement are summarized here and are set forth in full in the Settlement Agreement attached as Exhibit A.

E.     **The Settlement Class and Subclasses**

The proposed Settlement will establish a Nationwide Settlement Class and various state Settlement Subclasses as follows:

(a)     **The Nationwide Class**: All individuals who resided in the United States of America between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database;

(b)     **The Illinois Subclass**: All individuals who resided in the state of Illinois between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database;

(c)     **The California Subclass**: All individuals who resided in the state of California between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data were or are contained in the Biometric Database;

8

(d)　　**The New York Subclass**: All individuals who resided in the state of New York

between July 1, 2017, and the date of Preliminary Approval, and whose facial images,

facial vector data, and/or Biometric Data are or were contained in the Biometric

Database; and

(e)　　**The Virginia Subclass**: All individuals who resided in the state of Virginia

between July 1, 2017, and the date of Preliminary Approval, and whose facial images,

facial vector data, and/or Biometric Data are or were contained in the Biometric

Database.

**F.　　The Settlement Fund**

The Parties have agreed to Clearview's payment of substantial relief to the Class and

Subclasses.  As described in more detail below, the Settlement creates a Settlement Fund for the

benefit of the Class and Subclasses.  The Settlement Fund will be based upon a Settlement Stake

– a monetary amount equal to a 23% stake in Clearview as of September 6, 2023 (the stake is

subject to the same dilution by future investments as for the founders), where the Settlement

Fund will be funded by (a) the Class receipt of the value of the Settlement Stake  upon the

occurrence of an IPO or certain Liquidation Events or (b) the amount the Class will receive if it

elects to sell its right to receive the Settlement Stake Payment, or (c) a payment by Clearview of

an amount equal to 17% of Clearview's GAAP recognized revenue for the period commencing

on the date of final settlement approval and ending with the election of this option, which expires

on September 30, 2027. The Class has the ability to pick whichever relief seems the most

advantageous as events play out for the company in the future.


To exercise this right and to protect the interests of the Class and Subclasses overall, the

Parties have agreed to the appointment of Hon. Sidney I. Schenkier (ret.) to act as a Settlement

Master.[7] As such, Judge Schenkier will have the right, (i) upon reasonable notice, to inspect the books and records of Clearview, (ii) to request and receive bi-annual interviews with the Clearview management team, and (iii) to receive information regarding the price and terms of any secondary sales of Clearview stock. In addition to holding the 23% stake until a Liquidation Event, or exchanging it for the 17% of revenues, the Settlement Master will also have the authority to sell the Class's rights to a third-party (immediately distributing the proceeds to the Settlement Fund) if he deems it in the Class's best interests.

This structure both provides meaningful relief to the Class and flexibility in how to best realize value from its stake in Clearview.

### G.      Funding Events and Distribution

The Settlement Stake – a monetary amount equal to the value of the number of shares of Clearview common stock equal to twenty-three percent (23%) of the capitalization of Clearview as of September 6, 2023, calculated on a fully-diluted basis – will fund the Settlement Fund in one of four ways, summarized below:

(1) An IPO. If Clearview consummates an IPO, the Settlement Payment will be a cash payment equal to the Settlement Stake (the monetary equivalent to a 23% interest) multiplied by the public offering price. As noted above, Clearview's enterprise value as of January 2024 was estimated to be as high as approximately $225,000,000.00. If Clearview can eventually IPO at this valuation without taking on dilution, the Settlement Fund would total $51,750,000.00.

---

[7] Plaintiffs' Motion to Appoint Settlement Master will be filed in advance of the Final Approval hearing.

(2) A "Deemed Liquidation Event." [8] Generally speaking, if Clearview enters into a merger or consolidation, or sells all or substantially all of its assets, the Settlement Fund will receive a cash payment equal to what the Class and Subclasses would have received had they been issued the Settlement Stake immediately prior to the liquidation event. Again, the gross relief to the Class and Subclasses would total $51,750,000.00 if the Deemed Liquidation Event was based on Clearview's January 2024 capitalization and an estimated, third-party valuation from January 2024.

(3) A "Cash Demand." At any point on or before September 30, 2027, if he deems it in the best interest of the Class and Subclasses, the Settlement Master may elect to require Clearview to pay a cash demand payment equal to 17% of Clearview's GAAP recognized revenue for the period commencing on the date of final approval and ending on the date of the cash demand. Although it is difficult to estimate the amount of settlement proceeds from the cash

---

[8] A "Deemed Liquidation Event" means: (a) a merger or consolidation in which (i) Clearview is a constituent party or (ii) a subsidiary of Clearview is a constituent party and Clearview issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving Clearview or a subsidiary in which the shares of capital stock of Clearview outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting entity; or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger or consolidation, the parent corporation of such surviving or resulting entity; or (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by Clearview or any subsidiary of Clearview of all or substantially all the assets of Clearview and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of Clearview if substantially all of the assets of Clearview and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of Clearview.

demand option, the Settlement Master would only elect this if he deemed it a better deal for the class than the potential equity-based payments described above.

(4) The sale of the right to receive the settlement payment. At any time after Final Judgment, if he deems it in the best interests of the Class and Subclasses, the Settlement Master has the right to elect to sell the right to receive the settlement payment to a single third party for a commercially reasonable price, subject to certain conditions. Again, while the settlement proceeds from such a sale are difficult to estimate, the risk-adjusted benefits to the Class and Subclasses would assumedly exceed the other options set forth above in the Settlement Master's estimation.

Regardless of how the Settlement Fund is established, that Fund will be the source of all attorneys' fees and incentive payments to the named Plaintiffs as approved by the Court.[9] The remainder will be distributed to Class and Subclass Members who submit an Approved Claim on a pro rata share based on each claimant's state of residence as follows: Approved claimants who resided in Illinois during the relevant time period will be entitled to 10 shares of the Net Settlement Fund; those who resided in California, New York or Virginia during the relevant time period will be entitled to 5 shares of the Net Settlement Fund, and those who did not reside in any of the four subclass states will be entitled to 1 share of the Net Settlement Fund.

### H.  Incentive Awards and Attorneys' Fees

Pursuant to the Settlement Agreement, Class Counsel have moved for an award of attorneys' fees in the amount of 39.1% of the Settlement Fund, which amount is inclusive of

---

[9] Settlement administration fees are solely Clearview's responsibility and will not diminish the recovery available to the Class.

litigation costs and expenses.[10] The Class Representatives have also moved for Incentive

Awards, subject to the Court's approval, equal to the lesser of an amount equal to 50 pro rata

shares of the Net Settlement Fund, with a cap of $1,500.00, for their contributions to this

litigation.[11]

### I.    **Release of Liability**

In exchange for the relief described above, the Settlement Class Members who do not

exclude themselves will provide the Released Parties (including the Macy's Defendants) a full

release of all Released Claims, arising from or relating to the factual conduct included in the

Litigation and all claims that were brought or could have been brought in the Litigation, by

Plaintiffs and/or the Settlement Class Members.

### J.    **Implementation of the Notice Plan**

Upon preliminary approval, the Court-approved settlement administrator, Epiq Class

Action and Claims Solutions, Inc. ("Epiq") promptly implemented the comprehensive Notice

Plan approved by the Court. Epiq's Cameron Azari has prepared a Declaration ("Epiq Decl.")

which is attached hereto as Exhibit B. The Notice Plan included various forms of notice,[12] most

---

[10] Dkt. 583.

[11] *Id.*

[12] As Lead Class Counsel learned through the discovery process in this matter, Clearview does not collect nor know the actual identity of persons in the biometric database. Rather, it provides its customers with the images, if any, that match a photo of an unidentified individual submitted by the customer, together with the internet location(s) from which Clearview obtained the matching image(s). The customer is then able to visit those websites to conduct their own research in an effort to determine the subject's identity. This process was demonstrated during discovery in this matter: in order to determine whether any particular individual's images were included in the database, the query must use a photo standard so that Clearview could conduct probe searches against the database to determine whether any matching photos existed, and if so whether the individual's identity could be determined from the hyperlinks that accompanied the match(es). Accordingly, direct individual notice to potential class members was not possible, because Clearview does not know the identities of the individuals whose faces are in its database.

notably an internet digital notice campaign, the combined measurable reach of which as implemented was approximately 70% of adults aged 18+ in the United States, with an average frequency of 2.6 times each. The reach was enhanced further by internet sponsored search listings, an informational release, a Settlement Website, and a toll-free telephone number, which were not included in the reach calculations.[13] Each implemented component of the implemented Notice Plan is discussed in detail below.

### 1. Internet Digital Notice Campaign

Internet advertising has become a standard component in legal notice programs. The internet has proven to be an efficient and cost-effective method to target class members as part of providing notice of a class action settlement. According to MRI-Simmons data, 97% of all adults in the United States are online and 85% of all adults in the United States use social media.[14]

The Notice Plan included targeted digital advertising on the selected advertising networks *Google Display Network*, *Yahoo Audience Network*, *Outbrain Network*, and *Taboola Network*, which together represent thousands of digital properties across all major content categories. Digital Notices were targeted to selected target audiences, were designed to encourage participation by Settlement Class Members, and linked directly to the Settlement Website, allowing visitors easy access to relevant information, documents and the Claim Form. Consistent with best practices, the Digital Notices used language from the Class Notice, which

---

[13] Epiq Decl., ¶ 13. "Reach" refers to the estimated percentage of the unduplicated audience exposed to the notice. "Frequency," in contrast, refers to how many times, on average, each member of the target audience had the opportunity to view the notice. *Id.*
[14] Epiq Decl,, ¶ 14, *citing* MRI-Simmons 2023 Survey of the American Consumer®.

allowed users to identify themselves as potential Settlement Class Members. Digital Notices were in both English and Spanish.[15]

The Digital Notices were also placed on Facebook, Instagram, and X (Twitter).[16] All Digital Notices appeared on desktop, mobile, and tablet devices, and were displayed nationwide to reach Settlement Class Members. Digital Notices were also targeted (remarketed) to people who clicked on a Digital Notice.[17]

Details regarding the target audiences, distribution, specific ad sizes of the Digital Notices, and the number of delivered impressions are included in the following table:[18]

| Network/Property | Target | Language | Ad Size | Delivered Impressions |
|---|---|---|---|---|
| Google Display Network | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 172,657,967 |
| Yahoo Audience Network | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 54,923,624 |
| Outbrain Network | Adults 18+ | English & Spanish | Custom Feed Ads | 5,324,647 |
| Taboola Network | Adults 18+ | English | Custom Feed Ads | 5,274,252 |
| Facebook | Adults 18+ | English | Newsfeed & Right Hand Column | 71,375,097 |
| Instagram | Adults 18+ | English | Newsfeed | 41,063,778 |
| X (Twitter) | Adults 18+ | English | Feed Ads | 22,199,203 |
| **Total** | | | | **372,818,568** |

As part of the targeted digital advertising on *Google Display Network, Yahoo Audience Network, Outbrain Network,* and *Taboola Network*, the Digital Notice ran on photo-sharing sites

---

[15] Epiq Decl., ¶ 15.
[16] Epiq Decl., ¶ 16.
[17] Epiq Decl., ¶ 17.
[18] Epiq Decl., ¶ 18.

including *Flickr*, *Imgur*, *Tumblr*, *500PX*, *PhotoBucket*, and others. Of the total impressions generated by the Digital Notices, more than 30 million of those impressions ran across photo-sharing sites.[19]

Combined, more than 372 million impressions were generated by the Digital Notices, which were displayed nationwide. The Digital Notices ran from July 25, 2024, through September 5, 2024. Clicking on the Digital Notices linked the readers to the Settlement Website, where they could easily obtain detailed information about the Settlement.[20]

### 2. Sponsored Search Listings

To further assist Settlement Class Members in locating the Settlement Website, Epiq acquired sponsored search listings on the three most frequently visited internet search engines: *Google*, *Yahoo!*, and *Bing*. When search engine visitors searched on selected common keyword combinations related to the Settlement, the sponsored search listing created for the Settlement was displayed at the top of the visitor's website page prior to the search results or in the upper right-hand column of the web-browser screen. The sponsored search listings were targeted nationwide. All sponsored search listings linked directly to the Settlement Website.[21]

The sponsored search listings ran from July 25, 2024, through September 5, 2024, and were displayed 23,714 times.[22]

---

[19] Epiq Decl., ¶ 19.
[20] Epiq Decl., ¶ 20. Examples of the Digital Notices are included as Attachment 2 to the Epiq Declaration.
[21] Epiq Decl., ¶ 21
[22] Epiq Decl., ¶ 22.

### 3. Informational Release

To build additional reach and extend exposures, on July 25, 2024, a party-neutral Informational Release was issued nationwide over *PR Newswire's US1* and *Hispanic newslines* in English and Spanish to approximately 5,000 general media (print and broadcast) outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States, as well as approximately 4,500 websites, online databases, internet networks, and social networking media.[23] The Informational Release included the address of the Settlement Website and the toll-free telephone number. The Informational Release served a valuable role by providing additional notice exposures beyond that which was provided by the paid media.[24]

### 4. Settlement Website

On July 3, 2024, Epiq established a dedicated website for the Settlement with an easy to remember domain name (www.ClearviewClassAction.com). The Settlement Website contains relevant documents and information including the Class Notice (in English and Spanish), Complaint, Settlement Agreement, Preliminary Approval Order, and Motion for Attorneys' Fees and Expenses Award and Service Awards. In addition, the Settlement Website includes answers to frequently asked questions ("FAQs"), instructions for how Settlement Class Members could opt-out (request exclusion) or object prior to the deadlines, contact information for the Settlement Administrator, and how to obtain other case-related information. Settlement Class Members visiting the Settlement Website were also able to file the Claim Form online prior to the deadline. The Settlement Website address was prominently displayed in all notice

---

[23] Epiq Decl., ¶ 23.
[24] Epiq Decl., ¶ 24.

documents. As of January 16, 2025, there were 6,908,339 unique visitor sessions to the Settlement Website, and 18,077,527 web pages have been presented.[25]

### 5.    Toll-free Telephone Number and Postal Mailing Address

On July 3, 2024, a toll-free telephone number (1-888-851-3156) was established and is available to Settlement Class Members.  Callers are able to hear an introductory message and have the option to learn more about the Settlement in the form of recorded answers to FAQs. The toll-free telephone number was prominently displayed in all notice documents.  The automated telephone system is available 24 hours per day, 7 days per week.  As of January 16, 2025, there have been 101 calls to the toll-free telephone number, representing 240 minutes of use.[26] A postal mailing address was also provided, allowing Settlement Class Members the opportunity to request additional information or ask questions.[27]

### K.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

### 1.    Legal Standard for Final Approval

"A court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 921 (N.D. Ill. 2022) (internal quotation omitted).

### 2.    The Court Should Certify the Settlement Class and Subclasses

Certification of the settlement classes is appropriate under Federal Rule of Civil Procedure 23(b)(3). To certify a class under that subsection, Plaintiffs must "show that: '(1) the

---

[25] Epiq Decl., ¶ 25.
[26] Epiq Decl., ¶ 26.
[27] Epiq Decl., ¶ 27.

class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Id*. at 922, quoting Fed. R. Civ. P. 23(a). Plaintiffs must further "show that 'the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that 'a class action is superior over other available methods for fairly and efficiently adjudicating the controversy.'" *Id*., quoting Fed. R. Civ. P. 23(b)(3). The Settlement Class and Subclasses satisfy all of these factors.

First, based on Epiq's current analysis of submitted claim forms, there are at a minimum 65,000 Class Members,[28] which easily satisfies the numerosity standard. *See*, *e.g.*, *Anderson v. Weinert Enterprises, Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (noting that 40 class members is typically enough to satisfy numerosity).

Similarly, there are numerous questions of fact and law that are common to the Class Members. For example, Plaintiffs allege that the Defendants are liable for violations of BIPA and various state statutes and common law, and for unjust enrichment, by virtue of having covertly scraped each Class Members' biometric facial image(s) from the internet and stored those images in a biometric database, all without Class Members' consent and without providing any compensation to Class Members. The conduct is similar across the Class, and the answer to the question of whether that conduct violates the cited state laws would be the same for each Class Member.

---

[28] Epiq Decl., ¶ 39.

The claims of the Named Plaintiffs are identical to other Class Members and to their respective Subclasses. Each Named Plaintiff, like each Class Member, had a picture of their face on the internet which Clearview likely collected without consent, and accordingly suffered the same statutory privacy violation and tortious conduct as the various members of the Class and respective Subclasses. Moreover, the Named Plaintiffs and Class Counsel have adequately represented the Class. Each of the Named Plaintiffs has participated in and represented the Class Members in the litigation since being added as Named Plaintiffs. Dkt. 573; *see also* Dkt. 583 at 16.. In addition, Lead Class Counsel has significant class action and complex litigation experience, has devoted substantial resources to this case, and overall has more than adequately represented the Class. *See generally* Dkt. 583; *see also* Dkt. 583-1(Declaration in Support of Plaintiffs' Fee Petition).

Finally, common issues are present, and, in the context of a settlement, predominate. A class action is the superior method for resolving the issues in this case through settlement. Common issues predominate in the settlement context because settlement enables the central questions in this case to be resolved without having to address the most complicated questions in the case, *e.g.*, whether Defendants are liable under state privacy laws and for unjust enrichment for their unauthorized scraping and collection of Class Members' biometric facial scans. Instead, they can simply be resolved for all class members through settlement. *See Bell v. PNC Bank, Nat. Assn.*, 800 F.3d 360, 378 (7th Cir. 2015) ("a common question predominates over individual claims if a failure of proof on the common question would end the case and the whole class will prevail or fail in unison) (internal quotation marks omitted).

Superiority is also satisfied. "Individual class members would likely have little interest in prosecuting" individual lawsuits against the Defendants relating to their collection and storage of

20

biometric facial scans given, among other things, the vast resources necessary to prosecute the action through trial and the uncertainties relating to establishing liability and collectability. *See*, *e.g.*, *In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d at 927. Thus, a class action is the only reasonable way to ensure that any significant number of people who were affected by Defendants' conduct have an opportunity to obtain redress. That is not just supposition. Every action brought against Defendants was brought as a class action, and only a small fraction of the total claimants excluded themselves from the Settlement.

### 3. The Implemented Notice Plan Comports with Due Process

Before approving the Settlement, the Court must consider whether the notice provided to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595 (N.D. Ill. 2011). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process, but it often includes direct notice to individuals who can be identified by regular mail. *See Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985) (noting that "Rule 23 does not require defendants to exhaust every conceivable method of identification"). Class members who cannot be identified through reasonable effort may be notified by publication. *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013).

At the Preliminary Approval stage, the Court held that the proposed Notice Plan consisting of an extensive digital media campaign, supplemented by sponsored keyword searches, a settlement website, and a toll-free telephone number, was the best practicable notice available. Dkt. 580 ¶ 4. Following Preliminary Approval, Settlement Administrator Epiq carried out that Notice Plan. Namely, as detailed above and in the Epiq Declaration, Epiq placed digital

ads on major internet advertising platforms, as well as on popular social media platforms including Facebook, Instagram and X (Twitter). The digital ads themselves generated more than 370 *million* impressions. Epiq estimates that the ads reached approximately 70% of the U.S. adult population, with each member of the target audience seeing the ads more than two-and-a-half times. As required by the Notice Plan, the digital ads were supplemented with the requisite informational release, sponsored keyword searches and the toll-free number, which generated an additional tens of thousands of impressions directing potential class members to the settlement website.[29]

Finally, the required notice was sent to the Attorney General of the United States as well as the Attorneys General of all 50 states, the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands, the U.S. Virgin Islands, and American Samoa.[30]

The notices directed Class Members to the Settlement Website created for this case – www.ClearviewClassAction.com – which included the Notice, important Court documents (such as the Settlement Agreement), and the ability to submit a Claim Form online. As of January 16,

---

[29] As the Court is likely aware, the Notice Plan was far from the only means by which potential class members might have learned of the settlement. A Google search for "Clearview class action settlement" on January 16, 2025 produced (in addition to the Settlement Website) the following articles (among many others): *Facial Recognition Startup Clearview AI Settles Privacy Suit*, AP News June 21, 2024, available at https://apnews.com/article/clearview-ai-facial-recognition-lawsuit-settlement-5a99ded04630a4e94af01f9f3adf1e29 ; *Clearview AI Used Your Face. Now You May Get a Stake in the Company*, New York Times June 13, 2024, available at https://www.nytimes.com/2024/06/13/business/clearview-ai-facial-recognition-settlement.html; *Clearview AI Strikes "Unique" Deal to End Privacy Class Action*, Reuters June 13, 2024, available at https://www.reuters.com/legal/litigation/clearview-ai-strikes-unique-deal-end-privacy-class-action-2024-06-13/.  Suffice it to say that this potential settlement has been well-covered in the press.
[30] Epiq Decl., ¶ 10.

2025, there were 6,908,339 unique visitor sessions to the Settlement Website, and 18,077,527 web pages have been presented.[31]

In short, the implementation of the Notice Plan was extensive, comprehensive, and provided the best notice practicable under the circumstances of this case, where individual direct notice was not possible. As such, the implemented Notice Plan meets the requirements of due process and Rule 23.

### 4. The Proposed Settlement Should be Approved Because it is Fair, Reasonable and Adequate

Rule 23(e) requires judicial approval of a proposed class action settlement based on a finding that the agreement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *Synfuel Techs. Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006). "Federal courts naturally favor the settlement of class action litigation," *In re AT&T Mobility Wireless Data Svcs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)).

The Seventh Circuit has identified five factors for district courts to consider in determining whether to approve a class action settlement: (i) the strength of a plaintiff's case compared to the amount of the defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel*, 463 F.3d at 653 (citation and internal quotations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (hereinafter "*In re AT&T II*").

---

[31] Epiq Decl., ¶ 25.

Courts should also consider whether the settlement is the product of collusion, or whether there are any "red flags" present in the settlement that would suggest it is unfair to the class. *Eubank v. Pella Corp.*, 753 F.3d 718, 723-29 (7th Cir. 2014).[32]

**5.    The Strength of the Plaintiffs' Case Compared to the Amount of the Settlement Offer Favors Approval**

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *In re AT&T II*, 789 F. Supp. 2d 935, 958 (N.D. Ill. 2011) (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted). The strength of a plaintiff's case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012) (quoting *Synfuel*, 463 F.3d at 653) (internal quotations omitted); *see also Eubank.*, 753 F.3d at 727 (finding that the district court should "estimate the likely outcome of a trial in order to evaluate the adequacy of the settlement").

---

[32] In addition to these factors, the Seventh Circuit has identified several "red flags" that may suggest a problematic settlement, including: (1) the failure to establish the total class recovery, (2) the reversion of un-awarded attorneys' fees to the defendant, (3) overly complicated claim forms, and (4) coupon-based relief. *Eubank v. Pella Corp.*, 753 F.3d 718, 723-26 (7th Cir. 2014). The only even arguable concern here is the first one. While the total class recovery is in fact established in equity terms, the future dollar value of the equity is not known. This is not a red flag given that the future value cannot be known. Moreover, while Clearview has some control over its future valuation (it could choose to give up and not work to increase its value) its incentives to become as valuable as possible are aligned with those of the Class to recover as much as possible.  As detailed in Judge Andersen's declaration, this aspect of the settlement was not born of collusion or a desire on the part of Class Counsel to "cash in" at the expense of the Class. Dkt. 578-2. To the contrary the settlement is structured in this way precisely to provide maximum value to the Class, and the attorneys are in the same boat with the Class in that any fee award is just as contingent and delayed as payment to the Class Members.

However, "the Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations" and "[i]nstead courts are to provide a ballpark valuation of the class's claims." *Am. Int'l Grp., Inc.*, 2012 WL 651727, at *2 (internal quotations omitted). "In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (Kennelly, J.). Finally, "[b]ecause the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T*, 270 F.R.D. at 347 (N.D. Ill. 2010) (quoting *Isby*, 75 F.3d at 1200) (internal quotations omitted). In terms of tangible monetary relief, the proposed Settlement here warrants approval, and that is true when compared to other similar BIPA class actions, and especially when viewed in light of the risks of a jury trial, potential appeals, and the ultimate collectability of any judgment.

The Class claims against Clearview asserting Illinois BIPA violations are strong, and Plaintiffs believe they were highly likely to have been certified and survived summary judgment. There is ample case law under BIPA to support this result. *See, e.g., In re Facebook Biometric Information Privacy Litig.*, 326 F.R.D. 535, 542-49 (N.D. Cal. 2018 (certifying class of Facebook users for whom Facebook created and stored facial geometry); *Svoboda v. Amazon.com, Inc.*, No. 21-C-5336, 2024 WL 1363718 (N.D. Ill. Mar. 30, 2024) (same). Still, putting aside the inherent uncertainty in a jury trial, recent *dicta* from the Illinois Supreme Court in *Cothron v. White Castle Systems, Inc.*, 23 IL 128004, ¶ 42, 216 N.E.3d 918, 929 (2023) has led to a still-unresolved argument as to whether the statutory damages in BIPA are mandatory (as Plaintiffs contend) or discretionary (as the Clearview Defendants contend). It is unlikely this issue would have been resolved prior to trial in this matter, and if so, uncertain in who's favor. If

decided against Plaintiffs, marshaling evidence on actual damages could substantially prolong this litigation. Moreover, Clearview would have argued that BIPA does not even apply to it, as it has no direct relationship with any Illinois residents who appear in images that it has collected. "It would be patently unreasonable to construe BIPA to mean that Facebook was required to provide notice to, and obtain consent from, non-users who were for all practical purposes total strangers to Facebook, and with whom Facebook had no relationship whatsoever." *Zellmer v. Facebook, Inc.*, 3:18-cv-01880-JD, 4 (N.D. Cal. Mar. 31, 2022). Even if, based on particular factual circumstances, BIPA applies to some of the images of Illinois residents collected by Clearview, but not others, that uncertainty may create differences among class members that may make it harder to certify a uniform class.

The claims under California, New York and Virginia law are less strong in that none of those laws target biometric data specifically (as BIPA does) and the application of those statutes and common law principles to the unauthorized collection of biometric data is relatively unexplored. No case has ever reached judgment imposing liability on a defendant for its handling of biometric data under any of those state laws. While this Court denied Clearview's motion to dismiss as to most of those claims, Clearview would have raised those arguments again at summary judgment, at trial, and on appeal.

Moreover, the risk of a pyrrhic victory loomed large. Clearview plainly lacked and lacks sufficient funds for a meaningful settlement and was likely to be bankrupted by its costs of litigation alone. Even the most dead-bang winner claims are worthless when brought against an empty-pocket defendant. As Judge Andersen explains:

> I also was convinced that even a 'victory' by the Class after a long and expensive trial would not necessarily lead to a meaningful recovery for the Class. Clearview did not have the funds to pay a multi-million-dollar judgment. Indeed, there was great uncertainty as to whether Clearview would even have enough money to

26

make it through to the end of trial, much less fund a judgment. In addition, Clearview explained, and substantiated, that certain of its convertible note holders possessed security interest in the technology being used by Clearview. This meant that, in the event of a Clearview bankruptcy – during litigation or after trial – the holders of those security interests would have priority to any claim by the Class after a judgment, leaving little to nothing with which to satisfy a judgment. Dkt. 578-2, ¶ 13.

The claims against Macy's are being released in the settlement and so should also be considered along with the claims against the putative defendant class. There were and are multiple problems with these claims.

Unlike the certification of plaintiff classes, which are difficult but routine, defendant classes are rarely certified, particularly given courts' "reluctan[ce] to certify [a] Defendant Class based on due process and other related concerns." *Moffat v. UniCare Midwest Plan Group 31451*, No. 04-C-5685, 2006 WL 897918, * 7 (N.D. Ill. Apr. 5, 2006) (citing *Ameritech Benefit Plan Comm. v. Communication Workers of Am.*, 220 F.3d 814, 820 (7th Cir. 2000)); *see also Thillens, Inc. v. Community Currency Exch. Assoc. Of Ill. Inc.*, 97 F.R.D 668, 674-75 (N.D. Ill. 1983) (noting "great judicial reluctance to certify a defendant class when the action is brought by a plaintiff class"). Additionally, discovery showed that certification of a defendant class was questionable because of Macy's unique defenses, which are uncommon and atypical of the putative defendant class. For example, discovery showed that Clearview made a contractual covenant, warranty and representation solely to Macy's – and not other customers – that Clearview would not include any biometric data of Illinois residents while providing services to Macy's.

Certification of a defendant class (or a plaintiff class against Macy's) would have been particularly problematic based on the evidence adduced in discovery, which showed that the Clearview customers, like Macy's, neither collected nor possessed any information in the

biometric database, contrary to what plaintiffs had believed.[33] This meant that the plaintiff class, defined in the MDL to include all individuals whose biometric information is in Clearview's database, was vastly overbroad as to Macy's and/or that there were no good claims as to the entire putative defendant class. Even if there were a narrower class of individuals whose images the customers sent to or received from Clearview, this theory was abandoned years ago in favor of the broader class definition of the MDL *See Carmean v. Macy's Retail Holdings, Inc.* 20-cv-04589 (N.D. Ill.) Dkts. 1, 30 (entering voluntary dismissal of complaint seeking certification of a class of Illinois residents who visited a Macy's store); *In re Clearview*, 21-cv-00135 (N.D. Ill.) Dkt. 96 (filing appearance on behalf of Carmean in the MDL). Even so, such a class of plaintiffs was likely to be quite small and none of the representatives appeared to have standing to bring such claims.

In addition to these procedural challenges and limitations, the group would have faced very significant legal problems establishing liability. Again, while the Court denied Macy's motion to dismiss because Plaintiffs plausibly alleged that Macy's possessed and collected individuals' biometric data through its use of the Clearview app, further discovery into how the app works[34] undermined these allegations. Macy's was merely a subscriber to Clearview's software as a service. Clearview owns its proprietary software, systems and data, and made contractual covenants, warranties and representations to Macy's that while providing its services, it would comply with applicable laws and would not include any biometric data results of Illinois residents. These facts and recent developments in BIPA case law made it difficult to prove that

---

[33] *See, e.g.*, Ex. D, No. 12.
[34] *See* fn. 15, *supra*.

Macy's took an active step to possess or collect the biometric data in Clearview's database. *See, e.g., Bhavilai v. Microsoft Corp.,* No. 22 C 3440, 2024 WL 992928, at *1 (N.D. Ill. Feb. 8, 2024) (dismissing BIPA claims under sections 15(a) and (d) because plaintiff failed to allege the defendant "used or exercised any control over her facial scan data in any way.") *Barnett v. Apple*, 469 Ill.Dec. 759, 225 N.E.3d 602, 611 (Ill. 2022) (holding Apple did not "collect" or "possess" biometric information used by Apple users to access their iPhones); *Stauffer v. Innovative Heights Fairview Heights, LLC,* No. 3:20-CV-00046-MAB, 2022 WL 3139507, at *6 (S.D. Ill. Aug. 5, 2022) (dismissing BIPA claim against franchisor where the plaintiff's allegations failed to raise an inference that franchisor "ever did anything to extract or obtain the biometric information" from another company's system); *Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683-85 (granting motion to dismiss on grounds that defendant did not "collect" or "otherwise obtain" biometric data stored on its cloud servers); *Sheppard v. Fantasia Trading LLC*, 731 F. Supp. 3d 1152, 1163-64 (C.D. Cal. 2024) (granting motion to dismiss on grounds that the defendant did not take an active step to collect or possess biometric data).

Against these uncertainties, achieving a settlement that may exceed $50 million (and potentially greatly exceed) is a fantastic result for the Class, even if the gratification is necessarily delayed. This is particularly true in light of similar high profile BIPA settlements. In *In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD, for example, the class obtained a $650 million settlement, but that amounted to *less than 1% of Facebook's market value* at that time. The same is true of the $100 million settlement in *Rivera v. Google, LLC*, Cook Cty. Cir. Ct. No. 2019-CH-990, which *represented approximately .01% of Google's value*. Measured against these benchmarks, obtaining *23% of Clearview's enterprise value* is an exceptional result. *See also In re TikTok, Inc. Consumer Privacy Litig.,* N.D. Ill. No.

20-cv-4699 ($92 million settlement, representing less than 1% of TikTok's estimated valuation); *Boone v. Snap Inc.*, Cir. Ct. DuPage Cty. Ill. No. 2022-LA-708 ($35 million settlement representing less than 1% of Snapchat's market capitalization).

For each of these reasons, the most important factor for the Court's consideration weighs heavily in favor of approval of the proposed settlement.

### 6. The Potential Length, Complexity, and Expense of Further Litigation Favor Approval

Preliminary approval is also favored in cases such as this one, where "[s]ettlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). While a massive amount of written discovery had taken place, the Parties were in the process of scheduling depositions when settlement discussions began in earnest, with Plaintiff having noticed 20 depositions (including 30(b)(6) depositions for both Clearview and Macy's). Expert discovery, class certification, and summary judgment were all yet to occur. While Plaintiffs believe that they would have obtained class certification, defeated motions for summary judgment, and then prevailed at trial, they are also confident that any judgment would have been appealed. For their part, Defendants similarly remained confident in their litigation positions. For instances, they likely would have raised challenges to – among other things – the viability of the liability claims, whether class certification is appropriate, what relief is available to the class members, and the existence of injuries to the class members. Although Plaintiffs strongly believe in the correctness of their positions, losing these or other issues on appeal could reduce or eliminate a jury award.

Regardless of the eventual outcome, those steps would have undoubtedly taken years to complete. Settlement entirely avoids the possibility that class members will not receive any

recovery. Thus, even though the proposed settlement calls for a delayed payment, the Class will still likely receive its compensation prior to the time by which the Class could have collected on any judgment, presuming against the weight of the evidence that such collection could ever actually have occurred. This factor therefore strongly supports final approval.

Finally, Plaintiffs confronted the very substantial risk that the case would never see a trial, not because it was not meritorious but because the costs of litigation would have driven the company to take bankruptcy. This factor, as much as any, made settlement a sensible approach for the Class.

**7.    An Evaluation of the Opposition to the Settlement Favors Approval**

**As the Court is aware, 15 objections have been filed on behalf of 16 putative class members,[35] and a group of Attorneys General from 22 states and the District of Columbia filed an additional brief raising objections as *amici curiae*.[36] This number of objectors is exceedingly small given the context of a class that potentially includes every adult in the country, with digital ads that have been seen multiple times by 70 % of the adult US population (or approximately 180 million people) through the implemented Notice Plan.**

**If there were serious concerns with any of the elements a court should be looking at when considering a class settlement, there would have been *vastly* greater number of objectors out of the 180 million notified. Indeed, as explained in more detail in the Parties' Responses to Objections filed concurrently herewith, the concerns raised in the handful of objections are all issues that Class Counsel (along with this Court, Judge Andersen, and the Defendants) took into consideration and accounted for when adopting the unique settlement structure needed to provide meaningful relief to the Class. Stated another way, the Objectors raise relevant concerns, but none have been able to identify either a more certain or more significant recovery for the Class. Counsel has obtained the best possible settlement under the circumstances. The proposed Settlement navigates the numerous thorny issues detailed herein that posed significant obstacles to obtaining a recovery for the Class. Accordingly, notwithstanding the opposition set forth in the Objections, the Settlement remains the best (and perhaps only) means of providing a meaningful recovery for the Class.**

**8.    The Opinion of Competent Counsel Supports Approval**

The fourth factor is the opinion of competent counsel as to whether a proposed settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200. In assessing the qualifications of class counsel under this factor, a court may rely upon affidavits submitted by class counsel as well as its own observations of class counsel during the litigation. *Id.*

a.    *Loevy & Loevy has Extensive Experience in Litigating and Settling Large Class Actions*

Here, Lead Class Counsel has extensive experience litigating and settling class actions and other complex litigation of similar size and scope. Aside from this case, Plaintiffs' counsel at

---

[35] Dkts. 581, 586, 592, 590-602.
[36] Dkt. 609.

Loevy & Loevy have significant experience prosecuting class actions, they are successful trial lawyers, and they have secured large verdicts and settlements in class cases and others.[37] *See, e.g., Rogers v. BNSF*, 19 C 3083, 2022 WL 787955 (N.D. Ill. Mar. 15, 2022) (trial counsel in the first ever BIPA trial resulting in initial entry of judgment exceeding $220 million and subsequent settlement); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240 (N.D. Ill. 2014) (class co-counsel in the largest ever TCPA settlement of $76 million); *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920 (N.D. Ill. Apr. 25, 2007) (class counsel in $55 million settlement plus an assignment of insurance-related claims following trial on liability and sample damages trials); *Solis v. Hilco Redevelopment LLC*, N.D. Ill. No. 20-cv-2348 (class counsel in environmental action achieving $12.5 million settlement); *Flood v. Dominguez*, Case No. 08-cv-153 (N.D. Ind.) (Loevy & Loevy class counsel in $7.2 million settlement). Based on their significant experience litigating and trying class actions and other complex cases, Lead Class Counsel is well-equipped to weigh in on the strength of the settlement, and believe that the Agreement is fair, reasonable, adequate, and deserving of preliminary approval.

> b. *Interim Lead Class Counsel has Sought Input from and Given Due Consideration to Co-Counsel*

Given the background of Clearview's inability to pay substantial money to settle the case and the massive potential liability on paper, it is unsurprising that there would be a diversity of views on whether and how to accomplish a settlement. That was the case here, where co-counsel (many of whom who previously opposed undersigned counsel's appointment as Interim Lead Class Counsel) variously proposed settling for injunctive relief only (allocating the available

---

[37] For a more detailed explanation of the firm's experience and success in complex matters, see the Declaration of Mike Kanovitz in Support of Plaintiffs' Fee Petition, Dkt. 583-1.

cash to attorney's fees), bankrupting Clearview by continuing to litigate (gaining bragging rights but accomplishing nothing for the class members), and/or pursuing the defendant class of Clearview customers who might be able to pay a larger settlement but against whom the case is shaky to the point of being valueless, as explained above. These co-counsel have ultimately declined to endorse the settlement reached with Judge Andersen's assistance and have absented their clients from serving as named representatives for the proposed settlement class.[38]

This Court put Lead Class Counsel in charge of evaluating the options and making the ultimate decisions, subject to court approval, in light of our firm's history, expertise, stellar record and achievements for other classes, including in privacy litigation. We have done so and have decided that the settlement we propose for the Court's approval is the best path for the classes the Court appointed us to represent.

9. **The Stage of the Proceedings and the Amount of Discovery Completed Support Preliminary Approval**

The last factor to consider concerns the stage of the proceedings and amount of discovery completed at the time the settlement is reached. *Synfuel*, 463 F.3d at 653. This factor is significant because "it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Am. Int'l Grp.*, 2011 WL 3290302, at *8 (quoting *Armstrong*, 616 F.2d at 325) (internal quotations omitted).

Fact discovery was near completion prior to being stayed pending the outcome of mediation. All parties had completed their document production (save for a dispute between Plaintiffs and Clearview that was the subject of a pending motion to compel) and the noticed

---

[38] Notably, while the original eight named Plaintiffs each declined to participate in the Settlement, only three opted out. *See* Epiq Decl., Attachment 8.

depositions of the named Plaintiffs and some 20 witnesses on the Defendants' side were imminent. Plaintiffs had also retained multiple experts at significant expense to evaluate the documents and data Defendants had produced, and those experts had devoted significant time to developing their anticipated opinions.

In short, Plaintiffs had ample information with which to evaluate all the relevant factors including the likelihood of success and collectability. The Court, likewise, had presided over a docket with over 550 entries prior to the Settlement, and was intimately familiar with the legal and factual issues in dispute.

## III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court enter an order (1) granting final approval of the Settlement, and (2) providing such other and further relief as the Court deems reasonable and just.


Dated: January 16, 2025                         Respectfully submitted:


By:*/s/ Thomas M. Hanson*
Jon Loevy
jon@loevy.com
Michael Kanovitz
mike@loevy.com
Thomas M. Hanson
hanson@loevy.com
**LOEVY & LOEVY**
311 N. Aberdeen St.
Chicago, Illinois
312.243.5900

*Interim Lead Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Hanson, an attorney, hereby certify that, on January 16, 2025, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ *Thomas M. Hanson*
Thomas M. Hanson
