**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | Civil Action File No.: 1:21-cv-00135 |
| | Judge Sharon Johnson Coleman |
| | Magistrate Judge Maria Valdez |

**PARTIES' JOINT RESPONSE TO OBJECTIONS AND AMICUS BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

    I.    The Objectors Have no Entitlement to Injunctive Relief Over Damages........................................................................................................ 3

          A.    The Nationwide Class Has No Meaningful Claim to Injunctive Relief ................................................................................. 6

          B.    The State Specific Subclasses Have No Claim to Injunctive Relief that Is...................................................................... 10

          Strong Enough to Undercut the Settlement ................................................. 10

    II.    The Objections to the Notice Program Are Not Persuasive. ........................ 17

    III.    The Settlement Relief is Certain and Adequately Described. ...................... 22

    IV.    The Release Is Not Overbroad Because It Is Tailored to the Actual Defendants In This Case. .................................................................. 28

    V.    Independent, Nationwide Class Representation Is Not Needed For Adequate Representation. ............................................................................. 30

CONCLUSION.................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................ 38

*Birchmeier v. Caribbean Cruise Line, Inc*., 12 C 4069, 302 F.R.D. 240
(N.D. Ill. Aug. 11, 2014)............................................................................................................ 27

*Brown v. Sega Amusements, U.S.A., Inc.*, 2015 (S.D.N.Y. Mar. 9, 2015)................................... 28

*Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019) ....................... 40

*Clement v. Am. Honda Fin. Co.*, 176 F.R.D. 15 (D. Conn. 1997) ................................................ 39

*Coss et al. v. Best Buy*, Case No. 1:22-cv-04280 (N.D. Ill.) ........................................................ 36

*Coss et al. v. The Home Depot*, Case No. 1:22-cv-04275 (N.D. Ill.) ........................................... 36

*Coss et al. v. Walmart, Inc*., Case No. 22-cv-04277 (N.D. Ill.)................................................... 36

*Coss v. Kohls, Inc*. Case No.1:22-cv-04274 (N.D. Ill.) ............................................................... 36

*Duban v. Diversified Mortgage Investors*, 87 F.R.D. 33, 40 (S.D.N.Y. 1980) ........................... 37

*Eubank v. Pella Corp.,* 753 F.3d 718 (2014) ............................................................................... 39

*Gaskill v. Gordon*, 942 F. Supp. 382 (N.D. Ill. 1996) ................................................................ 40

*Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016) .................................... 35, 37

*Girsh v. Jepson*, 521 F.2d 153 (3rd Cir. 1975) ........................................................................... 27

*Greenfield v. Villager Indus.,* 483 F. 2d 824 (3rd Cir. 1973) ...................................................... 27

*Hughes v. Kore of Ind. Enter.*, 731 F.3d 672 (7th Cir. 2013) ...................................................... 26

*In re Am. Fam. Enterprises*, 256 B.R. 377 (D.N.J. 2000) ........................................................... 36

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig*., No. C 06-4333 PJH,
2013 (N.D. Cal. Jan. 8, 2013) .................................................................................................... 30

*In re Facebook, Inc.*, 18-md-02843-VC, 402 F. Supp. 3d 767 (N.D. Ca. Sept. 9, 2019)............. 20

*In re Lupron Mktg. & Sales Pracs. Litig*., No. CIV.A. 01-10861-RGS,
2005 WL 613492 (D. Mass. Mar. 16, 2005)............................................................................. 37

*In re NCAA Student-Athlete Concussion Injury Litig*., 13 C 9116, 332 F.R.D. 202
(N.D. Ill. Aug. 12, 2019)............................................................................................................ 26

*In re Potash Antitrust Litig*., No. 08-6910 (N.D. Ill. June 12, 2013)........................................... 40

*In re Sw. Airlines Voucher Litig.*, 799 F.3d 701 (7th Cir. 2015) ................................................. 31

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ........................................................ 39

*In re TikTok, Inc., Consumer Priv. Litig*., 20 C 4699, 617 F. Supp. 3d 904
(N.D. Ill. July 28, 2022)............................................................................. 25, 29, 33, 39

*Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y. 2007) ............................................................... 27

*Kolinek v. Walgreen Co.*, 311 F.R.D. 483 (N.D. Ill. 2015) .................................................... 35, 38

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998)........................... 33

*Lugosi v. Universal Pictures*, 160 Cal.Rptr. 323 (Cal. 1979)..................................................... 19

*Mansfield et al. v. Airline Pilots Assoc.*, No. 06 cv 6869 (N.D. Ill. Dec.14, 2009)..................... 40

*Matter of Superior Beverage/Glass Container Consol. Petrial*, 133 F.R.D. 119
(N.D. Ill. 1999)........................................................................................................................... 40

*Michaels v. Internet Ent. Grp., Inc.*, CV 98-0583 DDP, 5 F. Supp. 2d 823
(C.D. Cal. 1998)......................................................................................................................... 19

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374, 139
S. Ct. 1652, 1658, 203 L. Ed. 2d 876 (2019) ...................................................................... 33, 34

*Modern Holdings, LLC v. Corning, Inc.,* 5:13-cv-00405-GFVT, 2022

(E.D. Ken. Mar. 28, 2022) .................................................................................... 19
*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)....................... 26, 27
*Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. 2015)................................ 25, 26
*Nobles v. MBNA Corp.*, C 06-3723 CRB, 2009 U.S. Dist. (N.D. Cal. Jun. 29, 2009) ............... 19
*Patel v. Facebook*, 932 F.3d 1264 (9th Cir., 2019) ...................................................... 20
*Redman v. RadioShack Corp.,* 768 F.3d 622 (7th Cir. 2014) ...................................... 31
*Reinhart v. Lucent Techs., Inc. (In re Lucent Techs., Inc. Sec. Litig.*
    (327 F. Supp. 2d 426 (D. NJ 2004)) ............................................... 32, 33, 35
*Renderos v. Clearview AI*, 2022 Cal. Super. (Nov. 18, 2022) ..................................... 19
*Sherman v. Fin. Credit, LLC.,* 03 C 00023, 2003 U.S. Dist. (N.D. Ill. Apr. 1, 2003)................. 19
*Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139
    (N.D. Ill. Nov. 2, 2010)............................................................. 26, 27
*Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226 (N.D. Ill. 1993) .......... 40
*State of Vermont v. Clearview AI, Inc.*  No. 226-3-20 Cncv (Vt. Sup. Ct. Apr. 26,  2024)......... 16
*State of Vermont v. Clearview AI, Inc.*  No. 226-3-20 Cncv (Vt. Sup. Ct. Mar. 10, 2020) ......... 16
*Uhl v. Thoroughbred Tech. & Telecomms.*, 309 F.3d 978 (7th Cir. 2002)....................... 32
*Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266 (7th Cir. 1998)......................... 37
*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) .................................... 33

## Rules

Fed. R. Civ. P. 23(e)(2)..................................................................................... 35

## State Law

740 ILCS 14/1 .................................................................................................. 11
Cal Bus & Prof Code § 17200 .......................................................................... 12
Cal. Civ. Code § 3344A ..................................................................................... 11
California Civil Code § 3344(a) .......................................................................... 19
New York Civil Rights Law §§ 50-51 ................................................................ 12
Va. Code § 18.2-152.1 ....................................................................................... 11
Virginia Code § 8.01-40 .................................................................................... 11

## Statutes

28 U.S.C. § 1712.............................................................................................. 31

## INTRODUCTION

This Response is filed jointly by all named Parties to this litigation -- Plaintiffs Rondell Sanders, Gerard Dache, Eric Gould and Jordan Orlando ("Plaintiffs") as representatives of a Nationwide Class and, respectively, an Illinois Subclass, a Virginia Subclass, a California Subclass, and a New York Subclass; Defendants Clearview AI, Inc. ("Clearview"), Hoan Ton-That, Richard Schwartz, Rocky Mountain Data Analytics LLC, and Thomas Mulcaire (collectively, the "Clearview Defendants"); and Defendants Macy's, Inc., Macy's Retail Holdings, Inc. (n/k/a Macy's Retail Holdings, LLC), and Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC) (collectively, the "Macy's Defendants") (together, "the Parties"). This Joint Response addresses the criticisms of the proposed Settlement Agreement (Dkt 578-1) raised by the various Objectors (Dkt 581, 585-86, 590-602) and by the Amicus Curiae brief ("Amicus Brief") filed by various state attorneys general (Dkt 609). Because those filings repeat several arguments, the Parties address them in this single Response. As this Response makes clear, the Objectors and Amicus Brief offer no legal basis for rejecting the Settlement, that followed years of hard-fought litigation and nearly a year of mediated negotiations, and that this Court reviewed and preliminarily approved on June 21, 2024 (Dkt 580).

This Court has presided over this multi-district class action for almost exactly four years – since the Panel on Multi-District Litigation consolidated nine cases before this Court on January 8, 2021 (Dkt 1). The litigation has been hard fought throughout; the docket sheet reveals over 500 filings in the first two years of the dispute, including several amended complaints, multiple motions to compel, and motions for sanctions. As the Court is also acutely aware, Clearview and this litigation have been the subject of exhaustive media scrutiny. The Objections and the Amicus

1

Brief (Dkt 609) cite media reports about Clearview, highlighting risks the authors imagine to be posed by the Clearview business model.[1]

Plaintiffs and others made claims similar to those of the Objectors at the outset of this litigation, but over four years later, those nightmare scenarios have not come to fruition. The harms that Objectors now conjure remain largely hypothetical. In contrast, the indispensable and sometimes lifesaving work that Clearview's technology performs for law enforcement and government state agencies is not hypothetical. Clearview's technology helps solve crimes, identify and rescue minor victims of sexual abuse, and exonerate the wrongfully accused. Recently, the Department of Homeland Security and Interpol led a joint operation that used Clearview's search engine to identify hundreds of victims and abusers with unprecedented effectiveness, even in cold cases.[2] Clearview's search engine helped exonerate Florida resident Andrew Conlyn when it was used to identify an eyewitness whose testimony confirmed Conlyn was not responsible for a fatal drunk driving accident.[3] Recently, Clearview's technology was instrumental in a successful investigation of a home invasion robbery in Hot Springs, Arkansas, where it enabled the police to identify a man who entered and robbed an elderly woman's home while she slept.[4]

Fortunately for this Court, however, it need not take a position on the debate about whether the concrete benefits that Clearview's technology provides outweigh the privacy concerns cited in

---

[1] Many of the media reports cited by amici and Objectors (see Dkt 591) relate to activities outside the U.S., under other countries' laws, or to business conducted prior to Clearview's settlement with the ACLU, pursuant to which Clearview adjusted its business practices.

[2] One former Homeland Security Investigation's agent stated "No single effort like this has resulted in that amount of identifications in such a short period of time[.]" Thomas Brewster, *Exclusive: DHS Used Clearview AI Facial Recognition In Thousands Of Child Exploitation Cold Cases*, Forbes.com, August 7, 2023.

[3] "*Clearview AI, Used by Police to Find Criminals, Is Now in Public Defenders' Hands"* Kashmir Hill, Nytimes.com, September 18, 2022.

[4] "*Facial recognition software leads to arrest in September home invasion,"* Stephen Mross, The Sentinel Record (hostr.com), October 30, 2024.

media reports and highlighted by Objectors and Amici. As discussed below, every state and municipality may consider the benefits and risks of using facial recognition technology, and then impose whatever restrictions that state or municipality deems proper. This Court's responsibility is to evaluate the terms of the Settlement Agreement here, in light of the claims and laws asserted in the operative, Third Amended Consolidated Class Action Complaint (Dkt 573). Is the Class receiving fair and adequate consideration for surrendering its claims under the state laws of Illinois, California, New York and Virginia that have been raised in this action? The answer is "yes." The Class is receiving a meaningful, and potentially lucrative, recovery where any other path forward would yield neither economic recovery nor injunctive relief.

## ARGUMENT

### I.     The Objectors Have no Entitlement to Injunctive Relief Over Damages.

The most common objection, contained in all Objections and the Amicus Brief, is the argument that the Court should not approve the Settlement because it does not include injunctive relief. These objections ignore the fact that Clearview's current business practices are legal. Clearview serves only government clients, in contrast to its prior business practices. The Objectors never demonstrate that a single of Clearview's current practices violates any laws. They just assume their own conclusion.

Typically, the Objectors proceed from a premise that Clearview's entire business is illegal and objectionable, and oppose any settlement that does not bar Clearview from collecting publicly available images from the internet and using its facial recognition software.[5] The Amicus Brief

---

[5] Settlement does not "stop Clearview's illegal practice" (Wang Obj., Dkt 581). Clearview's actions and practices are "illegal and immoral" (Younge Obj., Dkt 53). Settlement does nothing to stop Clearview's "historically harmful and illegal conduct" (Rodriguez Obj., Dkt 596). After describing what she perceives to be harm caused by Clearview's business, Objector Lee bluntly states: "Simply put, I don't care if Clearview goes bankrupt." (Dkt 599.)

likewise presumes that Clearview's current practices are illegal, and that as a result injunctive relief necessarily should have been included in the settlement. (Dkt 609 at 4-5.) In other words, the Objectors would only accept a settlement that puts Clearview out of business, and, therefore, leaves the Class no access to monetary relief. That is a policy choice which is (a) contrary to the goal of recovering damages for the persons actually injured and (b) not their choice to make.

Moreover, the Objectors' demand for injunctive relief instead of damages lacks a basis in the claims asserted in the thrice-amended consolidated class action complaint. The Motion for Final Approval, filed contemporaneously with this Response, addresses the strengths and weaknesses of those claims. This Response will not repeat that discussion, but aspects of the claims that were included (and not included) in this class action are vital to understanding the Objector and Amicus arguments:

- This action is a multi-district litigation, created when the Joint Panel consolidated six actions pending in New York federal courts with three actions pending in the Northern District of Illinois (Dkt 1). Two additional cases, from federal courts in New York and California, were later added (Dkt 108).

- Following consolidation, class counsel filed a Consolidated Class Action Complaint (Dkt 29), which Class Counsel has amended three times (Dkt 116, 428, 573).

- The operative complaint (Dkt 573) contains seven claims under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*. The seven BIPA counts are the Complaint's only claims brought under a state privacy statute, and the only claims under a state law directly focused on biometric identifiers.

- BIPA's one of its kind structure, unlike any other state privacy statutes, includes both a private right of action and per violation damages of $1,000 or even $5,000.

- The Complaint also asserts claims under state laws of Virginia, California, and New York that do not relate specifically to data privacy or biometric identifiers.[6]

---

[6] These claims are: Count Eight under Virginia Code § 8.01-40, Unauthorized Use of Name or Picture; Count Nine under Virginia Computer Crimes Act, Va. Code § 18.2-152.1 *et seq*.; Count Eleven under Cal. Civ. Code § 3344A – Commercial Misappropriation; Count Twelve under California's common law Right of Publicity; Count Thirteen under California's Constitutional Right to Privacy; and Count Fourteen under New York Civil Rights Law §§ 50-51. The Court dismissed Count Ten, under Cal Bus & Prof Code § 17200. (See Dkt 272, 279.)

- At no point, prior to or after consolidation of eleven separate actions before this Court, has any class member or Class Counsel asserted claims under any state's law other than the Complaint's claims under Illinois, Virginia, California and New York law.

Thus, the Class can be entitled to injunctive relief, as the Objections and Amicus Brief demand, only if class members could have had a reasonable expectation of such relief under the asserted claims had the case proceeded to trial. In the Motions for Preliminary Approval (Dkt 578) and Final Approval, the Parties explain that there was no more meaningful injunctive relief that Clearview could provide with regard to the case's chief claims, the seven counts under BIPA. As a result of a 2022 settlement with the ACLU, Clearview already adjusted its business practices to ensure that it was not violating BIPA. The ACLU refers to its settlement with Clearview as a "big win" that "ensure[s] Clearview is in alignment with [BIPA]."[7] Indeed, the terms of the ALCU settlement address Clearview practices under all applicable BIPA sections, and apply across the nation, regardless of whether other states' laws apply to the conduct or to whether out-of-state individuals would be entitled to relief under BIPA. For example, the settlement imposes a five-year bar on Clearview's granting paid or free access to its facial vector database to private entities and individuals nationwide; after five years, it may only offer such access subject to explicit and narrow exceptions in BIPA. In addition, Clearview must comply with BIPA's strict requirements for contracting with state, county, or local government agencies and government contractors (including law enforcement agencies) for access to Clearview's database (with a five-year bar on such contracts with any state or local government entities in Illinois). Finally, in the ACLU settlement, Clearview agreed to allow Illinois residents to opt out of having their images included

---

[7] In Big Win, Settlement Ensures Clearview AI Complies with Groundbreaking Illinois Biometric Privacy Law (May 9, 2022),https://www.aclu.org/press-releases/big-win-settlement-ensures-clearview-ai-complies-with-groundbreaking-illinois. Prior to that settlement, the ACLU had filed an Amicus brief in this case opposing Clearview's Motion to Dismiss (Dkt 131).

in the searchable database of facial vectors, an option Clearview also extends to states with arguably pertinent data protection laws, including California and Virginia.

Contrary to the arguments of Objectors Weissman and Claypool and the Amicus Brief, the Parties are not "relying" on the terms of the ACLU settlement as if those terms represent relief or consideration provided to the Class under the Settlement. (Dkt 590 at 13; Amicus Br. at 5.) Rather, the Parties refer to those terms to illustrate why additional injunctive relief relating to BIPA would have provided no value to the Class – precisely the problem in the cases Amici cite for the proposition that courts may not approve business practices changes that do not actually benefit the Class. (Dkt 609, at 5-6, citing cases.) Given that the alleged Illinois violations already were addressed by changed business practices, with the new restrictions on Clearview extending beyond Illinois, the question for the Court is whether members of the Nationwide Subclass, or of the state Subclasses, had legitimate expectations of injunctive relief that were so strong that a failure to grant such relief – particularly where the relief would preclude the hope of a future damages recovery – requires rejection of the Settlement. The answer is that Nationwide Class and state subclass members would have had no such expectations of injunctive relief, and the Settlement should be approved.

### A. The Nationwide Class Has No Meaningful Claim to Injunctive Relief

All of the Objectors except Objector De Leon (Dkt 591) object on behalf of the Nationwide Class. The Amicus Brief likewise objects to the lack of injunctive relief for Nationwide Class members, complaining that the opt out option for Illinois residents "did not extend to nationwide residents. The notable lack of a nationwide opt-out in the proposed Settlement renders the Settlement unfair." (Amicus Br. at 3-4.) This position ignores the fact that the Consolidated Class Action Complaint asserts claims under only four states' laws. The objections on behalf of Nationwide Class members are demanding that this Court reject a settlement for failing to grant relief to citizens of states whose laws are not in any way implicated in this litigation.

The proposed settlement recognizes that the Nationwide Class claims are far weaker than those of the Illinois Subclass, and also weaker than those of the Virginia, California, and New York Subclasses. A successful Illinois Subclass member claim is worth 10 shares of the Net Settlement Fund; successful claims by Virginia, California or New York Subclass members are worth 5 shares; whereas "Each Nationwide Class Member who submits an Approved Claim and who is not a member of any subclass will receive one (1) share of the Net Settlement Fund." (Settlement, Dkt 578-1 at 1.56.) This differentiation in recovery reflects the reality that the Illinois BIPA claims are strongest, since these are the only claims under a state statute, with a private right of action, allowing for statutory damages, that directly targets data privacy and biometrics. As discussed below, the claims under the other three states' laws are weaker, though sufficient to withstand a motion to dismiss. Members of the Nationwide Class can recover only if they can somehow succeed in arguing that the Illinois or other states' laws apply to and protect non-residents. This would have been a severe challenge, had the case proceeded to trial.[8]

When it comes to injunctive relief, as opposed to portions of the Settlement Fund, the Nationwide Class has an even weaker claim for relief. For residents of states other than Illinois, Virginia, California, and New York, the Complaint includes no legal basis under state law for enjoining Clearview's conduct. If other states' laws exist that are enforceable by private plaintiffs and that prohibit aspects of Clearview's business – and Clearview does not believe that there are any such laws – the Class Complaint could have included them. It did not. This Court is charged with construing the laws and enforcing the claims that are presented in the case before it. Here, the Consolidated Class Action Complaint provides this Court with no basis to enjoin Clearview conduct under any state laws other than Illinois, Virginia, California, and New York. The failure to include injunctive relief under such un-cited, un-pled state laws is hardly a basis for attacking

---

[8] At the Motion to Dismiss stage, the Court declined to dismiss based on Clearview's extraterritoriality defense as applied to all class members, including the Illinois Subclass members, noting that such a defense is a "fact intensive inquiry." (Dkt 279 at 6.) Clearview still believes that its extraterritoriality defense would have provided a complete defense against all claims, but certainly would have knocked out the claims of Nationwide Class Members seeking to recover under the laws of states in which they did not reside.

the settlement; indeed, one plausibly could have attacked the settlement if it had attempted to provide injunctive relief under state laws that have not been included as part of this litigation.

Tellingly, the amicus curiae filed objections with this Court but *nowhere claim that they have filed litigation for injunctive relief in their respective states.*[9] If the states represented by the Amicus Brief wish to address Clearview's conduct, they have avenues available that do not involve asking a federal court to grant relief under state laws not before the court. The Amici represent the chief legal officers in 22 states and the District of Columbia. If those attorneys general believe that the laws in their respective states prohibit Clearview's conduct, there are other avenues they may pursue. Litigating in courts of the relevant states, and asserting claims under applicable state laws, is far more appropriate than asking a federal court in Illinois to enjoin conduct under state laws not asserted in the case before it.

The states represented by amici also are free to pass new state data protection laws that implicate facial recognition software businesses, like Clearview. Indeed, several states have enacted such statutes (see e.g., Colorado, Connecticut, Delaware, Indiana, Iowa, Minnesota, Nebraska, New Jersey, Oregon, Rhode Island, Tennessee,) and Clearview has revised its activities in those states, by allowing for opt-outs, not doing business therein, and/or by taking other steps, to ensure compliance with those state laws. The Objection of Weissman and Claypool simply ignores the relationship between existing state laws and class opt-out rights in asserting that the Settlement is objectionable for not granting opt-out rights to the entire Nationwide Class. (Dkt 590 at 14-15.) The Complaint provides no basis for granting (much less requiring) such opt-out rights in states that have not passed applicable legislation and whose laws are not asserted in the Complaint. Even where states have not yet enacted legislation addressing facial recognition technology, individual municipalities within the states are able to enact guidelines on the use of such products, and several municipalities have done so, as the De Leon Objection notes. (Dkt 591.) Addressing Clearview conduct via legislation is far more appropriate than demanding that a federal

---

[9] The sole exception being Vermont, discussed below.

judge in a foreign state bar conduct under unasserted state law theories that have never even been tested in the courts of the respective amici's states.

The experience in the State of Vermont, whose assistant AG has appeared and who is the signatory of the Amicus Brief, highlights the impropriety of asking this Court, rather than state courts or legislatures, to address Clearview's ongoing conduct towards the Nationwide Class. Having failed to persuade Vermont courts that Clearview conduct violates the rights of Vermont residents under Vermont law, and having failed to pass new legislation to create new data privacy protections, the Vermont AG asks this Court to reject the settlement in this case because it does not grant injunctive relief to Vermont residents -- never mind that no claims have been asserted in this case under Vermont law. The Vermont Attorney General alleged in 2020 that Clearview's conduct violates Vermont law and sued Clearview to enjoin that conduct. *State of Vermont v. Clearview AI, Inc.* No. 226-3-20 Cncv (Vt. Sup. Ct. Mar. 10, 2020.) After previously denying the State of Vermont's motion for summary judgment, in April 2024, the Vermont court dismissed the case in ruling on Clearview's motion for summary judgment. *State of Vermont v. Clearview AI, Inc.* No. 226-3-20 Cncv (Vt. Sup. Ct. Apr. 26, 2024) (Ruling on Defendant's Motion for Summary Judgment attached as Exhibit A). Vermont also has considered a new data privacy law, which the governor vetoed.[10] Vermont's objection to the settlement for failing to include injunctive relief is not persuasive.

The Amicus Brief's remaining arguments attacking the lack of injunctive relief for the Nationwide Class likewise have no merit. The Brief argues that the "lack of broader relief" should cause the Court to reject the Settlement because it calls for the release of any and all Class member claims, even claims of class members who reside in states with laws that, they claim, would prohibit Clearview from collecting facial images. First, as discussed above, none of those laws are asserted in this case, on behalf of Nationwide Class Members. Second, Clearview disputes that its collection process violates any of those state laws, which Clearview analyzes and with which it

---

[10] *See* https://statescoop.com/vermont-phil-scott-vetoes-data-privacy-bill-2024.

believes it complies. Third, and finally, injunctive relief is by definition prospective. If any member of the Nationwide Class, or state Attorney General, believes that Clearview's ongoing operations violate the Nationwide Class Member's or AG's state laws, they are free to initiate litigation to address that conduct.

The Amicus Brief also references other data privacy settlements (Facebook, Google, Tik-Tok and Snapchat) and suggests that because those settlements involve changes to ongoing business practices, this settlement also must include such changes. (Amicus Br. at 6-8.) The differences between those cases and this case are significant. The defendants in those cases were able to provide notices and adjust the terms of their relationships with class members because they could identify them, and they had ongoing user relationships with them. Clearview has no idea whose pictures are in its database and no way of communicating with those individuals. Critically, the Facebook, Google and Snapchat settlements resolved cases brought solely on behalf of Illinois residents. No objector here has complained about a need for injunctive relief to the Illinois Subclass. Finally, whatever injunctive relief was offered in other cases, here there is no basis in the Third Amended Consolidated Class Action Complaint for granting injunctive relief to the Nationwide Class, and certainly no basis for rejecting the Settlement, where Plaintiffs have asserted no laws of states other than Illinois, Virginia, California, and New York.

**B.    The State Specific Subclasses Have No Claim to Injunctive Relief that Is Strong Enough to Undercut the Settlement**

Along with the Nationwide Class Claims, the Complaint asserts claims under Illinois, Virginia, California, and New York law on behalf of state specific subclasses. Since the Settlement does not include any injunctive relief, it necessarily does not include injunctive relief on behalf of the Illinois, Virginia, California or New York Subclasses. No one has objected to the lack of injunctive relief under Illinois, Virginia, or New York law, on behalf of those state Subclasses.[11]

---

[11] This lack of objections is not surprising. As already discussed, no additional injunctive relief would have benefitted

Objectors De Leon (Dkt 591) and Lee (Dkt 599) argue that the Settlement should be rejected because it fails to offer injunctive relief to the California Subclass. Because the Objections misrepresent the scope (and limitations) of the Settlement releases, and because the California law theories Plaintiffs advanced remain novel and untested – they are raised under state statutes and common laws that do not relate specifically to facial recognition, which claims have never yet reached judgment in cases involving facial recognition technology – these Objections provide no basis for invalidating the entire Settlement. Indeed, these claims have scarcely been litigated, even in this case. The Objectors demand that the Court reject the Settlement so that this Court can be the first court ever to enjoin such conduct under these California law theories.

The Complaint includes four counts under California law, establishing the claims specific to the California Subclass. Objectors De Leon (Dkt 591) and Lee (Dkt 599) object to the lack of injunctive relief for California Subclass Members, arguing that the California claims are strong and the rights of Californians under such theories will be "sacrificed" if the settlement is made final. Both arguments are unavailing. First, the Complaint's California law claims are speculative and uncertain. None of the theories alleged in the Complaint arises under a law that specifically targets data privacy or biometric information. Although this Court declined to dismiss three of the four California law claims at the Motion to Dismiss stage, this is far short of an actual, final judgment on the claims, based on an undeveloped factual record, accepting all well-pleaded assertions as true, and resolving all doubt in favor of plaintiffs. *Nobles v. MBNA Corp.*, C 06-3723 CRB, 2009 U.S. Dist. LEXIS 59435 at *4 (N.D. Cal. Jun. 29, 2009) (approving class action

---

the Illinois Subclass after Clearview's settlement with the ACLU. Like the California claims discussed *infra*, the claims under Virginia and New York law were asserted under state statutory and common law theories that have never before served as a basis for judgment on claims involving facial recognition technology. At most, those uncertain claims (including the claims raised here) have survived the pleading stage, meaning a facial recognition technology claim *might* be possible, but whether a claim would survive to judgment under the state laws remains speculative.

settlement, even where Plaintiff's claim survived motion to dismiss, noting that success on a motion to dismiss does not guarantee success at trial); *Modern Holdings, LLC v. Corning, Inc.,* 5:13-cv-00405-GFVT, 2022 U.S. Dist. LEXIS 55203 at **63-64 (E.D. Ken. Mar. 28, 2022) ("success at the motion to dismiss stage does not equate to success at the motion for summary judgment stage"); *Sherman v. Fin. Credit, LLC.,* 03 C 00023, 2003 U.S. Dist. LEXIS 5052 , at *6 n.2 (N.D. Ill. Apr. 1, 2003) ("because Plaintiff has survived this motion to dismiss does not mean that Plaintiff will automatically prevail on a motion for summary judgment or at trial.") To date, no court has ever held a defendant liable under those theories for its use of facial recognition technology.

Specifically, the relevant claims and theories are:

- Under Count 11, Plaintiffs allege commercial misappropriation in violation of California Civil Code § 3344(a). Other than the present case, the only case considering § 3344 in the context of facial recognition technology is *Renderos v. Clearview AI,* 2022 Cal. Super. LEXIS 70732 (Nov. 18, 2022). Even there, the court has not yet concluded that § 3344 applies and can be the basis of an enforceable judgment. The cases that De Leon cites demonstrate that the effort to apply § 3344 here is a stretch. The cases involving Brett Michaels and Bela Lugosi, *Michaels v. Internet Ent. Grp., Inc.*, CV 98-0583 DDP, 5 F. Supp. 2d 823, 836 (C.D. Cal. 1998); *Lugosi v. Universal Pictures*, 160 Cal.Rptr. 323, 328 (Cal. 1979) (De Leon Obj., Dkt 591, at 11) represent efforts by defendants to appropriate and use the likeness of well know individuals – rock musician Bret Michaels and movie star Bela Lugosi – in commercial enterprises not approved of by the subject. [12]

- Plaintiffs' claim of violation of the common law right of publicity (Count 12) likewise has no precedent in caselaw. Notably, the Northern District of California has dismissed right of publicity claims with respect to information shared by Facebook with third parties, as that type of conduct "is categorically different from the type of conduct made unlawful by this tort, such as using a plaintiff's face or name to promote a product or service." *See In re Facebook, Inc.*, 18-md-02843-VC, 402 F. Supp. 3d 767, 803 (N.D. Ca. Sept. 9, 2019).

---

[12] The Complaint also includes another California law claim, Count Ten under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. The Court dismissed this claim. (Dkt 272, 279.) That dismissal further recognizes the speculative nature of the California state-law claims. As with Counts 11 -13, no court has granted injunctive relief based on a failure to comply with the §17200 in the context of facial recognition technology.

- Count Thirteen asserts a claim for violation of the right to privacy under California's constitution. This constitutional right does not directly or specifically target the use of biometric information or facial recognition technology. Although the Ninth Circuit has noted that such technology may implicate privacy concerns, its ruling only went so far as to conclude that BIPA specifically protects concrete privacy interests sufficient to confer Article III standing – the court was not faced with a California constitutional right to privacy claim. *See Patel v. Facebook*, 932 F.3d 1264 (9th Cir., 2019).

Given the lack of precedent applying California law to facial recognition technology claims, there is no merit in objections founded on an assumption that class members would necessarily be entitled to injunctive relief.

The De Leon Objection makes a few other points, none of which create a basis for rejecting the Settlement, but which the Parties address here. First, De Leon suggests that the settlement here somehow precludes California Subclass members from benefitting in the *Renderos* case if the *Renderos* court ultimately grants injunctive relief. (Dkt 591 at 14.) This is not accurate. As this Court likely recalls, the *Renderos* case originally was consolidated into this multi-district litigation, but this Court remanded after plaintiffs argued that a California court was better able to assess the novel applications of state law at issue. (Dkt 193.) That case is still pending. In the hypothetical and still uncertain world in which the *Renderos* court grants injunctive relief, Clearview may need to adjust its business practices, and those updated practices will apply alike to all California Subclass Members, regardless of whether they participate in the present Settlement or opt out.

The De Leon Objection notes that more than twenty communities around the country have "banned the use of Clearview and other facial recognition technology," – which refutes, rather than supports, his objection. (Dkt 591 at 7.) This point highlights that, as discussed above, with respect to Nationwide Class objections, the appropriate method to regulate the use of facial recognition technology is to have local or state bodies develop and pass legislation that evaluates the risks and benefits of such technology and imposes guardrails that the legislators deem best. The notion that

13

a federal court should reject a proper settlement for failing to include far-reaching injunctive relief under novel applications of state laws that were not enacted to address facial recognition technology is inappropriate. Moreover, in the *Renderos* case – discussed at length by De Leon – the plaintiffs successfully argued for remand by noting that certain municipalities in California have enacted ordinances barring their city departments from using facial recognition technology (Dkt 193, 209, 210). Such ordinances would be superfluous and unnecessary if, as De Leon suggests, California state laws already ban the use of that technology.

Like the Amicus Brief, the De Leon objection notes that Clearview offers opt-out rights to residents of certain states, including California. (Dkt 591 at 13-14.) Since members of the California Subclass already have such rights, De Leon does not (and could not) argue that the Settlement should have included such an option. Rather, De Leon argues for even broader injunctive relief because he suggests that the opt-out option is insufficient for two reasons: (1) it requires a well-informed individual to take the affirmative step of opting out, and (2) Clearview does not really delete all of the opting out individual's images from the database. Neither point is persuasive. First, Clearview cannot reach out to individuals whose images are stored in the Clearview database for the simple reason that Clearview does not know their identities or addresses.

As to the retention of images, Clearview must retain some data related to an image of the opting-out individual to ensure that their image is excluded from all future searches. When an individual electing to opt-out provides a facial image, Clearview generates a facial vector from that image and then discards the provided image from the Clearview platform. Clearview maintains a database of these opt-out facial vectors, without any link to identifying information, so that vectors from customer-requested searches can automatically be checked against the opt-out

14

database. Searches of vectors that match opt-out vectors are automatically cancelled. As Clearview adds and processes new images into its searchable database, Clearview screens the vectors of those new images against the vectors of opt-out images and discards all matches. This process ensures that the database contains no new images of opting-out individuals. Clearview does not use images or vectors of opt-out submitters for any purpose except maintaining an effective and complete opt-out process. As detailed below, Clearview's disclosure and execution of its opt-out process has been independently audited for compliance with the SOC-2 Privacy standard.

Because De Leon is represented by counsel, his objection is lengthier and contains more citations and legal arguments than others. But it proceeds from the same flawed premise: Clearview's business is objectionable, creating "ongoing harms," (pp. 1,6), is "illegal" or "illicit" (pp. 1, 3, 6, 8), and places everyone in a "perpetual police lineup," with harms exacerbated for people of color (pp. 6-7). These unsupported assertions are not bases for questioning the propriety of the settlement. In reality, Clearview's customers are exclusively government agencies and contractors, who use Clearview's technology to save lives and solve crimes.[13] (*See* Mulcaire Decl., Ex. B at ¶ 2.) Additionally, Clearview strives to provide the strongest possible protection for its technology, attaining SOC2 certification for both cybersecurity and privacy.[14] (*Id.* at ¶ 3.) The

---

[13] In addition to the examples of successes discussed above, the Miami Police Department used Clearview's technology to help identify an attempted murder suspect, in an investigation that ultimately led to the arrest of that suspect for another murder in a neighboring jurisdiction. https://www.clearview.ai/success-stories/two-law-enforcement-agencies-solve-a-murder-and-attempted-murder. In another example, Clearview's technology was used to help identify a minor victim from an online sex trafficking advertisement in Reno, Nevada, leading to a rapid identification of the victim, enabling investigators to locate and rescue her before she was trafficked to another jurisdiction. https://www.clearview.ai/success-stories/rescuing-a-minor-from-her-violent-trafficker

[14] "A SOC 2 report is regarded as the primary document that proves your proper security measures…A SOC 2 is considered the one of the most rigorous reports that exists to date, which means that any business that has gone to the lengths of completing one is serious about security. It is also the most commonly accepted report when conducting business with US-based enterprises." Introduction to SOC-2: Why SOC 2 is the most accepted security framework. Vanta, 2024.company is taking proper security measures…A SOC 2 is considered the one of the most rigorous reports that exists to date, which means that any business that has gone to the lengths of completing one is serious about security. It is also the most commonly accepted report when conducting business with US-based enterprises." Introduction to SOC-2: Why SOC 2 is the most accepted security framework, Vanta, 2024. https://www.vanta.com/collection/soc-2/soc-2-most-accepted-compliance-standard

most recent SOC-2 cybersecurity audit of Clearview, completed on January 3, 2025, verified Clearview's implementation of hundreds of individual security controls and measures. (*Id.* at ¶ 4.) The American Institute of Certified Public Accountants (AICPA) determined these measures to be consistent with the highest commercial standard of security. (*Id.*) Similarly, Clearview's SOC-2 Certification for Privacy demonstrates Clearview is aligned with internationally-recognized standards, set by the AICPA, for the maintenance of privacy in the processing of personal data. An independent auditor evaluated and confirmed Clearview's implementation of dozens of technical and organizational controls and best practices within Clearview's business operations that ensure it meets privacy standards. (*Id.* at ¶ 5.)

Clearview submits each successive version of its facial recognition algorithm to the independent testing regime maintained by the National Institute of Standards and Technology (NIST), prior to deploying the algorithm to customers. (*Id.* at ¶ 6.) The NIST program evaluates algorithms using test datasets of millions of images. (*Id.*) It measures their ability to correctly identify persons of color and of all races, and to match images under varying conditions of quality, and publishes the results to the world. (*Id.*) Clearview's algorithm has performed extremely well in NIST testing and Clearview continues to improve its performance with each successive algorithmic update.[15] (*Id.*)

Clearly, the situation that led to the Settlement is not as simple or one-sided as De Leon and other objectors suggest. Federal, state and local governing bodies – not this Court – are the appropriate entities to determine how to regulate facial recognition technology. Although Class Counsel believes the Complaint's California law theories are valid applications of those laws, and

---

[15] Kashmir Hill, Clearview AI does well in another round of facial recognition accuracy tests, N.Y. Times (Nov. 23. 2021) https://www.nytimes.com/2021/11/23/technology/clearview-ai-facial-recognition-accuracy.html

Defendants strongly disagree, all Parties agree that those theories are too unproven to make compulsory the inclusion of injunctive relief in the instant Settlement.

## II.     The Objections to the Notice Program Are Not Persuasive.

As described in detail in the Unopposed Motion for Preliminary Approval (Dkt 578) and in the Motion for Final Approval filed contemporaneously with this Response, the Notice Plan was a comprehensive plan devised to address the unique circumstances of this case, including a sizeable potential class pool, for which the Parties have no identifying information. And, as further explained in the Declaration of Cameron R. Azari, Esq. ("Epiq Decl."), attached as Exhibit B to the Motion for Final Approval, the Notice Plan as implemented successfully reached approximately 70% of the Settlement Class through digital/internet notice and social media.

Broadly, the Notice Plan consists of the following measures to reach potential settlement members: an internet digital notice campaign involving targeted digital advertising via banner ads on selected advertising networks (Google Display Network, Yahoo Audience Network, Outbrain Network and Taboola Network), and also including notices on Facebook, Instagram and X (Twitter), as well as on photo-sharing sites such as Flickr, Imgur, and Tumblr; sponsored search listings; an informational release; complete information, including full notice, on a dedicated settlement website; and a toll-free telephone number and mailing address. (Epiq Decl., ¶¶ 13-27.)

As discussed more fully in the Motion for Final Approval, the Media Notice Plan was intended to – and successfully did – reach 70% of adults in the United States, an average of 2.6 times each, which numbers did not include internet sponsored search listings, the informational release, and visits to the dedicated Settlement Website. The 70% reach, further enhanced by the additional notice measures, undoubtedly meets the standards set forth in Rule 23, as explained in further detail below and in the Epiq Declaration. *See In re TikTok, Inc., Consumer Priv. Litig.*, 20

C 4699, 617 F. Supp. 3d 904, 927 (N.D. Ill. July 28, 2022) (notice to at least 70% of the class generally meets due process standards).

Despite the extensive reach of the implemented Notice Plan, three individuals object to the Notice Plan as inadequate. (Kesselbrenner, Dkt 586; De Leon, Dkt 591; Lee, Dkt 599.) Generally, Objectors Kesselbrenner and Lee claim that the class size is too large and notice to such a large class is too difficult. (Dkt 586, at 2-3; Dkt 599, at 1; Dkt 591, at 19.) Objector Lee also suggests that the fact that she did not personally see the notice indicates that the notice plan is insufficient, arguing that the notice "should have been mailed to every US address." (Dkt 599) These objections, however, do not demonstrate that the Notice Plan failed to meet Rule 23 or due process standards. Rule 23, for example, does not state or suggest that large class size makes notice plans impossible to achieve. Nothing in Rule 23, or the cases construing it, requires direct mail to every U.S. address, or demands proof that notice reach every individual class member. Rather, Rule 23(c)(2)(B) requires only "the best notice that is practicable under the circumstances." Indeed, "[n]either Rule 23 nor due process requires that every class member actually receives notice. Instead, notice suffices if it is reasonably calculated to reach the absent parties." *In re TikTok, Inc.*, 617 F. Supp. 3d at 927 (internal quotations omitted); *see also Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. 2015) ("While actual individual notice may be the ideal, due process does not always require it.")

The standard of reasonableness is particularly appropriate in situations where, like here, the identities of potential class members are not known or easily knowable. In these circumstances, courts retain "broad discretion in fashioning the notice program in each particular case, subject only to the broad reasonableness standards imposed by due process." *Shurland v. Bacci Café & Pizzeria on Ogden, Inc*., 271 F.R.D. 139 (N.D. Ill. Nov. 2, 2010) (internal citations and quotations

omitted). In evaluating notice plans, courts are increasingly willing to order notice through a "variety of mechanisms – including demographically targeted publication – designed to reach unidentified or unidentifiable class members." *Id*. at 145; *see also Hughes v. Kore of Ind. Enter*., 731 F.3d 672, 677 (7th Cir. 2013) ("When reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted"); *Mullins*, 795 F.3d at 665 (When identifying class members is not possible, "courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members, all without offending due process.") Even Objector Kesselbrenner's cited authority confirms that notice by publication does not violate due process with respect to unidentifiable class members. *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306 (1950) (rejecting publication notice for known class members, but approving it for unknown class members.) Finally, the internet has greatly expanded the ability of settling parties to reach and target broad audiences, in ways that were not possible via traditional publication notice – which itself was frequently deemed acceptable.

Thus, recent cases consider larger class pools (like the class in this matter) and evaluate and accept more sophisticated and creative mechanisms for publication. Courts regularly approve plans that involve these methods so long as they are tailored to reasonably reach likely settlement candidates. For example, in *In re NCAA Student-Athlete Concussion Injury Litig*., 13 C 9116, 332 F.R.D. 202 (N.D. Ill. Aug. 12, 2019), the court approved a notice plan that included such methods as internet banner advertisements, text link advertisements, and tweets that were targeted to likely settlement class members via Facebook, Google, Twitter and other media outlets. In *Birchmeier v. Caribbean Cruise Line, Inc*., 12 C 4069, 302 F.R.D. 240 (N.D. Ill. Aug. 11, 2014), the number of potential class members was substantial, possibly exceeding one million people. The court noted

the impracticality of reaching each person individually "making broad-based forms of notice appropriate." *Id.* at 254-55. In approving the proposed notice program, which included notice in nationwide newspapers and magazines, an online media campaign and notice on defendants' websites and online complaint boards, the court found the "several methods" of notice satisfied the requirement to provide "only the best notice that is practicable." *Id.*

In challenging the adequacy of the various publication methods adopted by the settlement here, the Objectors largely rely on cases addressing publication where class members are *known*. Clearview does not dispute that, where identities are known, publication alone is likely not enough, and many of Objectors' cited cases merely confirm that well-established proposition. *See e.g. Mullane*¸ 339 U.S. 306 (publication alone not sufficient for known individuals; is sufficient for unknown members); *Greenfield v. Villager Indus.,* 483 F. 2d 824 (3rd Cir. 1973) (notice was only sent by publication even though individual class members could be identified); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71 (E.D.N.Y. 2007) (addressing challenge to notice to known class members); *Girsh v. Jepson*, 521 F.2d 153 (3rd Cir. 1975) (noting insufficient support for notice plan that limited identification of class members, where identity of additional class members could be discovered). The Notice Plan here provides for email notice where contact information was known – a situation that simply did not apply. Because the Class here is made up of unidentifiable members, cases addressing failures to provide direct notice to known class members are inapt.

*Shurland* – a case on which Objector De Leon relies in his Objection – confirms that publication alone *is* sufficient for unidentified members: "In the court's understanding, however, case authority does contemplate notice by publication alone in 23(b)(3) class actions where individual class members cannot be identified." 271 F.R.D. at 144. Although it tweaked the particular approach to publication notice, the *Shurland* court approved of notice by publication as

an acceptable method to reach unknown class members. *Id*. Similarly, in *Brown v. Sega Amusements, U.S.A., Inc.*, 2015 U.S. Dist. LEXIS 28442 (S.D.N.Y. Mar. 9, 2015), also cited by De Leon (Dkt 591, at 21), the court did not hold that publication is inadequate, and instead simply held that the record ***in that particular case*** was insufficient to demonstrate that the proposed banner ads would provide proper notice. Here, the Notice Plan apprises the Court of the various methods for notice and the reasons why those methods are appropriate.

Finally, the content of the Notice is adequate, and objections thereto should be overruled. The Notice language is set forth in Exhibit D to the Motion for Preliminary Approval. (Dkt 578-4.) The Objectors do not and cannot contend that the notice fails to meet the criteria of 23(c)(2)(B), which requires that notice supply: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Notwithstanding the sufficiency of the long-form notice, the Objectors quibble with the Notice language. (Dkt 591, pp 19-20.) Objector De Leon, for example, objects to the broad, plain language of the Notices, suggesting that the Notice should have included key words, such as "privacy," "facial recognition," "surveillance," "biometric," "faceprint," "identification," "profit," or "company." (Dkt 591, 19-20.) As Azari points out, however, such key words are limiting and would not reach potential Settlement Class Members who are unaware that their biometric data was used. (Epiq Decl., ¶ 32.) In addition, Objector De Leon's criticisms of the shorter form banner ads do not account for the propriety of "summary notices with strict character limits" – referred to by Azari as the "Digital Notices." Epiq used these types of Digital Notices to alert Settlement Class

Members of the Settlement and provide a link by which they could access the more extensive information available to them. (*Id.*) There is no requirement that shorter messages, like the banner ads used here, must in themselves fulfill each of Rule 23's requirements. In *In re Tik Tok*, for example, the court analyzed the adequacy of a message which simply stated the following:



617 F. Supp. 3d at 928. The court approved this in-app message without commenting on or condemning the brevity of its content and the content of the banner ad in this case mirrors that of the TikTok message. *Id*. The Court here should likewise disregard De Leon's objections to the minimal phrasing of a banner ad.

### III. The Settlement Relief is Certain and Adequately Described.

Objectors Wang, De Leon, Younge, and Weissman & Claypool, object that the settlement relief is uncertain because it does not guarantee a specific amount of final compensation and provides "coupon" compensation, requiring plaintiffs to do business with Clearview again. (Dkts 591, at 21-23; 593, at 2; 581, at 1; 590, at 12-16.) Relatedly, Objector Lee objects that the settlement is inadequately described because it does not offer a range of what the claims will be worth from a dollar amount perspective. (Dkt 599, at 2.) None of these objections have merit or provide an obstacle to final approval.

This is not a "coupon settlement" or anything of the kind. The settlement agreement clearly explains the settlement terms and funding, providing finality to a highly litigated case. As stated in the Motion for Preliminary approval, the Class is receiving a present interest in 23% of the value of the company. Though the dollar value of that interest is uncertain the eventual recovery "may

exceed $50 million which is a fantastic result for the Class, even if the gratification is necessarily delayed. This is particularly true considering similar high profile BIPA settlements." (Dkt 578, at 20.) The Motion for Final Approval further emphasizes this reality. Elsewhere, both Approval Motions explain various forms of monetary valuation for the triggering events. (Dkt 578 at 14-17: "the gross relief to the Class and Subclasses would total $51,750,000.00 if the deemed liquidation event was based on Clearview's current capitalization and a recent, estimated valuation.")

Relief is not uncertain merely because the settlement agreement does not specify a final dollar amount that will be distributed to each class member who files a claim. The settlement seeks the appointment of a Settlement Master to exercise and protect the rights of the Class with respect to the determination and distribution of final monetary relief. "Special Masters are frequently used to assist settling parties and the courts in arriving at fair, adequate and reasonable plans of allocation and distribution." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL 12333442, at *77 (N.D. Cal. Jan. 8, 2013) Here, the Parties seek the appointment of Hon. Sidney I. Schenkier (Ret.) as Settlement Master. He is a former Magistrate Judge for the United States District Court for the Northern District of Illinois and a current JAMS arbitrator and mediator with considerable experience mediating BIPA lawsuits. If appointed, Settlement Master Schenkier will have a fiduciary duty to the settlement class and the right to inspect Clearview's books and records, interview Clearview's management, and receive information on secondary sales of Clearview stock. *See* (Dkt 578, at 14-15.)

The Amicus Brief argues that Plaintiffs have not shown enough support for why the "speculative" monetary relief is adequate. (Dkt 609, at 9-12.) But Amici cannot have it both ways – in one breath asserting Clearview has the money to pay tens of millions of dollars while also suggesting a 23% interest in Clearview is worthless. (*Id.* at 11.) The Amicus Brief relies on a 2024

23

news article, quoting Clearview's founder who optimistically notes that the start-up still has *the potential* to become a billion-plus annual recurring revenue company "given that there are 18,000 state and local agencies in law enforcement and government alone." (*Id.* at 11, fn.2.) In light of Amici's apparent support for law enforcement's continued access to the Clearview database (*Id*. at 4, fn 1), Amici cannot dispute there is a non-speculative likelihood that Clearview can attain a value sufficient to trigger a class payment under the settlement by selling its software exclusively to law enforcement.

Additionally, the Objectors' claim that this is a "coupon" settlement, requiring them to do business with Clearview again is unfounded. A "coupon" settlement "provide[s] for 'a recovery of coupons.'" *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015), quoting 28 U.S.C. § 1712. In this context, the term "coupon" is afforded its ordinary meaning and includes "'vouchers' (good for an entire product) and 'coupons' (good for price discounts)." *Id.*, quoting *Redman v. RadioShack Corp.,* 768 F.3d 622, 636–37 (7th Cir. 2014). Here, the proposed settlement agreement clearly does not entail "coupon" relief. By submitting a claim, settlement class members are neither receiving a coupon for a discount on a subscription to Clearview, nor a voucher for a free or discounted subscription to Clearview. Rather, they will receive a cash payment after the occurrence of one of four future eventualities, with formulas set to determine the payment in each of the four possible settings. In short, calling this a coupon settlement is misleading, inaccurate rhetoric.

Several Objectors further complain that the settlement requires them to "endorse" Clearview's unlawful collection and use of biometrics, and to root for the success of a company whose business they find objectionable. (*See e.g.*, Dkt 581, 585, 590, at 12, 592.) That characterization is invalid for several reasons. First, no one is required to "root" for Clearview.

Every class member may elect to opt out, as the Objectors have done. Second, this objection fails to consider that the only way for participating Class Members to receive any compensation is to allow the Clearview business the opportunity to grow. Several Objectors say that they would prefer if Clearview were driven into bankruptcy – and if Clearview's business does not succeed, they will get their wish – but that preference creates no basis for rejecting the Settlement on behalf of Class Members who wish to receive some future compensation on their claims. Courts have approved settlements that, like this one, require class members to receive an interest in the struggling defendant, with the settlement creating conditions that may permit the defendant to grow and provide substantial value to the settlement class. In *Reinhart v. Lucent Techs., Inc. (In re Lucent Techs., Inc. Sec. Litig.),* the court noted that Defendant Lucent "could not fund a sizeable cash ***settlement*** and could have filed bankruptcy at any moment during the litigation." 327 F. Supp. 2d 426, 438 (D. NJ 2004). Instead, class counsel reached a global settlement that included interests in Lucent (warrants), allowing Lucent the chance to "continue its operations and work towards achieving stability and prosperity once again," with the class sharing in that upside. *Id*. at 437. The court praised the creative settlement that gave the class an interest in a defendant that, like Clearview, likely would not have survived until the end of litigation. *Id*. at 436-39. *See also*, *Uhl v. Thoroughbred Tech. & Telecomms.*, 309 F.3d 978, 987 (7th Cir. 2002) (affirming trial court's approval of "unusual and innovative" class action settlement in which class members received ownership interest in newly created company, rejecting objector's preference for a "different" settlement structure not dependent on company's future performance.)

Moreover, these objections are based on the flawed premise that the mere collection of biometrics is illegal. It is not. As discussed above, this case asserts no claims under state laws other than Illinois, California, New York and Virginia. And only Illinois's BIPA addresses biometrics

and contains a private right of action. Clearview believes that it is now, indisputably, fully BIPA compliant, following the ACLU settlement.

Finally, as the Motion for Final Approval discusses, the settlement relief is substantial – particularly in comparison to what the settlement class is likely to recover through litigation. Like *In Re Tiktok, Inc., Consumer Privacy Litigation*, which granted final class settlement approval in an MDL involving BIPA claims, the complexity, length, time, and expense of future litigation here "would be enormous." 617 F. Supp. 3d 904, 949 (N.D. Ill. 2022), citing *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 863 (7th Cir. 2014). If the settlement is not approved, this MDL will still require substantial discovery -- including depositions and expert discovery – along with class certification motions and dispositive motion practice. It would take years to proceed to trial with significant costs and little benefit to the class. The individual cases of the MDL would also need to return to the transferor courts for trial preparation and trials, following pretrial proceedings. *Id.*, citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34–35 (1998).

As in *Lucent*, 327 F. Supp. 2d at 438, continued litigation would likely bankrupt Clearview, providing the Class with at best a fraction of the relief that may be obtained from the settlement. *See, e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374, 139 S. Ct. 1652, 1658, 203 L. Ed. 2d 876 (2019)(recognizing unsecured creditors typically receive "only cents on the dollar."); (Dkt 578-2, Andersen Decl. at ¶ 13.) The Amicus Brief quibble with this suggestion, complaining that Plaintiffs failed to provide evidence of Clearview's financial state to show that it would go bankrupt on litigation costs alone and could not pay a judgment. (Dkt 609, at 11.). Not so. Plaintiffs provided the sworn declaration of third-party mediator, Judge Wayne R. Andersen - executed on June 11, 2024. (Dkt 578-2.) Judge Andersen noted "the parties and I considered the inability of Clearview, as a technology start-up with limited funding, client-based, and revenue to

pay any judgment…Clearview provided extensive information – everything that the Class requested – as to its financial condition." (*Id.* at ¶ 6.) The Parties and mediator worked extensively on this aspect of the settlement, and even retained tax experts to consider the impact to the class, class counsel, and Clearview posed by the unique settlement structure. (*Id.* at ¶ 11.) Judge Andersen found (1) "Clearview did not have the funds to pay a multi-million dollar judgement;" (2) it was uncertain whether it "would even have enough money make it through to the end of a trial;" and (3) Clearview substantiated that convertible note holders would have priority over any class judgment in the event of bankruptcy. (*Id.* at ¶ 13.)

Amici provide no support for the proposition that the sworn declaration of "a former U.S. District and state court Judge and mediator" is not sufficient evidence. (*Id.* at ¶ 17.) Nor have Amici challenged the credibility of Judge Andersen who has overseen the parties' negotiations, including their evidence and legal arguments, *for years.* Indeed, Amici admit "third-party mediation" and "hard-fought arm-length negotiation" show a class settlement is trustworthy, and then claim that they "do not question the process under which the Settlement was obtained." (Dkt 609, at 10.) As such, Amici undercut their own objection. Contrary to Amici's submission, Judge Andersen also explained why a 23% stake in Clearview is appropriate -- too large a percentage would jeopardize Clearview's ability to attract investors, while too small a percentage would not sufficiently compensate the Class for its claims and its advocacy of them. (Dkt 578-2, at ¶ 15.)

Moreover, courts consider the risk of bankruptcy when approving class settlements against even billion-dollar companies like Chase Bank. *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) (approving TCPA class settlement as "[a] $52.50 recovery in the hand is better than a $500 or $1,500 recovery that must be chased through the bankruptcy courts."); *Reinhart v. Lucent Techs., Inc. (In re Lucent Techs., Inc. Sec. Litig.),* 327 F. Supp. 2d 426, 437-438. It is also

pertinent that the defendant here is not an established billion-dollar company like the defendants in the cases cited in the Amicus Brief (Dkt 609, at 12 (naming TikTok, Meta f/k/a Facebook Inc., and Vizio, Inc.). Amici do not cite a single case including a defendant that was remotely similar to Clearview. As Judge Andersen recognized, Clearview is still a start-up technology company, this settlement was negotiated in good faith, and it is the "best result" based on the "legal and economic risks involved." (Dkt 578-2, at ¶ 2.) The settlement is not required to fit the mold of class settlements against established billion-dollar companies under different facts and legal claims; it is required to be "fair, reasonable, and adequate," which Plaintiffs have shown with ample support. Fed. R. Civ. P. 23(e)(2). Thus, the settlement relief is substantial, certain and adequately described. The settlement agreement should be approved.

## IV.   The Release Is Not Overbroad Because It Is Tailored to the Actual Defendants In This Case.

Objectors Weissman & Claypool and De Leon object on the basis that the release is supposedly overly broad in the conduct and defendants it covers, such as the Macy's Defendants. (Dkts 590, at 19-21; 591, at 28-29.) Notably, only Objectors Weissman & Claypool have raised this issue of Macy's non-contribution of funds to the settlement. Neither they, nor any other Objectors explain *why* any Macy's Defendant had any liability in this matter, nor could they.

As an initial matter, the release applies only to the actual defendants in this case – not the "defendant class" sought by plaintiffs. Following this Court's denial of plaintiffs' request to amend the complaint to add individual retailers as defendants, several new lawsuits were filed against retailers who allegedly used Clearview's services and are members of the putative defendant class. *See Coss v. Kohls, Inc*. Case No.1:22-cv-04274 (N.D. Ill.); *Coss et al. v. Walmart, Inc*., Case No. 22-cv-04277 (N.D. Ill.); *Coss et al. v. Best Buy*, Case No. 1:22-cv-04280 (N.D. Ill.); *Coss et al. v. The Home Depot*, Case No. 1:22-cv-04275 (N.D. Ill.). The courts dismissed all of those cases not

long after each was filed, but in any event the Settlement does not address those claims nor release those defendants.

As the Motion for Final Approval discusses, there are grave problems with any legal theory advanced against the Macy's Defendants. If litigation were to proceed, the Macy's Defendants would show that they never collected or possessed any biometric data or information in Clearview's biometric database. *See* (Dkt 578, at 24-26.) Discovery showed that Macy's Corporate Services, Inc. specifically negotiated an agreement with Clearview in which Clearview represented, covenanted, and agreed that it would not include any biometric data of Illinois residents while providing services to any Macy's Defendant. Thus, even if they possessed biometric information (which they did not) it would have been an unwitting, non-negligent possession, for which there is no private right of action. Additional problems with obtaining liability and certifying a class on these claims are discussed in the Motion for Final Approval The dominant claims in this litigation are the seven counts under BIPA – with its focus on biometrics, private right of action and per violation recoveries – and Clearview covenanted it that it would not provide Macy's with biometric data of Illinois residents covered by BIPA. That contract also contains provisions obligating Clearview to indemnify Macy's for breaches of Clearview warranties, representations and covenants.

"Courts have consistently held that so long as the total compensation paid to the plaintiff class is fair, it does not matter that even *noncontributing* parties are released by a settlement[.]" *In re Am. Fam. Enterprises*, 256 B.R. 377, 428 (D.N.J. 2000), citing *Duban v. Diversified Mortgage Investors*, 87 F.R.D. 33, 40 (S.D.N.Y. 1980); *In re Lupron Mktg. & Sales Pracs. Litig.*, No. CIV.A. 01-10861-RGS, 2005 WL 613492, at *3 (D. Mass. Mar. 16, 2005) (rejecting intervenors assertion that a settlement release of non-contributing parties in an MDL showed evidence of collusion,

particularly given that the MDL action had been litigated through extensive discovery and heated motions and the court preliminarily found the settlement to be fair). So too here. Given the Macy's Defendants' defenses, and the fairness of the total compensation paid to the Settlement Class, the settlement agreement is fair, reasonable and adequate.

With respect to the scope of the released claims, Objectors complain that the conduct released by the settlement includes factual bases outside the complaint. Not so. The release is narrowly tailored to the conduct at issue in the operative complaint. Regardless of the legal theory, the released claims include only those related to the collection and use of biometrics through the Clearview database.[16] Standard releases are based on conduct rather than legal theories and it is well-settled that the "court may release not only those claims alleged in the complaint but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Gehrich*, 316 F.R.D. at 231, citing *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273–74 (7th Cir. 1998))(finding a release of all claims "related to automatic telephone dialing systems or callers using an artificial or prerecorded voice" was not overbroad where the plaintiffs only alleged statutory TCPA claims.) Likewise, here, the released claims are limited to those based on the collection and use of biometrics, and are not overboard.

## V. Independent, Nationwide Class Representation Is Not Needed For Adequate Representation.

Weissman & Claypool object on behalf of the Nationwide Subclass, stating it lacks adequate representation because all class representatives are part of subclasses. (Dkt 590, at 22-

---

[16] "Released Claims" means…arising from or related to Defendants' alleged collection, capture, purchase, storage, possession, receipt through trade, obtainment, sale, lease, trade, profiting from and/or dissemination, disclosure or redisclosure *of images and/or facial vectors and/or Biometric Data using the Clearview Biometric Database or other Clearview technology*, including, without limitation, Clearview's algorithms, facial vectors, or other proprietary technology, *to make use of those images and/or biometric data*… Doc. 578-1, ¶ 1.46.

23.) However, the purpose of the adequacy of representation requirement is to "uncover conflicts of interest between the named parties and the class they seek to represent." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492 (N.D. Ill. 2015), quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (overruling FRCP 23(a) objections to adequacy of representation). Like in *Walgreen*, "[n]o objectors have argued, and there is no evidence on the record to suggest, that [class representatives'] interests are adverse to those of the [nationwide] settlement class." *Id.*

The state specific subclasses will receive higher shares than the Nationwide Class. Rightfully so. As discussed above, in addressing the decision not to include injunctive relief under non-Illinois laws, this MDL consolidated cases filed in some of the subclass states, and alleged claims only under the state laws of Illinois, Virginia, California and New York. Additionally, Illinois' BIPA is the driving cause of action, as it addresses biometrics and includes a private right of action allowing for statutory damages in the absence of actual damages, which are difficult to prove and almost impossible to certify on a class basis. The claims charging Clearview with BIPA violations are the strongest, while claims under California, New York and Virginia law are weaker, relying on undeveloped areas of statutory and common law principles applied to the collection of biometric data. (Dkt 578, at 23.) Recovery for solely Nationwide Subclass Members was even more remote, requiring proof that non-citizens were somehow entitled to the protections of foreign states' laws. The rights of these subclass members were adequately considered and protected.

Weissman & Claypool also take issue with the class representatives receiving incentive awards. (Dkt 590, p. 19.) Incentive awards "are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Here, the class representative awards are modest, capped at $1,500. *See Walgreen*, 311 F.R.D. at 503 (noting courts have regularly approved $5,000 incentive awards in common fund cases); *In re*

*TikTok*, 617 F. Supp. 3d at 949 ("A study of approximately 1,200 class actions showed that the median incentive award per plaintiff was $5,250"). Also, the settlement structure here avoids the frequently-cited problem with class representative awards -- giving the representatives compensation that is different and more valuable than the Class compensation, i.e. representatives receive cash where class receives only coupons or dubious injunctive relief. *Eubank v. Pella Corp.*, 753 F.3d 718 (2014) (cited by Weissman & Claypool Objection, Dkt 590); *Clement v. Am. Honda Fin. Co*, 176 F.R.D. 15 (D. Conn. 1997) (cited by De Leon Objection, Dkt 591). Here, the class representative awards are shares in the Settlement Fund, subject to the same uncertainties, and with the same upside, as the awards to the Class and to Class Counsel. Finally, although the class representatives were named after a settlement reached, they meaningfully participated in the result, each agreeing to attach their names to this litigation and spending time understanding and approving Class Counsel's representation of the classes and other matters substantially benefitting the classes. Because the modest incentive awards for class representatives are justified, the Court should overrule the objections.

Relatedly, Amici's objections to a 39% attorney's fee award are misplaced. The Amicus Brief argues on the one hand, monetary relief is too speculative, while on the other asserting that Class Counsel's fee – which gets paid only if and when the class gets paid – is somehow "exorbitant." (Dkt. 609, at 12-13.) Plaintiffs provided ample support in their fee petition explaining why the percentage sought is reasonable and aligned with Seventh Circuit caselaw. (Dkt. 584.)[17] The Amicus Brief makes no attempt to address those authorities. Instead, the Brief relies on

---

[17] *See e.g., Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) ("A 33.99% market rate award in a complex case that involved a lengthy and contentious discovery period would by no means be an unreasonable outlier."); *In re Potash Antitrust Litig.*, No. 08-6910, Dkt 589 at 2 (N.D. Ill. June 12, 2013) (one-third fee awarded from $90 million settlement fund); *Mansfield et al. v. Airline Pilots Assoc.*, No. 06 cv 6869 at 7 (N.D. Ill. Dec.14, 2009) (approving 35% of a $44 million common fund and finding 35% to be the market rate given that there was a "significant risk" of non-payment).

authorities that do not support their position, including *Gaskill v. Gordon*, where the Seventh Circuit actually approved a similar fee aware of 38%. 942 F. Supp. 382, 388 (N.D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998). Similarly, Amici argue that *Spicer v. Chicago Bd. Options Exch., Inc.*, supports their view, but in that case, the court found a 59% fee award to be excessive. 844 F.Supp. 1226, 1252 (N.D. Ill. 1993). That is a far cry from the 39% award sought here and much closer to the 38% award approved in *Gaskill*. Notably, Amici's reliance on *Matter of Superior Beverage/Glass Container Consol. Petrial*, 133 F.R.D. 119 (N.D. Ill. 1999) is also unpersuasive because it purports to summarize common fund fees from at least 35 years ago. Amici also ignore the fact that this case has been contentiously litigated over five years with over 600 filings, several mediation attempts, and extensive expert costs, contributing to class counsel incurring $160,000 in litigation expenses alone prior to consideration of any attorneys' fees. There is no windfall here. Class Counsel are seeking a fair fee that they earned over many years.

## CONCLUSION

Based on the foregoing, and for the additional reasons stated in the Motion for Preliminary Approval (Dkt 578) and the Motion for Final Approval filed on this date, the Parties jointly request that this Court not credit the Objections and enter an order granting final approval to the class action settlement in this case.

Dated: January 16, 2025                    Respectfully submitted:

By:*/s/ Thomas M. Hanson*
Thomas M. Hanson
Jon Loevy (jon@loevy.com)
Michael Kanovitz (mike@loevy.com)
Thomas M. Hanson (hanson@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, Illinois
312.243.5900
*Lead Class Counsel*

By: */s/ James Thompson*
James Thompson (ARDC No. 6199621)
Daniel Lynch (ARDC No. 6202499)
LYNCH THOMPSON LLP
150 South Wacker, Suite 2600
Chicago, Illinois 60606
Phone: (312) 346-1600
jthompson@lynchthompson.com
dlynch@lynchthompson.com
*Counsel for the Clearview Defendants*

By: */s/ Rachel Schaller*
Daniel R. Saedi (ARDC No. 6296493)
Rachel Schaller (ARDC No. 6306921)
Blank Rome LLP
444 W. Lake St., Suite 1650
Chicago, IL 60606
Phone: 312-776-2600
Daniel.Saedi@blankrome.com
Rachel.Schaller@blankrome.com
*Counsel for the Macy's Defendants*

## <u>CERTIFICATE OF SERVICE</u>

       I, Thomas M. Hanson, an attorney, hereby certify that, on January 16, 2025, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

<u>/s/ <i>Thomas M. Hanson</i></u>
Thomas M. Hanson
