**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re Clearview AI, Inc., Consumer Privacy Litigation, | ) ) ) ) ) | Case No. 21-cv-00135  Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

After over five years of litigation, before the Court is Plaintiffs' motion for final approval of a class action settlement in the multidistrict litigation against Clearview AI, Inc. for its collection, storage, and use of biometric face images the company scraped from the internet without consent. This class action settlement agreement and release is entered into by Plaintiffs Rodell Sanders, Gerard Dache, Eric Gould and Jordan Orlando (collectively "Plaintiffs"), individually and on behalf of all others similarly situated (the "Settlement Class" or "Class Members"). The Settlement Class is further divided into a Nationwide Class, an Illinois Subclass, a California Subclass, a New York Subclass, and a Virginia Subclass. Plaintiffs and the Settlement Class are represented by Loevy & Loevy ("Lead Class Counsel").

Included as parties to the agreement are the following Defendants: Clearview AI, Inc. ("Clearview"), Clearview co-founders Hoan Ton-That and Richard Schwartz, Clearview affiliate Rocky Mountain Data Analytics LLC ("Rocky Mountain"), and Clearview General Counsel Thomas Mulcaire (collectively, the "Clearview Defendants"); and Macy's, Inc., Macy's Retail Holdings, Inc. (n/k/a Macy's Retail Holdings, LLC), and Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC) (collectively, the "Macy's Defendants" or "Macy's").

For the following reasons, the Court grants the motion for final approval of the settlement.

1

**Background**

*A. Biometrics and the launch of multidistrict litigation*

This litigation concerns the collection, storage, and use of biometric data. "Biometrics" refers to the automated recognition of individuals based on their biological and behavioral characteristics.[1] While the average person may not be familiar with the term, they likely are familiar with common biometric characteristics: fingerprints, DNA, voice, and, at issue here, face geometry.[2] Face biometrics use aspects of a person's face geometry, such as the eyes, nose, or mouth, to create a unique face image. Once captured, this face image can be stored and used to identify that individual through a variety of facial recognition applications, such as unlocking a smartphone, finding missing persons, and identifying criminal suspects.

The identification power of face images, combined with the ubiquity of facial capture and recognition platforms in the modern digital era, makes this biometric characteristic both incredibly powerful and highly susceptible to misuse. Seeing an opportunity in the proliferation of face images on the internet, in 2017, Hoan Ton-That and Richard Schwartz founded Clearview AI, Inc. Using a proprietary tool, the start-up assembled a massive biometric database of individuals by "scraping" their photos from publicly available websites and collecting their biometric facial geometry. With this database, Clearview customers—primarily federal and state law enforcement agencies and private retailers—seeking to identify an individual could upload an image of the person in question to Clearview's platform. Using its facial recognition software, Clearview would then compare the uploaded image to those in its database to locate other images of the individual in question, enabling the customer to identify the individual.

---

[1] "Information technology—Vocabulary—Part 37: Biometrics," THE INTERNATIONAL ORGANIZATION FOR STANDARDIZATION, https://www.iso.org/obp/ui/#iso:std:iso-iec:2382:-37:ed-3:v1:en (last accessed Mar. 18, 2025).
[2] "Types of Biometrics," BIOMETRICS INSTITUTE, https://www.biometricsinstitute.org/what-is-biometrics/types-of-biometrics/ (last accessed Mar. 18, 2025).

Through its internet scraping efforts, Clearview's database quickly grew to a staggering three billion images. In early 2020, the *New York Times* published a story titled "The Secretive Company that Might End Privacy as We Know It" describing Clearview's growing law enforcement and commercial retail clientele and the erosion of privacy signaled by the increasing use of facial recognition technology by private and government entities.[3] The article sparked a flurry of class action lawsuits in both federal and state court. The first federal court case was filed before this Court on January 22, 2020 by Lead Class Counsel. Then on May 28, 2020, the ACLU filed a complaint against Clearview in the Circuit Court of Cook County seeking injunctive relief for violation of the Illinois Biometric Information Privacy Act (BIPA). *American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cnty. Cir. Ct. No. 2020 CH 04353.

On August 18, 2020, Clearview moved to consolidate the existing actions into a multidistrict litigation (MDL) pursuant to 28 U.S.C. § 1407. *In re Clearview AI, Inc. Privacy Litigation*, MDL No. 2967. On January 8, 2021, the Judicial Panel on Multidistrict Litigation (JPML) issued a transfer order consolidating nine of the pending actions before the Court. The JPML would later order two additional cases be transferred to the MDL on June 21, 2021, bringing the total number of consolidated cases, which originated from four different districts, to eleven.

On April 9, 2021, Plaintiffs filed a consolidated class action complaint. (Dkt. 29.) That same day, Plaintiffs moved for a preliminary injunction that sought to enjoin Clearview from continuing to possess, collect, profit from, and distribute Illinois residents' biometric data. (Dkt. 31.) After a raft of briefing, on June 4, 2021, the parties entered into a joint stipulation under which Clearview would cease certain allegedly BIPA-violating practices, namely distributing, redistributing, transferring or

---

[3] Kashmir Hill, *The Secretive Company that Might End Privacy as We Know It*, N.Y. TIMES (Jan. 18, 2020), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

otherwise disseminating to any entity or person the biometric identifiers of any Illinois plaintiff or Illinois resident. (Dkt. 97.)

B. *Plaintiffs' claims*

On June 29, 2021, following the JPML's second and last consolidation order, Plaintiffs filed their first amended consolidated class action complaint on behalf of a nationwide class and Illinois, California, New York, and Virginia subclasses. The complaint named as defendants Clearview, its co-founders Hoan Ton-That and Richard Schwartz, Clearview's affiliate Rocky Mountain, and Clearview's general counsel, Thomas Mulcaire. The complaint also named Macy's, Inc. as a defendant, individually and on behalf of a defendant class comprised of private entities who had used Clearview for security purposes.

In their complaint, Plaintiffs: alleged violations of (1) BIPA, 740 ILCS § 14/15(b) (c) (d) and (e); (2) Viginia statutes addressing the unauthorized use of names or pictures, Va. CODE §§ 8.01-40, and the Virginia Computer Crimes Act, Va. CODE § 18.2-152.1, *et seq.*; (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, California's Commercial Misappropriation statute, Cal. Civ. Code § 3344(A), California common law protections for the right of publicity, and the California state constitution's protections against invasion of privacy; and (4) New York's civil rights protections against invasion of privacy, N.Y. CIV. RIGHTS LAW §§ 50–51; and (5) brought an unjust enrichment claim and sought judgment under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* (Dkt. 116.)

1. *Illinois Subclass claims*

The first seven counts were brought by the plaintiff from Illinois on behalf of the Illinois subclass for violation by Defendants of several provisions of the Illinois Biometric Information Privacy Act. 740 ILCS § 14/1 *et seq.* BIPA was enacted in 2008 in response to the growing use of

biometrics in the business and security screening sectors and the corresponding need to ensure that biometric information is properly collected, stored, and distributed. 740 ILCS § 14/5. To accomplish this goal, § 14/15 prescribes a range of requirements for the retention, collection, disclosure, and destruction of biometric information by private entities:

- Section 14/15(b) prohibits private entities from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining an individual's biometric information without their written consent;

- Section 14/15(c) prohibits private entities in possession of an individual's biometric information from selling, leasing, trading, or otherwise profiting from that biometric information;

- Section 14/15(d) prohibits private entities in possession of an individual's biometric information from disclosing, redisclosing, or otherwise disseminating this information unless: (1) the entity has the individual's consent; (2) the disclosure or redisclosure completes a financial transaction requested by the individual; (3) disclosure or redisclosure is required by state or federal law or municipal ordinance; or (4) the disclosure is pursuant to a valid warrant or subpoena;

- Section 14/15(e) requires a private entity to store, transmit, and protect biometric information using the reasonable standard of care and in a manner in which it stores other confidential and sensitive information.

In addition to these prohibitions, § 14/20 provides individuals with a right of action to seek the following forms of relief against entities that violate the statute's provisions: the greater of liquidated damages of $1,000 or actual damages for negligent violation; the greater of liquidated

damages of $5,000 or actual damages for intentional or reckless violation; reasonable attorneys' fees and costs; and other relief, including injunctive relief.[4]

### 2. Virginia Subclass claims

The next two counts were brought by the plaintiff from Virginia on behalf of the Virginia subclass for violation by Defendants of two statutes addressing the unauthorized use of names or pictures: Va. CODE §§ 8.01-40 and the Virginia Computer Crimes Act, Va. CODE § 18.2-152.1, *et seq.* Section 8.01-40 permits an individual to seek injunctive relief and punitive damages against a person, firm, or corporation that uses her name, portrait, or picture without her written consent. Section 18.2-152.1 permits an individual "injured by . . . any act of computer trespass" to sue for damages sustained by the trespass and the costs of the suit. Under the statute, acts of computer trespass include fraud, trespass, invasion of privacy, and gathering personal information through deception.

### 3. California Subclass claims

Four counts were brought by the plaintiff from California on behalf of the California subclass for violation of California law. The first count sought restitution and disgorgement and injunctive relief under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). The second sought damages under California Civil Code § 3344(a) for commercial misappropriation, which provides the greater of statutory damages for up to $750 or actual damages for the use of one's photograph or likeness without consent. The third count sought damages and injunctive relief for violation of the California common law right of publicity, which protects persons from the

---

[4] As noted by Plaintiffs in their motion for final approval, the Illinois Supreme Court has yet to resolve the question of whether statutory damages under BIPA are mandatory or discretionary. *See Cothron v. White Castle Sys., Inc.*, 2023 IL 128004, 216 N.E.3d 918, 929 as modified on denial of reh'g (July 18, 2023) (inviting the state legislature to "make clear its intent regarding the assessment of damages under [BIPA]").

unauthorized use of a person's identity by another for commercial gain. The fourth and final count sought damages and injunctive relief for intrusion of the state's constitutional right to privacy.

### 4. *New York Subclass claim*

One sole count was brought by the plaintiff from New York on behalf of the New York subclass for violation of New York Civil Rights Law §§ 50–51. Section 50 provides for a right of privacy and publicity and establishes the use of a person's name, portrait, picture, likeness, or voice without written consent as a misdemeanor. Section 51 enables a person to seek actual damages and injunctive relief for violation of these rights.

### 5. *Nationwide Class claims*

The final two counts were brought on behalf of all plaintiffs and the Settlement Class. The first sought an order compelling Defendants to disgorge into a common fund or constructive trust "proceeds that they unjustly received from the sale, lease, trade, distribution, dissemination and use of the personal information" under a theory of unjust enrichment. The second—and sixteenth total—count sought judgment under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, declaring that Defendants were in violation of the common law and statutory claims brought under the complaint and requesting the issuance of a nationwide injunction preventing Clearview from continuing to engage in the unlawful conduct alleged in the complaint.

### C. *Settlement negotiations*

The Court, with the support of Magistrate Judge Valdez, oversaw and adjudicated several motions for reconsideration, interlocutory appeal, and discovery disputes throughout the litigation. But the scale of Clearview's activities combined with the early-stage nature of the company presented a challenge for both parties. As of October 29, 2021, Clearview's database contained approximately ten billion images, creating a class that encompassed virtually any individual whose face had been

posted on the internet prior to and during the period of Clearview's operation. But as a start-up, Clearview was financially dependent on capital from investors and government contracts that had dried up during the litigation. The cost of trial and a multi-million-dollar judgment would likely lead to the company's bankruptcy, foreclosing the possibility of meaningful monetary relief for the class. Additionally, in May 2022, Clearview entered into a settlement with the ACLU in its case in Illinois state court, a development that significantly impacted the relief possible in the MDL.[5]

In light of these challenges, in mid-2022 the parties engaged the Honorable Wayne Andersen (ret.) to mediate settlement discussions. As explained by Judge Andersen in his report supporting the preliminary approval of the settlement, the parties discussed a range of issues in-depth during these discussions, including: (1) the facts surrounding Clearview's data scraping and database of facial images; (2) the size of Clearview's potential liability under BIPA and recent BIPA decisions; (3) Clearview's defenses to the Settlement Class's claims under BIPA; (4) Clearview's arguments as to the territorial limitation of BIPA as applied to non-Illinois residents; (5) the strength of and defenses to the subclass claims brought under Virginia, California, and New York law, as well as the strength of and defenses to the nationwide class claims; and (6) claims against Macy's and the vendor defendant class, including the scope and extent of any use by vendors of the information from the Clearview database. (Dkt. 578, Ex. B.) The parties also discussed Clearview's inability to pay the significant judgment expected from a loss in litigation, supported by extensive information provided by Clearview as to its financial condition. (*Id.*) Ultimately, these 2022 discussions did not lead to a settlement, as Plaintiffs insisted on receiving a substantial payment from Clearview, along with other forms of possible relief, that Clearview believed it could not provide.

---

[5] *American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cnty. Cir. Ct. No. 2020 CH 04353, available at https://www.aclu.org/cases/aclu-v-clearview-ai?document=Exhibit-2-Signed-Settlement-Agreement#legal-documents (hereinafter "ACLU Settlement Agreement").

Undeterred, in February 2023, the parties once again engaged Judge Andersen to resume mediation. This time, the parties agreed from the outset that any viable class action settlement would need to include the Settlement Class receiving a meaningful equity stake in Clearview, as Clearview continued to maintain that it could not afford a payment large enough to serve as the basis for a settlement with a class of this size. (*Id.*) The need for an equity stake was further necessitated by the fact that in the event of a Clearview bankruptcy, several security interests held priority to any claim by the Settlement Class after judgment, which would leave little monetary relief for the Settlement Class to recoup. (*Id.*)

After over six months of negotiations, the parties landed on a settlement agreement providing the Settlement Class with payout from a 23% equity stake in Clearview. (*Id.*) This equity percentage represents the outcome of a delicate balancing act by the parties. Too large a percentage ran the risk of preventing Clearview from attracting the investors necessary for the start-up to grow and provide relief to the Settlement Class. But too small a percentage would not have been commensurate with the injuries of the Settlement Class and the zealous advocacy of their claims by Lead Class Counsel. This pursuit of a Goldilocks percentage was also shadowed by the numerous appellate issues that could be raised by both sides, further risking a prolonged litigation and the provision of any monetary relief for the Settlement Class.

### D. *Proposed settlement agreement*

On June 12, 2024, the parties filed a joint motion for preliminary approval of the settlement agreement. In exchange for a release of liability from the Settlement Class's claims, the settlement provides the following relief.

1. *Establishment of a nationwide settlement class and state subclasses*

The settlement establishes four state subclasses (Illinois, California, New York, and Virginia) and one nationwide class consisting of the following:

- **The Nationwide Class:** All individuals who resided in the United States of America between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The Illinois Subclass**: All individuals who resided in the state of Illinois between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The California Subclass**: All individuals who resided in the state of California between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The New York Subclass**: All individuals who resided in the state of New York between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database; and

- **The Virginia Subclass**: All individuals who resided in the state of Virginia between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database.

2. *Monetary relief*

As monetary relief, the settlement creates a Settlement Fund for the benefit of the Nationwide Class and the subclasses based upon a Settlement Stake—a monetary amount equal to a 23% equity stake in Clearview as of September 6, 2023. As of January 2024, Clearview's value was estimated to be approximately $225 million dollars, making the Settlement Stake worth $51.75 million dollars. (Dkt. 621.) The Fund will be funded and paid by the triggering of one of four events:

1) the occurrence of an IPO;

2) the occurrence of a liquidation event, such as a merger or consolidation or sale of all or substantially all of Clearview's assets;

3) a payment by Clearview of an amount equal to 17% of Clearview's GAAP recognized revenue for the period commencing on the date of final settlement approval and ending with the election of this option, which expires on September 30, 2027; or

4) the amount the Settlement Class will receive if it elects to sell its right to receive the Settlement Stake payment.

The Settlement Class can pick whichever relief seems the most advantageous as events play out for Clearview in the future. To exercise this right and to protect the interests of the Settlement Class, the settlement appoints a Settlement Master with the right: (1) to, upon reasonable notice, inspect Clearview's books and records, (2) to request and receive biannual interviews with Clearview's management team, and (3) to receive information regarding the price and terms of any secondary sales of Clearview stock. In addition to holding the 23% stake until a triggering event, the Settlement Master also has the authority to sell the Settlement Class's rights to a third-party (immediately distributing the proceeds to the Settlement Fund) if he deems it in the Settlement Class's best interests.

Irrespective of the method of funding, the Settlement Fund serves as the source of all attorneys' fees (39.1% of the Settlement Fund) and incentive payments to Plaintiffs (equal to fifty pro rata shares of the net Settlement Fund, with a cap of $1,500). After these payments have been made, the remainder will be distributed to Settlement Class members who submit an approved claim. These shares are distributed pro rata based on each claimant's state of residence and the relative strength of each claim brought under the complaint. Approved claimants who resided in Illinois during the relevant time period will be entitled to ten shares of the Settlement Fund, while those who resided in California, New York or Virginia will be entitled to five shares. Claimants who did not reside in any of the four subclass states will be entitled to one share of the Settlement Fund.

After evaluating the fairness, adequacy, and reasonableness of the settlement agreement, the Court entered a preliminary approval of the settlement on June 21, 2024. (Dkt. 580.) The Court made three principal findings in its preliminary approval: that (1) there was good cause to believe that the settlement is fair, reasonable, and adequate; (2) the settlement had been negotiated at arm's length over several months between experienced attorneys familiar with the legal and factual issues of the case and was reached with the assistance of Magistrate Judge Valdez and mediation by Judge Andersen; and (3) the settlement provided a plan for providing notice of its material terms to the Settlement Class for their consideration and reaction. (*Id.*) The settlement also set a deadline of September 20, 2024, for the filing of any objections to the settlement or requests for exclusion.

E. *Notice plan, submission of objections, and the final approval hearing*

Following the Court's preliminary approval of the settlement, the parties proceeded with the notice plan developed by the settlement administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"). *See generally* Dkt. 621, Ex. B. Per the Court's preliminary approval order, the notice period began on July 25, 2024, and concluded on October 25, 2024, the date by which all claims were due.

Because Clearview did not collect or know the actual identity of persons in its biometric database, individual notice to potential class members was not possible. Accordingly, on July 3, 2024, Epiq created a settlement website that contained relevant litigation documents, frequently asked questions, and instructions for opting out of, objecting to, or filing a claim under the settlement. Epiq also established an automated telephone system through a toll-free number that provided callers with information about the settlement, as well as a postal mailing address.

Epiq then employed several different forms of notice to reach class members. First, Epiq established a digital advertising campaign on select advertising networks and social media platforms designed to encourage participation by class members. This advertising campaign reached more than 372 million impressions across each platform between July 25 and September 5.

| Network/Property | Target | Language | Ad Size | Delivered Impressions |
|---|---|---|---|---|
| *Google Display Network* | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 172,657,967 |
| *Yahoo Audience Network* | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 54,923,624 |
| *Outbrain Network* | Adults 18+ | English & Spanish | Custom Feed Ads | 5,324,647 |
| *Taboola Network* | Adults 18+ | English | Custom Feed Ads | 5,274,252 |
| *Facebook* | Adults 18+ | English | Newsfeed & Right Hand Column | 71,375,097 |
| *Instagram* | Adults 18+ | English | Newsfeed | 41,063,778 |
| *X (Twitter)* | Adults 18+ | English | Feed Ads | 22,199,203 |
| **Total** | | | | **372,818,568** |

Next, Epiq acquired sponsored search listings that linked directly to the settlement website on the three most frequently visited internet search engines: *Google*, *Yahoo!*, and *Bing*. When search engine visitors searched selected common keyword combinations related to the settlement, the sponsored search listing was displayed at the top of the visitor's website page prior to the search results or in the upper right-hand column of the web-browser screen. These search listings were displayed 23,714

times between July 25 and September 5. Finally, a party-neutral informational release was issued nationwide over *PR Newswire's US1* and *Hispanic newslines* in English and Spanish to approximately 5,000 general media (print and broadcast) outlets, as well as approximately 4,500 websites, online databases, internet networks, and social media platforms.

By Epiq's estimation, approximately 70% of adults aged eighteen and older in the United States were reached through the notice plan, with an average frequency of 2.6 times each. (Dkt. 621.) Epiq also estimates that the final number of valid claims will be between 65,000 and 125,000, with 1,008 requests for exclusion. (*Id.*) Sixteen objections were filed by class members through this notice plan. A coalition of state attorneys general led by Vermont ("Amici States") also filed an amicus brief objecting to the settlement agreement.[6] (Dkt. 609.)

After the notice and claims submission period closed, Plaintiffs filed a motion for final approval of the settlement on January 16, 2025. On January 30, 2025, the Court held a hearing on the motion, at which time it granted Plaintiffs' motion appointing the Honorable Sidney I. Schenkier (ret.) as Settlement Master. (Dkt. 630.)

For the reasons set forth below, the Court overrules the objections and grants Plaintiffs' motion for final approval of the settlement.

**Legal Standard**

A court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 921 (N.D. Ill. 2022) (Lee, J.) (citing Fed. R. Civ. P. 23(e)(1)–(2)).

---

[6] Amici States include: Vermont, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, Oregon, Rhode Island, Tennessee, Washington, and the District of Columbia.

**Discussion**

*A. Class certification*

A plaintiff seeking class certification has the burden of showing that their proposed class meets the requirements of Rule 23(a) and the requirements for one of the three types of classes identified in Rule 23(b). *Id.* at 922 (citing *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019)). Rule 23(a) requires a plaintiff to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Plaintiffs also must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As the Court concluded in its preliminary approval order, Plaintiffs have satisfied these Rule 23(a) and (b) requirements. Accordingly, the Court certifies the class for settlement purposes.

*1. Numerosity, commonality, and typicality*

The numerosity, commonality, and typicality requirements of Rule 23(a) are readily satisfied here. The expected class size of 65,000–125,000 members satisfies the numerosity requirement because it is too large for joinder to be practicable. *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (noting that "a forty-member class is often regarded as sufficient to meet the numerosity requirement" by courts in the Seventh Circuit). As to commonality, there are numerous "common contention[s] . . . capable of classwide resolution" of which the "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374

(2011). Namely, Plaintiffs allege that Defendants are liable for violations of BIPA and several state statutes and common law, and for unjust enrichment, for the scraping and storing of Class Members' biometric facial images from the internet without consent or compensation, resolution of which would be the same for each Class Member. As to typicality, Plaintiffs' claims "share the same essential characteristics" with those of the Class Members because each named plaintiff suffered the same statutory privacy violation and tortious conduct as the Class Members. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021).

### 2. *Adequacy of representation*

The only Rule 23(a) factor in dispute is the requirement that class representatives fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4); *see Howard*, 989 F.3d at 609. The purpose of this requirement is to protect the rights of absent class members by "uncover[ing] conflicts of interest between named parties and the class they seek to represent" and to "screen[ ] for conflicts of interest among class members." *Howard*, 989 F.3d at 609 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 2236, 138 L. Ed. 2d 689 (1997)). The adequacy-of-representation requirement "is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) (St. Eve, J.) (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)).

As the Court found in its preliminary approval of the settlement, Lead Class Counsel's representation of the class and that of Plaintiffs is adequate. As described further in Plaintiffs' petition for fees and later in the Court's evaluation of the opinion of competent counsel, Lead Class Counsel has shown its significant experience in class-action litigation and settlement throughout the case, with no demonstrated conflicts with the interest of the class members. (Dkt. 583.) And since being added

to the case in May 2024, each of the plaintiffs has satisfactorily participated in the litigation and represented the class.[7]

Two objectors disagree. As to representation of counsel, the Amici States protest that the 39.1% attorney's fee award is "significantly higher than normally approved in common fund cases like this." (Dkt. 609.) But this argument is in opposite to Seventh Circuit caselaw, where courts have routinely provided fee awards of 30% or greater of a common fund.[8] The fee award is also commensurate with the length and complexity of the case and the significant amount of time and effort Lead Class Counsel expended in their representation of the Settlement Class. *See Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (explaining that "the market price for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case") (internal quotations omitted).

Separate from the fee award, objectors Weissman and Claypool argue on behalf of the Nationwide Class that the interests of Plaintiffs, all of whom are subclass members, and the interests of the Nationwide Class are in conflict. (Dkt. 590.) First, Weissman and Claypool argue that the availability of injunctive relief is likely more significant for Nationwide class members because they, unlike the subclass members, do not allege claims for additional monetary damages under state law. Second, the objectors argue that the pro rata distribution of shares of the Settlement Fund—ten to the Illinois Subclass, five to the California, New York, and Virginia subclasses, and one to the Nationwide Class—reflects inadequate representation because there is not a named plaintiff

---

[7] Plaintiffs filed a second amended complaint on August 22, 2022. (Dkt. 428.) Plaintiffs then filed a third amended complaint on May 13, 2024—the operative complaint—substituting Plaintiffs David Mutnick, Steven Vance, Mario Calderon, Anthony Hall, Isela Carmean, Shelby Zelonis Roberson, Andrea Vestrand, and Aaron Hurvitz for Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando as class representatives. (Dkt. 573.)

[8] *See, e.g., Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (approving a fee of 38% of a $20 million-dollar common fund); *Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) (approving a fee of 33.99%); Dkt. 583 (collecting cases).

representing the Nationwide Class. Finally, the objectors argue that because Plaintiffs were named after the settlement was reached, they could not have meaningfully participated in the result to be deserving of 50 pro rata shares of the Settlement Fund and the $1,500 incentive award.

But general concerns, unsupported by evidence, do not a conflict of interest make. As the Court explains in more detail later in this opinion, the possibility of injunctive relief is not determined by the desires of the class members but by the strength and weaknesses of the bases for the relief. While some members of the Nationwide Class may have a strong interest in receiving injunctive relief under the settlement, that possibility is foreclosed by the fact that the complaint provides no basis for such relief. The same is true for the pro rata distribution of shares across each subclass, which was not the product of shadowy, backroom negotiations between Plaintiffs and Defendants but reflects the strength and viability of the respective Illinois, California, Virginia, New York, and nationwide claims. Finally, not only are incentive awards "justified when necessary to induce individuals to become named representatives" as is the case here, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), Weissman and Claypool do not provide any factual allegations to support their claim that Plaintiffs have not provided representation deserving of such an award.

For these reasons, the Court finds that Plaintiffs and Lead Class Counsel fairly and adequately represent the class.

### 3. Rule 23(b)(3) factors: predominance and superiority

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry requires the Court to "understand what the plaintiffs will need to prove and [to] evaluate the extent to which they can prove their case with common evidence." *In re Allstate Corp Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). That is, "it is the method of determining the answer

and not the answer itself that drives the predominance consideration." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022). *Bell v. PNC Bank, Nat. Assn.*, 800 F.3d 360, 378 (7th Cir. 2015) ("[A] common question predominates over individual claims if a failure of proof on the common question would end the case and the whole class will prevail or fail in unison.") (internal quotation marks omitted). Superiority is satisfied when a class action is "superior over other available methods for fairly and efficiently adjudicating" the case, keeping in mind "the class members' interests in individually controlling the prosecution . . . of separate actions" and "the extent and nature of any litigation concerning the controversy already begun." Fed. R. Civ. P. 23(b)(3).

Both predominance and superiority are satisfied here, a finding which no objector disputes. As to predominance, all class members allege injury due to Clearview's image scraping, allegations that are readily amenable to generalized proof of this conduct. And to superiority, this settlement represents the resolution of eleven consolidated class action disputes that were filed in four different districts on behalf of a class that encompasses most of the country. Given the cost and complexity of investigating and litigating the conduct at issue in this case, individual class members would likely have had little interest in prosecuting Clearview on their own. *See California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 513, 137 S. Ct. 2042, 2054, 198 L. Ed. 2d 584 (2017) ("The very premise of class actions is that 'small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Amchem*, 521 U.S. at 617).

For these reasons, the Court finds that both predominance and superiority are satisfied as required by Rule 23(b)(3) and certifies the Settlement Class for the purposes of settlement.

B. *Rule 23's notice requirement*

To approve the settlement, the Court must next find that the notice plan provided to the class "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Fed. R. Civ. P.

19

23(e)(1)(B) (requiring the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified"). Neither Rule 23 nor due process requires that every class member actually receives notice. Instead, "notice suffices if it is reasonably calculated to reach the absent parties." 3 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 8:36 (5th ed. 2011) (updated 2024).

The Court finds that Plaintiffs have satisfied these requirements. As explained above, Epiq's notice plan was broad and comprehensive, consisting of digital advertising, sponsored search listings, and informational releases, and the establishment of a dedicated settlement website, a toll-free telephone number, and a mailing address. All told, Epiq estimates that approximately 70% of adults aged eighteen and older in the United States were reached through the notice plan, a figure that comports with the standard recommended by the Federal Judicial Center. *See* FED. JUDICIAL CTR., JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed March 18, 2025).

Three individuals—Kesselbrenner, Lee, and De Leon—object to the notice plan as being inadequate. Kesselbrenner argues that providing meaningful notice to such a large nationwide class is inherently impossible. (Dkt. 586.) Similarly, Lee argues that the fact that she and four members of her social circle did not see or utilize any of the options provided by the notice plan means that notice was insufficient and that notice instead "should have been mailed to every US address." (Dkt. 599.) Finally, De Leon argues that the banner advertisements were not sufficiently descriptive of the alleged harm and are generally an ineffective method of notice due to low engagement with such advertisements. (Dkt. 591.) De Leon further argues that the use of sponsored search listings inappropriately places the burden on individuals to take action to prompt the corresponding banner advertisement. (*Id.*)

20

None of these objections support a finding that the notice plan was insufficient. To accept the contention that it is impossible to provide meaningful notice to nationwide classes would be to foreclose class action as a method of litigation despite the increasing interconnectedness of our digital society. Nor would direct notice to every US address been practicable under the circumstances given the size of the class and the fact that Clearview did not possess address information for the face images in its database. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th Cir. 2015) (explaining that Rule 23(c)(2)(B) "does not insist on actual notice to all class members in all cases" and in fact "recognizes it might be *impossible* to identify some class members for purposes of actual notice") (emphasis in the original). And while banner advertisements and sponsored search listings are in no way a silver bullet for ensuring notice when class members' names and address are not known or not knowable with reasonable effort, Epiq's notice plan used a variety of different methods and media to reach class members to overcome such limitations. *Id.* (noting that "courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members" to meet the due process requirements that underpin Rule 23(c)(2)(B)).

For these reasons, the Court finds that the notice program was adequate under Rule 23.

### C. Rule 23(e) fairness inquiry

#### 1. Legal standard

The Court now turns to the fairness of the settlement itself. To evaluate the fairness of a settlement, a court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)

(citing *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). This analysis does not "focus on individual components of the settlement, but rather views it in its entirety in evaluating its fairness." *Isby*, 75 F.3d at 1199.

When conducting this analysis, courts consider the facts "in the light most favorable to the settlement." *Id.* At the same time, courts must be mindful that, when sizeable class action settlements are concerned, the parties may have incentives to "sell out the class" by accepting a "deal that promotes the self-interest of both class counsel and the defendant[s]" at class members' expense. *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). As a result, the court must act akin to "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).

### 2. *Strength of Plaintiffs' case and the value of the settlement*

The first and "most important" factor in the fairness inquiry asks the Court to balance the strength of the merits of Plaintiffs' case against the value that they will receive from the settlement. *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014). In the past, this inquiry required district courts to "quantify the net expected value of continued litigation" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002). But recently, the Seventh Circuit has moved away from this formulaic, quantitative analysis and endorsed an examination of "indicia of trustworthiness"—such as third-party mediation, extensive confirmatory discovery, and hard-fought, arm's-length negotiation—in making this determination. *In re TikTok, Inc.*, 617 F. Supp. 3d at 933–34 (collecting cases applying this method of scrutiny).

Indicia of trustworthiness and good faith so permeate the prior litigation and the settlement agreement before the Court that the "mechanical mathematic valuation exercise" required by *Reynolds*

is not necessary. As described above, the settlement was the result of extensive settlement negotiations overseen by Judge Andersen, a well-respected former federal judge and experienced mediator. These negotiations were not only characterized by zealous advocacy by both Plaintiffs and Defendants on behalf of their respective interests but also clear-eyed awareness of the structural barriers that stood in the way of injunctive and monetary relief for the Settlement Class. The contentiousness of the motion practice and discovery prior to settlement discussions is also indicative of the entrenchment of both sides in their respective positions.

These indicia of trustworthiness do not absolve the Court of its responsibility to carefully examine the value of the settlement, particularly in light of the arguments raised by objectors. The objections regarding the value of the settlement fall into three camps: the lack of nationwide or state-specific injunctive relief, the uncertainty of the amount of compensation provided by the Settlement Stake, and the breadth of the release. The Court considers each objection in turn, finding that they do not impact the Court's assessment that the value of the settlement is proportionate to the strength of Plaintiffs' case.

### a. Lack of injunctive relief

The most common objection brought by the individual objectors and Amici States is that the Court should not approve the settlement because it does not include injunctive relief, namely in the form of a nationwide injunction or a California-specific injunction preventing Clearview from future operations. But the wishes of the objectors at settlement must be balanced against the realities of the case during litigation. As the Seventh Circuit has consistently made clear, "[t]he essence of settlement is compromise." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Accordingly, a settlement should not be rejected as unfair "solely because it does not provide a complete victory to the plaintiffs," *Isby*, 75 F.3d at 1200, but instead be evaluated based on an estimate of the likely outcome of a trial. *Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014).

23

The sixteen counts in the amended consolidated class action complaint reflect not only the size and scope of Clearview's database but also the nascency of state biometric data privacy protections. Accordingly, and as described by Plaintiffs in their motion, the relief provided by the settlement depended on the strength and weaknesses of each of Plaintiffs' claims as measured by the extent to which the cause of action directly targeted data privacy and biometrics.

Of the causes of action brought under the statute, BIPA is the only one that directly targets data privacy and biometrics. Furthermore, the statute provides for statutory damages, actual damages, and injunctive relief. As such, the seven BIPA counts emerged as the strongest claims in the complaint. The claims brought under the other laws were more square-peg-round-hole in nature. Unlike those brought under BIPA, the California, Virginia, and New York law claims were brought under state statutory and common law theories that had yet to serve as a basis for judgment in a case involving facial recognition technology. The novel and untested nature of these claims made them comparatively weaker than those brought under BIPA. And unbound by any state's law, the unjust enrichment and declaratory judgment claims formed an even weaker basis for relief, let alone nationwide relief.

In sum, Plaintiffs complaint only provided a basis for injunction under the laws of four states, with relief under BIPA being the most certain. But even if Plaintiffs succeeded in their BIPA claim, the statute does not expressly intend to operate extraterritorially such that it could be used as the basis for nationwide or state-specific injunctive relief. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 852 (Ill. 2005). As the Court explained in its prior opinion granting in part and denying in part a motion to dismiss brought by Clearview, Dkt. 279, the critical question in determining extraterritoriality is whether the circumstances relating to the violations occurred "primarily" and "substantially" in Illinois. *Avery*, 216 Ill.2d at 187. This is a fact-intensive inquiry that requires courts to look to "the residency of the plaintiff, the location of harm,

communications between parties (where sent and where received), and where a company policy is carried out." *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101 (N.D. Ill. 2017) (Chang, J.).

The resolution of the ACLU's case against Clearview further shifted the options for injunctive relief under BIPA. *See* ACLU Settlement Agreement, *supra* note 5. Among other relief, the settlement applied a permanent nationwide injunction banning Clearview from granting paid or free access to its database to any private entity or individual except in compliance with BIPA or to any individual government employee not acting in their official capacity, effectively limiting Clearview's clientele to federal and state government agencies and their contractors. The settlement also placed a five-year injunction prohibiting Clearview from granting either paid or free access to its database to Illinois state, county, local, or other government agencies or to private entities located in the state. Finally, the settlement established an opt-out program for Illinois residents, through which a resident, after uploading a photograph of themselves through an online form, could request that Clearview block any search results that include photographs of the resident and prevent future collection of photographs.

Contrary to the arguments raised by objectors, the proposed settlement does not rely on the ACLU settlement as collateral relief to justify not including injuncting relief within its own terms. Instead, given the expansive reach and scope of the ACLU settlement, the settlement recognizes that any additional injunctive relief stemming from BIPA would be a null set that would leave the Settlement Class in largely the same position as they were before the settlement. Including relief premised on such empty words would not strengthen the settlement, as the objectors argue, but instead call its fairness into question. *See In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("[I]f the class representatives have agreed to a settlement that provides meaningless relief to the putative class, the district court should refuse to certify or, alternatively, decertify the class."); *In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016) ("No class

action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand."). As such, the lack of nationwide or state-specific injunctive relief does not undermine the fairness of the settlement.

    b. *Certainty of monetary relief*

The second major objection to the fairness of the settlement relates to the fact that monetary relief is provided through an equity stake with an unspecified value rather than an immediate, direct payment to the Settlement Class at the time of settlement. Objectors Wang, De Leon, Younge, and Weissman and Claypool object that the settlement relief is uncertain because it does not guarantee a specific amount of compensation for Class Members and provides "coupon" compensation that requires Class Members to do business with Clearview again to get any monetary benefit from the settlement. (Dkts. 581, 591, 593; 590.) Relatedly, Objector Lee argues that the settlement is inadequate because it does not offer a range of what the claims will be worth from a dollar amount perspective. (Dkt 599.) The Amici States raise a similar objection, arguing that the monetary relief is inadequate because Plaintiffs do not know "the true valuation of Clearview and whether there will be any monetary payment to class members at all." (Dkt. 609.)

Though novel in the context of past BIPA settlements, the concept of equity- or security-based monetary relief is not a new idea. *See Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 987 (7th Cir. 2002) (affirming the district court's approval of a class-action settlement premised on the issuance of securities to class members). Just as necessity is the mother of invention, the decision to premise monetary relief on a 23% equity stake in Clearview was driven by the practical realities of the case. Judge Andersen describes Clearview's precarious financial condition in detail in his report on the settlement negotiations, saying:

> I also was convinced that even a 'victory' by the Class after a long and
> expensive trial would not necessarily lead to a meaningful recovery for the

26

Class. Clearview did not have the funds to pay a multi-million-dollar judgment. Indeed, there was great uncertainty as to whether Clearview would even have enough money to make it through to the end of trial, much less fund a judgment. In addition, Clearview explained, and substantiated, that certain of its convertible note holders possessed security interest in the technology being used by Clearview. This meant that, in the event of a Clearview bankruptcy – during litigation or after trial – the holders of those security interests would have priority to any claim by the Class after a judgment, leaving little to nothing with which to satisfy a judgment.

(Dkt. 578, Ex. B.) Because of Clearview's evident financial constraints, as substantiated by information on Clearview's "financial position, revenues, and capitalization," both parties agreed at the outset of settlement discussions that "any viable class action settlement would need to include the Class receiving a meaningful equity stake in Clearview." *Id.* The choice was clear: secure the Settlement Class monetary relief in the form of an equity stake in Clearview, or risk leaving litigation victorious, but empty-handed.

Nor is this 23% figure an empty, speculative gesture. As of January 2024, Clearview's value was estimated to be approximately $225 million dollars, making the Settlement Stake worth $51.75 million dollars. Granted, the nature of an equity stake is that it could shrink or grow depending on the performance of the company. But as Amici States themselves note in their objection, Clearview is bullish about the company's potential growth based on the available market of federal, state, and local agencies.[9] And even if this valuation were to remain unchanged, the 23% equity stake is

---

[9] *See* Dkt. 609. (citing Sam Blum, Clearview AI's Founder on the Company's Controversial Beginnings and Massive Growth, INC. MAGAZINE (Aug. 12, 2024), https://www.inc.com/sam-blum/clearview-ais-founder-on-companys-controversial-beginnings-massive-growth-since.html (in which Clearview co-founder Hoan Ton-That estimated that Clearview could become "a billion-plus or $2 billion annual recurring revenue company" in the next five or ten years)).

significant compared to similar BIPA settlements.[10]  Furthermore, classifying this equity stake as "coupon" relief, as argued by Weissman and Claypool in their objection, mischaracterizes the nature of the Settlement Stake, as the Settlement Class is neither receiving a coupon or voucher for discounted services with Clearview.  *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) (describing "coupon settlements" as those that provide recovery through "'vouchers' (good for an entire product) and 'coupons' (good for price discounts)").

Still, puffery and the vagaries of the free market are seldom enough to hang one's hat on, particularly in the context of a settlement agreement.  That is why the settlement does not leave the administration of this equity stake to chance but instead appoints Judge Schenkier as Settlement Master.  (Dkt. 625.)  As Settlement Master, Judge Schenkier will be responsible for overseeing the Settlement Stake and acting on behalf of the Settlement Class.  The Court notes that no objection has been made to the appointment of a Settlement Master or the selection of Judge Schenkier for that role, which reflects the appropriateness of the position's scope and Judge Schenkier's qualifications.

    *c.  Breadth of the release*

Weissman and Claypool object to the breadth of the release of claims provided by the settlement, arguing that the settlement releases the Macy's Defendants without any obligation for them to contribute to the Settlement Fund.  (Dkt. 590.)  But this argument runs into the now familiar buzzsaw that is the need to compare the provided relief with the strength of Plaintiffs' claims.  Here, as outlined in Plaintiffs' motion for final approval and response to objections, discovery demonstrated that though a client of Clearview, Macy's did not itself possess any biometric data or take any active

---

[10] *See, e.g.*, *In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD ($650 million settlement, representing less than %1 of Facebook's market value at the time of settlement); *Rivera v. Google, LLC*, Cook Cnty. Cir. Ct. No. 2019-CH-990 ($100 million settlement, representing 0.01% of Google's value at the time of settlement); *In re Tiktok*, N.D. Ill. No. 20-cv-04699 ($92 million settlement, representing less than %1 of TikTok's estimated valuation at the time of settlement); *Boone v. Snap Inc.*, Cir. Ct. DuPage Cnty. Ill. No. 2022-LA-708 ($35 million settlement, representing less than 1% of Snapchat's market capitalization at the time of settlement).

steps to possess or collect the biometric data in Clearview's database. (Dkt. 621.) Clearview's contract with Macy's also provided that Clearview would not include any biometric data of Illinois residents while providing services to Macy's. (*Id.*) These facts greatly weaken the strength of the claims against Macy's, rendering a requirement that they contribute to the Settlement Fund suspect at best.

Weissman and Claypool also object to the language of the release itself as being overbroad because it requires class members to release "any other claim arising under any federal law, state law, or common law, including state law privacy claims." (Dkt. 590.) But as the Seventh Circuit notes, "a court may release not only those claims alleged in the complaint but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273–74 (7th Cir. 1998); *see also id.* at 274 ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other."). As such, neither of these objections impact the Court's evaluation of the fairness of the settlement.

### 3. Other settlement factors

The remaining settlement factors also support a finding that the settlement is fair, reasonable, and adequate. *See Wong*, 773 F.3d at 863.

Given the nature of the claims and number of putative class members, the complexity, length, and expense of future litigation in this case would be enormous. The parties were in the thick of fact discovery before they began discussing settlement in earnest in 2023, with expert discovery, class certification, and summary judgment yet to occur. And as described by Judge Andersen in his report on the settlement negotiations, both sides were confident in the strength of their legal and substantive arguments, a level of entrenchment that all but guaranteed lengthy and adversarial litigation at both the trial and appellate level. Such litigation also would not have been confined to one court. Because

the eleven cases were consolidated into one MDL, once the Court completed pretrial proceedings, each individual case would have been returned to their original courts for trial preparation and trial. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 33–35, 118 S. Ct. 956, 961–62, 140 L. Ed. 2d 62 (1998) (explaining the process for returning cases under 28 U.S.C. § 1407). All the while, the risk of Clearview going bankrupt defending this litigation loomed large, an outcome that would have denied class members the possibility of any monetary relief.

The relative dearth of opposition to the settlement and the reaction of class members weighs in favor of approval as well. After 70% of adults aged eighteen and older in the United States were reached through the notice program, with an average frequency of 2.6 times each, only sixteen objections and 1,008 requests for exclusion were filed by class members. This level of opposition is remarkably low given the size of the class, the intense media scrutiny applied to Clearview and this litigation, and the breadth of the notice plan. And even taking into account the objections raised by Amici States in their brief, the substance of these objections largely concerns requests for injunctive and monetary relief that was improbable through litigation given the relative strength of the claims and Clearview's financial limitations.

Additionally, the opinion of competent class counsel supports approval of the proposed settlement. *See Isby*, 75 F.3d at 1200 (explaining that courts may "rel[y] upon affidavits that outline the qualifications of class counsel and perhaps more importantly upon its own observations over the course of the litigation as to the quality of the representation provided to the class"). Lead Class Counsel has extensive experience litigating and settling class actions of this size, scope, and complexity. This experience is further validated by the Court's own observations throughout the course of this five-year litigation and those of Judge Andersen during settlement negotiations. *See, e.g.*, Dkt. 578, Ex. B, Dkt. 583, Ex. A, Dkt. 621.

The last factor—"the stage of the proceedings and the amount of discovery completed"—asks "how fully the district court and counsel [were] able to evaluate the merits of plaintiffs' claims" before reaching the settlement. *In re AT & T*, 270 F.R.D at 350. Here, settlement was reached over four years into litigation. By the time fact discovery was stayed in June 2023 in light of the parties' ongoing settlement efforts, all parties had completed document production, Plaintiffs had retained experts to evaluate this production, and depositions of the class representatives and Defendants' witnesses had been noticed. This information gathering was then supplemented by the over a years' worth of intensive settlement negotiations, during which the relative strength of each sides' arguments and Clearview's financial condition was heavily scrutinized by the parties. As such, both the Court and the parties had ample time to evaluate the merits of Plaintiffs' claims before reaching the settlement before the Court today.

### 4. Policy objections to the settlement

Though fair, reasonable, and adequate when examined within its four corners, the settlement agreement leaves unresolved the question that motivated this multidistrict litigation: whether the collection of publicly available biometric information for use by private or government entities—even when done in accordance with the law—is reconcilable with constitutional privacy rights.

For the objectors to this settlement, the answer to this question is a resounding "no." Amici States argue that the settlement "has severe flaws that undermine consumers' fundamental right to privacy" and that the 23% Settlement Stake will not "redirect the company's moral compass." (Dkt. 609.) Objector De Leon picks up this baton, stating that "Clearview's business practices erode long-established rights of personal privacy and autonomy, supercharging governments' power to surveil marginalized groups and threatening free expression." (Dkt. 590.) And Objector Younge decries Clearview's actions and practices as "illegal and immoral" and "worr[ies] for the safety of [her]self and [her] community because it feels like companies like Clearview can pull information from anywhere

31

without my knowledge or consent." (Dkt. 593.) For Objector Lee, these privacy concerns outweigh the monetary relief the settlement provides to the Settlement Class. "Simply put, I don't care if Clearview goes bankrupt," Lee writes. (Dkt. 599.) "My concern is that mine and fellow residents have their privacy protected. I want the bad behavior to be stopped; not to be given a tiny fraction of the profits from it."

These concerns regarding the dangers of the use—and misuse—of biometric information are not wholly without merit. According to the ACLU, "numerous studies have shown that face recognition technology misidentifies Black people and other people of color at higher rates than white people," leading to higher incidence of wrongful arrest.[11] But on the other side, supporters of facial recognition technology point to its ability to help solve crimes, including in underserved areas, and exonerate those who have been wrongfully accused.[12]

The Court is not the first to grapple with the impact of law enforcement's use of advanced technologies such as facial recognition on the privacy rights of Americans. In determining whether the use of pole cameras by police to surveil a private residence violates the Fourth Amendment protection against unlawful search, the Seventh Circuit invited us to imagine a world of constant surveillance:

> [W]e are steadily approaching a future with a constellation of ubiquitous public and private cameras accessible to the government that catalog the movements and activities of all Americans. Foreseeable expansion in

---

[11] Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024), https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true (noting that, to date, over twenty communities across the nation have implemented bans on the use of facial recognition technology by government and/or law enforcement agencies); *see also* Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen to Anyone Else*, TIME MAGAZINE (June 29, 2024), https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/.
[12] *See, e.g.*, Thomas Brewster, *Exclusive: DHS Used Clearview AI Facial Recognition in Thousands of Child Exploitation Cold Cases*, FORBES (Aug. 7, 2023), https://www.forbes.com/sites/thomasbrewster/2023/08/07/dhs-ai-facial-recognition-solving-child-exploitation-cold-cases/; Kashmir Hill, *Clearview AI, Used by Police to Find Criminals, is Now in Public Defenders' Hands*, N.Y. TIMES (Sep. 18, 2022), https://www.nytimes.com/2022/09/18/technology/facial-recognition-clearview-ai.html.

> technological capabilities and the pervasive use of ever-watching surveillance will reduce Americans' anonymity, transforming what once seemed like science fiction into fact. Constitutionally and statutorily mandated protections stand as critical bulwarks in preserving individual privacy vis-à-vis the government in this surveillance society.

*United States v. Tuggle*, 4 F.4th 505, 509–10 (7th Cir. 2021). Though ultimately finding that the use of pole cameras was consistent with current Fourth Amendment jurisprudence, the Seventh Circuit cautioned that, "barring a transformation in governing law," courts would continue to be confronted with these questions on the line between surveillance and the right to privacy:

> Today's pole cameras will be tomorrow's body cameras, 'protracted location tracking using [automatic license plate readers],' drones, facial recognition, Internet-of-Things and smart devices, and so much more that we cannot even begin to envision. New technologies of this sort will not disappear, nor will the complicated Fourth Amendment problems that accompany them. If anything, we should expect technology to continue to grow exponentially. And if current technologies are any indication, that technological growth will predictably have an inverse and inimical relationship with individual privacy from government intrusion, presenting serious concerns for Fourth Amendment protections.

*Id.* at 527–28.

But unlike the court in *Tuggle*, it is not the role of this Court to address whether Clearview's past, present, or future conduct is fundamentally violative of the privacy rights provided by the federal Constitution or state constitutions. Instead, the Court is limited to determining whether the proposed

settlement is fair, reasonable, and adequate in the face of the claims brought by Plaintiffs and in its provision of relief to the Settlement Class.

Viewed through this limited aperture, the policy concerns raised by the objectors cannot stand as a basis for rejecting the settlement. While individual objectors may believe that the practice of collecting face images is illegal, they do not point to any law that Clearview's practices currently violate. Nor does the brief by Amici States—submitted on behalf of a coalition of twenty-two state attorneys general—identify any such violations. This is not an omission, but a practical result of the over five years of litigation in state and federal court seeking to ensure Clearview's compliance with the law. Absent any such violations, it would be a dereliction of the Court's duty to act as a fiduciary for the Settlement Class to reject a settlement, hard-fought and negotiated in good faith, and the relief it provides to address concerns not at issue in the present case.

Applying determinative effect to the policy concerns raised by objectors would also exceed the bounds of the Court's authority under the principles of separation of powers, namely the prohibition on issuing advisory opinions. As Chief Justice Marshall wrote in the foundational case *Marbury v. Madison*, "[i]t is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177, 5 U.S. 137, 177, 2 L. Ed. 60 (1803). So as not to "intrude into areas committed to the other branches of government," Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies" presented before the courts. *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S. Ct. 1942, 1949–50, 20 L. Ed. 2d 947 (1968). This same limitation prohibits courts from issuing advisory opinions on disputes that fall outside the confines of the case presently before it. *Id.*

The prohibition against advisory opinions has practical as well as theoretical merit. As noted by the Seventh Circuit, a familiar concern with advisory opinions is that they might be "ill-informed and unreliable because the factual record on which it was based was incomplete or hypothetical."

34

*People of State of Ill. ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 942 (7th Cir. 1983). Advisory opinions also "promote friction with the other branches of government" by "multiplying the occasions" on which federal courts would need to decide whether specific conduct is permissible under law. *Id.* Wise to these constraints on its authority, the Court will not use the policy concerns raised by the objectors to reject the settlement and issue what would in effect be an advisory opinion on whether the use of facial recognition technology impermissibly erodes constitutional privacy rights.

It is these same separation of powers principles that ensure that this settlement will not be the last word on the constraints our society should place on the use of facial recognition technology. As was the case in *Tuggle*, facial recognition is "an apt area for Congress to legislate because, as some have noted, 'Congress has significant institutional advantages over the courts in trying to regulate privacy in new technologies.'" *Tuggle*, 4 F.4th at 528 (citing Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311, 313 (2012)). Notably, and to this very point, Amici States themselves are careful to explain in their objection, "for the sake of clarity," that though they object to the settlement, they "do not advocate a settlement that prohibits law enforcement accessing the Clearview database." (Dkt. 609.) That Amici States object to the settlement's terms but nevertheless endorse the use of Clearview's database by law enforcement demonstrates why it is the province of Congress and state legislatures—not the federal courts—to enact data protection laws if these bodies deem them necessary to curb the collection of face images by private entities such as Clearview and the corresponding use of facial recognition technology by law enforcement agencies.

The expansion of Clearview's opt-out program provides an example of the necessary and proper role of state legislatures in protecting the data privacy rights of their residents. As a result of its settlement with the ACLU, Clearview was required to implement an opt-out program for Illinois residents through which an individual could submit a request to be removed from Clearview's database. *See* ACLU Settlement Agreement, *supra* note 5. Today, this opt-out program has expanded

to twelve states including Illinois in response to those states enacting data protection laws concerning the collection and use of biometric information.[13]  These states have not waited for the Court's approval of this settlement to implement these programs.  Nor are they constrained by the settlement in taking further steps to protect the privacy rights of their residents.  While it may be more expedient, as suggested by several objectors, for the settlement to include a nationwide opt-out provision, expediency cannot justify overstepping the confines of judicial power.  Because such a provision both lacks a legal claim as its basis and improperly shortcuts the deliberative and representative role of legislatures in crafting responses to the proliferation of facial recognition technology, the Court will not reject the settlement on those grounds or any of the other policy concerns brought by the objectors.

**Conclusion**

For the reasons set forth in this opinion, the Court finds that the proposed settlement is fair, reasonable, and adequate pursuant to the requirements of Rule 23(e).  And, with all three prerequisites—class certification, notice, and fairness—satisfied, the Court grants Plaintiffs' motion for final approval of the settlement [621].  The Court further finds that the attorneys' fees and incentive awards requested by Plaintiffs are reasonable, and accordingly grants Plaintiffs' Fee Petition [583].

**IT IS SO ORDERED.**

Date: 5/12/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

---

[13] These states are: California; Colorado; Connecticut; Delaware; Illinois; Iowa; Montana; Nebraska; Nevada; New Hampshire; Utah; and Virginia. *Clearview AI, Inc. Privacy Policy*, CLEARVIEW AI, INC., https://www.clearview.ai/privacy-policy (last accessed Mar. 18, 2025).